Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
Ross M. Kwasteniet, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROBERT CAMPAGNA, MANAGING DIRECTOR OF ALVAREZ & MARSAL NORTH AMERICA, LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Robert Campagna, hereby declare under penalty of perjury:

1.    I am a Managing Director of Alvarez & Marsal North America, LLC ("A&M"), a global restructuring advisory services firm and a restructuring advisor to the above-captioned debtors and debtors in possession ("Debtors"). I submit this declaration in support of the Debtors' chapter 11 petitions and first day motions filed contemporaneously herewith. I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (0143); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

2.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the

United States Bankruptcy Court for the Southern District of New York (the "Court").  Filed

contemporaneous therewith is a detailed description of the facts and circumstances of these

chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of*

*Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "Mashinsky

Declaration").

3.      Unless otherwise indicated, the statements set forth in this declaration (the

"Declaration") are based upon (a) my personal knowledge of the Debtors' business,

(b) information learned from my review of relevant documents, (c) information I received from

the A&M team working under my supervision or the Debtors' management team and other

advisors, or (d) my experience as a restructuring professional.  I am not being specifically

compensated for this testimony other than through payments that are proposed to be received by

A&M as a professional retained by the Debtors.  If I were called upon to testify, I could and would

competently testify to the facts set forth herein.  I am authorized to submit this Declaration on

behalf of the Debtors.

4.      If called to testify, I would testify competently as follows.

## Professional Background

5.      Since 1983, A&M has been a global provider of turnaround advisory services to

companies in crisis or those in need of performance improvement in specific financial and

operational areas.  A&M's debtor advisory services have encompassed a wide range of activities

targeted at stabilizing and improving a company's financial position, including developing and

validating forecasts and business plans; monitoring and managing cash, cash flow, and supplier

relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

6.      Since the Debtors engaged A&M in mid-June of 2022, I have worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.  I lead the A&M team advising the Debtors.

7.      I have over 25 years of distressed company advisory experience.  Through roles in both senior management and as a restructuring advisor, I have substantial experience helping financially-distressed companies stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances. I have advised clients in numerous major bankruptcy cases, including *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ); *In re Payless Holdings LLC*, No. 17-42257 (KSS); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH); *GT Advanced Techs. Inc.*, No. 14-11916 (HJB); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS); *V2V Holding LLC*, No. 12-11385 (MG); *Education Holdings 1, Inc.*, No. 13-10101 (BLS); *Orchard Brands Corp.*, No. 20-10566 (MFW); *Cooper-Standard Auto.*, No. 09-12743; and *Interstate Bakeries Corp.*, No. 04-45814 (JWV).  I received my bachelor's degree in business administration from Bucknell University.  I am a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.  This Declaration sets forth the relevant facts in support of each of the Debtors' chapter 11 petitions and first day motions.

### First Day Motions[2]

8.     Contemporaneously herewith, the Debtors have filed a number of First Day
Motions (as defined in the Mashinsky Declaration) seeking orders granting various forms of relief
intended to stabilize the Debtors' business operations, facilitate the efficient administration of
these chapter 11 cases.  The First Day Motions include the following:

- **Joint Administration Motion.** *Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

- **Creditor Matrix Motion.** *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Prepare a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (IV) Approving the Form and Manner of notifying Creditors of Commencement, and (V) Granting Related Relief* (the "Creditor Matrix Motion");

- **Schedules/SOFAs Extension Motion.** *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief* (the "Schedules and Statements Extension Motion");

- **Notice & Claims Agent Application.** *Debtors' Application Seeking Entry of an Order (I) Authorizing and Approving the Appointment of Stretto, Inc. as Claims and noticing Agent and (II) Granting Related Relief* (the "Notice & Claims Agent Application");

- **Cash Management Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* (the "Cash Management Motion");

- **Wages Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other*

---

[2]    Capitalized terms used but not defined herein have the correlative meaning ascribed to such term as in the Mashinksy Declaration or the corresponding First Day Motion, as applicable.

*Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (the "Wages Motion");

- **Insurance Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain Their Surety Bond Program and (II) Granting Related Relief* (the "Insurance Motion");

- **Critical Vendors Motion.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to all Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* (the "Critical Vendors Motion");

- **Taxes Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion");

- **NOL Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* (the "NOL Motion");

- **Automatic Stay Motion.** *Debtors' Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* (the "Automatic Stay Motion"); and

- **Utilities Motion.** *Debtors' Motion Seeking Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion").

9.      The First Day Motions seek authority to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by these chapter 11 cases, and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible. The Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause

immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Motions could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.

10.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates.  I have reviewed each of the First Day Motions.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions, as further described below.

**Procedural Motions**

A.     **Joint Administration Motion.**

11.     The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Entry of the order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective

constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates. Parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

12.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**B.      Case Management Motion.**

13.     The Debtors seek entry of an order approving and implementing notice, case management, and administrative procedures. Given the size and complexity of these chapter 11 cases, the Debtors believe that implementing the Case Management Procedures will facilitate the fair and efficient administration of these chapter 11 cases and promote judicial economy. Specifically, the proposed Case Management Procedures will benefit the Debtors, the Court, and all parties in interest by, among other things:

a.  assuring prompt and appropriate notice of matters affecting parties' interests;

b.  allowing for electronic notice pursuant to the Court's Electronic Filing System;

c.  providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;

d.  reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties in interest who file documents in these chapter 11 cases;

e.  reducing the administrative burdens on the Court and the clerk of the Court; and

f.  providing for Omnibus Hearings for the Court to consider motions, pleadings, applications, objections, and responses thereto.

14.    I believe that the relief requested in the Case Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors to continue to operate their businesses in chapter 11 without disruption.

**C.    Schedules and Statements Extension Motion.**

15.    Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions; (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3, or to file a motion with the Court seeking a modification of such reporting requirements for cause, to the later of:  (i) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code and (ii) 44 days from the Petition Date, each without prejudice to the Debtors' ability to request additional extensions; and (c) granting related relief.

16.    Given the size and complexity of the Debtors' business and financial affairs, and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

17.    I believe that extending the deadline to file the initial 2015.3 Reports will provide the Debtors with the necessary time to examine the books and records of their non-debtor subsidiaries that are subject to Bankruptcy Rule 2015.3.  The additional time will also enable the

Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

18.    I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**D.    Claims Agent Application.**

19.    The Debtors seek entry of an order (a) appointing Stretto, Inc. as the claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases and (b) granting related relief.  Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of entities to be noticed in these chapter 11 cases.

20.    Given the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of Stretto, Inc. as Claims and Noticing Agent is both required by Local Rule 5075-1(b) and is otherwise in the best interest of the Debtors' estates and their creditors, because the distribution of notices and the processing of claims will be expedited, and the Clerk's Office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

21.    I believe that the relief requested in the Claims Agent Application is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**E.      Creditor Matrix Motion.**

22.      The Debtors have filed a purely administrative or procedural First Day Motion requesting that the Court enter an order (a) authorizing the Debtors to (i) prepare a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' fifty (50) largest unsecured creditors, and (iii) redact certain personal identifiable information for the Debtors' employees; (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases; and (c) granting related relief.

23.      Permitting the Debtors to maintain the Creditor Matrix in consolidated format only, in lieu of each Debtor filing a creditor matrix, is warranted under the circumstances of these cases. Because the Debtors have many thousands of creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

24.      The Debtors submit that the proposed maintenance of the Creditor Matrix by the Debtors' proposed Claims and Noticing Agent, Stretto is consistent with applicable Local Rules. Pursuant to Local Rule 5075-1, a debtor filing a petition with more than 250 creditors and equity interest holders, in the aggregate, as is the case here, is required to retain an approved claims and noticing agent pursuant to an order of the Court.

25.      Compiling separate top twenty (20) creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' fifty (50) largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.  Filing a single consolidated

list of the fifty (50) largest unsecured creditors in these chapter 11 cases is appropriate for these reasons.

26.     The Creditor Matrix and Schedules and Statements may contain the home addresses of individuals—including the Debtors' employees and former employees; such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking. The Debtors therefore, propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted to the proposed order to the Court, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (if any), and any party-in-interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.

27.     The Debtors believe that using Stretto to undertake all mailings directed by the Court or the U.S. Trustee, or as required by section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002 (a) and (f) to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, Stretto will assist the Debtors in preparing creditor lists and mailing initial notices, and therefore there are efficiencies in authorizing Stretto to mail the notice of commencement of these chapter 11 cases. Accordingly, the Debtors respectfully submit that Stretto should undertake such mailings.

28.     I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**Operational Motions**

**F.      Cash Management Motion.**

29.      The Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System; (ii) honor certain prepetition obligations related thereto; (iii) maintain existing Business Forms in the ordinary course of business; and (iv) continue to perform Intercompany Transactions consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; and (c) granting related relief.

30.      In the ordinary course of business, the Debtors maintain a cash and cryptocurrency management system.  As of the Petition Date, the Debtors' Cash Management System is comprised of fourteen (14) bank accounts and certain cryptocurrency workspaces, vaults, and "wallets."  Of those Bank Accounts, eleven (11) are maintained at Signature Bank.  The remaining three Bank Accounts are brokerage accounts which are maintained at Oppenheimer & Co. Inc., Signature Securities Group Corporation, and ED&F Man Capital Markets, Inc.

31.      The Debtors maintain a treasury account which serves as the Debtors' primary concentration account.  The vast majority of the Debtors' inflows are received directly into the Treasury Account by way of transfers from the Signature Bank SIGNET platform.  Generally, funds are then transferred from the Treasury Account to the other Bank Accounts in the Cash Management System and used to support the Debtors' business operations.

32.      As of the Petition Date, the Debtors have approximately $130 million of cash on hand.

33.      In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System.  The Debtors incur a *de*

*minimis* amount in Bank Fees each month under the Cash Management System. As of the Petition Date, the Debtors estimate that no prepetition amounts remain outstanding on account of Bank Fees.

34.    Signature Bank is designated as an authorized depository in the Southern District of New York by the Office of the United States Trustee for the Southern District of New York, pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees*. Signature Bank is party to a uniform depository agreement with the U.S. Trustee, and therefore, the Debtors believe that the Bank Accounts at this institution will be collateralized in a manner consistent with the requirements of section 345 of the Bankruptcy Code. The Debtors' Brokerage Accounts are not maintained at authorized depositories. However, the banks at which the Brokerage Accounts are maintained are trustworthy, well-capitalized, and financially stable institutions with strong reputations.

35.    In addition, the Debtors hold cryptocurrency assets through third party custodians in the ordinary course of business.

36.    The Debtors operate as a global enterprise, and thus, routinely engage in intercompany financial transactions with other Debtors and non-Debtor affiliates, resulting in intercompany receivables and payables. In the ordinary course of business, the Debtors make Intercompany Transactions to either (a) reimburse certain Debtor or non-Debtor affiliates for various expenditures associated with their business or (b) fund certain Debtors' or non-Debtor affiliates' accounts in anticipation of such expenditures, as needed. As discussed above, the Treasury Account is the Debtors' primary operating account where substantially all of the Debtors' cash is directly or indirectly wired or transferred throughout the Cash Management System.

37.     The Debtors track all fund transfers through their accounting system and can ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

38.     As part of the Cash Management System, the Debtors utilize a number of preprinted business forms in the ordinary course of their business, including, but not limited to, letterhead, purchase orders, invoices, and checks.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they shall ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

39.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**G.      Wages Motion.**

40.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

41.    As of the Petition Date, the Debtors employ approximately 370 employees and independent contractors across approximately fourteen (14) countries, approximately 285 of which are U.S. Employees, and the remaining Non-U.S. Employees are located in, among others, Australia, Canada, and the United Kingdom.  None of the Employees are represented by a union or collective bargaining unit.

42.    As of the Petition Date, the Debtors estimate that the total amount outstanding on account of the Compensation and Benefits is approximately $1.094 million.  During the first twenty-one (21) days of these chapter 11 cases the Debtors estimate that $686,000 will become due and owing.  While certain of the Employees are owed prepetition amounts in excess of the $15,150 priority cap set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, the Debtors seek to pay the amounts above the Statutory Cap pursuant to the Final Order only.

43.    Without the continued, uninterrupted services of the Debtors' workforce, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.  The Debtors seek to continue their applicable prepetition Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases in the Debtors' sole discretion.

44.    To minimize the personal hardship that the Employees and Independent Contractors would suffer if prepetition Employee and Independent Contractor-related obligations remain unpaid during these chapter 11 cases, the Debtors seek authority to:  (a) pay and honor certain prepetition claims relating to, among other things, Wage/Pay Obligations, Withholding

Obligations, Reimbursable Expenses, the Insperity Benefits Obligations, Unpaid Payroll Processing Fees, Paid Leave Benefits, a Non-Insider Severance Program and Non-Insider Severance Benefits, and certain other benefits that the Debtors have historically provided in the ordinary course; and (b) pay all costs related to or on account of the Compensation and Benefits.

45.    Subject to the Court's approval, I understand the Debtors intend to continue their prepetition Compensation and Benefits in the ordinary course of business.  Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits and/or to implement new programs, policies, and benefits in the Debtors' sole discretion and in the ordinary course during these chapter 11 cases (subject in all respects to the terms of the Interim Order or Final Order, as applicable) and without the need for further Court approval, subject to applicable law.

46.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  Additionally, the Debtors should be authorized to pay certain withholding obligations amounts that governments, Employees, and judicial authorities have designated for deduction from Employees' wages and that federal, state, and local government require the Debtors to remit.

47.    I believe the relief requested in the Wages Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(a). I understand the Debtors believe that without the relief requested in the Wages Motion, Employees

may seek alternative employment opportunities, perhaps with the Debtors' competitors, which would deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.

48.    I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**H.    Insurance Motion.**

49.    The Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) pay their obligations under prepetition insurance policies, (ii) continue to pay certain brokerage fees, (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course, and (iv) maintain their Surety Bond Program on an uninterrupted basis; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing twenty-one (21) days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of the Insurance Motion on a final basis.

50.    The Debtors are the beneficiaries of various insurance policies administered by certain third-party insurance carriers.  Continuation and renewal of the Insurance Policies and entry into new insurance policies, as applicable, are essential to the preservation of the value of the Debtors' properties and assets.  Moreover, in many instances, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirement of the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

51.    Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, and to renew, supplement, or enter into

new Insurance Policies in the ordinary course of business on a postpetition basis consistent with past practice.

52.    The Debtors utilize the services of certain Insurance Brokers, whose services are necessary to the Debtors' ability to obtain Insurance Policies on advantageous terms and at competitive rates.  The Insurance Brokers' services will also facilitate the proper maintenance of the Debtors' Insurance Policies postpetition, administer insurance-related claims on a postpetition basis, and ensure adequate protection of the Debtors' property.  Accordingly, the Debtors request authority to pay and/or reimburse any amounts owed on account of Insurance Brokerage Fees or any other prepetition obligations in full, in cash, in the ordinary course of business and to continue paying Insurance Brokerage Fees on a postpetition basis in the ordinary course of business and consistent with past practices.

53.    Moreover, in the ordinary course of business, certain statutes, rules, contracts, and regulations require that the Debtors provide surety bonds to certain third parties, often to governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.  The Debtors obtain their Surety Bonds through their surety broker, which assists the Debtors in, among other things, obtaining the Surety Bonds and evaluating bond offerings.  The Debtors request authority to continue paying the Premium Payments and Surety Brokerage Fees in the ordinary course of business on a postpetition basis, including any prepetition obligations related thereto, to ensure uninterrupted coverage under the Surety Bond Program.

54.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

## I.    Critical Vendors Motion.

55.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay, in the ordinary course of business, prepetition amounts owing on account of: (a) claims of critical vendors, in an amount not to exceed $3.23 million; (b) claims of foreign vendors, in an amount not to exceed $753,422; (c) claims of distribution vendors, construction vendors, and other lien claimants, in an amount not to exceed $1.28 million; and (d) claims of 503(b)(9) claimants, in an amount not to exceed $1.26 million.  In addition, the Debtors request that the Court schedule a final hearing in approximately twenty-one (21) days after the commencement of these chapter 11 cases, or as soon thereafter as is convenient for the Court, to consider approval of the Critical Vendors Motion on a final basis.  The Debtors do not seek to accelerate payment of amounts that would not otherwise come due in the interim period.

56.    As part of their crypto mining enterprise—one of the largest in the country—the Debtors own 80,500 rigs, 43,632 of which are in operation and generated a total of 3,114 Bitcoin in 2021.  To increase their ability to mine Bitcoin, the Debtors decided to build a proprietary crypto mining center in Texas.  Following months of preparation, construction began in earnest in June 2022.  In connection with the construction of the Mining Center, the Debtors engaged Vendors to procure and provide goods and services.  Currently, the Debtors are in the process of expanding their mining enterprise and expect to operate up to 122,722 rigs and project to generate approximately 10,000 Bitcoin by the end of 2022.  When completed in the coming weeks, the new Mining Center will consist of four (4) sites, which will host over a quarter of the Debtors' mining rigs.  Accordingly, the Mining Center is an essential driver of growth in the Debtors' business and will allow the Debtors to expand and more profitably mine Bitcoin.

57.     After an extensive review and analysis of the Debtors' Vendors, the Debtors and their advisors identified the Vendors that supply products and services vital to the Debtors' operations.  The Debtors rely on the Critical Vendor Products and Services to operate their business, and depend on the Critical Vendors' timely provision of specialized services to provide top-quality content and services to their customer base.

58.     The Critical Vendors procure and provide construction materials for the construction of the Mining Center.  These Critical Vendors are instrumental in the timely completion of the Mining Center.  If they fail to provide their mission-critical goods and services, construction efforts would grind to a halt and significantly delay the project timeline.  Once completed, the Mining Center is expected to be a critical source of value, and any delays would negatively impact the Debtors' ability to operate as well as the Debtors' long-term growth and revenue strategy.

59.     The Critical Vendors also provide goods and services which form the backbone of the Debtors' platform, products, and services.  Such Critical Vendors include Vendors who provide software, IT, and security services, which are essential to ensuring that the Debtors' platform and products and services are secure; finance and trading goods and services; and a range of operational goods and services.  Any attempt to replace these Critical Vendors would be highly disruptive, particularly during the Debtors' transition into chapter 11.

60.     I understand that the Debtors' trade relationships with their Critical Vendors generally are not governed by long-term contracts, and the Debtors believe those trade relationships may materially deteriorate, causing disruption to the Debtors' operations if the Debtors are unable to pay these Critical Vendor Claims.    Accordingly, the Debtors believe

payment of the Critical Vendor Claims is essential to avoid costly disturbances to the Debtors'

business during these chapter 11 cases at this critical juncture.

61.    As of the Petition Date, the Debtors believe they owe Critical Vendors $3.23

million, which is approximately 20 percent of the total outstanding accounts payable.

62.    As a result of the global nature of their operations, a critical component of the

Debtors' operations involves transactions with foreign vendors.  In the ordinary course of business,

the Debtors incur obligations to numerous suppliers of goods or services whose assets are located

exclusively outside the United States.

63.    Maintaining existing relationships with the Foreign Vendors is critical to

continuing to operate the Debtors' business in the ordinary course.  Replacing these Foreign

Vendors would be time-consuming, impracticable, and cost prohibitive.  Foreign Vendors often

have skeptical reactions to the United States bankruptcy process because many of them are

unfamiliar with the chapter 11 process.  Short of severing their contractual relations with the

Debtors, nonpayment of prepetition claims may cause the Foreign Vendors to take other

precipitous actions, including delaying shipments or initiating a lawsuit in a foreign court to obtain

a judgment against the Debtors to collect prepetition amounts owed to them.  Although the

automatic stay applies to protect the Debtors' assets where they are located in the world, the

Foreign Vendors may erroneously believe that they are not subject to the automatic stay of section

362 of the Bankruptcy Code.  Moreover, attempting to enforce the Bankruptcy Code in foreign

countries will be uneconomical.

64.    As of the Petition Date, the Debtors estimate that there is approximately $753,422

outstanding in Foreign Vendor Claims, approximately $351,597 of which will become due and

owing within twenty-one (21) days of the Petition Date.

65.     In light of the above, the Debtors seek entry of the Interim Order and Final Order granting them authority to make payments, in their sole discretion and business judgment, on account of the Critical Vendor Claims and the Foreign Vendor Claims in an amount not to exceed an aggregate amount of $1.86 million on an interim basis and $3.98 million on a final basis, which amounts represent the Debtors' best estimate as to what amounts must be paid to the Critical Vendors and the Foreign Vendors to continue an uninterrupted supply of critical goods and services.  The Debtors further request that the Court grant the Debtors the authority to allocate the foregoing amounts at their discretion, without prejudice to seek additional relief, and subject to an agreement to receive terms consistent with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment from the Critical Vendors and the Foreign Vendors.

66.     The Debtors may also have received goods worth millions of dollars from various vendors within the 20-day period immediately preceding the Petition Date, thereby giving rise to prepetition claims to the 503(b)(9) Claimants.  The Debtors receive large volumes of construction materials from their vendors on a rolling basis to satisfy their current building demands related to the Mining Center.

67.     The vast majority of the 503(b)(9) Claimants are also Mining Critical Vendors.  The Debtors' relationships with these vendors, and with many of the other 503(b)(9) Claimants, are not governed by long term contracts.  Rather, the Debtors obtain goods from such claimants on an order by order basis.  As a result, 503(b)(9) Claimants may refuse to supply new orders if the Debtors do not pay the 503(b)(9) Claims.  Such refusal would significantly delay the completion

of the Mining Center, negatively impacting the timely deployment of the Debtors' rigs, which will constitute the Mining Center's primary source of revenue.

68.    I understand that the Debtors also believe that certain 503(b)(9) Claimants could demand payment in cash on delivery—further exacerbating the Debtors' liquidity.  The Debtors believe that, as of the Petition Date, they owe approximately $1.26 million on account of goods delivered within the 20 days immediately preceding the Petition Date, approximately $944,531 of which may become due within the first twenty-one (21) days of these chapter 11 cases, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

69.    Accordingly, the Debtors seek authority, but not direction, to pay outstanding prepetition obligations on account of the 503(b)(9) Claims, up to $1.26 million in the aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, and to continue to pay the 503(b)(9) Claims as they come due in the ordinary course of business.

70.    Additionally, in the ordinary course of business, the Debtors may have ordered goods prior to the Petition Date which will not be delivered until after the Petition Date.  In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders.  Because the Outstanding Orders are administrative expenses of the Debtors' estates, the Debtors are requesting that the Court confirm the administrative expense priority under section 503(b) of the Bankruptcy

Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business and subject to the limitations set forth in the Interim Order and Final Order.

71.    The Debtors routinely transact business with a number of third parties who may assert various statutory liens, including mechanics' liens, against the Debtors and their property if the Debtors fail to pay for the services rendered.   The Lien Claimants primarily consist of: (a) vendors who provide shipping, storage, and related services for the Debtors' mining operations; and (b) Vendors providing construction services.

72.    As of the Petition Date, the Debtors owe Lien Claimants an aggregate amount of approximately $1.28 million on account of Lien Claims, approximately $956,250 of which will come due within the first twenty-one (21) days of these chapter 11 cases.   For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to obtain release of critical or valuable goods and materials and induce the Lien Claimants to continue performing and otherwise supporting the Debtors' Mining Center construction project on a postpetition basis.   I understand the Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefit to their estates from making such payments will exceed the costs that their estates would incur by bringing an action to compel the turnover of such goods and the delay associated with such actions.

73.    Subject to the Court's approval, I understand the Debtors intend to pay Trade Claims only to the extent necessary to preserve their business.   The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' business and in the Debtors' value-preserving process to review, assess, and potentially recommend any

payment on account of these claims. In return for paying these claims, the Debtors will use commercially reasonable efforts to condition payment of Critical Vendor Claims, Foreign Vendor Claims, 503(b)(9) Claims, and Lien Claims upon each claimant's agreement to continue supplying goods and services to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment.

74.    In particular, the Debtors will condition the payment of Critical Vendor Claims upon each such party's agreement to continue supplying goods or services on Customary Trade Terms by executing a trade agreement.  Each such Trade Agreement, once agreed to and accepted by a party, shall be a legally binding contractual arrangement between the parties governing the commercial trade relationship as provided in the Critical Vendors Motion.

75.    I believe that the relief requested in the Critical Vendors Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**J.    Taxes and Fees Motion.**

76.    Pursuant to the Taxes and Fees Motion, the Debtors seek entry of an interim and final orders (a) authorizing the Debtors, in their sole discretion, to remit and pay (or use applicable tax credits to offset) Taxes and Fees and (b) granting related relief.

77.    In the ordinary course of business, the Debtors collect, withhold, incur, remit and/or pay sales and use taxes, value added taxes, income taxes, custom and import duties, property taxes, as well as other governmental taxes, fees, and assessments, as applicable, to various federal, state, and local governments, including taxing and licensing authorities.  The Debtors generally pay and

remit Taxes and Fees through checks and electronic transfers processed through their banks and other financial institutions or service providers.

78.     Failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, the Debtors seek authority to pay, in their reasonable discretion, the Taxes and Fees in the ordinary course as they become due.

79.     I believe that the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**K.     NOL Motion.**

80.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders approving certain notification and hearing procedures related to certain transfers of, or declarations of worthlessness, with respect to the Debtors' Common Stock and Preferred Stock or any beneficial ownership therein, and directing that any purchase, sale, other transfer of, or declaration

of worthlessness with respect to Common Stock or Preferred Stock in violation of the Procedures shall be null and void *ab initio*.

81.     I understand that the Debtors expect to generate various Tax Attributes that are of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases.  Additionally, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years.  I believe that any termination or limitation of the Tax Attributes, including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.

82.     If no restrictions on trading or worthlessness deductions are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors.

83.     I believe that the relief requested in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**L.     Automatic Stay Motion.**

84.     The Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code, (b) approving the form and manner of notice related thereto, and (c) granting related relief.

85.     The Debtors' business operations and customer base are international in scope.  The Debtors have customers in, and regularly contract with, counterparties that are based outside of the United States.

86.     The Debtors' customers and contract counterparties located in various foreign jurisdictions may be unfamiliar with the chapter 11 process, including the scope of a debtor in possession's authority to operate its business and the importance of the automatic stay.  The Debtors may owe certain of these customers and contract counterparties prepetition obligations. These creditors—and others—may attempt to take actions violating the automatic stay to the detriment of the Debtors, their estates, and other creditors.

87.     Furthermore, upon the commencement of these chapter 11 cases, non-U.S. counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts pursuant to *ipso facto* provisions in contravention of sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside the United States may attempt to deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, leases, or other similar grants required for the Debtors' ongoing business operations, violating section 525 of the Bankruptcy Code.

88.     The Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in better informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.  For the avoidance of doubt, I understand the Debtors do not seek to expand or enlarge the rights afforded to them under the Bankruptcy Code with the Automatic Stay Motion.  Instead, I understand that the Debtors seek to affirm those rights and believe that an order from this Court will help guard the Debtors against improper actions taken by, and provide clarity for, non-U.S. parties in interest.  For these reasons, the relief requested in

the Automatic Stay Motion is in the best interest of the Debtors, their creditors, and all other parties in interest.

89.     I believe that the relief requested in the Automatic Stay Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**L.     Utilities Motion.**

90.     The Debtors seek entry of an order (a) approving the Debtors' proposed Adequate Assurance of payment for future utility services under section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Debtors' proposed Adequate Assurance Procedures, and (d) granting related relief.

91.     In connection with the operation of their business, the Debtors obtain electricity, telecommunications and other similar services from a number of utility providers or brokers.

92.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these chapter 11 cases.  The Utility Services are essential for the Debtors to maintain their business and to operate their corporate offices and cryptocurrency mining operations in multiple states across the United States to provide functions essential for daily operations.  These locations require electricity, telecommunications, internet, and other Utility Services to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be needlessly disrupted.

93.     For some of the Debtors' locations, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.

94.    To the best of the Debtors' knowledge, there are no defaults or arrearages with respect to undisputed invoices for prepetition Utility Services.  In the aggregate, the Debtors pay approximately $31,000 each month for Utility Services, calculated as the historical average payment for the twelve-month period ending June 30, 2022, or based on the latest invoice if not billed monthly or not received as of June 30, 2022.

95.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  The Debtors' believe that cash held on hand by the Debtors and generated in the ordinary course of business will provide sufficient liquidity to pay the Utility Providers for Utility Services in accordance with their prepetition practice during the pendency of these chapter 11 cases.

96.    To provide additional assurance of payment, the Debtors propose to deposit $15,508 into a segregated account equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated as the historical average payment for the twelve-month period ending June 30, 2022, or based on the latest invoice if not billed monthly or not received as of June 30, 2022, plus an additional $5,000 included out of an abundance of caution to provide assurance to any Utility Provider that may have inadvertently been excluded from the Utility Services List.

97.    The Adequate Assurance Deposit will be held in the Adequate Assurance Account at Signature Bank for the benefit of the Utility Providers for the duration of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utility Services, and may be applied to any postpetition payment owed to the Utility Providers by the Debtors.  The Adequate Assurance Deposit will be held by the Debtors, and no liens senior to the interests of the Utility Providers will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

98.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in accordance with their prepetition practice, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of payment as required by section 366 of the Bankruptcy Code.

99.     Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for adequate assurance of future payment pursuant to the Adequate Assurance Procedures.

100.    Absent compliance with the Adequate Assurance Procedures, the Debtors request that the Utility Providers, including subsequently added Utility Providers, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance, pending entry of a final order approving the relief requested in the Utilities Motion.

101.    The relief requested in the Utilities Motion is for all Utility Providers providing Utility Services to the Debtors and is not limited to those parties or entities listed on the Utility Services List.  To the extent the Debtors identify new or additional Utility Providers or discontinue services from existing Utility Providers, the Debtors seek authority to add or remove parties from the Utility Services List.  For any Utility Provider that is subsequently added to the Utility Services List, the Debtors will serve such Utility Provider with a copy of the Bankruptcy Court's order regarding Utility Services, including the Adequate Assurance Procedures, and increase the Adequate Assurance Deposit by an amount equal to one-half of the Debtors' average monthly cost of services from the subsequently added Utility Provider, net of any prepetition deposits, letters of credit, or surety bonds already provided to the Utility Provider in the ordinary course of business. The Debtors request that the terms of such Utility Services order and the Adequate Assurance

Procedures apply to any subsequently identified Utility Provider to the same extent as if the Utility Provider was listed on the original Utility Providers List attached hereto.  For any Utility Provider that is subsequently removed from the Utility Providers List, the Debtors request the authority to decrease the Adequate Assurance Deposit by an amount equal to one-half of the Debtors' average monthly cost of services from such removed Utility Provider.

102.    I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 14, 2022
New York, New York

By:    _/s/ Robert Campagna_
Name:    Robert Campagna
Title:    Managing Director
Alvarez & Marsal North America, LLC