**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) ) | (Jointly Administered) |

**NOTICE OF FILING OF EXCLUSIVE CLAIMS DATA ACCESS AGREEMENT**

**PLEASE TAKE NOTICE** that Stretto, Inc. ("Stretto") hereby files a true and correct copy of that certain Exclusive Claims Data Access Agreement, dated November 23, 2020, by and between Stretto and Xclaim Inc. (as amended, the "Agreement"), which is attached hereto as **Exhibit A**.

Dated: July 18, 2022
New York, New York

*/s/ Sheryl Betance*
Sheryl Betance
Senior Managing Director
Stretto
410 Exchange, Ste. 100
Irvine, California 92602

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining IL Ltd. (7106); Celsius Mining LLC (1387); Celsius Network IL Ltd. (7294); Celsius Network Inc. (1219); Celsius Network Limited (0143); Celsius Networks Lending LLC (8417); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

# **EXHIBIT A**

**EXECUTION COPY**

# EXCLUSIVE CLAIMS DATA ACCESS AGREEMENT

This Exclusive Claims Data Access Agreement (this "Agreement"), dated as of November 23, 2020 (the "Effective Date"), is made by and between Bankruptcy Management Solutions Inc., d/b/a Stretto, a Delaware corporation with offices at 410 Exchange, Ste. 100, Irvine, CA 92602 ("Stretto"), and XClaim Inc., a Delaware corporation with offices at 5792 W. Jefferson Blvd., Los Angeles, CA 90016 ("XCLAIM"). Stretto and XCLAIM may be referred to individually herein as a "Party" or together as the "Parties."

**WHEREAS**, XCLAIM is in the process of developing an easily accessible electronic platform (the "Platform") to facilitate the purchase and sale of claims that are filed or scheduled (each, a "Claim") in any bankruptcy proceeding (each, a "Bankruptcy Proceeding") filed in the United States pursuant to title 11 of the United States Code (the "Bankruptcy Code"); and

**WHEREAS**, Stretto is one of approximately seven (7) companies often authorized by the United States bankruptcy courts with jurisdiction over such Bankruptcy Proceedings to serve as claims agent (in such capacity in any such Bankruptcy Proceeding, any company acting in such capacity, including Stretto, a "Claims Agent"), which requires Stretto, among other things, to maintain the Bankruptcy Proceeding's official, public claims register in such Bankruptcy Proceeding (each a "Claims Register" and collectively, the "Claims Registers") to record all Claims filed against, or scheduled by, the debtor(s); and

**WHEREAS**, XCLAIM desires to obtain access to Claims-related data that is maintained by Stretto on Claims Registers, or otherwise publicly available in Bankruptcy Proceedings, (i) on a read-only basis such that XCLAIM shall have no ability to directly modify such Accessible Data (as defined below), and (ii) to allow XCLAIM to transmit to Stretto all necessary information and documentation relating to any Claims that are bought or sold on the Platform (the "Claims Transfer Data") so that Stretto may review the Claims Transfer Data and have an expedient means to update the Claims Registers.

**NOW, THEREFORE**, in consideration of the mutual promises and the other terms and conditions contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Definitions**. The defined terms used in this Agreement shall have the meanings set forth herein or as defined in this Section 1.

    1.1  **"Accessible Data"** means, for all Bankruptcy Proceedings in which Stretto is the Claims Agent, (a) the publicly-available data contained in all fields in Official Form 410 (Proof of Claim) with respect to all filed Claims; (b) the publicly-available data reflected in the debtors' schedules of liabilities with respect to all scheduled Claims; and (c) to the extent agreed upon by the Parties in writing, certain additional publicly-available data relating to Claims, such as information regarding Claim objection, allowance, amendment, withdrawal, estimation, balloting, satisfaction, expungement and disallowance status, and data reflecting amendments to schedules; provided, however, that Accessible Data does not include any Confidential Information, any information that Stretto may not disclose under applicable Law, or any information that Stretto elects not to publicly disclose.

1.2 **"API"** means one or more private application programming interface(s) created by XCLAIM to interface with the Accessible Data so that the Platform will have current information and documents as reflected in each Claims Register.

1.3 **"Business Day"** means all days excluding Saturdays, Sundays, and holidays recognized by the U.S. federal court system.

1.4 **"Confidential Information"** means the terms of this Agreement and any confidential or proprietary information marked or otherwise identified in writing as confidential or proprietary at the time of disclosure by the disclosing Party, or which the receiving Party reasonably should recognize from the circumstances surrounding such disclosure or the contents of such disclosure to be confidential or proprietary, and including any redacted information, personally identifiable information, source code, software tools, designs, schematics, plans, or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either Party, its present or future products, services, customers, employees, investors or business.

1.5 **"Intellectual Property Rights"** means all past, present, and future rights of the following types, whether registered or unregistered, which may exist or be created under the Laws of any jurisdiction in the world: (a) rights associated with works of authorship, including copyrights, design rights, and moral rights ("Copyrights"); (b) trademark, trade name, service name, trade dress and service mark rights and similar means of identification and similar rights, including all goodwill associated with the foregoing (collectively, "Trademarks"); (c) trade secret rights and other rights in know-how and confidential or proprietary information (including any techniques, specifications, designs, processes, practical knowledge and skills, or other similar information) (collectively, "Know-How"); (d) United States and foreign patents, including utility models, industrial designs and design patents, and applications therefor (and any patents that issue as a result of those patent applications), and any renewals, reissues, reexaminations, extensions, continuations, continuations-in-part, divisions and substitutions relating to any of such patents and patent applications, and any counterparts worldwide claiming priority therefrom, and all rights in and to any of the foregoing (collectively, "Patents"); (e) rights in data, including technical data, clinical data, user data, algorithm training data, feasibility study results, data from research and development, including user research, safety data rights in databases and data collections (including knowledge databases, safety databases, user lists and user databases) (collectively, "Data"); (f) all other intellectual property rights or proprietary rights; and (g) all past, present and future claims and causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

1.6 **"Law"** means all applicable laws, statutes, ordinances, codes, rules, regulations, orders, directions, or decrees of any court or other governmental authority, including the Executive Office of the United States Trustee and any Regional Office of the United States Trustee.

1.7 **"Losses"** means any and all losses, claims, damages, judgments, liabilities, expenses, settlements, interest, awards, penalties, fines, and costs, whether direct or indirect (including, without limitation, reasonable and documented out-of-pocket counsel fees and expenses), fees and costs of enforcing any right to indemnification hereunder, and the cost of

pursuing any insurance providers. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party.

1.8     "**Release Date**" means the date upon which the Platform goes live and is operational for the trading of Claims in cases in which Stretto is the court-appointed Claims Agent, such date to occur no later than six (6) months from the Effective Date.

1.9     "**Stretto Software**" means Stretto-developed custom software and all operating manuals and other documentation and materials supplied to XCLAIM or Stretto's clients by Stretto and all copies thereof.

1.10    "**Technical Data**" means any data, related interface access points, and other technical information required by XCLAIM to create and use the API for its intended purposes.

1.11    "**XCLAIM Improvements**" means all improvements, modifications and enhancements to the Technical Data created by or on behalf of XCLAIM.

2.  **Data Access; Ownership; Claims Transfer Data**.

2.1     **Access**.  Stretto shall provide XCLAIM direct access to all Accessible Data through data files as specified in Exhibit A (a "Data File"); provided, however, that (a) Stretto may suspend access to Accessible Data (and delivery of Data Files) in order to accommodate changes to the Stretto Software, and (b) XCLAIM must immediately delete any data provided by Stretto to XCLAIM that is not Accessible Data when provided or that subsequently no longer constitutes Accessible Data (e.g., data that is no longer publicly available on Claim Registers). To the extent agreed upon by the Parties in writing as provided in Section 2.5 hereof, Stretto may also allow XCLAIM to transmit Claims Transfer Data to Stretto for its review and approval of any changes to the Claims Registers to reflect any Claim transfers facilitated through the Platform. Stretto agrees not to provide any Accessible Data by programmatic electronic or digital means, such as by Data Files or API, to any other party that operates a claims-trading platform similar to the Platform unless required by Law; provided that, for the avoidance of doubt, Stretto may directly provide Accessible Data to any party or parties seeking to purchase or sell Claims. XCLAIM may use Accessible Data solely to facilitate the purchase and sale of Claims on the Platform and for no other purpose, including providing mailing services to customers.

2.2     **Initial Delivery**.  Stretto shall promptly, but in no more than thirty (30) Business Days following the Effective Date, deliver to XCLAIM (a) a list of all pending Bankruptcy Proceedings in which Stretto serves as a Claims Agent and (b) a Data File including all Accessible Data as of the date of delivery (together, (a) and (b), the "Initial Delivery").

2.3     **Subsequent Deliveries**.  Following the Initial Delivery, Stretto shall provide XCLAIM with Data Files for all Accessible Data as set forth in Exhibit A.

2.4     **Ownership**.  As between the Parties, Stretto shall continue to own all rights in and to Stretto's Technical Data and all changes to Stretto's Technical Data created or developed by, or on behalf of, Stretto. As between the Parties, XCLAIM shall own all right, title, and interest in and to (i) the Platform, XCLAIM's Technical Data, and the API, and (ii) any XCLAIM Improvements that XCLAIM creates or develops as a result of the access granted by Stretto herein

to facilitate XCLAIM's ability to access the Accessible Data, or to provide Claims Transfer Data to Stretto, excluding any portion thereof created or developed in Stretto Software.  To the extent that the Parties agree, in writing and in advance, to collectively create or develop software, the Parties shall have joint ownership of such software.  Notwithstanding the foregoing, all Intellectual Property Rights to the Stretto Software remain the property of Stretto.  XCLAIM will not sell, transfer, publish, disclose, display, or otherwise make available to others the Stretto Software or any copies thereof, except as provided in this Agreement.  All Stretto Software is subject to the confidentiality provisions of this Agreement.  XCLAIM shall not, and shall not permit any third-party to, reverse engineer, decompile, or otherwise derive the source code of the Stretto Software.

2.5     **Claims Transfer Data**.  Following the Release Date, to the extent agreed upon by the Parties in writing, Stretto may receive and review Claims Transfer Data provided by XCLAIM.  For the avoidance of doubt, nothing in this Agreement requires Stretto to receive or use Claims Transfer Data to update any Claims Register.

3.  **Security; Errors; Referral**.

3.1     **Security**.  XCLAIM shall permit its employees to have access to and use of the Accessible Data solely to the extent necessary to perform the functions permitted pursuant to this Agreement.  Passwords granting access to the Platform will require a minimum of eight (8) characters, one (1) capital letter, one (1) number and one (1) special character.  XCLAIM will require password changes at least every 180 days and will not allow for the reuse of passwords.  XCLAIM will make further advances in these security protocols over time to meet or exceed industry standards for maintaining security of financial information.

3.2     **Errors**.  For the avoidance of doubt, XCLAIM shall be responsible for any errors or omissions contained in Claims Transfer Data transmitted to Stretto, and in any resulting updates to the Claims Registers made by Stretto using such Claims Transfer Data.

3.3     **Referral to XCLAIM**.  To the extent agreed upon by the Parties in writing, Stretto may place a hyperlink on certain of Stretto's case websites or its case directory which will navigate persons interested in buying or selling Claims listed on the Claims Registers to the Platform.  Stretto also agrees that it will not allow any other person or entity offering a service that competes with XCLAIM's services contemplated in this Agreement to place a similar link or device on Stretto's case websites or otherwise promote any other operator of a claims-trading platform similar to the Platform unless required by Law.  Notwithstanding the foregoing, nothing herein shall prohibit Stretto from responding to questions from interested parties where such response includes a discussion of XCLAIM's competitors, if any.

4.  **Payment**.

4.1     **Processing Fee**.  XCLAIM shall pay Stretto a processing fee (the "Fee") equal to 10.0% of the commissions collected by XCLAIM related to any transfers of Claims facilitated by the Platform in any Bankruptcy Proceedings in which Stretto serves as the Claims Agent and has provided Accessible Data to XCLAIM as set forth in Section 2 hereof and Exhibit A hereto.  In the event that XCLAIM agrees to pay any other Claims Agent for Bankruptcy Proceedings a Fee greater than 10.0%, XCLAIM will offer such higher Fee to Stretto within ten (10) Business Days

after the later of the execution date or the effective date of such agreement, and Stretto shall have the right to accept or reject such offer within fifteen (15) Business Days of receipt of such offer (the "Most Favored Nation Clause"). If Stretto accepts such offer, the Parties shall enter into an amendment to this Agreement and XCLAIM will pay such new Fee with respect to all transfers of Claims facilitated by the Platform made on and after the date Stretto accepted such offer.

4.2     **Timing**. Within thirty (30) calendar days after the end of each calendar quarter, XCLAIM shall deliver to Stretto a written report (the "Fee Report") detailing commissions actually collected during such calendar quarter by XCLAIM on account of Claim Transfers. If Stretto does not object to the amount of the Fee contained in the Fee Report within ten (10) Business Days after receipt of the Fee Report, XCLAIM shall remit the Fee to Stretto for such quarter within five (5) Business Days thereafter by check or wire transfer in U.S. Dollars and in accordance with written instructions provided by Stretto. Stretto's failure to object during such ten (10) Business Day period shall not constitute a waiver of Stretto's right to object to such payment amount at any later date or preclude Stretto from seeking additional fees related to such Claim Transfers.

4.3     **Audits**. XCLAIM shall maintain accurate and complete records, in a manner sufficient to permit audits in accordance with this Section 4.3. Upon a reasonable prior request from Stretto, XCLAIM shall provide Stretto and its representatives with access to such financial records and supporting documentation as may be reasonably requested by Stretto solely to the extent necessary to determine the accuracy of any Fee Report. Stretto shall be permitted to access XCLAIM's business premises to the extent necessary to perform such audit, as long as Stretto conducts the audit at its expense and during business hours and with reasonable written advance notice. Unless required by Law or requested by a regulatory body, Stretto shall not perform more than one audit per calendar year. If Stretto's audit reflects that XCLAIM has underpaid or overpaid any Fee owing to Stretto, then Stretto shall inform XCLAIM as to Stretto's calculations and methodology regarding its determination of the correct Fee. XCLAIM will have thirty (30) calendar days to respond to Stretto's audit determinations (the "Audit Response Deadline"). To the extent XCLAIM agrees with any portion of the Fee discrepancy reported by Stretto, XCLAIM shall promptly pay any agreed underpayment amount to Stretto, no later than the Audit Response Deadline, and Stretto shall pay XCLAIM any agreed overpayment by XCLAIM within seven (7) Business Days following XCLAIM's delivery of its audit response to Stretto. If XCLAIM disputes any part of an underpayment claimed by Stretto, XCLAIM shall inform Stretto as to XCLAIM's calculations and methodology regarding its determination of the correct Fee. The Parties shall thereafter meet and confer in an effort to resolve any remaining Fee dispute. If such dispute is not resolved within ten (10) Business Days, or such longer period as agreed by the Parties, the dispute shall be submitted by the Parties to binding arbitration regarding the final Fee determination, in accordance with Section 10.7 hereof. In the event of material underpayment by XCLAIM, XCLAIM shall reimburse Stretto for all reasonable documented costs and expenses incurred in connection with the audit (including, without limitation, payment in full of the audit) no later than thirty (30) calendar days after receipt of an invoice from Stretto.

5.  **Representations and Warranties**.

   5.1  **Joint Representations and Warranties**. Each Party represents and warrants as follows:

   5.1.1  **Authority**. Such Party has all requisite power and authority to execute and deliver this Agreement and any and all instruments necessary or appropriate in order to perform its obligations under this Agreement. This Agreement has been duly authorized, executed, and delivered by all necessary action on the part of such Party and constitutes a valid and legally binding obligation of such Party.

   5.1.2  **Compliance with Laws**. The execution, delivery, and performance of this Agreement does not and will not conflict with or result in any violation or breach of Law.

   5.1.3  **Non-Contravention**. The execution, delivery, and performance of this Agreement does not and will not violate any other agreement to which such Party is a party.

   5.1.4  **Requisite Approvals**. Notwithstanding anything in this Agreement, the Parties acknowledge that this Agreement has not been reviewed or approved by any bankruptcy court, the Executive Office of United States Trustee, or any Regional Office of the United States Trustee. Should any such entities suggest that aspects of this Agreement be changed or suspended as to any Bankruptcy Proceeding(s), the Parties shall confer in a good faith effort to reach a consensual resolution regarding proposed changes to this Agreement as to any affected Bankruptcy Proceeding(s). If the Parties cannot agree on changes to or suspension of this Agreement as to any affected Bankruptcy Proceeding(s), and either Party's proposed changes materially impact the other Party's "benefit of the bargain" pursuant to this Agreement in its entirety, such impacted Party may terminate this Agreement on thirty (30) days' notice with no liability as such Party's sole remedy, provided that Fees accruing based on transfers of Claims through the effective date of termination (whether XCLAIM receives its commission on such transfers of Claims before or after such effective date) shall be remitted. The Parties agree that no prior notice or approval requests regarding this Agreement are necessary to the Parties' knowledge. For the sake of clarity, as an example, if the Executive Office of the United States Trustee demands that Stretto stop providing some or all of the services set forth under this Agreement either entirely or until making certain revisions to the Parties' activities, Stretto may request that XCLAIM participate in such revisions and Stretto may suspend or modify its activity under this Agreement until Stretto and XCLAIM can take reasonable steps to satisfy the concerns of the Executive Office of the United States Trustee; and, on the other hand, XCLAIM may then terminate this agreement on thirty (30) days' notice if the Parties do not satisfy such concerns and restart the activities hereunder.

   5.2  **XCLAIM's Representations and Warranties**. XCLAIM represents and warrants to Stretto as follows:

   5.2.1  **Title**. XCLAIM exclusively owns all right, title, and interest in and to the Platform and the API free and clear of any encumbrances, security interests, notes, loans, instruments, liens, judgments, orders, decrees, commitments, liabilities, licenses,

agreements or other binding arrangements or obligations between XCLAIM and any other person or entity that conflict with the rights granted by XCLAIM under this Agreement.

   5.2.2 **No Infringement**. XCLAIM's Platform and API, and Stretto's delivery of the Accessible Data and Technical Data for use in the Platform, does not infringe, misappropriate or violate any Intellectual Property Right of any person or entity.

  5.3 **Stretto's Representations and Warranties**. Stretto represents and warrants to XCLAIM as follows:

   5.3.1 **No Encumbrances**. The execution, delivery and performance of this Agreement does not and will not result in the creation of any lien, security interest, or other encumbrance in or upon any of the Claims Registers or Accessible Data.

   5.3.2 **No Infringement**. Stretto's transfer of Data Files, Accessible Data, and Stretto's Technical Data (excluding any resulting XCLAIM Improvements) in accordance with this Agreement will not, infringe, misappropriate, or violate any Intellectual Property Right of any person or entity.

   5.3.3 **Accuracy of Accessible Data**. To Stretto's knowledge, the Accessible Data accurately reflects the respective Claims Registers as of the time such Accessible Data is transferred to XCLAIM.

6. **Indemnification**.

  6.1 To the fullest extent permitted by applicable law, XCLAIM shall indemnify and hold harmless Stretto and its members, shareholders, directors, officers, employees, representatives, affiliates, consultants, subcontractors and agents (collectively, the "Stretto Indemnified Parties") from any against and Losses resulting from, arising out of, or related to the trading of Claims through the Platform, excluding Losses resulting from Stretto's gross negligence or willful misconduct.

  6.2 To the fullest extent permitted by applicable law, Stretto shall indemnify and hold harmless XCLAIM and its members, shareholders, directors, officers, employees, representatives, affiliates, consultants, subcontractors and agents (collectively, the "XCLAIM Indemnified Parties") from and against any Losses resulting from, arising out of, or related to any errors in Accessible Data provided by Stretto to XCLAIM, excluding Losses resulting from XCLAIM's gross negligence or willful misconduct.

  6.3 Stretto and XCLAIM shall notify each other in writing promptly upon the assertion, threat, or commencement of any claim, action, investigation or proceeding that either party becomes aware of with respect to the services provided hereunder.

  6.4 The Parties' indemnification obligations hereunder shall survive the termination of this Agreement.

7. **Limitation of Liability**.

    7.1    Except as expressly provided herein, each Party's liability to the other Party for any Losses, unless due to such Party's gross negligence or willful misconduct, shall be limited to the total amount paid by XCLAIM to Stretto for the portion of the particular work that gave rise to the alleged Loss.  In no event shall either Party be liable to the other Party for any indirect, special, or consequential damages (such as loss of anticipated profits or other economic loss) in connection with or arising out of the services provided hereunder.  Notwithstanding the foregoing, the Parties intend there to be no limitation with respect to (a) any Losses arising from or related to a breach by either Party of its confidentiality obligations hereunder or fulfillment of related indemnification obligations hereunder, or (b) Stretto's right to any unpaid Fee, whether XCLAIM's failure to pay such fee relates to simple underpayment, failure of XCLAIM to honor the Most Favored Nation Clause, or otherwise.

8. **Confidentiality**.

    8.1    **Nondisclosure; Nonuse**. All Confidential Information exchanged between the Parties pursuant to this Agreement shall not be distributed, disclosed, or disseminated by the receiving party to anyone except its own employees, agents, affiliates, owners, or subcontractors who have a reasonable need to know such Confidential Information and who have been advised of the confidential nature and required to observe the terms and conditions hereof; nor shall Confidential Information be used by the receiving party for its own purpose, except for the purposes of exercising its rights or fulfilling its obligations under this Agreement.  The restriction on disclosure will not apply to Confidential Information that is required to be disclosed by a court, government agency, or regulatory requirement, provided that the recipient shall first notify the disclosing party of such disclosure requirement or order and use reasonable efforts to obtain confidential treatment or a protective order.

    8.2    **Exclusions**. The obligations of Section 8.1 shall not apply to any information that: (a) is already in the public domain or becomes available to the public through no breach of this Agreement or other confidentiality obligation by the receiving party; (b) was in the receiving party's possession prior to receipt from the disclosing party as proven by the receiving party's written records; or (c) is received independently on a non-confidential basis from a third party free to disclose such information to the receiving party.  The obligations of Section 8.1 shall also not apply to any information that the receiving party discloses under an obligation of confidentiality to persons or entities who are considering making an investment in or lending funds to the receiving party, provided that such disclosures are made subject to the confidentiality terms set forth herein and the disclosing party accepts all responsibility and liability for any breach made by such recipient.

9. **Term; Termination**.

    9.1    **Term**.  This Agreement shall be effective on the Effective Date and shall continue in full force and effect for thirty (30) months after the Effective Date (the "Initial Term"), which term shall be automatically extended for an additional thirty (30) month period after the Initial Term expires unless either Party provides at least thirty (30) days' prior written notice of non-renewal.

9.2  **Termination for Breach**.  Either Party may terminate this Agreement for cause by notice in writing if the other Party shall at any time be in material breach of this Agreement and shall fail to remedy such breach (if capable of remedy) within thirty (30) calendar days from receipt of notice in writing from the first Party specifying such breach.

9.3  **Termination Right – Delayed Release Date or Trading Threshold**.  The occurrence of any of the following conditions shall permit termination of this Agreement by Stretto, on thirty (30) days' written notice:

9.3.1  The Release Date does not occur on or before six (6) months after the Effective Date;

9.3.2  The total number of claim transfers executed by third parties through the Platform does not exceed 100 during the twelve (12) month period following the Release Date; or

9.3.3  The total number of claim transfers executed by third parties through the Platform does not exceed 500 during the twenty-four (24) month period following the Release Date.

9.4  **No Waiver of Termination**.  No failure or delay on the part of either Party in exercising its right of termination hereunder for any one or more causes shall be construed to prejudice its rights of termination for such cause or any other or subsequent cause.

9.5  **Effect of Termination**.  The termination of this Agreement shall not release either Party from any liability which, upon such termination, has already accrued to the other Party.  If XCLAIM terminates this Agreement for cause, XCLAIM shall have no further obligation to pay the Fee specified in Section 4 with respect to Claim Transfers consummated after the date of termination, but will pay the Fees specified in Section 4 with respect to any Claim Transfers consummated prior to the date of termination.  Upon any termination of the Agreement, each Party shall return or destroy any Confidential Information of the other Party then in its possession, except as reasonably necessary for XCLAIM to continue to exercise its rights under this Agreement, in which case XCLAIM shall: (a) inform Stretto of the exact Confidential Information retained and the reason for such retention; (b) return or destroy any such retained Confidential Information as soon as possible; and (c) update Stretto upon request (such requests not to occur more often than weekly) as to the status of the continued need to retain such Confidential Information.  Within thirty (30) days of any termination, an officer of each Party shall certify in writing that all Confidential Information within such Parties' possession or control has been returned or destroyed.  In addition to the foregoing, the following Sections shall survive any termination or expiration of this Agreement: 1, 2.4, 4, 5, 6, 7, 8, 9, and 10.

10.  **Miscellaneous**.

10.1  **Waiver**.  No failure or delay by any Party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial waiver thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

10.2 **Amendment**. This Agreement may be modified only by a written document signed by duly authorized officers of each of the Parties.

10.3 **Notices**. All notices and other communications required or permitted hereunder shall be in writing and shall be personally delivered by hand, or delivered by first-class, registered or certified mail, postage prepaid, by messenger, or by overnight delivery at the addresses first set forth above or at such other address as each Party shall have furnished to the other in writing. Any notice or other communications so provided shall be deemed to be given when actually received by the addressees.

10.4 **Relationship of Parties**. Nothing herein contained shall be deemed to create an agency, joint venture, or partnership relationship between the Parties. It is understood and agreed that neither Party is, by reason of this Agreement or anything herein contained, constituted, or appointed the agent or representative of the other Party for any purpose whatsoever.

10.5 **Assignment**. Neither Party may assign this Agreement nor any of its rights or obligations hereunder without the prior written consent of the other Party, such consent not to be unreasonably conditioned, delayed, or withheld. Notwithstanding the foregoing, either Party may assign this Agreement and its rights and obligations hereunder, without the other Party's consent, to an affiliate of the assigning party or to a successor in interest upon any merger, reorganization, acquisition, change of control, or sale of all or substantially all of the assets of the assigning Party; provided, however, that Stretto may terminate this Agreement at any time within eighteen (18) months of such assignment if XCLAIM assigns this Agreement to (a) another Claims Agent, or (b) to an assignee that owns or controls, or is under common ownership or control with, another Claims Agent. Any purported assignment not in compliance with this Section 10.5 shall be deemed null and void *ab initio*. This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns.

10.6 **Governing Law**. This Agreement and the Parties' performance hereunder shall be governed by New York law, excluding choice-of-law rules. Any proceeding arising out of or based upon this Agreement shall be submitted to binding arbitration pursuant to Section 10.7 hereof. EACH PARTY HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY PROCEEDING BROUGHT BY OR ON BEHALF OF EITHER PARTY RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OF ANY OBLIGATIONS HEREUNDER.

10.7 **Arbitration**. Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined exclusively by arbitration in Los Angeles, California, before a single arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10.8 **Severability**. Whenever possible, each provision of the Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision

of the Agreement is held to be prohibited by or invalid under applicable Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of the Agreement.

10.9    **Headings; Construction**. The headings to the clauses, sub-clauses, and parts of this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. The terms "this Agreement," "hereof," "hereunder" and any similar expressions refer to this Agreement and not to any particular Section or other portion hereof. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including," and variations thereof, will be deemed to be followed by the words "without limitation."

10.10    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. This Agreement may be executed by facsimile or .pdf signature by either Party and such signature will be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

10.11    **Entire Agreement**. This Agreement, including all exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any prior agreements, or understandings of the Parties in either written or oral form.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date.

**Bankruptcy Management Solutions, Inc. d/b/a Stretto**

By: _____

Eric S. Kurtzman
Co-CEO

Date: 11/23/2020

**XClaim Inc.**

By: _____

Matthew D. Sedigh
President and CEO

Date: 11/23/2020

# EXHIBIT A

# TECHNOLOGY AND DATA EXCHANGE

1. **Accessible Data Sent Electronically by Stretto to XCLAIM**.

    1.1 **SFTP File Transfers**.

    1.1.1 Stretto to place a JavaScript Object Notation (JSON) or other mutually agreed format on a Stretto-owned Secure File Transfer Protocol (SFTP) server (the "SFTP Server"). Stretto to provide XCLAIM personnel named credentials to access the SFTP Server for up to five (5) XCLAIM employees and one (1) service account.

    1.1.2 Stretto to include data elements in each Data File from all Accessible Data, in fields and format to be mutually agreed by the Parties within thirty (30) days after the Effective Date of the Agreement. Within such thirty (30) day period, the Parties will use their best efforts to spend three (3) working days onsite at XCLAIM or Stretto, as mutually agreed upon.

    1.1.3 During the Term of the Agreement, except as may be otherwise agreed by the Parties in writing, Stretto agrees to use commercially reasonable efforts to post a date-stamped Data File to the SFTP Server every one (1) hour with all Accessible Data as a cumulative bundle.

2. **Claim Transfer Data Sent Electronically by XCLAIM to Stretto.**

    The Parties recognize that Stretto has no duty hereunder, nor will any such duty arise hereunder, unless and until, among other things, Stretto determines, in its sole discretion, that updating the relevant Claims Register is appropriate, is authorized by the respective bankruptcy court, and satisfies Stretto's business judgment; this paragraph gives rise to absolutely no duties hereunder, but rather operates as a placeholder identifying the future goals of XCLAIM, which goals Stretto has not agreed to advance at this point or committed to advance at any point in the future.

# FIRST AMENDMENT TO CLAIMS DATA ACCESS AGREEMENT

This First Amendment (this "**Amendment**") to the Exclusive Claims Data Access Agreement, dated November 23, 2020 (as modified or amended from time to time in accordance with its terms, the "**Agreement**"), by and between Stretto, Inc. ("**Stretto**") and XClaim, Inc. ("**XCLAIM**" and together with Stretto, the "**Parties**"), is hereby adopted by the Parties. All capitalized terms herein that are not otherwise defined shall have the meaning ascribed to them in the Agreement.

**WHEREAS**, the Parties have agreed to remove any exclusivity-related provisions in the Agreement;

**NOW THEREFORE**, the Parties amend the Agreement as follows:

1. <u>Amendments</u>.

    a. The title of the Agreement is revised to "Claims Data Access Agreement".

    b. The third sentence of Section 2.1 is deleted.

2. <u>Governing Law</u>. This Amendment shall be construed in accordance with and governed by the laws of the State of New York, without reference to the conflicts or choice of law principles thereof.

3. <u>Counterparts</u>. This Agreement may be executed by facsimile or email and in several counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be executed effective as of July 7, 2022.

STRETTO, INC.

_____    Dated: 7/6/22
Name: Eric Kurtzman
Title: Chief Executive Officer

XCLAIM, INC.

_____    Dated: 07/07/2022
Name: Matthew D. Sedigh
Title: President and CEO