Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                July 18, 2022

17                2:00 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MARIA

Page 2

1    HEARING re First Day Hearings

2

3    HEARING re Debtors' Amended Motion Seeking Entry of an Order

4    (I) Directing Joint Administration of the Chapter 11 Cases

5    and (Il) Granting Related Relief (Doc #7)

6

7    HEARING re Debtors' Application Seeking Entry of an Order

8    (I) Authorizing and Approving the Appointment of Stretto,

9    Inc. as Claims and Noticing Agent and (Il) Granting Related

10   Relief (Doc #4)

11

12   HEARING re Debtors' Motion Seeking Entry of Interim and

13   Final Orders (I) Authorizing the Debtors to (a) Continue to

14   Operate Their Cash Management System, (b) Honor Certain

15   Prepetition Obligations Related Thereto, (c) Maintain

16   Existing Business Forms, and (d) Continue to Perform

17   Intercompany Transactions, (II) Granting Superpriority

18   Administrative Expense Status to Postpetition Intercompany

19   Balances, and (Ill) Granting Related Relief (Doc #21)

20

21   HEARING re Debtors' Motion Seeking Entry of Interim and

22   Final Orders (I) Authorizing the Debtors to (a) Pay

23   Prepetition Employee Wages, Salaries, Other Compensation,

24   and Reimbursable Expenses and (b) Continue Employee Benefits

25   Programs and (Il) Granting Related Relief (Doc #19)

Page 3

1    HEARING re Debtors' Motion Seeking Entry

2    of Interim and Final Orders (I) Authorizing the Debtors to

3    Pay Prepetition Claims of Certain Critical Vendors, Foreign

4    Vendors, 503(B)(9) Claimants, and Lien Claimants, (Il)

5    Granting Administrative Expense Priority to All Undisputed

6    Obligations on Account of Outstanding Orders, and (III)

7    Granting Related Relief (Doc #20)

8

9    HEARING re Debtors' Motion Seeking Entry of Interim and

10   Final Orders (I) Establishing Certain Notice, Case

11   Management, and Administrative Procedures and (Il) Granting

12   Related Relief (Doc #15)

13

14   HEARING re Debtors' Motion Seeking Entry of an Order (I)

15   Authorizing the Debtors to Prepare a Consolidated List of

16   Creditors in Lieu of Submitting A Separate Mailing Matrix

17   for Each Debtor, (II) Authorizing the Debtors to File A

18   Consolidated List of the Debtors Fifty Largest Unsecured

19   Creditors, (III) Authorizing the Debtors to Redact Certain

20   Personally Identifiable Information, (IV) Approving the Form

21   and Manner of Notifying Creditors of Commencement, and (V)

22   Granting Related Relief (Doc #18)

23

24

25

Page 4

1    HEARING re Debtors' Motion Seeking Entry of an Order (I)

2    Extending Time to File Schedules of Assets and Liabilities,

3    Schedules of Current Income and Expenditures, Schedules of

4    Executory Contracts and Unexpired Leases, and Statement of

5    Financial Affairs, (Il) Extending Time to File Rule 2015.3

6    Financial Reports and (Ill) Granting Related Relief (Doc #8)

7

8    HEARING re Debtors' Motion Seeking Entry of Interim and

9    Final Orders (I) Authorizing the Debtors to (a) Pay their

10   Obligations Under Prepetition Insurance Policies, (b)

11   Continue to Pay Certain Brokerage Fees, (c) Renew,

12   Supplement, Modify, or Purchase Insurance Coverage, and (d)

13   Maintain their Surety Bond Program and (Il) Granting Related

14   Relief (Doc #16)

15

16   HEARING re Debtors' Motion Seeking Entry of Interim and

17   Final Orders (I) Authorizing the Payment of Certain Taxes

18   and Fees and (Il) Granting Related Relief (Doc #17)

19

20   HEARING re Debtors' Motion Seeking Entry of Interim and

21   Final Orders (I) Approving Notification and Hearing

22   Procedures for Certain Transfers of Declarations of

23   Worthlessness with Respect to Common Stock and Preferred

24   Stock and (Il) Granting Related Relief (Doc #5)

25

Page 5

1    HEARING re Debtors' Motion Seeking Entry of an Order (I)

2    Restating and Enforcing the Worldwide Automatic Stay,

3    Anti-Discrimination Provisions, and Ipso Facto Protections

4    of the Bankruptcy Code, (II) Approving the Form and Manner

5    of Notice, and (III) Granting Related Relief (Doc #6)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS

4        Attorneys for Debtor

5        601 Lexington Avenue

6        New York, NY 10022

7

8    BY:  PAT NASH (TELEPHONICALLY)

9        ROSS KWASTENIET (TELEPHONICALLY)

10        ALISON WIRTZ (TELEPHONICALLY)

11        SIMON BRIEFEL (TELEPHONICALLY)

12        JOSHUA SUSSBERG (TELEPHONICALLY)

13

14    MILBANK LLP

15        Attorneys for Series B Preferred Equity Shareholders

16        55 Hudson Yards

17        New York, NY 10001

18

19    BY:  DENNIS JOHN (TELEPHONICALLY)

20

21

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for The United States Trustee

3         201 Varick Street

4         New York, NY 10014

5

6    BY:  SHARA CORNELL (TELEPHONICALLY)

7

8    ALSO APPEARING TELEPHONICALLY:

9         DENNIS F. DUNNE, Representing Community First Partners

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            CLERK:  Good afternoon.  This is Greg White, the

3    Courtroom Deputy.  This hearing is in Case Number 22-1094,

4    Celsius Network LLC.  It's 2:00 PM on July 18th.  At this

5    time, I'd like to take appearances from anyone who plans on

6    speaking during the hearing, please.

7            MR. NASH:  Good afternoon.  Pat Nash, from

8    Kirkland & Ellis, proposed counsel to Celsius Network LLC

9    and it's seven affiliated Debtors.

10           CLERK:  Thank you.

11           MR. JOHN:  Good afternoon.  It's Dennis John, from

12   Milbank LLP, on behalf of several holders of the Debtors'

13   Series B Preferred Equity Shares.

14           CLERK:  Thank you.

15           MR. NASH:  This is Pat Nash again, from Kirkland &

16   Ellis.  I'd also like to make appearances for my partner,

17   Mr. Ross Kwasteniet; a colleague of mine, Ms. Alison Wirtz;

18   and a third colleague of mine, Mr. Simon Briefel, each of

19   whom will be addressing the Court, with the Court's

20   permission, during the course of the hearing today.

21           CLERK:  Okay, thank you.

22           MR. SUSSBERG:  Your Honor, it's Joshua Sussberg,

23   from Kirkland & Ellis.  I am not planning to appear today,

24   just participate with my partners and colleagues.  Thank

25   you.

1              CLERK:  And I'd also like to just that everyone

2      know that -- please mute your cellphone and make sure there

3      are no electronic devices or notifications that will

4      interfere with the recording.  Mute your line if not

5      speaking.  A party can mute themselves by clicking mute on

6      the lower left-hand corner of the screen.

7              Also, this hearing is a court proceeding and any

8      recording other than the official court version is

9      prohibited.  No party may record images or sound from any

10     location.

11             Also, please state your name each time you speak

12     so we can make an accurate record.  Thank you.

13             THE COURT:  All right.  Good afternoon, everyone.

14     This is Judge Glenn.  We're here in Celsius Network LLC, 22-

15     10964.  We're here in connection with the first day motions.

16     I am in my courtroom.  There is one person who came to Court

17     today, even though this hearing was noticed as a remote

18     hearing on Zoom.  And I've permitted him to appear in the

19     courtroom.  There is also a court security officer during

20     the hearing as well.

21             Before we begin, I want to make just a few very

22     preliminary comments.  So, the Court -- I received on Friday

23     at 10:41 AM an email addressed to me from what appears to be

24     a creditor.  How the person obtained my email address, I

25     don't know.  A copy of the email -- of the text of the email

Page 10

1    -- is going to be filed on ECF.  It has not happened yet

2    (indiscernible).  I think it's fair to say the text of the

3    email from this person is very critical of the existing

4    management of the Debtor.  I won't comment further.

5            I would also note that if there are any creditors

6    who intend to file anything, their filling should be filed

7    on the electronic case filing system.  No email should be

8    sent to me or to chambers.

9            There are two other letters or texts addressed to

10   me, but which were filed on ECF.  One was filed as ECF

11   Docket Number 26 on July 14th, and the other was filed

12   yesterday, the 17th, as ECF Docket Number 41.

13           The Court's docket in this case, of course, is a

14   public docket, and people are free to either on their own

15   behalf or if they have lawyers, to file anything in relation

16   to the case.  But I just want to caution that nothing should

17   be sent directly to me or to chambers.  Rather, they should

18   be sent to -- should be filed on the electronic case filing

19   system.

20           All right.  Who's going to take the lead for the

21   Debtors today?

22           MR. NASH:  That would be me, Your Honor, Pat Nash,

23   from Kirkland & Ellis.

24           THE COURT:  All right.  Good afternoon, Mr. Nash.

25   Go ahead.

Page 11

1           MR. NASH:  Good afternoon, Judge.  It's good to be

2    with you today.  At the outset, Judge, if you'll permit me,

3    I'd like to thank Your Honor and Your Honor's chambers.

4    Incredibly accommodating in hearing us on short notice and

5    in a very organized fashion, and we greatly appreciate that.

6           I'd also like to thank the United States Trustee's

7    office, in particular, Ms. Cornell, Mr. Bruh and Mr.

8    Masumoto.  They've been very accommodating, made themselves

9    very available.  Cautiously optimistic that we've resolved

10   all of their issues in advance of the hearing.  To the

11   extent we haven't, anything that's left is very minor.

12          I'd also, if you'll permit me, Judge, like to draw

13   to your attention, present here on the Zoom is Mr. Alex

14   Mashinsky, CEO and Cofounder -- one of the cofounders -- of

15   Celsius.  Mr. Mashinsky filed a declaration at Docket Number

16   23.

17          Also with us virtually, Your Honor, participating

18   in the hearing is Mr. Robert Compagna.  Mr. Compagna is a

19   Managing Director at Alvarez and Marsal, proposed financial

20   advisor to the Debtors.  Mr. Compagna filed a declaration in

21   support of the first day relief that we seek today.  That

22   declaration can be found at Docket Number 22.

23          I have already had an opportunity, Your Honor, to

24   introduce some of my colleagues who will be addressing you

25   today.  And so, with that, let me jump into it.

Page 12

1          And, you know, Your Honor, I do have a suggestion

2     for, with your permission, how we proceed today.  But before

3     I even make that suggestion, again, with Your Honor's

4     permission, would you permit me to make an observation?

5               THE COURT:  Go ahead, Mr. Nash.

6               MR. NASH:  Your Honor, many people are listening

7     to this proceeding this afternoon.  And literally tens if

8     not hundreds of thousands of people are paying close

9     attention to what is happening here this afternoon.

10          This case has generated significant public

11     interest, not only significant, but intense public interest.

12     It's receiving significant media attention, both traditional

13     media, but probably more impactfully, social media

14     attention.

15          As Your Honor can imagine, when the gates came

16     down on June 12th and the company paused withdrawals,

17     customers were angry, they were irate, they were passionate

18     in these feelings, they had questions, and they were

19     confused.

20          This anger and frustration has been exacerbated,

21     in my view, by the company's relative silence in the weeks

22     leading up to the filing.  As Your Honor is familiar with,

23     but everybody may not be -- everybody who's listening -- in

24     the leadup to a Chapter 11 filing, it's typical that a

25     company is limited in the things that they can say publicly,

Page 13

1    limited in what their attorneys allow them to say publicly.

2         The level of anger and frustration evidenced on

3    social media has caused some employees of Celsius to fear

4    for their personal safety and the safety of their families.

5    And while that sounds dramatic, it is the case.  And it is

6    for that reason, Your Honor, that Celsius welcomes the

7    opportunity to be in Chapter 11.

8         And while in many respects that may be an odd

9    thing to say, and we all wish that the macroeconomic

10   environment and the crypto economic environment was such

11   that the pause would've never been necessary and these

12   proceedings wouldn't be necessary, Chapter 11 gives Celsius

13   the opportunity to start answering at least some of these

14   questions.  Chapter 11 affords us a forum to communicate

15   with our customers on the path forward.

16        This morning, Judge, I received an email from a

17   significant retail customer, seven-figure-plus retail

18   customer, expressing grave concern and his expectation that

19   the goal of these proceedings is to fix claims as of the

20   petition date for the purpose of forcing customers to take

21   recovery in U.S. dollars or other fiat currency.

22        Celsius wants me to be crystal clear here at this

23   moment, Judge.  This is not what we're going to be doing.

24   This is not a liquidation.  We do not intend to force

25   customers to take their recovery in fiat currency.  All is

Page 14

1    not lost.  We intend for this to be a reorganization.  Our

2    goal is to maximize the value of Celsius' assets for the

3    benefit of our customers.

4           More than any place I can remember, Judge, we look

5    forward to the UST appointing an official Committee of

6    Unsecured Creditors.  We expect that this committee will be

7    essentially, if not literally, a customer committee.  We

8    have very little unsecured trade debt.  We know that it will

9    be incumbent upon us to work expeditiously on the path

10   forward with this committee.  A reorganization plan for

11   Celsius is not going to succeed without the buy-in of our

12   stakeholders and our community.

13          At a very high level, Judge, what does this plan

14   look like?  And this isn't to preordain anything, but we do

15   have a lot of folks listening and paying attention, and

16   they're very interested in what our general game plan is.

17          THE COURT:  Mr. --

18          MR. NASH:  At a high level --

19          THE COURT:  Before you go on, Mr. Nash, then

20   everyone can understand this, there are now two people in my

21   courtroom observing the hearing.  But my Zoom screen shows

22   that there are 197 participants who have signed in for the

23   hearing at this point.  So, obviously, this is a matter

24   that's had very broad attention and concern.  And I'll let

25   you go on in a second.

Page 15

1              I just want to make clear to all parties in

2     interest, creditors small or large, that my Court is an open

3     process and I certainly want to give people an opportunity

4     to address issues that come up during the case.

5              And I'd certainly appreciate it, Mr. Nash, if you

6     and your colleagues, once there is a committee in place,

7     counsel to a committee also is open to listening to any

8     concerns that are expressed by -- whether it's the smallest

9     of customers or the largest of customers, that everyone's

10    voice is heard.  And to the extent necessary, I will hear

11    and decide whatever needs to be done.

12             But go ahead, Mr. Nash.

13             MR. NASH:  Well, thank you, Judge.  And it's in

14    that light and consistent with why we welcome the

15    opportunity to be here and have this forum to engage with

16    our community on the path forward.  And at a high level,

17    look, we've got a couple hundred thousand customers around

18    the world.  Certainly, undoubtedly, some percentage of them,

19    some number of them, will be interested in getting a

20    recovery in U.S. dollars or other fiat currency.  It'll be

21    our objective to make that option available to them.

22             But we definitely expect that the vast majority,

23    dental majority of our customers, are going to be interested

24    in, you know, riding out what you've heard referred to as

25    this crypto winter, remaining long crypto, having the

1   opportunity to realize their recovery through and

2   appreciation in the macro crypto market or environment.  And

3   it's our goal to work closely with the official

4   representative of our customers in order to make that kind

5   of a reorganization possible.  That's why we're here.

6          And so I appreciate Your Honor giving me the

7   opportunity and indulging me, just given, you know, the

8   passionate focus that this is receiving in the community.  I

9   wanted to and I appreciate you letting me make those opening

10  remarks.

11         THE COURT:  All right.

12         MR. NASH:  With that, by way of -- oh, sorry,

13  Judge.

14         THE COURT:  It's okay, go on.  Your office

15  provided my chambers last night with a slide deck, short

16  slide deck of issues.  I don't know whether you're going to

17  cover that, not plan to cover that.  What I would ask you to

18  do, again, for the importance of transparency in the case,

19  is that after the hearing today, you file a copy of that

20  slide deck on ECF so everyone can see what it is that the

21  Court has seen.

22         MR. NASH:  We will do that, Judge.  And my

23  apologies.  We should have done that, frankly, before the

24  hearing.  I will say for the benefit of anybody listening,

25  that presentation, Your Honor, is up on the Stretto website,

1    our claims agent.  Why we put it up on the website and

2    didn't file it, Your Honor, I apologize for that.  But we

3    will file right away after the hearing.

4          THE COURT:  No, Mr. Nash, I've looked at the

5    docket several times today.  I didn't see it there.  It

6    could be maybe that I've missed it, but I'm glad it's on the

7    Stretto website.

8          And you know, in terms of the description of the

9    key legal questions that you identify, I agree.  I mean, I

10   think those are key legal questions.  None of those are

11   going to be resolved today.  Those are issues for the future

12   in terms of your dealings with creditors as you move forward

13   to try and get support for a plan.  So, go ahead.

14         MR. NASH:  So, Your Honor, I do think it would be

15   useful, again, not only for Your Honor, but for the benefit

16   of folks who are paying attention to what we're doing here

17   today.  If I do give an overview of the assets that we had

18   on the petition date, steps we've taken to secure those

19   assets, the nature of the operations today, little bit of a

20   business overview and then a little bit of the events that

21   led us here, I'm going to be using this deck as a guide, so

22   those who can assess it to the website can follow along.

23   Otherwise, you can listen closely or take notes and it'll be

24   available on the docket here shortly.

25         Does that work for Your Honor?

1        THE COURT:  Absolutely.  And I have a hard copy of

2    it in front of me.

3        MAN 1:  I do too, Judge.

4        MR. NASH:  So, Judge, I'm on Page 2.  You know,

5    this is a critical focus for the community.  What is our

6    asset base?  And what we have here is as of the petition

7    date, $4.3 billion in assets.  And this is unaudited, Judge,

8    but you know, it is accurate to the best of our ability.

9    And so $4.3 billion of assets as of the petition date.

10   Approximately $22 billion of assets just a few months

11   earlier on March 30, 2022.

12       I know what people are most interested in is March

13   30, 2022, we had cryptocurrency assets in the amount of

14   $14,560,000,000.  And on July 13th or 14th, we had crypto

15   assets with a market value of $1,750,000,000.  So the

16   depreciation or the reduction in the level of assets from

17   March to the petition date largely relates to the market

18   value depreciation of cryptocurrency.

19       There are some other assets broken out here.  We

20   also have a bridge, Your Honor, here, which is probably

21   useful for both, in terms of user withdrawals accounts for

22   approximately $1.9 billion in the reduction in crypto on

23   hand.  Crypto liquidated by third parties, and that's

24   primarily Tether.  Tether liquidated about $900 million of

25   our cryptocurrency in the months leading up to the petition

Page 19

1    date.  We didn't lose that much money there.  It was

2    approximately a $97 million loss to the company, because

3    Tether liquidated that crypto collateral in satisfaction of

4    an $800 million loan.

5           And then there's some other entries here, Judge,

6    that we hope folks will find useful and will inform some

7    questions and feedback from our community in terms of, you

8    know, how our assets got from where they were a while ago to

9    where they are now.

10          THE COURT:  Mr. Nash?

11          MR. NASH:  Yes, sir.

12          THE COURT:  At some point -- you don't have to do

13   it now -- but among the questions I have is with respect to

14   the assets being held in custody accounts.  And I understand

15   summer being held by the Debtor, some where the Debtor has

16   used third parties for custody.

17          In the papers I've read, it indicates that the

18   Debtors' documentation provided that the Debtor could hold

19   it in comingled accounts.  And I want to get a sense before

20   we finish today about how much in assets are being held in

21   custody not by the Debtor, by other parties; how much is

22   being held in custody accounts by the Debtor, I think -- or

23   Debtors -- among the -- I think one of the letters that was

24   posted on ECF had questions because of a freeze on

25   withdrawals of 10 customers.

1           If their cryptocurrency is being held in the

2    custody account, are they able to recover it and what's

3    happening with that?  You don't have to cover that now, but

4    at some point in your presentation, I would like you to

5    discuss the custody accounts.

6           MR. NASH:  Yeah, why don't I do that now, Judge,

7    just because it's top of mind and...  So, approximately four

8    percent -- and I have this percentage somewhere here in this

9    deck, but I think I'm close enough -- approximately four

10   percent of the cryptocurrency that we hold, our crypto

11   assets, only four percent are in this custody account.  So

12   it's a small percentage of our crypto assets.

13          The crypto, Your Honor, that we hold pursuant to

14   the custody arrangement is isolated and comingled.  But all

15   of those proceeds are sitting in a specific and identifiable

16   account.  And we are going to keep it that way.  And to the

17   -- we think, Your Honor, that it is a legal question as to

18   whether or not it is, you know, truly a custodial account,

19   truly in trust, or despite that having been people's

20   intentions, is that the legal effect?

21          I anticipate almost for sure that that is a

22   question that Your Honor is going to have to answer at some

23   point in the case.  And, you know, what I can assure the

24   Court and assure any of our customers who are party to a

25   custodial arrangement, that crypto is sitting in an account

Page 21

```
 1    and it is available, to the extent that Your Honor were to
 2    rule that that is their property.  And again, it's only a
 3    very small percentage of the cryptocurrency assets that we
 4    have on hand.  Approximately four percent of our
 5    cryptocurrency assets are held pursuant to the custodial
 6    program.
 7              THE COURT:  I can certainly see that customers
 8    whose assets are in a custody account would be concerned if
 9    that account was frozen and their continue to be fairly wide
10    gyrations of the value of crypto assets, if they're unable
11    to access it.  So I won't say anything more about it now,
12    but I certainly understand concerns that have been raised.
13    Four percent is still probably a large dollar value or
14    equivalent dollar, equivalent value.  So --
15              MR. NASH:  Oh, it is.  It's about $180 million,
16    Judge.  So we're talking about big dollars here.  And again,
17    I don't expect you to necessarily respond to this
18    observation, Judge, but just so you know that it's not lost
19    on us, you know, we've thought on our side about a little
20    bit unusual, I think, in Bankruptcy Court, but rather than
21    wait, we've got 58 -- so, again, I talk about only four
22    percent of our cryptocurrency in a custody account, but
23    that's 58,000 customers, Judge.  So you could be getting a
24    lot more emails, you know, posted to the docket.
25              And we've had conversations on our side about, you
```

Page 22

1   know, would this be an instance where it would be efficient

2   and worthwhile for the Debtors sooner rather than later to

3   bring some sort of declaratory judgment pleading to get a

4   ruling, rather than wait for what is inevitably going to be

5   10, 50, 120 lift stay motions for people to get access to

6   those -- you know, to their custody fund.  So we are acutely

7   aware of the issue and have thought on our side about how to

8   bring it to a head sooner rather than later.

9        THE COURT:  And I think as soon as you get a

10  committee in place with a professional, you can engage in

11  discussions with them.  Additionally, if this has to be

12  brought to a head more quickly, that probably unrelated case

13  some years ago where there was a legal issue like this that

14  affected a lot of people, there were arrangements at the

15  Debtor's expense in that case, that special counsel was

16  selected (indiscernible) dealing with the issue on behalf of

17  those, in that case, customers who were dealing -- it's

18  premature to get to that.

19       But I can certainly understand $180 million is a

20  lot of money and I can certainly understand the frustration

21  if people believe they signed documentation that this was a

22  custody account that's held in trust.  They want to be able

23  to act quickly.  If the crypto markets remain volatile, it

24  could have a big impact to the extent the account remains

25  frozen.  But let's move on from that.  Go ahead, Mr. Nash.

Page 23

1          MR. NASH:  Thank you, Judge.  I'm now -- I'm

2     turning to Page 3, skipping over the key legal questions.

3     We can pick those up at some point in the presentation.  If

4     Your Honor has questions for me about them, we can address

5     them.

6          We did, though, frankly, again in the interest of

7     transparency, what we see as key legal questions -- and some

8     of which are relatively novel -- we wanted to get those out

9     into the public domain so that the universe of attorneys and

10    customers and stakeholders can see real time what we think

11    are going to be determinative legal issues.  So that's one

12    reason that you see them here in the presentation.

13         THE COURT:  Let me ask, but -- I know your firm is

14    also Debtors' counsel in the Voyager case that's before my

15    colleague, Judge Wiles.  And to what extent are these same

16    issues arising in Voyager?

17         MR. NASH:  They are.  There's significant overlap,

18    Judge.

19         THE COURT:  Okay.  Go ahead.

20         MR. NASH:  Your Honor, I'm going to talk a little

21    bit about the current status of the company's operations,

22    and I'm really kind of speaking off of Slide Pages 4 and 5.

23    The headline for the status of the company's current

24    operations is that there really aren't any.  It is not

25    business as usual, Your Honor.  No new customer accounts are

Page 24

1    being opened.  No new deployment.  No new loans.  No new

2    staking.

3           We are not making margin to the extent that we are

4    the lender, and we have retail and institutional borrowers,

5    Judge.  We are not issuing margin calls.  We are not

6    liquidating collateral.  It is --

7           THE COURT:  Let's come back to this point about

8    no margin calls, because one of the communications from a

9    creditor that I read today, that was a particular concern,

10   as to whether they could face margin calls where they're not

11   able to access or liquidate their collateral.

12          MR. NASH:  Yes, Judge.  And I think that may have

13   been one of the communications that was filed.  Or somehow,

14   I recall seeing that communication.

15          THE COURT:  That one was -- yes.

16          MR. NASH:  I did see that one.  And so the way the

17   business operates and what that customer was very

18   understandably concerned about, is probably in the present

19   tense understandably concerned about, is they take out a

20   loan from Celsius and they post coin collateral.  And the

21   coin collateral that they post has a greater market value

22   than the amount of the loan.

23          If during the life of the loan the market value of

24   the posted collateral drops below a certain level, Celsius

25   has the ability to liquidate that collateral in order to

Page 25

1    satisfy the loan.  So you have customers out there who are

2    very concerned that on the one hand it doesn't make sense to

3    them to post additional collateral to the Celsius platform,

4    in light of the Chapter 11 case.

5         But on the other hand, they are concerned that

6    their collateral that has been posted, the coins that they

7    posted to secure the loan, will be liquidated at a trough

8    price, albeit one for enabling Celsius to recover on the

9    loan.  And that is a very valid concern, an understandable

10   concern.

11        But I can state here very clearly, Judge, we're

12   not doing that right now.  We're not issuing margin calls

13   and we're not liquidating collateral to satisfy loans.  And

14   we're not going to restart doing that.  Any of these things

15   that I'm talking about, the things that we're not doing

16   today, we're not going to resume doing, absent bringing it

17   to your attention and getting Court authority.

18        THE COURT:  All right.  Thank you, Mr. Nash.

19   That's good.

20        MR. NASH:  Again, though, Judge, in the interest

21   of being very clear about what's happening, the one thing

22   that we can't do -- and this is a function of the blockchain

23   -- with respect to existing customers, we have noticed that

24   some coin deposits are showing up into their accounts post-

25   petition.  We don't have the ability to approve that.  We

Page 26

1    don't have the ability to deny that.  It's a function of the

2    blockchain.  I'm reading here, so I can be precise, because

3    I'm not a cryptocurrency expert, Judge.  I know more than I

4    did two weeks ago, but...

5         So, users transfer digital assets from external

6    wallets to Celsius' platform by recording such transactions

7    on the blockchain.  And so to the extent that coins show up

8    form an existing customer's account post-petition, we had no

9    role in approving that.  We have no ability to stop or deny

10   that.

11        But the good news is we do have the ability to

12   track and record that.  I don't yet have a view, or even a

13   preliminary one, Judge, over, you know, whether or not post-

14   petition coin deposits, as compared to pre-petition coin

15   deposits is going to be dispositive or even relevant.  But

16   to the extent it is, Your Honor, we will track that, and

17   we'll be able to deal with that.

18        THE COURT:  Let me ask a follow-up question on

19   that.  If I read the papers correctly, the account

20   agreements provide that when customers deposit crypto

21   assets, title is transferred to Celsius, and with Celsius

22   free to do what it wants with, basically; encumber it

23   further, transfer it, et cetera.

24        Does that remain true on post-petition deposits

25   that are being made?

Page 27

1          MR. NASH:  It does, Judge.  But recall, we're not

2    actually doing anything with the crypto that is -- and it's

3    a very limited amount.  But whatever crypto is being

4    deposited post-petition is sitting there on the platform,

5    because we're not doing any deployment with it.

6          THE COURT:  Go ahead, Mr. Nash.

7          MR. NASH:  Your Honor, I'm talking now off of Page

8    5, which is a little bit of the flipside of the slide I was

9    just speaking to.  And this is the proactive steps that

10   Celsius is taking to safeguard and preserve its assets.

11          Prior to the filing, Your Honor, Celsius was very

12   focused on pulling crypto assets back into Celsius' custody.

13   Celsius unwound most positions where it had borrowed from a

14   posted collateral to third parties.

15          And to illustrate that, on June 27, 2022 -- so

16   just, you know, two and a half weeks before the petition

17   date -- Celsius was a borrower, had taken out loans in the

18   amount of approximately $648 million of DeFi or

19   decentralized finance borrowings.  So, Celsius owed $648

20   million pursuant to those arrangements.  But Celsius had

21   posted as of June 27th approximately $1.61 billion in market

22   value of collateral to secure those obligations.

23          And so, in the weeks leading up to the petition

24   date, Your Honor, it was very important to the company that

25   we secure and bring back into the estate, back into our

Page 28

1  possession and control, that very meaningful over-

2  collateralization.  Because now, you know, that excess

3  crypto assets is in our control.  It's not sitting on a

4  third-party platform, where it would be subject to market

5  risk, the specific risk of the platform, you know, the still

6  a volatile market.

7          And we felt like, you know, we could be describing

8  a scenario for you where we're describing that we've got

9  $1.61 billion of crypto assets on a Tuesday, and then we

10  could be back in front of you on a Thursday and tell you, uh

11  oh, we may not have anymore because there's been a problem

12  with, you know, the third-party platform on which those

13  assets were placed up until very recently.

14          So, as of the petition date, Judge, we had

15  approximately only $3.2 million in outstanding DeFi

16  borrowings, with about $6.6 million of posted collateral to

17  secure that.  So two and a half weeks ago, you had over a

18  billion dollars of our crypto assets on third-party

19  platforms; now you've got a little over six million.

20          And so, you know, we are pleased to report that

21  those assets are in our custody and control, where we feel

22  good about being able to preserve and safeguard them for

23  ultimate distribution to our stakeholders under a plan.

24          THE COURT:  Let me ask another question that

25  somewhat relates to that, then let's come back to the --

1   where the Debtors are using third-party custodians.  And

2   that's a question of whether -- have you pulled back crypto

3   that's in custody accounts that were being held by any third

4   parties?  Have there been any defaults by the third parties

5   that are holding the custody accounts, and what is the value

6   of assets that are held by third-party custodians?

7                MR. NASH:  So, Your Honor, I don't believe that

8   there have been any -- I can tell you that in the first day

9   declaration in describing some of the events that caused us

10  to be where we are, one of the incidents or one of the

11  issues that we cite is approximately 35,000 of our ether

12  being lost in connection by a third-party custodian, in

13  connection with being transferred to the third-party

14  custodian.

15               THE COURT:  Open the account.

16               MR. NASH:  And we -- I apologize, Your Honor.  Did

17  I miss...?

18               THE COURT:  Go ahead.  No, it's -- go ahead.

19               MR. NASH:  And we have taken steps, Your Honor,

20  then -- and my partner, Mr. Kwasteniet, I think will be able

21  to describe this in more detail in connection with the cash

22  management motion -- but we have taken steps to be

23  comfortable that where are cryptocurrency assets sit, it is

24  as safe a place as we can have them at the moment.  And I

25  know that we've been in discussions with the U.S. Trustee,

Page 30

1    and I do think they probably can get into that with a little

2    more granularity in connection with the cash management

3    motion.  I think Mr. Kwasteniet, frankly, can get into that

4    with a little more granularity than I can right here at this

5    moment.

6              THE COURT:  Go ahead.

7              MR. NASH:  So, Your Honor, to sum it up in terms

8    of, you know, the status of the operations, it's not

9    business as usual, no new deployment.  We've been focused on

10   harvesting and safeguarding our assets and we've been doing

11   that because it's very important.  Had we not been doing

12   that we might render some of these interesting legal issues

13   moot.  You know, are folks entitled to their coin back in

14   kind?  That would end up being an academic legal exercise if

15   we, over the course of the case through what otherwise might

16   be considered ordinary course activities, you know, we lost

17   all or a meaningful portion of our coin.

18              So the coin that we have today, we intend to keep.

19   And I said now, probably more than once, ultimately

20   distribute in connection with a plan of reorganization.

21              Now, Judge, I'm turning to page 7.  For the

22   benefit of folks on the phone, a bit of a business overview

23   and a corporate structure overview.  From the outset here,

24   Judge, just to make sure that nobody listening misses it, we

25   have no long-term or funded debt.  So, our customers are our

Page 31

1    primary creditors.  And when you look at this structure

2    chart, Judge, and you look at who the Debtors are, the lead

3    debtor, kind of down, towards the bottom in the middle,

4    Celsius Network LLC; since August 21, since August 19,

5    pardon me, 2021, that entity has been the primary customer

6    facing, you know, the retail business.  That is the entity

7    that the retail customers do business with, Judge; Celsius

8    Network LLC.

9              Right below that, Celsius Lending LLC, that is the

10   entity that conducts the retail lending business.  If you go

11   up the chain, Judge, you've got an intermediate holding

12   company, but you get up to Celsius Network Limited, UK,

13   which owns 100 percent of the deposit business, 100 percent

14   of the mining business, which is over on the right, and 100

15   percent of the non-debtor business, GK8, which I'll talk

16   about in a second.

17             So, Celsius Network Limited UK is the entity out

18   of which the company has historically conducted, and up

19   until the petition date, its institutional borrowing and

20   lending business.  Up until August of 2021, Judge, Celsius

21   Network Limited UK was the customer-facing party for the

22   retail depositors.  So, up until about 11 months ago, if you

23   were opening a -- if you were a retail customer and you

24   wanted to open an account, you interfaced with Celsius

25   Network Limited UK.  In August of last year, Celsius Network

Page 32

1    Limited UK, transferred the existing customer accounts down

2    to Celsius Network LLC.  And from that point forward, any

3    new accounts were open by Celsius Network LLC.  And so, you

4    know, that history and that transaction may or may not end

5    up being relevant in these cases.

6           Celsius Network Limited, UK, as I said, Judge,

7    owns 100 percent of Celsius Mining.  And I talk about that a

8    little bit later in the presentation.  Celsius Mining is a

9    bitcoin mining business, currently operational.  Celsius

10   Mining was established and developed through financing from

11   Celsius Network Limited UK.  And as of the petition date,

12   Celsius Mining owes approximately $576 million to Celsius

13   Network Limited UK.

14          Celsius Network Limited UK, Judge, also, again,

15   owns 100 percent of the deposit business.  And it also owns,

16   over here on the left, non-Debtor, the Celsius Network

17   Limited Israel, and its subsidiaries, who we refer to as

18   GK8.

19          In October of 2021, Celsius acquired GK8 for

20   approximately $115 million.  GK8 is a market-leading cold

21   storage platform for crypto assets.  The company is

22   currently engaged in an out-of-court market process, with

23   respect to GK8.  And to the extent that, you know, that

24   process goes well and we receive a bid that we like, we

25   would envision it being sold, and proceeds being available

1    to be dividended up to Celsius Network Limited UK, and

2    addressed in connection with a plan at Celsius Network

3    Limited UK.  And if we don't get a bid that we like, we

4    would intend to fold that business into our operations and

5    include it in our reorganization.  So, that's the --

6              THE COURT:  When we get to first day motions, cash

7    management, intercompany transactions, you know, the

8    organizational chart, corporate structure that we're looking

9    at now, has Debtor entities shown in red, and non-Debtor

10   entities shown in blue.  One of the things that you're

11   asking, to enable to make critical vendor payments, relates

12   to the efforts by Celsius mining to build out its

13   operations.  And you're going to have to explain, you or one

14   of your colleagues, is going to have to explain to me

15   further the flow of funds -- what is going, what is proposed

16   to go to non-Debtors, what goes to Debtors.  I mean, Celsius

17   Mining, there's a Debtor and there's a non-Debtor shown in

18   that same -- the Debtor owns a non-Debtor.  So, we have to

19   talk about where the funds are going.  But I'll wait until

20   you get to it.  Since you were on this organizational chart,

21   I wanted to be sure that I understood the flow of funds

22   going forward, to make the relief you're asking for.

23             MR. NASH:  We'll take that up in connection with

24   the specific motion, Judge.  You know, Celsius Mining is a

25   Debtor.  It started the case with its own cash on the

Page 34

1    balance sheet and it needs relief to use that cash to make

2    critical vendor payments.  But in any event, you know, we'll

3    deal with that in connection with that motion.

4            Your Honor, I'm now, I'm speaking off of page 8.

5    Celsius has approximately 1.7 million registered users.

6    That's not how many active and open accounts we have.  We

7    have approximately 300,000, a little more than 300,000

8    active users with account balances of more than $100.  So,

9    we've got 300,000 with more than $100.  We've got probably a

10   couple of hundred thousand more than that, Judge, who have

11   accounts with balances less than $100,000.  And these

12   customers are spread out, literally, all over the world,

13   100-plus countries.

14           I'm turning to page 9, Judge, going through the

15   key business segments.  Our retail business, we had the Earn

16   program.  This is by far and away where most of our crypto

17   assets are held, in what was the most popular product for

18   the customers.  The terms of use of the Earn program

19   provided a title to coins as transfer to Celsius.  And

20   Celsius is entitled to use, sell, pledge and rehypothecate

21   those coins.

22           It was Celsius' ability to do those things that

23   allowed it to generate yield and, correspondingly, pay

24   yield, or what we call rewards, to our retail customers.

25           The Borrow program.  This is the folks, charge

Page 35

1    retail customers who took out loans, and posted collateral,

2    and could conventionalize this for Your Honor.  A moment

3    ago, I talked about having, you know, 300,000 with more than

4    $100 in the account, and as many as 200,000 more with any

5    amount of money in the account.

6         As of the petition date, of those hundreds of

7    thousands of retail customers, there were approximately

8    23,000 loans with an open balance of approximately $411

9    million.  So, retail customers, approximately 23,000 of

10   them, maybe you have one customer who's got more than one

11   loan, I don't know.  But a small subset of the many hundreds

12   of thousands of retail customers who took out loans, and in

13   the aggregate, owe $411 million to Celsius.  And in

14   connection with taking those loans out, collateral with a

15   market value of $765 million is posted on the Celsius

16   platform.

17        THE COURT:  Valued as of when?  When was -- that

18   765 million collateral, valued as of when?

19        MR. NASH:  The petition date, Judge.  Sorry I

20   missed your question.

21        Talking off of page 10 now, Judge, key business

22   segments, the institutional and the mining business.

23   Institutional lending and borrowing program, as I mentioned

24   a minute or two ago, that's conducted out of Celsius Network

25   Limited UK.  It is a bespoke lending and borrowing business

Page 36

1    or platform with institutional clients such as hedge funds

2    and market makers.  Depending on the creditworthiness of the

3    counterparty, loans to institutional investors may be

4    secured, partially secured or unsecured.  As of July 11,

5    2022, Judge, we had 47 institutional borrowers who, in the

6    aggregate owed 93 million, approximately, to Celsius; that

7    had posted coin collateral with a market value as of that

8    July 11 date, of approximately $98.5 million.

9          Another important business, Your Honor, the mining

10   business.  Mining is a Debtor.  Celsius, through its Debtor

11   subsidiary, Celsius Mining LLC, operates one of the largest

12   bitcoin mining enterprises in the United States.  Celsius

13   operates over 43,000 mining rigs currently, with plans to

14   operate approximately 112,000 mining rings some time in Q2

15   of 2023.

16         And a few more stats, Judge, that I think are

17   interesting:  In the seven days leading up to the petition

18   date, Celsius mining mined approximately $14.2 bitcoin per

19   day.  The operation mined approximately 3,114 bitcoins in

20   2011.  And we expect, if everything goes well, in 2022, to

21   mine approximately 10,100 bitcoin.

22         And, again, if everything goes well, in 2023, we

23   hope and expect to be in the position to mine approximately

24   15,000 bitcoin a day.  And so, Judge, this mining business,

25   which is wholly owned by a Debtor is, we think, a potential

Page 37

1    very valuable source of recovery for our stakeholders, for

2    our customers.  It gives us the ability to literally mine

3    bitcoin; which could be relevant in terms of a repayment in

4    kind or, to the extent that we can, repayment in kind type

5    plan.  And so, the mining business, Your Honor, we think is

6    interesting and in a world where the crypto market rebounds,

7    we think it has the potential to be quite valuable.

8            And I should say, it makes money today, Judge,

9    even at these prices.  So, to the extent the market

10   improves, it becomes that much more valuable.

11           Page 11, Judge, I have a slide here that talks

12   about things we used to do historically from a deployment

13   point of view.  We're not doing any of these things during

14   the case.  And if we ever do, we'll come back to you for

15   approval.  So, unless Your Honor has any questions, you

16   know, maybe I'll just move on.

17           Now, going to page 13, Judge, assets by program,

18   asset breakdown.  So, this is a useful slide, Your Honor,

19   when you think about what we were talking about before when

20   you were asking about the custody accounts.

21           In terms of our cryptocurrency assets, 77 percent

22   of those are held through the Earn program; approximately 4

23   percent of those are held through the Custody program.

24   Approximately 15 percent of those were provided in

25   connection with collateral for a loan.  And approximately 4

1      percent of our crypto assets consist of the CEL token, which

2      is a company-generated cryptocurrency that acts somewhat

3      like a rewards program, Judge.  But when you look at, you

4      know, the assets that we have on hand, the vast majority of

5      those, are cryptocurrency assets held pursuant to the Earn

6      program.

7                  THE COURT:  Thanks to this, Mr. Nash, I saw that

8      securities fraud action filed against the Debtor and against

9      officers and directors in the District of New Jersey.  Is

10     that right?

11                 MR. NASH:  I think that's right, Judge.

12                 THE COURT:  Was it filed before or after the

13     Petition was filed?

14                 MR. NASH:  It was filed before, I'm told.

15                 THE COURT:  Are there other securities -- I guess

16     the gist of the allegations, as I understand it, is that the

17     award program is actually a security, unregistered security.

18     Is that the gist of it?

19                 MR. NASH:  I think that is the gist of that

20     lawsuit, yes, Judge.

21                 THE COURT:  Are there other similar actions

22     against either any of the Debtor or non-Debtors here, or

23     against any other crypto company, Voyager or Debtors or non-

24     Debtor.  So far, I haven't seen that many that have filed

25     bankruptcy so far, but there are some and you know, I got a

1    chapter 15 case with three arrows.  So, there may be more of

2    these.  But are there similar kinds of securities fraud

3    actions that have been filed?

4                MR. NASH:  I'm not aware of another securities

5    fraud action, Your Honor.  But I do want to make a certain

6    disclosure, and I'm going to read this carefully.  With

7    regard to regulatory oversight and the regulatory, you know,

8    framework or dynamic, there is significant regulatory

9    uncertainty in the cryptocurrency industry.  Celsius has

10   been working cooperatively with US regulators since before

11   the pause, to respond to information requests and inquiries.

12   Since the pause, Celsius has received additional regulatory

13   inquiries, and the company is continuing to work

14   cooperatively with regulators to address their questions and

15   requests.  The investigations relate primarily to compliance

16   with federal and state securities laws.

17                THE COURT:  Did the Debtors change their practice

18   at some point, only to make certain programs available to

19   qualified investors?

20                MR. NASH:  You know, Judge, I know that happened

21   as of April of 2022, it was no longer possible to be a

22   participant in the Earn program if you were a US-based non-

23   accredited investor.  That's right.  Any more questions,

24   Your Honor, before I move on?

25                THE COURT:  No, why don't you move on, go ahead.

Page 40

1                MR. NASH:  All right, so the events leading to

2      chapter 11, Judge.  I'm working off of page 15.  And here, I

3      think it's important to highlight, Your Honor, we're not

4      here because of losses we suffered, you know, directly

5      attributable to the collapse of Terra Luna.  We're not here

6      because of losses suffered directly related to the collapse

7      of Three Arrows.  I mean, we lost a relatively de minimis

8      amount of money, and I'll speak to it specifically in a bit.

9                But we're really here because of the collateral

10     consequences of the contagion, and a lack of confidence, on

11     account of the customers; which led to a rapid increase in

12     the pace and level of withdrawals.  But we're not here

13     because of, you know, a one or two or three specific -- with

14     the benefit of hindsight -- wrong investment or loan

15     decision, for example, made by the company.

16               So, as Your Honor is very familiar with, and many

17     paying attention here today are familiar with, 2022 has been

18     marked by a massive selloff in traditional assets.  The

19     financial press has characterized the current climate as a

20     risk-off environment.  The cryptocurrency market hasn't been

21     immune to this risk-off environment.  If anything, it's been

22     hit even harder than the market generally.  And we've got a

23     graph here on this page, Your Honor, that shows the price of

24     bitcoin and Ethereum, and just how much they've

25     underperformed, the underwhelming performance of the Dow

Page 41

1    Jones Industrial Average and the S&P 500.

2              As of June 22, Your Honor, the crypto market lost

3    2 trillion, approximately 2 trillion of value from its 3

4    trillion market cap peak in November of 2021.  As of June

5    22, 72 of the top 100 digital assets had dropped more than

6    90 percent from their all-time highs.

7              So, that's the general macro environment.  And

8    then you definitely had a couple of specific circumstances

9    or developments in the May-June timeframe, that really

10   contributed to a run on the bank.  And one of those, for

11   sure, is an early May -- the well-publicized Terra Luna

12   collapse, which resulted in the evaporation of approximately

13   $50 billion in market value over a three-day period.

14             Now, Celsius' loss is attributable to the Terra

15   Luna collapse, are approximately only 15.8 million.  So,

16   from that perspective, while 15.8 million is still a lot of

17   money relative to the company's asset base, and relative to

18   the losses many other investors sustained, that is not why

19   we're here; not because we lost $15.8 million to Terra Luna.

20             What wasn't helpful is that in the immediate wake

21   of the collapse of Terra Luna, there was a relatively

22   widespread and completely misleading Twitter and social

23   media commentary linking Celsius to a proposed bailout of

24   Terra Luna, with the market perception being that if Celsius

25   was focused on bailing out Terra Luna, it must have a lot of

Page 42

1    exposure to Terra Luna.  And we have the ability to track --

2    and this chart, which isn't all that easy to read, Judge,

3    but at the bottom left, as you get towards the end, the

4    second bar from the right, that's May of 2022.  And you

5    know, we have our highest level of withdrawals ever there in

6    the month of May.  And we don't have anywhere close to a

7    corresponding number of new deposits.

8              Also, in May, you know, we have the well-

9    publicized, by the traditional financial media, and social

10   media, coin basis 10Q and coin basis disclosure; their

11   inclusion of our new risk factor, apprising their customers

12   of the possibility that in an insolvency proceeding, they

13   might be treated as general unsecured creditors.  I recall

14   reading about that, back in May when, you know, that

15   disclosure was made and it received that financial media

16   press and that coverage.

17             THE COURT:  Hold on, before you go on Mr. Nash,

18   there's someone speaking in the background.  Please mute

19   your line.  Greg, are you able to determine who is speaking

20   and mute them?  Greg is my --

21             GREG WHITE:  I did just notice a couple that went

22   on mute.  I just muted them.  I don't hear any longer.

23             THE COURT:  Thank you.  Okay, go ahead, Mr. Nash.

24   I just encourage anybody, if you're not -- Mr. Nash should

25   be the only one whose line is not muted as he's talking.  Go

Page 43

1    ahead, Mr. Nash.

2              MR. NASH:   Thank you, Judge.   So, we've got the

3    Terra Luna, we've got the Terra Luna collapse in May.   We've

4    got the Coinbase disclosure in May which, again, impacted,

5    you know, market confidence in platforms like Celsius.   And

6    then, in June, as Your Honor is definitely familiar with,

7    because you're hosting the recognition proceeding, we had

8    the insolvency or the collapse of Three Arrows Capital,

9    which has had and will likely continue to have collateral

10   consequences for crypto investors who have significant

11   exposure to Three Arrows Capital.   But that's not the case

12   with respect to Celsius.   As disclosed in our papers,

13   Celsius has a claim of approximately $40 million against

14   Three Arrows Capital; not something that we're, you know,

15   happy about.   But also, not the reason that we're here

16   today.

17             The reason that we're here today is the general

18   macro environment, and a couple of these very specific, very

19   public, very high profile collapses, to cause, right, a lack

20   of confidence in the program, in the platform; a concern

21   over the safety of their assets on the platform, those being

22   customers and, effectively, a run on the bank.

23             And as the company was endeavoring, in the early

24   part of June, to both satisfy customer withdrawal requests,

25   and satisfy the need to post additional collateral where it

Page 44

1   was the borrower, and had a need to protect existing

2   collateral.  Because if you don't protect the existing

3   collateral, you run the great risk that the lender

4   liquidates the collateral at a trough, and you end up losing

5   a lot of value that way.

6           As we got increasingly into June, in advance of

7   June 12, Judge, that just became untenable.  And on June 12,

8   the Celsius Board unanimously made the difficult, but in its

9   view necessary, decision to lower the gates.

10           And this is important.  I think it's a concept

11  that Your Honor can appreciate, but if you're someone who's

12  sitting out there and you've got money, you know, value

13  you've deposited on the platform and now you can't get it,

14  you're not nearly so sanguine, and we understand that and we

15  appreciate that.

16           But the reality is, is that before the gates were

17  closed, what was happening is those customers who were first

18  to the exit, were recovering a hundred cents.  And so those

19  customers, who were the first to leave the platform, the end

20  up doing just fine.  Those are our most loyal customers, or

21  customers who are at least open to seeing if we can ride it

22  out.  They get left holding the bag, so to speak.  And so,

23  the pause was put in place with full knowledge of the impact

24  that it would have in the community and the marketplace, to

25  their own reputations.  And frankly the, you know, social

Page 45

1   media feedback -- blowback I want to say, and the customer

2   blowback -- none of it is a surprise, I don't think.  But

3   the reality is, is that the pause was necessary in order to

4   preserve the asserts that the company has, so that they can

5   be ratably and equitably distributed to all of the

6   platform's customers.

7              And when you think about -- and I'm wrapping up

8   here, Judge -- but when you think about some of the aspects

9   of my presentation here this afternoon, the pause was put in

10  place to make sure we get a handle on the assets that were

11  existing as of June 12.  Leading up to the filing, very

12  reasonable steps and appropriate steps in my view were taken

13  to bring our cryptocurrency assets back to our platform and

14  remove the over collateralization and the possibility of

15  third-party risk.  And, you know, since the Petition may be

16  going forward, it's not going to be business as usual.

17  We're not going to have a circumstance where what otherwise

18  might have been ordinary course, could lead us to lose

19  valuable crypto assets; thereby rendering academic some of

20  these interesting legal issues that Your Honor is going to

21  have the opportunity to make new law on.

22              And so, our goal here as we move forward, as I

23  said at the outset, we look forward to the committee being

24  formed.  We anticipate it will be a customer committee.  I

25  pledge that we are going to be open and transparent with the

Page 46

1    customer committee.  It's not lost on us that a

2    reorganization of that platform is not going to succeed

3    without the buy-in of our community.  So, it would be a

4    fool's errand to be anything other than open and transparent

5    with the official representative of our customers.

6              But that's what we're going to endeavor to do.  We

7    believe we've got some valuable assets that we can

8    reorganize around.  And with that, I'm going to, I guess,

9    ask Your Honor if you have any questions, but also, thank

10   you very much for indulging me and giving me the opportunity

11   to somewhat laboriously take you through all this.

12             THE COURT:  That's been very helpful, Mr. Nash.

13   One of the things that you may be reluctant to do, but I ask

14   that you consider -- it may be some weeks away before there

15   is a committee, committee counsel.  You should at least

16   consider establishing a dedicated email address at your

17   firm, so that if unrepresented customers of the Debtors want

18   to communicate, they can send emails to a particular email

19   address and you and your colleagues will decide whether to

20   respond.  I think, from some of the large cases I've had in

21   the past with a lot of retail customers, there can often be

22   frustration when they don't feel there's anyone listening to

23   any of their questions.  It may be that you can't answer

24   some of the questions.  But I think, to the extent you're

25   able to be transparent about how things are going --

Page 47

1    certainly once there's a committee in place, that will be

2    another avenue where people will reach out.  But in would

3    certainly encourage you to find a way that customers with

4    questions can at least direct their questions to somebody

5    who, hopefully, can provide some responses.  So, a question

6    about first day motion.

7              MR. NASH:  Thank you, Judge, we're going to do

8    that, take you up on that suggestion.  I think it's a good

9    none.  And with that, Your Honor, thanks again.  Personally,

10   it's great to be back in the Southern District of New York,

11   and I'm going to hand the podium over to my partner, Mr.

12   Ross Kwasteniet.

13             MR. JOHN:  Your Honor, it's Dennis John.  I have

14   one question for the Court, if I may.

15             THE COURT:  Please, go ahead.  Remind me who

16   you're representing.

17             MR. JOHN:  For the record, this is Dennis John

18   from Milbank LLP.  We represent several holders of the

19   Debtor's series B preferred equity.  And I have some

20   comments to make about the structure and the preferred's

21   perspective on the case, which I can do now, Your Honor, or

22   in connection with the cash management order; whichever the

23   Court prefers.

24             THE COURT:  Let's deal with it when we get to the

25   cash management.

Page 48

1          MR. JOHN:  That's fine.

2          THE COURT:  And I certainly will here you, Mr.

3     John.  Let me say, who from the US Trustee's Office is

4     appearing today.

5          MS. CORNELL:  Good morning, Your Honor.  Shara

6     Cornell at the Office of the United States Trustee.

7          THE COURT:  Good morning, Ms. Cornell.  Let me

8     give you a chance to see if there's anything you want to

9     address preliminarily, and also, my question is, have you

10    yet solicited for a committee when you anticipate being able

11    to do that.  Go ahead.

12         MS. CORNELL:  Sure.  At the outset, we have

13    solicited for a committee.  The return date is actually this

14    Wednesday, so we hope to have a committee formed promptly

15    for Your Honor.  And just for Your Honor, information, we

16    already have quite a bit of creditors or customers that are

17    interested in the committee, so I think it will be a robust

18    process.

19         THE COURT:  I can imagine it will be.  Are there

20    any other comments you want to make at this time, Ms.

21    Cornell?

22         MS. CORNELL:  I can make them with respect to the

23    individual motions.  But I just wanted to reiterate some of

24    Your Honor's comments from earlier, and I think that they're

25    similar to what our office was concerned with, with this

Page 49

1    case.  And that is with overall visibility with respect to

2    what the assets are, what the business structure is, and how

3    some of that information was relayed in the 1007 statement.

4            I'm happy to give examples to Your Honor now, or

5    with respect to individual motions.  But that's something

6    that we're going to be looking at very closely now and

7    throughout this case.

8            THE COURT:  If you have comments that are more

9    general than the specific motions, why don't you go ahead

10   and make them now.

11           MS. CORNELL:  So, with respect to visibility and

12   the need for transparency, specifically, the 1007 failed to

13   give information about the regulatory actions that Your

14   Honor mentioned earlier; both state regulatory action, cease

15   and desist letters.  And we currently are not aware of, but

16   there may be foreign regulatory actions out there.  They're

17   a little bit harder for us to find, but I think that

18   information needs to be shared with the group.

19           I think a lot of the reasons that the Debtor was

20   holding back on some of this information, and looking for

21   more confidentiality provisions, is a fear of the market.

22   But I think that what the Debtors and this Court need to

23   need to be are of is that, while that may be a concern in a

24   lot of other cases, most of this information is already out

25   there.  And the Internet is a savvy place, particularly with

Page 50

1    respect to cryptocurrency and --

2              THE COURT:  We had (indiscernible).

3              MS. CORNELL:  But I've been able to find out more

4    details that weren't in the 1007, or they were alluded to,

5    just by a quick Google search.  So, some of those concerns

6    about confidentiality may not be as bold as the Debtor is

7    anticipating the to be.  So, I just want to draw your

8    attention to those overarching concerns and I'll speak up

9    with respect to the individual motions as they come up.

10             THE COURT:  And certainly, what I would expect,

11   and it's been true in other cases I've had, your office is

12   not shy about raising its concerns.  And I encourage you to

13   talk to Mr. Nash and his colleagues.  It may be that

14   supplemental disclosures would help.  Because I do think

15   here that, you know, transparency and credibility are going

16   to be keys to making this all work, this process work.  So,

17   I do encourage you to talk to Mr. Nash and his colleagues.

18   I'm sure he's got a large team that's working on this.  I

19   appreciate your comments, Ms. Cornell.

20             MS. CORNELL:  And I should say that the team over

21   at Kirkland has been very helpful with us since before the

22   filing, and we were in communication over the weekend.  And

23   the information is slowly trickling in, but we're working to

24   firm it up for Your Honor and for all of the public.

25             THE COURT:  Thank you very much, Ms. Cornell.

Page 51

1          MS. CORNELL:  Thank you.

2          THE COURT:  All right, Mr. Nash, which one of your

3     colleagues is going to pick up now?

4          MR. KWASTENIET:  Good afternoon, Your Honor.  It's

5     a good segue.  Ross Kwasteniet from Kirkland & Ellis on

6     behalf of the Debtors.

7          I just want to echo the recent colloquy.  We have

8     been engaged many times, including over the weekend -- I

9     again, want to share Mr. Nash's compliments and appreciation

10    to the Office of the United States Trustee for working

11    around the clock and over the weekend, to comment on our

12    first days, give us their feedback and to, as much as

13    possible.  And I think we'll be able to achieve it, to have

14    a relatively smooth hearing.  Not to say that there won't be

15    discussions around particular language, on particular orders

16    as we go through.  But overall, I think we've agreed to --

17    you know, we've made a lot of progress.  And one of the

18    things we have discussed is filing a separate seal motion

19    with respect to some of the information that we think needs

20    to or ought to be sealed.

21          There was an important category that hasn't come

22    up in discussion yet, or at least not in this colloquy,

23    which is personally identifiable information that would be

24    subject to restriction or a prohibition on publishment under

25    EU and UK law.  That is something that we are engaged in

Page 52

1    discussions with European and UK regulators.

2              This is an issue that, you know, I've done many

3    cross-border cases.  It's an issue that there is a

4    resolution to and I'm confident we'll be able to find one.

5    But any time you have the intersection of conflicting and,

6    in some cases, competing requirements -- disclosure on the

7    one hand, versus nondisclosure on the other -- that requires

8    a little sensitivity.  And we're aware that Your Honor has

9    broker compromises in the past about sharing the information

10   with the US Trustee and maybe, you know, doing a code or

11   something for the information that's public.  All of that

12   are things that we're aware of and we're welcome to and we

13   will, of course, continue that conversation.  But we're

14   already pretty well down the field in at least fleshing out

15   and making sure that both sides understand some of the

16   competing issues and concerns and considerations.

17             THE COURT:  Thank you.  Go ahead.

18             MR. KWASTENIET:  Well, Your Honor, I'm tasked with

19   kicking us off on the agenda today.  Before we dive into the

20   agenda, I wanted to note that we did file a declaration from

21   Robert Compagna.  This was filed at Docket 22.  Mr. Compagna

22   is a Managing Director of Alvarez and Marsal.  He has over

23   25 years' experience advising distressed companies, and he

24   leads the A&M team working on a Celsius engagement.

25             Mr. Compagna's declaration was filed specifically

Page 53

1      in support of the first day motions.  And Mr. Compagna is on

2      the line.  I believe I saw him earlier on the video box, and

3      is available to testify to the extent that any party wishes

4      to cross examine him.  But given that his declaration serves

5      as the underpinning for the relief we're requesting,

6      including the establishing the Rule 6003 need for avoiding

7      imminent and irreparable harm, I would move his declaration

8      into evidence at the outset to streamline our presentation.

9               THE COURT:  All right, does anybody have any

10     objections.  All right the Compagna declaration, which is

11     ECF Docket 22, was filed on July 14, 2022, is admitted in

12     evidence.

13               (Compagna Declaration Admitted Into Evidence)

14               THE COURT:  I have both the Compagna declaration,

15     ECF 22 and the Mashinsky declaration, ECF 23, in front of

16     me, so I can refer to it as need be.  But why don't you go

17     ahead and offer the -- I assume you're going to offer the

18     Mashinsky declaration as well.

19               MR. KWASTENIET:  We're happy to, Your Honor,

20     although we don't think that we necessarily need to.  The

21     Mashinsky declaration was more of the background, how we got

22     here.  We wanted to tell Your Honor the story and tell the

23     community the story.  It's not so much the basis for the

24     relief.  The critical declaration for the first day motions

25     is the Compagna declaration, Your Honor.

Page 54

1          THE COURT:  That's fine.  I read the Mashinsky

2     declaration about three times and I'm still trying to

3     understand cryptocurrency markets and how they all work.

4     But go ahead.

5          MR. KWASTENIET:  Very good, Your Honor.  I also

6     just wanted to note at the outset, before jumping into the

7     agenda, that the Kirkland team was, of course, very mindful

8     of Rule 6003, in trying to limit the requests today to the

9     bare minimum relief new thought we needed to avoid immediate

10    and irreparable harm during the first 21 days of the case.

11    I'm sure Your Honor may have questions on particular aspects

12    of that as we go through, and we'll, of course, be happy to

13    address it.

14         But Your Honor, we also have reviewed transcripts

15    and first day orders from some of your other cases in an

16    attempt to tailor the relief that we're requesting to your

17    stated preferences in other matters.

18         THE COURT:  All right, go ahead.

19         MR. KWASTENIET:  You'll tell us if we -- how well

20    we did and maybe where we blew it or where we got it right.

21    But we did make that effort.

22         Your Honor, the first item on today's agenda is

23    the Motion for Joint Administration.

24         THE COURT:  Granted.  Move on.

25         MR. KWASTENIET:  Thank you.  Thank you, Your

1    Honor, appreciate that.

2           The next item on the agenda is the Stretto

3    retention.  We're proposing to retain Stretto as the Notice

4    and Claims Agent under 28 USC 156, as appointment of the

5    Notice in Claims Agent.  We believe this is required in

6    these cases under Rule 57, nor 50751(b) of the local rules,

7    because the number of creditors in this case is over 250.

8    In fact, the actual number of creditors in this case is well

9    over 250,000.

10          Your Honor, Stretto is highly qualified and

11   experienced, and was selected by Celsius after a competitive

12   search process involving at least two other candidates, who

13   made proposals and made pitches.  And similar to the order

14   approved in the Voyager case, where Stretto was also

15   retained, which we think does provide some additional

16   benefit here.  To the extent that we have overlapping or

17   similar issues in these two cases, having a claims agent --

18   you know, get up to speed in one and sort of be able to

19   efficiently, you know, share that sort of learning and

20   experience, in our case, we think is also beneficial.  But

21   Stretto has agreed to do two things, both of which were

22   flagged with and discussed with the US Trustee's Office

23   prior to filing the motion; one of which is they've agreed

24   to strike the limitation of liability provision in their

25   engagement letter; which was also a request in the Voyager

Page 56

1    case.  And they've agreed not to share any information with

2    or receive compensation from X claim in connection with

3    these chapter 11 cases.

4           THE COURT:  I want to make a brief statement about

5    that.  And I did review the declarations that were

6    submitted, the Stretto declaration submitted in support.

7    And I did review how it was dealt with in Voyager, and the

8    issue is also quite like had been dealt within the Madison

9    Boys and Girls Club.

10          And just so that the record is a little more

11   sketched out here, Stretto is one of a number of claims

12   agents that has entered into an agreement with Xclaim Inc.,

13   which operates, Xclaim operates a web-based market for

14   trading of bankruptcy claims.  And I am going to require

15   that Stretto's current contract with Xclaim be filed on the

16   docket in this case, even though it is being carved out of

17   coverage here.  But I want it publicly filed on the docket

18   in this case.

19          There is some uncertainty in my part whether the

20   contract originally was for exclusive access agreement and

21   whether that exclusivity provision has been altered.  But

22   the gist, as I understand it, is that Stretto had a contract

23   with Xclaim to provide Xclaim with access to the claims

24   registers and information in cases in which Stretto is the

25   claims agent; in return for which Xclaim would pay a

Page 57

1    commission to Stretto and any of the other claims agents

2    who've signed similar contracts for any claims that are

3    traded on the Xclaim platform.

4          The issue of those agreements, the Stretto

5    agreement, Epic has a similar -- at least had or has a

6    similar agreement, and perhaps some others, is whether the

7    existence of those agreements was only recently disclosed to

8    this Court.

9          And I'll speak for myself and the serious question

10   as to the propriety of such an agreement.  Stretto was

11   retained in Voyager.  It was dealt with with a change in the

12   form of the order that was approved by Judge Wiles.  In the

13   Voyager case, I've reviewed the disclosures that were made

14   here and also the carveout that was put into the proposed

15   order.

16         And at least as to that aspect of it, I'll

17   certainly hear Ms. Cornell whether the -- what the U.S.

18   Trustee could have...  I'm satisfied as to that portion of

19   it.  But, so if there are other things about the Stretto

20   retention you want to address, please go ahead and do that.

21         MS. CORNELL:  Thank you, Your Honor.  I'm sorry,

22   Shara Cornell with the Office of the United States Trustee.

23   I just wanted to echo Your Honor's comments that we're also

24   satisfied with the representations at this time.  Thank you.

25         THE COURT:  Thank you, Ms. Cornell.  Okay --

1          MR. KWASTENIET:  Okay, thank you -- thank you,

2    Your Honor.  With that, we would request entry of the order

3    approving Stretto's engagement.  We have submitted prior to

4    the hearing redlines of several other orders where the

5    language is changed a bit since what we filed, but I don't

6    believe the Stretto language has changed.  This is something

7    that we worked out prior to filing initially.

8          THE COURT:  Anybody else wish to be heard with

9    respect to the application to retain Stretto as the claims

10   and noticing agent?  It's granted.

11         MR. KWASTENIET:  Thank you, Your Honor.  Turning

12   to the next item on the agenda which is the Debtors' cash

13   management motion filed at Docket No. 21, we did submit

14   earlier this morning a revised form of order at Docket No.

15   40 with respect to the cash management order and we've had

16   subsequent conversations with the Office of the U.S. Trustee

17   about still further modifications to that order, which I'm

18   happy to walk through at the end, and then maybe with a

19   suggestion that, assuming Your Honor is inclined to enter

20   the order, that we could submit a revised version because

21   the version you have -- the latest version we've submitted

22   to Your Honor does not yet -- there have been other changes,

23   so we'll cover that.

24         THE COURT:  Go ahead with your description of it

25   and then I'll have Ms. Cornell address it.  One of my --

Page 59

1    I've had a hard time keeping track of the flow of funds

2    between Debtors, non-debtors, and that the cash management

3    system, if I'm reading the paper (indiscernible), accurately

4    keeps track of all of the transfers.  But go ahead with your

5    presentation.

6              MR. KWASTENIET:  Yeah, very good.  Thank you, Your

7    Honor.  The cash management motion that we filed describes

8    how the Debtors managed cash and cryptocurrency assets

9    historically.  As we stand here today, however, a lot of

10   that motion really does just serve to provide context on

11   where we've come from because the way that we are managing

12   cash and trypot assets going forward on a post-petition

13   basis is meaningfully curtailed when compared to prepetition

14   activities.

15             Your Honor, first, with respect to cash, the

16   Debtors do maintain treasury operating and lending accounts

17   at Signature Bank which is a U.S. authorized depository in

18   the SDNY and we anticipate continuing to use the treasury

19   and operating accounts to fund ordinary course expenses,

20   payroll, payments to vendors, and the like.

21             We also maintain three brokerage accounts which

22   are at Oppenheimer, Signature Securities, and ED&F Man.

23   Those accounts are all largely inactive at this point.  We

24   don't propose terminating those accounts because we can't

25   foresee the future.

1            There may be circumstances where it makes sense

2       after getting approval from Your Honor and consulting with

3       our constituents to liquidate one or more positions or to

4       otherwise make use of the brokerage accounts which have

5       served us well historically, but given, you know, as Mr.

6       Nash described, we are no longer doing new deployment

7       activities.  We're no longer buying, selling, trading,

8       investing cryptocurrencies.  The current need or current use

9       of those brokerage accounts is essentially nil.

10            Your Honor, we also talk in the cash management

11       motion about intercompany transfers and we've had extensive

12       discussions with the United States Trustee and I'm pleased

13       to announce that I think I'm able to simplify the scope of

14       what is going on here.  There is language that we've added

15       to the order that we'll walk you through in a few minutes

16       clarifying that we can't be transferring cryptocurrency

17       assets to non-debtors.

18            There was some concern, understandable, about

19       significant value that's in the estate today leaking out of

20       the estate to non-debtors.  And what we are proposing in the

21       interim order is that we be allowed to continue certain

22       transfers to non-debtors, but that that dollar amount be

23       capped at $300,000 U.S. for the interim period.  And I could

24       further represent to you, Your Honor, that the purpose of

25       those transfers is to fund payroll and operating expenses at

Page 61

1    the Debtors' Cypress subsidiary.  That is a facility that

2    provides back office support --

3              THE COURT:  Anybody who's -- anybody other than

4    counsel for the Debtor should have their line muted.

5              MR. KWASTENIET:  Dennis is -- Dennis, your name

6    popped up, so I don't know if you accidentally maybe bumped

7    it off of mute, but --

8              MR. DUNNE:  Think it was the other Dennis, for the

9    record.

10              THE COURT:  Shame on you, Mr. Dunne.

11              MR. KWASTENIET:  There's 30 Dennises on the line,

12    the last I saw, so I'm sure it was somebody else.

13              So in any event, Your Honor, the issue around

14    intercompany transfers and value leakage, again, I'll let

15    the U.S. Trustee speak for themselves, but by capping it at

16    $300,000 and having identified a back office support

17    function that really does benefit the Debtors because if we

18    didn't have the Cypriot operation, we'd be looking at likely

19    having to replicate that on a more expensive basis in the

20    U.S.  We think that that's an appropriate restriction on,

21    and frankly use of intercompany transfers in the interim

22    period.

23              THE COURT:  Let me ask you this.  It may be that

24    Ms. Cornell is the one to answer this, but the question I

25    had to myself was, does the U.S. Trustee, does the statute

Page 62

1    have any requirements or policies applicable to

2    cryptocurrency storage?  I certainly understand about the

3    dollar accounts and 345 -- Section 345, the need for a

4    qualified -- you know, accredited banks, but I've never had

5    this issue arise (indiscernible).

6              MR. KWASTENIET:  Well, I'm happy to start with my

7    perspective, Your Honor, which is that the code does not

8    have specific restrictions with respect to storage of or

9    management of cryptocurrency assets.  To my mind, this is a

10   pretty novel issue that's only come up, you know, very

11   recently and you know, generally speaking, when you're

12   looking at cryptocurrency assets, you know, they don't fit

13   the mold in terms of what would be deposited in bank

14   accounts and there are -- there's a whole different

15   ecosystem of companies who've developed with their own

16   specialized proprietary technology designed to most safely

17   and best handle these.

18              And so from the company's perspective, this is an

19   important topic and it's new and it's something that we will

20   have many more conversations about I'm sure, but at least --

21             THE COURT:  But this was part of the reason for

22   some earlier questions to Mr. Nash, because I asked whether,

23   for example, where the Debtor, you know, where customer

24   property is in custody accounts held by third parties or

25   where the Debtor is transferred.  I think Mr. Nash told me

Page 63

1   in the papers, certainly disclosed that at least one

2   counterparty can't find the key to unlock the account and

3   consequently hasn't been able to recover substantial sum of

4   money.

5        So whether the existing code covers it or the U.S.

6   Trustee policies have dealt with it, it's a concern of mine

7   about where the Debtor may be depositing or having third

8   parties hold crypto assets.

9        MR. KWASTENIET:  I understand, Your Honor, and

10  there's probably not a single issue in the whole lead-up to

11  this case that I've spent more time talking to people about

12  and that I've lost more sleep worrying about, and I want to

13  deal with that issue of the lost keys to approximately

14  35,000 Ether or Ethereum coins.

15       That transaction involved the Debtors' use of a

16  third party, somebody called StakeHound, to stake the assets

17  at Fireblocks.  Fireblocks is one of our biggest

18  relationships.  We store -- virtually all of the

19  cryptocurrency that we control is stored at Fireblocks.

20  Best we can tell, Your Honor, and there are legal

21  proceedings happening right now as between StakeHound and

22  Fireblocks about what exactly happened, but somewhere in

23  that handoff the keys were lost.

24       And keys is an important concept to understand.  I

25  only understand enough to give you like a very high overview

1    and then I have to bring somebody else in who could be more

2    technical.  But in order to effectuate a transaction

3    involving a cryptocurrency, you need two things.  You need a

4    public key which is readily identifiable, associated with

5    that particular kind of currency and then that needs to

6    match with a private key.  And people go through all kinds

7    of security protocols to guard their private keys.  Some

8    people will print them out on a piece of paper and laminate

9    them and put it in the safe deposit box -- hopefully not

10   under a mattress, but a physical storage of the code that is

11   needed in order to unlock the crypto.

12            Other times, they're stored in wallets

13   electronically and those wallets come in different forms.

14   There are hot walls that are tied to or connected to the

15   internet.  There are cold wallets that are not connected to

16   the Internet.  So there's a variety of ways to store this,

17   but suffice it to say, since the disappointing episode to

18   say the least from the Celsius standpoint of the lost keys

19   to the Ethereum -- and this basically mean, Your Honor, that

20   they still exist.  Nobody's stolen them.  Somebody isn't,

21   like, on the beach in Tahiti, having spent these coins.

22            THE COURT:  I wish I was as confident as you are.

23            MR. KWASTENIET:  Well, we think we know that

24   they're still there.  You can see them.  We just can't get

25   at them.  We can't access them because we lack the private

Page 65

1   key to unlock them.  So it's sort of a -- you know, it's the

2   muffin behind the bakery window when my kids are walking by.

3   They see it.  They want it.  They can't get it.  They're

4   missing the access, you know, component to it.  So --

5              THE COURT:  Let me stop you for a second, and I do

6   want to hear the U.S. Trustee and anybody else who wants to

7   be heard on this.  Assuming that I grant the relief and I --

8   you know, I've seen the revised order in that and you're

9   describing further revisions.  Whatever I agree to today is

10  for the interim period.  When there's a Committee in place,

11  I certainly want the Committee and its professionals and the

12  U.S. Trustee to do everything they can to get comfortable

13  about where, not just dollars -- I mean, the code is clear

14  in 345 about what institutions are qualified to hold funds,

15  but assuming that the code doesn't apply it, but I assume I

16  have the authority to say no, can't keep it there anymore.

17             But I obviously would be heavily guided by what

18  the U.S. Trustee and the Committee does.  You know, given

19  the apocalypse of -- in the crypto, worldwide crypto

20  markets, I'm very concerned that, you know, today I'm

21  dealing with Celsius and tomorrow there may be others in

22  this Court or elsewhere.  And I don't think you want to find

23  out and I don't want to find out that any substantial value

24  was possession, custody, or control of a third party that

25  winds up in insolvency proceedings here or elsewhere in the

Page 66

1    world where you can't find the people.

2              MR. KWASTENIET:  I understand that, Your Honor,

3    completely and I have asked many questions along those

4    lines.  And I can report to you that the responses that I've

5    gotten back are, A, that we have learned from the StakeHound

6    situation where keys were lost and now the crypto that we

7    store at Fireblocks, we maintain the keys.  Nobody else

8    does.  And this is referred to as a self-custody solution.

9              So in talking to the CEO, I asked him if it was

10   fair to analogize this to renting a storage locker within a

11   safe storage facility where you alone have the lock and the

12   key to the lock.  You own what's in that storage locker and

13   you can get it out anytime and the storage facility does not

14   have the key and they don't have an ability to access your

15   stuff, at least if it's a reputable storage company.

16             THE COURT:  Mr. Nash stated early on in the

17   hearing today that among the legal issues that may well have

18   to be decided is with respect to Celsius customers who had a

19   custody agreement with Celsius --

20             MR. KWASTENIET:  Yes.

21             THE COURT:  -- legal relationship that was

22   created, do they really have a right to them.  So, you know,

23   Mr. Nash himself acknowledged that there are legal issues or

24   customers of Celsius as to what rights they have in what

25   they thought were custody accounts and I -- at this stage, I

Page 67

1    have no reason to believe that those same issues wouldn't

2    arise if the counterparties to Celsius where you believe you

3    have these lockboxes, in effect, in the event of their

4    insolvency, the same issues don't arise.  So this is really

5    -- it's a concern of mine.  Okay?  It was a concern before I

6    heard Mr. Nash said this -- let's move on from there and

7    finish up with your presentation on the cash management,

8    then I'll hear from Ms. Cornell.

9                MR. KWASTENIET:  No -- thank you, Your Honor.  The

10   next point that I was going to cover was the actions we're

11   taking to safeguard the crypto assets.  I hear you loud and

12   clear.  This will be an important topic of conversation.

13   Just a few last points to note, Your Honor, is that we have

14   never -- Celsius has never suffered a loss or a hack of

15   crypto assets that are within our control.  We believe that

16   we have exceptionally good security.  We have made

17   investments in third parties who have not lived up to or

18   been able to return or promptly return some of the crypto

19   we've placed.

20          There have been hacks on third party systems, but

21   from Celsius' founding, Celsius has not been the subject of

22   a hack and I have -- I take a lot of comfort in the fact, in

23   their track record and the folks at Celsius are extremely

24   dedicated to this and focused on it.  All conversations that

25   we will have with the Committee, further conversations with

Page 68

1    the U.S. Trustee, and at any time with Your Honor, this is

2    among the most important issue in the case because we don't

3    want next week Three Arrows Capital, you know, for us to

4    come in and say, Judge, we've lost it all.  It was all --

5    you know, it was all pledged over here or something.

6            But as I understand it, Judge, we have control and

7    custody over the crypto.  It remains ours.  Title is ours

8    and it's in a lockbox for -- again, trust, verify.  More to

9    come, but I believe, having spent a lot of time with the

10   company on this, that we are as well positioned as we can be

11   right now, which is not to say that there may not be other

12   better, safer solutions for storage, all of which we are

13   open to.

14           I will flag for Your Honor that the GK8 business

15   that Mr. Nash referred to at the beginning of the case, that

16   is a cutting edge top, best in class, cold wallet storage

17   business and one of the potential next steps that we have

18   identified is perhaps transferring assets into the GK8 cold

19   storage as maybe being yet a further incrementally safer

20   place to store it.  But again, those are conversations we'll

21   have with other stakeholders and report back to Your Honor.

22           THE COURT:  Okay, go ahead.

23           MR. KWASTENIET:  Your Honor, in terms of

24   irreparable harm between the cash and the crypto --

25           THE COURT:  Don't spend your time on that one.

Page 69

1           MR. KWASTENIET:  Yeah.  Okay.  Thank you, Your

2    Honor.  With your permission -- we did also agree with the

3    U.S. Trustee's office that we've got 45 days to bring

4    ourselves into compliance.  If we have to comply with 345

5    for the crypto storage, I'm not sure how that works or if we

6    ever will, but we've got 45 days to further discussions.

7    What we've proposed, if it's okay with Your Honor, is that

8    the U.S. Trustee and the company can extend that by written

9    agreement that we'd file on the docket.  If we can't reach

10   agreement on extension --

11           THE COURT:  I've done that before.

12           MR. KWASTENIET:  Yeah.  Okay.  Great.  Thank you,

13   Your Honor.  So that is reflected in the order.  And with

14   that, maybe we'd turn to, if you have it, the revised form

15   of order that we filed at Docket No. 40.

16           And I can just walk you through the changes that

17   we've agreed to make.  This is a situation, Your Honor,

18   where if we were live it'd be a little easier because I'd

19   approach and hand you a hand markup of the redline.

20           THE COURT:  What do you think?

21           MR. KWASTENIET:  Okay.

22           THE COURT:  Before you do that, let me just ask

23   Ms. Cornell, where do things stand with the U.S. Trustee at

24   this point.

25           MS. CORNELL:  Thank you, Your Honor.  Shara

1    Cornell with the Office of the United States Trustee.

2    Things stand -- we still have some, a few open issues with

3    cash management.  I'm happy to go through them with Your

4    Honor and both generally and specifically with the proposed

5    order.  I don't know if you want to wait until after the

6    Debtors' presentation, but we certainly had several issues

7    with the current iteration that was filed, I think earlier

8    this morning.

9              THE COURT:  With ECF 40?  That's the --

10             MS. CORNELL:  Yes, Your Honor.

11             MR. KWASTENIET:  And I believe we've resolved

12   those and maybe me walking through the changes that we've

13   agreed to make hopefully will address those.

14             THE COURT:  All right.  I have ECF 40.

15             MR. KWASTENIET:  Great.  So the first change, Your

16   Honor, is in Paragraph 3, and again, we would propose to

17   submit a clean, and to the extent, Your Honor, further

18   redline after the hearing, but in the new section at the

19   end, we provided that intercompany transactions being cash

20   between Debtors and their non-debtor affiliates or for the

21   benefit of their non-debtor affiliates shall be deemed to

22   be, and we're striking loans from the relevant Debtor to the

23   relevant non-debtor affiliates and we're adding in, claims

24   against and loans to the related entities.

25             So it's a similar concept, but just a little

Page 71

1    wordsmithing.  And then at the end of that sentence we're

2    adding in a limitation that I referred to earlier --

3              THE COURT:  Right.

4              MR. KWASTENIET:  -- which is that the $300,000 cap

5    in U.S. dollars.

6              THE COURT:  That's for the interim period, right?

7              MR. KWASTENIET:  For the interim period.  Correct.

8              MS. CORNELL:  Your Honor, this is Shara Cornell

9    with the Office of the United States Trustee.  I just want

10   to confirm that that $300,000 cap, it's not just valued at

11   $300,000, that it's going to be paid in USD and not in

12   crypto.

13             MR. KWASTENIET:  Correct, yeah.  Payable only in

14   U.S. dollars.  Correct.

15             And Your Honor, the next changes are really just a

16   series of --

17             THE COURT:  With that change, Ms. Cornell, is

18   Paragraph 3 acceptable to you?

19             MS. CORNELL:  I believe so, Your Honor.  I haven't

20   seen a clean version, but I believe so.

21             THE COURT:  Obviously, I'm not going to do

22   anything until I get the revised orders.  In principle,

23   that's acceptable to you?

24             MS. CORNELL:  Yes.

25             THE COURT:  All right.  Go ahead.

Page 72

1          MR. KWASTENIET:  Great.  Thanks, Your Honor.  The

2     next change is in Paragraph 5 where we're talking about the

3     post-petition management of our cryptocurrency assets and at

4     the request of the U.S. Trustee, we added in a -- for the

5     avoidance of doubt, this does not authorize intercompany

6     transactions of cryptocurrency assets from Debtors to non-

7     debtors during the interim period, and we were fine with

8     that.

9          We proposed further language dealing with the

10    circumstance where we might want to transfer assets to the

11    GK8 non-debtor affiliate that we spoke about, but the U.S.

12    Trustee's office thought that that was better -- something

13    better discussed with the Committee, they'd want more

14    information about it, and so we agreed to strike that

15    request for the interim period.

16         THE COURT:  Ms. Cornell, with that change in

17    principle is that -- you've got to see the final language --

18    in principle resolve your concerns?

19         MS. CORNELL:  Yes.

20         THE COURT:  Okay.  Go ahead.

21         MR. KWASTENIET:  Great.  And I believe the last

22    change, Your Honor, is in new Paragraph 6 from the version

23    we filed earlier today.  We added that the Debtors are

24    authorized but not directed to sell any Bitcoin mined by

25    Debtor Celsius Mining, LLC.  This I think, we're also fine.

Page 73

1    The leading from this order but with a preview that this

2    will likely be something that comes up again for the final

3    order.   The Celsius Mining business, what it does is --

4              THE COURT:  So --

5              MR. KWASTENIET:  -- uses computer equipment to

6    generate Bitcoin that it then sells.  It can, in theory,

7    hold for its own account, but right now, it is completing

8    finalizing the acquisition of the remaining mining equipment

9    that it has bought on installments, finalizing the build-out

10   of a facility.  So at this point, part of its own cashflow

11   plan, unless it needs a further infusion from the parent, it

12   will need to sell the Bitcoin at fair market -- we will talk

13   to the Committee about the appropriate parameters.

14             THE COURT:  Just to understand, for now, you're

15   going to come back with a final order where you want that?

16             MR. KWASTENIET:  That's correct, Your Honor.

17             THE COURT:  All right.

18             MR. KWASTENIET:  We're okay deleting it for now,

19   but it will be an important part of how the mining business

20   funds itself on a go-forward basis.  And I believe that that

21   was it in terms of further changes to the cash management

22   order, so after the hearing, Your Honor, we propose to

23   email.  Would you like a redline to the Version 40?

24             THE COURT:  I would.

25             MR. KWASTENIET:  Okay.  Very good.  We will do

1    that and we will --

2              THE COURT:  Clean and redline.

3              MR. KWASTENIET:  Great.  We will copy Ms. Cornell

4    on that also and --

5              THE COURT:  I think you know, but the email

6    address -- chambers' email address is

7    MG.chambers@NYSB.USCourts.gov.

8              MR. KWASTENIET:  I think that Ms. Golden may have

9    that on her speed dial, Your Honor, but yes.  Thank you.

10   Your Honor, that --

11             MR. DUNNE:  May I be heard --

12             MR. KWASTENIET:  -- that's --

13             MR. DUNNE:  -- in connection with cash management?

14             MS. CORNELL:  And me as well, Your Honor.

15             THE COURT:  First Ms. Cornell then Mr. Dunne, if

16   you want to address this, I'm absolutely going to give you a

17   chance to talk about it.  Go ahead --

18             MS. CORNELL:  Thank you.  I just wanted to discuss

19   a few overarching issues with respect to cash management and

20   they -- possibly how they relate to some of the other

21   motions.  And it goes back to that issue of transparency I

22   mentioned earlier and some of the information missing from

23   the 1007 and maybe from the motion itself.

24             We need more information from the Debtors about

25   the transfer of their crypto assets and -- or transferring

Page 75

1      to cash between Debtors and non-debtor affiliates.  The

2      business practice really needs more information about, as

3      you mentioned earlier, about the how, but we also really

4      need to know about the why.  Why are they transferring the

5      assets regularly between different Debtor and non-debtor

6      entities and how much and what is the benefit to the company

7      in the past and now going forward in light of the change in

8      market?

9              And we worked diligently with Debtors' counsel to

10     limit a lot of this language, but there are still some

11     concerns about these intercompany transfers and how much

12     information we're getting and the speed in which we're

13     getting it.  As the Debtor indicated earlier, we asked them

14     to change some of the language about the loans.  We are

15     concerned about non-debtor entities and their ability to

16     repay any loans made by the Debtor now or in the future and

17     that's something that we're going to be considering

18     particularly because we don't have a great handle on the

19     Debtors' practices, both historically and going forward with

20     respect to its crypto assets and how they're being

21     transferred.

22             THE COURT:  I -- and I just -- let me, that was

23     one of my major concerns when I worked on this over the

24     weekend as well, and one of the questions I have, and I

25     don't know whether this is something you've addressed with

Page 76

1      the Kirkland folks, are there any intercompany services

2      agreements that govern the Debtors' payments of non-debtor

3      employees.  That was one of the areas in which they're

4      proposing to do, so -- and beyond that.  It's really any --

5      there are other services that some of the non-debtors

6      provide.

7              Are there agreements that define what they're

8      doing, what they're being paid or compensated for?  Those

9      were among the questions I had when I reviewed this over the

10     weekend.

11             MR. KWASTENIET:  Understood, Your Honor.  We will

12     track that down with the company and to the extent there are

13     intercompany agreements that govern, we will provide those

14     to the U.S. Trustee's office, to the Committee, to Your

15     Honor if you'd like to see them or if it becomes relevant.

16             THE COURT:  If there aren't agreements, then I

17     think it's important that you provide the U.S. Trustee and

18     the Committee when it's in place with historical practice so

19     that there is no sudden spike in the intercompany transfers.

20     What were the amounts that have been transferred in the

21     past, what were they for, how was it documented.  You know,

22     are there entries made --

23             MR. KWASTENIET:  Fair enough, Your Honor, and one

24     of the things that we're expecting to do here is we don't

25     have a DIP and we don't have a use of cash collateral

Page 77

1    because nobody has a lien on our cash collateral, and so we

2    don't have the conventional DIP budget, you know, that might

3    otherwise apply, but we are envisioning likely some sort of

4    a budget or schedule of anticipated, just to give people

5    context around these intercompany transfers.  It's something

6    I don't have fully developed today, but something that we

7    will work with the parties on developing going forward.

8              THE COURT:  I think you'd go a long way to giving

9    some comfort to a Committee and its professionals and the

10   U.S. Trustee if they could understand what the payments been

11   made, historically what they've -- if there are no current

12   written agreements, put some parameters around them, limits

13   (indiscernible) the interim period -- I'll stop there.  I'm

14   not trying to -- I'm trying to understand at this stage.

15   Okay?

16             MR. KWASTENIET:  No, understood and appreciated,

17   Your Honor.

18             THE COURT:  Mr. Dunne, you wanted to speak, too.

19             MS. CORNELL:  Your Honor, if I may?  I still have

20   just a few more points I'd like to bring up to Your Honor's

21   attention.

22             THE COURT:  Go ahead.

23             MS. CORNELL:  Thank you.  I just wanted to -- you

24   had mentioned the custodial account before and I just wanted

25   to mention two things.  The first one, I just want to

Page 78

 1   confirm that the pause -- I guess capital P, Pause -- has

 2   prevented depositors from making any withdrawals from those

 3   accounts at this time.

 4            MR. KWASTENIET:  Yes.

 5            MS. CORNELL:  And then, so the depositors retain

 6   title, but there appears to be a statement that in the event

 7   of insolvency the depositors may be unsecured.  So this just

 8   may be an issue going forward, but we wanted to highlight it

 9   for Your Honor that it's something that we're looking into

10   and we are concerned about.

11            THE COURT:  Me too.

12            MR. KWASTENIET:  Yeah, the title remains with

13   depositors under the custody program, but the assets are

14   comingled and so it's a more straight -- it's a more

15   complicated analysis than the customers who deposit under

16   the earn program where the terms and conditions there

17   provide clearly and unequivocally that title transfers and

18   that once Celsius has title it's free to use, sell, pledge,

19   et cetera.  Like, and on the blockchain also, Your Honor, if

20   you look at, okay, who's the owner of the crypto that got

21   transferred, Celsius shows up as the owner of that.

22            So that, I think is -- not to say that somebody

23   may not come in with a creative argument or, you know, say

24   it was a constructive trust or something.  We can deal with

25   all of that when and if it comes up and we're frankly not

1   taking any actions today that prejudice somebody from making

2   that argument, but just in terms of how we see the world, we

3   think that is not a close call in terms of those assets

4   being property of the estate.

5            And again, back to Mr. Nash's point, roughly 95

6   percent of the assets transferred to Celsius by customers

7   came in from -- through that earn program where we think

8   it's clear that those are assets of the estate, property of

9   the estate.

10           THE COURT:  -- $180 million dollars.  It may have

11  only been 5 percent of it, but $180 million --

12           MR. KWASTENIET:  Correct.

13           THE COURT:  -- lot of money.

14           MR. KWASTENIET:  It's -- and it's there and we're

15  not doing anything with it and people's rights are reserved

16  and that's a topic for another day.

17           THE COURT:  All right.  Ms. Cornell, is there

18  anything else you wanted to say now?

19           MS. CORNELL:  Just one more thing.  I want to

20  confirm that all disbursements, not just the disbursements

21  to the Cypress entity, will be in USD.

22           MR. NASH:  Yes.  We are not planning to pay

23  anybody in cryptocurrency.  And we understand, Miss Cornell,

24  your office also does not want to be paid in Ether or

25  Bitcoin.  There could be upside in it, but, you know, could

Page 80

1    be downside.

2            MS. CORNELL:  Thank you.

3            THE COURT:  All right.  Any other issue for now,

4    Ms. Cornell.

5            MS. CORNELL:  No, Your Honor.  Thank you.

6            THE COURT:  Mr. Dunne, you wanted to be heard.

7            MR. DUNNE:  Thank you, Your Honor.  Good

8    afternoon.  And for the record, Dennis Dunne from Milbank on

9    behalf of several of the Series B Preferred holders.

10           I just wanted to focus the Court on some of the

11   perspectives that the Series B Preferred had because they

12   kind of all landed on this cash management order and a lot

13   of our comments with respect to tracking intercompany

14   transfers as loans having maximum transparency I think are

15   comments and language fixes kind of overlapped with and

16   dovetailed with the U.S. Trustee's.

17           But with the Court's indulgence, to just give you

18   a sense of how the preferred sees these issues, as well as

19   the case.  In the fall of last year, the Debtors closed on

20   their largest capital raise by far.  The Series A came in

21   before, but it was about 30 million.  The Series B is nearly

22   $700 million of investments, and it all came in at the U.K.

23   parent, Celsius Network, Ltd.

24           One point related to that is given the total

25   enterprise value at that time -- and we all wish it was true

Page 81

1    today -- that was not a controlled transaction, so that the

2    founders still retained control then and they do now, and

3    they own the common stock and the common corporate

4    governance rights there.

5            We understand that the money that was raised last

6    fall was used principally to fund the buildout of the mining

7    rigs and the data mining business, as well as the purchase

8    of a GK entity.  That's important because, as Your Honor saw

9    from Mr. Nash's presentation, the corporate chart -- and

10   this is where it's a little different than Voyager, right.

11   Voyager doesn't have the additional business lines that

12   Celsius has.  This looks a bit like a conglomerate that owns

13   and manages, you know, several different business lines in

14   different legal entities.

15           And as you've heard, you know, the U.S. customers

16   are in the U.S. Delaware, LLCs.  The U.K. parent owns that

17   entity but has separate silos as well where the mining rig

18   flows up into the U.K. parent, as well as the GK8 entity.

19   We were very focused on making sure that that separateness

20   was tracked and maintained, both in the cash management

21   order and elsewhere, so that we could all figure out later.

22   I mean, you know, I can talk about the key legal issues on

23   Page 3, but that's all for a future date and let's see what,

24   you know, the committee has to say about them.

25           I think the role today is to make sure that we

Page 82

1    don't inadvertently change the realities that existed on the

2    petition date by, you know, post-petition actions or failure

3    to account properly.

4            Your Honor, this is a different case than I've

5    been involved, frankly, in the sense that the absence of,

6    you know, bank debt, the absence of bondholder debt, no debt

7    for borrowed money at all means that I think we, the

8    preferred equity, are going to play a larger role than you

9    might see other preferred equity holders play in cases where

10   that debt existed.

11           And I say that because, as Your Honor knows, it's

12   the ad hoc committees of bank or bond debt that often raises

13   and joins issues with the Court.  And here on top of that

14   where you have significant value flowing directly up into

15   the U.K. parent, we expect to play an important and active

16   role in these cases.

17           But with respect to the relief today, and

18   particularly cash management, we commend the Debtors for

19   spending a lot of time with us to kind of go through our

20   concerns and obviating the need for an objection with the

21   language changes that the Court has heard about and we

22   support the entry of the relief today.

23           I guess more broadly, we remain optimistic about

24   the prospects of a reorganization for certain aspects of the

25   Debtors' business and believe with sufficient time and

Page 83

1   stability stakeholders should receive substantial

2   distributions.  The Debtors' decision to file when they did,

3   you know, fixes that liability but also, hopefully, has

4   mitigated the noise around that's been endemic I think since

5   the pause on June 12th.

6        And we hope that provides a breathing spell where

7   the parties can get together and have a pathway for the

8   company to maximize value for all stakeholders and we look

9   forward to being actively involved in negotiations on,

10  hopefully, a consensual plan.

11       Thank you, Your Honor.

12       THE COURT:  If I shorten what you've said, you

13  support the cash management order with the changes that have

14  been proposed today.

15       MR. DUNNE:  Your Honor, as always, cuts through

16  it.  Yes, that's precisely.

17       THE COURT:  All right.  Is there anybody else who

18  wishes to be heard with respect to the cash management

19  motion?  All right.

20       Subject to seeing the final form of the order,

21  which hopefully will work out with Ms. Cornell and Mr.

22  Dunne, who have, you know, a dog in this hunt, so see if you

23  can get the final language worked out and submit it to

24  chambers, okay?  And indicate in the cover email that you'll

25  copy them on that the form of the order is acceptable to

1    them, okay?

2              MR. NASH:  Very good.  Thank you, Your Honor.  We

3    will do that.  With that, I am going to cede the podium --

4              THE COURT:  Assuming that will happen, assuming

5    you have their agreement, it'll be approved.

6              MR. NASH:  Great.  Thank you very much, Your

7    Honor.  With that, I'm going to cede the podium to my

8    colleague, Alison Wirtz, who is going to pick up with the

9    next item on the agenda.

10             MS. WIRTZ:  Good afternoon, Your Honor.  For the

11   record, Alison Wirtz from Kirkland & Ellis, proposed counsel

12   for the Debtors.  I will be taking us through the next few

13   items on the agenda, beginning with item number 7, the wages

14   motion.

15             The wages motion was filed at Docket No. 19, and

16   by this motion, the Debtors seek authority to pay

17   prepetition wages, salaries, other compensation, and

18   reimbursable expenses and continue employee benefits

19   programs in the ordinary course of business.

20             As with many companies, employees are the life

21   blood of the business for Celsius.  Without them, the

22   company could not operate.  As set forth in the motion and

23   the Compagna declaration, which was filed at Docket No. 22

24   and provides the evidentiary basis for this motion, the

25   Debtors employ approximately 370 individuals across 14

Page 85

1    countries, including the U.S., Australia, Canada, and the

2    United Kingdom, and have approximately 35 additional

3    independent contractors that provide mission critical

4    services to the Debtors in the marketing, mining,

5    engineering, and compliance functions.

6             The Debtors are seeking to pay approximately

7    668,000 in the interim period related to employee

8    compensation and benefits.  And as my colleagues have noted

9    before me, we have tried to tailor the scope of the relief

10   to that which is ultimately critical for this interim

11   period.

12            As noted in the motion, we're not seeking to pay

13   any non-insider severance, non-insider ad hoc bonuses,

14   direct compensation, nor are we seeking to pay anyone in

15   excess of the statutory cap during this interim period.  We

16   previewed the motion with the Office of the United States

17   Trustee, and they did not have any comments.

18            I would be happy to address any questions Your

19   Honor may have but, otherwise, we would respectfully request

20   entry of the order.

21            THE COURT:  If I understand it correctly, there

22   are a few employee where prepetition -- non-insider

23   prepetition employees where the amounts owed are in excess

24   of the statutory caps, but you're agreeing for the interim

25   period to limit payments to the statutory cap.

1          MS. WIRTZ:  Correct, Your Honor.  On an interim

2     basis, we're not seeking anything above the statutory cap.

3          THE COURT:  So the other question I had is from

4     reading the papers, it looked to me that the Debtor was

5     seeking authority to modify benefit plans.  And I want to be

6     sure that this does not -- I don't inadvertently bless what

7     would be described as KEIPs or KERPs.

8          MS. WIRTZ:  To Your Honor's question about

9     modifying existing benefits programs, we're not seeking to,

10    in any way, increase whatever the ordinary course historical

11    practice processes have been in place.

12          With regard to any sort of retention or insider

13    programming, we're merely trying to maintain on a post-

14    petition basis the existing programs consistent with

15    historical practices.

16          THE COURT:  All right.  Ms. Cornell, do you want

17    to be heard?

18          MS. CORNELL:  Your Honor, I have no objection to

19    the interim relief requested.  Thank you.

20          THE COURT:  Okay.  Does anybody else want to be

21    heard with respect to the wages motion?  It's ECF Docket No.

22    19 is the motion.  Hearing no objection, the motion is

23    granted.

24          MS. WIRTZ:  Thank you, Your Honor.  The next item

25    on the agenda is the Debtors' critical vendors motion, which

Page 87

1    was filed at Docket No. 20, and following discussions with

2    the U.S. Trustee, we filed a revised proposed order at

3    Docket No. 37.

4            By this motion, the Debtors seek entry of an order

5    authorizing but not directing the Debtors to pay in the

6    ordinary course of business prepetition amounts owed on

7    account of critical vendor claims, foreign vendor claims,

8    lien claims, and 503(b)(9) claims.

9            We are seeking a total of 3.76 million on an

10   interim basis.  In addition, we're seeking administrative

11   expense priority for any goods that are currently in transit

12   that were ordered prior to the petition date but have yet to

13   arrive.

14           Given the complex global nature of their business,

15   the Debtors' trade partners are critical to their worldwide

16   operations.  Within the category of critical vendors, a

17   substantial number of these are associated with the

18   construction of the minings that are in Texas that has been

19   discussed previously.

20           As mentioned earlier, the Debtors have made

21   significant investments in the construction of the mining

22   center and are currently rushing to complete the final

23   aspect of the center.  Once completed in approximately two

24   months, the mining center is expected to be a critical

25   source of value and any delays at this stage in the

Page 88

1   construction process would negatively impact the Debtors'

2   ability to operate and it could jeopardize the long-term

3   growth and revenue strategy.

4          Since this project is nearing completion, it's

5   imperative that we have authority to continue paying these

6   critical vendors to avoid any delays or issues of completion

7   of the project.

8          Now there had been some questions about where

9   these payments are going with respect to the mining center,

10  and I would like to address those quickly.  The payments

11  that are earmarked for the mining operations are all

12  earmarked to be paid for vendors that are contracting on

13  behalf of Celsius Mining, LLC.  There are no hard assets

14  that sit at the Israeli entity that sits below the Delaware,

15  LLC, and none of the critical vendor payments would be

16  diverted in any way to that non-debtor entity.

17         There are some additional critical vendors that

18  provide other critical services, including platform

19  products, that relate to technology, operations, and

20  finance.  And then finally, we seek to pay certain 503(b)(9)

21  claims, certain foreign vendors, and latent claims.

22         THE COURT:  Let me just understand because I think

23  this was a question I had for Mr. Nash.  I had a little

24  trouble understanding.  Looking back to the slide deck, I'm

25  looking at the organizational chart and there are two

1    entities that the first two names are Celsius Mining.  One

2    is Celsius Mining, LLC, which is a Debtor, and then Celsius

3    Mining -- I can't tell what the next initial are -- Ltd.

4               MS. WIRTZ:  I believe it's IL, Ltd.

5               THE COURT:  IL, Ltd., okay.  Tell me the

6    difference between them.

7               MS. WIRTZ:  Yes.  So the Celsius Mining, LLC, the

8    Delaware entity that is a Debtor entity is the entity that

9    holds all of the main operations of the mining center in

10   Texas, and this is the entity that any critical vendors

11   would be interfacing with and that would be the Debtor

12   entity that is going to be the one ultimately paying any of

13   these vendors.

14              The Celsius Mining IL, Ltd., the Israeli non-

15   debtor corporation -- or entity, apologies -- that entity

16   was created for certain employment reasons, but it does not

17   actually hold any of the operating assets.

18              THE COURT:  Okay.  Anything you want to add before

19   I see if anybody else wants to be heard?

20              MS. WIRTZ:  I was just going to note, as mentioned

21   before, we previewed this motion with the U.S. Trustee and

22   have incorporated their comments to the order.

23              And again, I would like to echo my colleagues and

24   thank Mr. Cornell and her team for their collaboration and

25   flexibility throughout this process.  They went above and

Page 90

1    beyond in making themselves available as we went through

2    turns of these motions and orders.  And I understand it's,

3    you know, been a process to get all of the information over,

4    but we really appreciate them making themselves available

5    and we look forward to continuing the dialogue as we share

6    information on the vendors and vendor payments going

7    forward.

8              THE COURT:  If I understand correctly, it's $3.76

9    million on an interim basis for the next 21 days?

10             MS. WIRTZ:  That is correct, Your Honor.

11             THE COURT:  And what's the total that you would be

12   seeking?

13             MS. WIRTZ:  On a final basis, we are seeking 6.52

14   million.

15             THE COURT:  Okay.  Ms. Cornell, do you want to be

16   heard?

17             MS. CORNELL:  Yes, Your Honor.  Shara Cornell at

18   the Office of the United States Trustee.

19             I just wanted to highlight a few issues for the

20   Court with the critical vendors motion in this case.  We've

21   been very slow to get information and $3.7 million is a lot

22   of money and it's a lot of money for payments at the

23   discretion of the Debtor and it's a lot of money to be spent

24   on an industry where we're not sure where the future

25   benefits lie.

1           And with that being said, the Debtors need to meet

2    the doctrine of necessity for a critical vendor motion, and

3    I'm not sure that they have met that in this case.  We only

4    just recently received -- my office received a list of the

5    intended critical vendors, but we still don't know which

6    entity each critical vendor relates.

7           We certainly don't know which critical vendor or

8    trade claimant belongs to this mining facility, we don't

9    know which are foreign, and that's a lot of information that

10   we really need to know in order to understand the necessity

11   for these payments, in particular with this mining facility.

12   I understand that construction is underway and that there

13   may be only two more months of construction, but I don't

14   know if that's true.  I don't know the timeline.  I don't

15   know what, in fact, has been constructed, what needs to be

16   constructed.  And I also don't know if it's going to be

17   benefiting the estate and I think that's best served for a

18   committee to evaluate.

19           THE COURT:  Does anybody else wish to be heard

20   with respect to the critical vendor motion?

21           So, Ms. Cornell, let me ask you this.  I agree

22   completely about the importance of transparency and

23   information sharing.  Can you tell me in more detail what

24   specific information you're asking to receive and whether

25   you believe the Debtor is being responsive in providing you

Page 92

1    with the information you're asking for.

2          MS. CORNELL:    Sure.  So the Debtor, as I

3    understand it, is working -- is trying to work diligently to

4    get us the information; however, it's been very slow.  And

5    it's been slow even though the Debtor has known how much

6    money it's needed since the filing of this motion, which is

7    curious to me that we just got the list just within the hour

8    before this hearing, but they knew they needed $3.7 million

9    over a week ago, and I'd like to see that information come

10   more quickly.

11         And I also think it's really important that we

12   know for which entity these different payments are going

13   because they all seem to do different things and I don't

14   have a good grasp on what those different things are, other

15   than the fact that there's one mining company that I don't

16   believe is currently operable but has cost the Debtor a

17   considerate amount of money and I'm not clear if

18   construction may or may not be the best avenue for the

19   Debtor at this time.  Why not just consider liquidating its

20   assets and move on?  We don't know.

21         MS. WIRTZ:  If I may address some of those points.

22   So as was discussed previously in Mr. Nash's presentation,

23   we believe that the mining segment is a unique segment that

24   offers value to the enterprise going forward, and we have

25   worked to provide additional detail on that.

1          In terms of the overall status of the project, as

2     Mr. Nash noted, we currently have part of the whole site up

3     and running and are currently mining approximately 14.23, I

4     believe, Bitcoin per day, which is considerable value as of

5     today.  The construction that we are working to complete has

6     to do with the final fourth of the overall mining center.

7     There are three areas that are currently completed and we're

8     working on the fourth set.

9          To give you a little bit more context on how much

10    the 3.76 million is in the aspect of -- in relation to the

11    enterprise as a whole.  In terms of investment on the site

12    build, there has already been approximately 27 million

13    invested to date and approximately 11.7 million of that was

14    spent in June when construction really got underway in

15    earnest.

16         And so, we come to the unfortunate situation where

17    the Debtors have filed Chapter 11 in the midst of a project

18    that had considerable investment, is nearing completion, and

19    we just want to make sure that we are not disrupting the

20    operational potential for the company because they chose to

21    file Chapter 11 now rather than two months from now when

22    this plant is fully -- when the mining center is fully

23    complete.

24         THE COURT:  So I'm looking at the blackline,

25    Paragraph 4:  "The Debtors will provide the U.S. Trustee by

Page 94

1    email with a list of holders of each category of trade

2    claims set forth and the function and the amounts owed as of

3    the petition date."  I'll stop reading, but it's within

4    seven days; you do this within seven days of the change in

5    characterization of such claim holder or amounts owed.  I'm

6    actually not sure what that means.

7              So what I've done in some other cases -- you know,

8    I don't necessarily say that has to be here -- is the Debtor

9    provides -- you know, and I perfectly understand that

10   debtors usually don't want to tell the world which of their

11   favorite creditors that they want to pay prepetition claims,

12   okay.

13             So I've usually required that list to be given to

14   the U.S. Trustee and/or committee -- well, there's no

15   committee -- and, you know, give the U.S. Trustee a very

16   short time, like 24 hours, to say yes, no, maybe.  And if

17   you can't resolve it, well, you can urgently arrange for a

18   telephone hearing or a Zoom hearing with me and I'll resolve

19   it.

20             But I didn't understand from the blackline is this

21   looks like an after-the-fact kind of thing.  You pay who you

22   want, and you give them a list within seven business day and

23   what do they do then.  So they're not -- you know, I've

24   usually found the U.S. Trustee quite responsive if you give

25   them the information.

1            And I'm not sure I share all of Ms. Cornell's

2    concerns about is the mining business -- you know, is the

3    cryptocurrency mining business the best business for the

4    Debtor to be engaged in.  I believe that's a business

5    judgment issue for the Debtor and not something for me or

6    the U.S. Trustee to decide, okay.  They're entitled to an

7    explanation, and I think they need the explanation before

8    they say, okay, go ahead.

9            This, of course, is the order for the interim

10   period.  I agree with Ms. Cornell in the aggregate, $3.76

11   million is a lot of money, but in the larger scope of the

12   case, I'm not sure that it is.

13           So why can't you give the U.S. Trustee the list

14   tomorrow of here's who we want to pay, these are the amounts

15   we want to pay it, this is what it's for, and give them a

16   very, you know, no more than a day turnaround to say, yes,

17   no, whatever.

18           MS. WIRTZ:  Yes, Your Honor, we would be amenable

19   to that.

20           THE COURT:  Ms. Cornell, does that solve some of

21   your problems?  I mean, look, neither you nor me are the

22   ones who ought to make this business judgment in the end.

23   Yes, this is a different sort of issue with respect to

24   critical vendor payments.  You make payments of prepetition

25   amounts, and you potentially benefit those creditors to the

Page 96

1    exclusion of others who would be entitled to equal

2    distributions.

3            But I think this can be, particularly for the

4    interim period, if they tell you tomorrow these are the ones

5    we feel we got to pay right away, these are the amounts,

6    this is what it's for, this is what they're doing.  And if

7    you don't agree, you get a hearing, you'll get a telephone

8    hearing.

9            MS. CORNELL:  I would also -- Your Honor, Shara

10   Cornell with the Office of the United States Trustee.

11           Because we'd like the Court to be aware of the

12   critical vendors and what is in the motion that they're

13   approving, I think that it would be appropriate for the list

14   to also be with the Court.

15           THE COURT:  Yes, I get that list.  So the list

16   under seal goes to the Court, to the U.S. Trustee, and a

17   committee once it's in place.

18           MS. WIRTZ:  We're amenable to that, yes.

19           THE COURT:  Does that work for you, Ms. Wirtz?

20           MS. WIRTZ:  Yes.  Thank you, Your Honor.

21           THE COURT:  Why don't you -- look, I will come up

22   -- I'm not going to wordsmith this change.  You've got the

23   concept that I think is appropriate.

24           MS. WIRTZ:  Yes.

25           THE COURT:  I think you and Ms. Cornell will be

1    able to work out this language, assuming that you come up

2    with -- and I'll see whether anybody else wants to be heard

3    on this issue before ruling.  But subject to hearing anybody

4    else, I'd be prepared to approve on an interim basis the

5    critical vendor motion if it's adjusted more or less in the

6    lines of what I've talked about.  Will that work for you,

7    Ms. Cornell?

8           MS. CORNELL:  Yes, Your Honor.

9           THE COURT:  Ms. Wirtz.

10           MS. WIRTZ:  Certainly.  We will plan to work out

11    the language with the Office of the U.S. Trustee and,

12    similar to the cash management order, send you a revised

13    proposed order after the hearing.

14           THE COURT:  That's fine.  Does anybody else want

15    to be heard on the critical vendor motion?  All right.  Not

16    hearing anybody else, go forward on that basis, Ms. Wirtz,

17    okay.

18           MS. WIRTZ:  Excellent.  That turns us to the next

19    item on the agenda, which is the Debtors' case management

20    procedures motion, which is filed at Docket No. 15.

21           As is customary in complex Chapter 11 cases, the

22    Debtors seek entry of an interim order approving and

23    implementing the notice of case management and

24    administrative procedures.  Given the size and the scope of

25    the filing and the number of parties in interest in these

1   cases, we view these procedures as a guidepost and believe

2   that these procedures will facilitate the efficient

3   administration of these Chapter 11 cases.

4        Unless Your Honor has any questions, we would

5   respectfully ask that the Court enter the order on an

6   interim basis.

7        THE COURT:  Ms. Cornell.

8        MS. CORNELL:  That's fine, Your Honor.

9        THE COURT:  All right.  Ms. Wirtz, once there's a

10   committee in place, I frequently wind up making some

11   adjustments in the procedures.  So on an interim basis, it's

12   approved, okay?

13        MS. WIRTZ:  Thank you, Your Honor.  Yes, we

14   anticipate that a committee would have feedback and look

15   forward to working with them at that time.

16        THE COURT:  Okay, thank you.

17        MS. WIRTZ:  Thank you, Your Honor.  The next item

18   on the agenda is the Debtors' creditors matrix motion, which

19   was filed at Docket No. 18, and this morning, we filed a

20   revised proposed order at Docket No. 38.

21        By this motion, the Debtor seeks authorization

22   to redact personal identifying information, specifically

23   individuals' home addresses and in some instances pursuant

24   to the U.K. and EU GDPR regulations, and we seek to redact

25   these names and personal identifying information from the

1   creditor matrix, schedules and statements, and other

2   documents, such as affidavits of service and fee

3   applications.

4           As a bit of background and as previewed by Mr.

5   Nash in his opening, given these cases have generated a lot

6   of press and social media commentary.  With that, certain

7   employees have been receiving death threats and hate mail.

8   Without the requested relief, the Debtors would be required

9   to publish individuals' home addresses without their

10  knowledge or consent, and we worry that this could escalate

11  certain situations.

12          One issue that has arisen after we filed the

13  creditor matrix motion is that we received certain

14  communications from scheduled corporate creditors stating

15  that corporate principals have been receiving death threats

16  and hate mail as well.  We informed them that we would raise

17  this concern with the Court at today's hearing.

18          In sum, we feel we've crafted what we believe is a

19  rational solution that adds a minimal step for the public to

20  access the creditor matrix and other documents.  The Debtor

21  is proposed to provide an unredacted version of the creditor

22  matrix, schedules and statements, and any other filings

23  redacted pursuant to the proposed order to the Court, the

24  U.S. Trustee, counsel to any official committee appointed in

25  these Chapter 11 cases, and any party in interest upon a

Page 100

1    reasonable request to the Debtors or to the Court that is

2    related to these Chapter 11 cases.

3            Nothing precludes a party in interest from the

4    right to file a motion requesting that the Court unseal the

5    information redacted by this order.  In discussions with the

6    U.S. Trustee, they requested and we agreed to have the

7    redaction relief requested in this creditor matrix motion

8    entered only on an interim basis pending the Debtor's filing

9    of a separate sealing motion for final relief.  That sealing

10   motion will be filed in time to be heard at the second day

11   hearing and we wanted to make sure that we noted that on the

12   record.

13           So unless Your Honor has any questions, we would

14   respectfully request entry of the order.

15           THE COURT:  So I had an emergency motion that I

16   heard last Tuesday morning in Three Arrows, and I commented

17   it was the first time as a judge I can remember anybody

18   wanting to seal a certificate of service.  And the Latham

19   partner who argued it said it was the first time he'd made

20   such a motion, and he wasn't aware of it.

21           So look, yes, I'm very sensitive about parties who

22   are receiving threats of violence.  But with all due

23   respect, that doesn't fit within the 107(b) grounds for

24   sealing.  I will hear Ms. Cornell.  I'm prepared to grant

25   this relief on an interim basis.

Page 101

1           But I have to tell you I have quite a few opinions

2     that deal with 107(b) and (indiscernible) I've been

3     sensitive in other cases to if foreign law, for example,

4     protects information that U.S. law doesn't protect and a

5     creditor is a citizen of the foreign nation, I'm often

6     sensitive to, and I believe I've carved out -- you know, if

7     there's a showing that foreign law precludes the

8     identification of a credit under specific circumstances, the

9     way I've dealt with it is the code sheet that I have the

10    code, the U.S. Trustee has the code and they have the code.

11    But I'm not a big fan of sealing information because I don't

12    think the code permits it.

13          But Ms. Cornell, do you want to be heard?

14          MS. CORNELL:  Yes, Your Honor.  Debtor's counsels'

15    representations are correct.  However I would just like to

16    ask that we set a deadline for the filing of the motion, not

17    just that it will be heard at the next hearing but all

18    proper parties have time too, particularly because we have

19    some foreign creditors on the creditors committee.

20          THE COURT:  Well, tell me when we're going to have

21    a creditors committee.

22          MS. CORNELL:  Well, when are we going to have a

23    second day hearing?

24          THE COURT:  Well --

25          MS. CORNELL:  But I --

1           THE COURT:  -- I want a committee in place --

2           MS. CORNELL:  -- to set the motion to be filed by?

3     Two weeks?

4           THE COURT:  We'll work it out.  Let me tell you,

5     because I really -- in a lot of these things, I really want

6     a committee with professionals in place to take position on

7     these.  And as well, look, I've commented before on sealing

8     motions, it's ordinarily your office that carries the

9     laboring war on this.

10          MS. CORNELL:  Yeah

11          THE COURT:  I want you to try and agree with the

12    Debtors' counsel on a date, the deadlines.  File a letter on

13    the docker and get agreement.  If you can't, I will set the

14    date, okay?  I really would like to have committee

15    professionals involved because I really do want to hear from

16    them on it, okay?

17          In the hearing last week in Three Arrows, part of

18    what -- there was actually an arbitration that already was

19    started in the United States against Three Arrows and they

20    don't want to disclose who commenced the arbitration.  And I

21    pointed them to an opinion that I wrote in Motors

22    Liquidation Company.  I inherited it from Judge Gerber in

23    2016.  So I wrote an opinion specifically about identifying

24    a party who was actually a plaintiff in litigation against

25    the avoidance action or the trust in GM.  So, and I have a

Page 103

1    bunch of sealing opinions.

2            But Ms. Cornell, work out -- see if you can work

3    out a date.  I really want a committee in place to do this.

4    I'm only granting this relief on an interim basis, and we'll

5    see what happens after that, okay?

6            My regular courtroom deputy is on vacation today.

7    I think she'll be back later this week.  So you'll need to

8    hold off.  We'll talk about other dates before we finish

9    today, okay?  We will set some dates.  Okay.  All right.

10           MS. WIRTZ:  Certainly --

11           THE COURT:  Ms. Wirtz, so I'm granting the relief,

12   okay?

13           MS. WIRTZ:  Thank you, Your Honor, and certainly

14   we will discuss the dates further and, as necessary, we're

15   happy to brief the issue under 107(c).

16           THE COURT:  Just to say, it may well be that I'm

17   going to decide the motion on the briefs and without

18   scheduling another hearing.  I've dealt with 107(b) a lot.

19   So we'll see.  Work out -- work out with Ms. Cornell a date

20   for filing the motion, briefing the motion and I'll reserve

21   the right to schedule a hearing after I see the briefs,

22   okay?

23           MS. WIRTZ:  Understood, Your Honor.  Thank you.

24   That brings us to the next item on the agenda which is the

25   SOFAs and scheduled extension motion.

1           By this motion, the Debtor seeks entry of an order

2     extending the deadline to file schedules and statements by

3     the earlier of 30 days or seven days before the 341 meeting

4     and extending the deadline by which the Debtors must file

5     their initial reports of financial information with respect

6     to entities in which the Debtors hold a controlling or

7     substantial interest as set forth under Bankruptcy Rule

8     2015.3 to the later of 30 days after the 341 meeting and 44

9     days from the petition date.

10           Prior to filing the Chapter 11 cases, we previewed

11     this motion with the United States Trustee and incorporated

12     their request that we make clear the extension is until the

13     earlier of 30 days or seven days before the 341 meeting just

14     to be sure that the schedules and statements are available

15     ahead of the 341.

16           So unless Your Honor has any questions, we

17     respectfully request entry of this order.

18           THE COURT:  Ms. Cornell?

19           MS. CORNELL:  That's correct, Your Honor.  The

20     schedules will be filed in advance of the 341 meeting.

21     We're working with the Debtor to come up with a date that

22     works for everybody.

23           THE COURT:  Okay.  Granted.

24           MS. WIRTZ:  Excellent.  Thank you, Your Honor.

25     And with that, I will turn the podium over to my colleague,

1    Mr. Simon Briefel, to take us through the remaining items on

2    the agenda.  Thank you.

3              THE COURT:  Thank you very much.

4              MR. BRIEFEL:  Good afternoon, Your Honor.

5              THE COURT:  And before Mr. Briefel begins his

6    presentation, I always disclose this when one of my former

7    law clerks appears before me in a matter.  What year was it,

8    Simon?

9              MR. BRIEFEL:  It was a long time ago now.  It was

10   probably 2017.

11             THE COURT:  It seems like only yesterday, but go

12   ahead.

13             MR. BRIEFEL:  That's right.

14             THE COURT:  Nice to see you.

15             MR. BRIEFEL:  Nice to see you as well.  So for the

16   record, Simon Briefel, of Kirkland & Ellis, proposed counsel

17   to the Debtors.

18             So as my colleague, Ms. Wirtz, mentioned, I will

19   be taking us through the balance of the agenda for today, if

20   that works for Your Honor.

21             THE COURT:  Go ahead.

22             MR. BRIEFEL:  All right.  So the next item on the

23   agenda is the Debtors' insurance motion which was filed at

24   Docket Number 16 and which seeks entry of interim and final

25   orders authorizing the Debtors to pay their obligations

Page 106

1    under their prepetition insurance policies, to continue to

2    pay certain brokerage fees and to maintain their surety bond

3    program.

4            Our insurance policies and our surety bond

5    programs are essential to the preservation of the value of

6    the Debtors' business, their property and their assets and

7    their ability to successfully administer these Chapter 11

8    cases.

9            Your Honor, as we explain in our papers, we do not

10   believe that there are any amounts that are currently

11   outstanding under the insurance and surety bond programs.

12   However we are still requesting interim relief under Rule

13   673 because in this instance we are adding in the ordinary

14   course of business additional coverage for our building and

15   construction sites that my colleagues mentioned in relation

16   to the mining business.

17           And so the premium that will be due under that

18   policy and under that coverage will become due on August

19   13th which is around the time that we think the second day

20   hearing is going to be scheduled.  And so we are asking for

21   that relief in the interim as a comfort in the even that we

22   are not holding that hearing before then.

23           THE COURT:  What is the amount, Mr. Briefel?

24           MR. BRIEFEL:  It is -- I think it's $1.5 million.

25           THE COURT:  Okay.  All right.  Go ahead.

Page 107

1          MR. BRIEFEL:  Excuse me.  Excuse me.  I don't

2     think that's the right amount.  It's much smaller than that.

3     It should be on here.  It is -- I can get back to you on

4     that number.  I think I had it somewhere.  I will find it

5     and let Your Honor know.

6          THE COURT:  Okay.  That's fine.  Go ahead.

7          MR. BRIEFEL:  I think it was $80,000.

8          THE COURT:  All right.  Go ahead.

9          MR. BRIEFEL:  Thank you.  So we discussed that

10    point with the Office of the United States Trustee, who I

11    understand was satisfied with it and does not object to

12    entry of that interim order.

13          And I will finally note, Your Honor, that the

14    interim order on that respect expressly provides that

15    there's nothing in the interim order that authorizes the

16    Debtors to accelerate any payments that are not otherwise

17    due under the Debtors' insurance program and surety program

18    prior to the date of the final hearing, and that's at

19    Paragraph Number 7.

20          THE COURT:  All right, and you also included in

21    this motion a request for authority to pay some surety bond

22    premiums; am I correct?

23          MR. BRIEFEL:  Yeah.  That is right.  It's also

24    part of the relief.  But as I mentioned, we don't think

25    there's any amounts that are due under the surety bond

Page 108

1    programs either.  But we are just asking for that relief as

2    a comfort in the event that any amount that we may not know

3    about may become due or to have the ability to modify the

4    existing surety program or enter into new ones.

5              THE COURT:  Ms. Cornell?

6              MR. BRIEFEL:  Other than that, Your Honor, if you

7    have any --

8              THE COURT:  Ms. Cornell, do you want to be heard

9    on the insurance?

10             MR. BRIEFEL:  Oh, I apologize.

11             MS. CORNELL:  Yes, Your Honor.  Again, Shara

12   Cornell, with the Office of the United States Trustee.  The

13   insurance -- I had a different understanding of the status

14   of this insurance motion.

15             The insurance motion is largely a comfort order.

16   There are no known premiums or payments due.  The Debtors

17   have nothing that's prepared to lapse in the next 21 days.

18   The Debtors have just given us some vague information that a

19   new policy will be entered on the mining site.  But we don't

20   know what the current policy is or why they need new

21   insurance or the extent of the new insurance.

22             And we just learned of this just prior to the

23   hearing.  But I don't believe we have the requisite details

24   to evaluate the new policy and that a committee would be

25   better -- would be the -- it would be better to have a

Page 109

1    committee in place.

2            But if Your Honor's prepared to enter the

3    insurance order, I think it should be more narrowly tailored

4    to include just this one policy that the Debtor is looking

5    to enter into.

6            THE COURT:  Mr. Briefel, do you want to address

7    that?

8            MR. BRIEFEL:  Your Honor, I mean, we'd defer to

9    your judgment.  But we think it's important for the Debtors

10   to have the ability, should they need to have that ability,

11   to change their programs in the interim period.  It is true

12   that there is only that one single policy that we're trying

13   to pay the premium for.  But we do think we need that

14   flexibility in the interim period.

15           THE COURT:  Well, let me -- let's see if we can do

16   it this way.  I'll certainly approve the motion for the

17   payment of the one premium that's due.

18           With respect to any other insurance or surety bond

19   payments the Debtor believes it needs to make in the next 21

20   days, consult with the Office of the U.S. Trustee and if

21   they provide their consent, I'm satisfied if this is done by

22   email, if I'm told this is what you're going to pay, what

23   you want to pay and you indicate you've gotten the consent

24   from the Office of the U.S. Trustee, I'll certainly approve

25   that as well.

Page 110

1          But for now I'm only approving the amount that you

2     know is currently due, okay?

3          MR. BRIEFEL:  Yeah.  Sounds good.  Thank you.

4          THE COURT:  Ms. Cornell, is that satisfactory?

5          MS. CORNELL:  Yes, Your Honor.  Thank you.

6          THE COURT:  All right.  Go ahead, Mr. Briefel.

7          MR. BRIEFEL:  Thank you, Your Honor.  All right.

8     So going to the next item on the agenda is the Debtors'

9     taxes motion that was filed at Docket Number 17.  That

10    motion seeks entry of interim and final orders authorizing

11    the Debtors to remit and pay taxes and fees in the ordinary

12    course of business that are payable or will become payable

13    during these cases.

14          Your Honor, it is crucial, of course, that the

15    Debtors be allowed to pay and continue paying these taxes

16    going forward because failure to pay taxes may subject the

17    Debtors to various fines and penalties as well as, in

18    certain cases, the accrual of interest.

19          Your Honor, we are requesting approval of an order

20    on an interim basis here under Rule 6003 because we have

21    estimated there is approximately $1.5 million worth of

22    customs and import duties that will become due during the

23    interim period and that's the reason we're requesting also

24    entry into an interim order.

25          THE COURT:  As I understand it, Mr. Briefel, the

Page 111

1    $1.5 million is the amount that's estimated to be due in the

2    interim period.  The approximate total amount accrued and

3    unpaid as of the petition date for all -- not just the

4    customs duties.  The customs duty is the $1.5 million.  But

5    for all taxes, it's $22 million.

6              MR. BRIEFEL:  That's right.  The amount that we're

7    seeking on a final basis is $22 million.

8              THE COURT:  Okay.  But on the interim basis, just

9    the $1.5 million?

10             MR. BRIEFEL:  That's correct.

11             THE COURT:  Ms. Cornell?

12             MS. CORNELL:  Thank you, Your Honor.  A couple of

13   things.  So $1.5 in customs and import duties, the Debtor

14   hasn't paid customs or import duty taxes since 2020.  That's

15   what their motion clearly states.  So they haven't made

16   these payments in over a year-and-a-half.  And it's unclear

17   to me why now, what's different and have there been

18   delinquency notes or actions by foreign governments with

19   respect to these.

20             And my second point is they owe $1.5 million in

21   customs and import duty taxes that haven't been paid since

22   2020.  They owe almost $20 million in sales and back taxes

23   that haven't been paid since 2020.  Both of these should

24   have been, in my understanding, escrowed this whole time.

25   I'm concerned --

Page 112

1           THE COURT:  We're only dealing with what relief

2     they want on an interim basis.

3           MS. CORNELL:  I'm just trying to understand why

4     they're looking to pay it on an interim basis and what

5     separates the two taxes, import and custom versus sales and

6     VAT.

7           THE COURT:  Mr. Briefel, can you address that?

8           MR. BRIEFEL:  Yeah, of course.  So my

9     understanding of the amounts first that are due under the

10    customs and import duties is that these amounts are not any

11    -- and aren't related to any amounts that may be outstanding

12    and delinquent.

13          On the other hand, this is relating to mining rigs

14    that the Debtors are importing from overseas and which are

15    currently sitting with the customs authorities.  And so as

16    soon as these rigs are cleared by customs, a payment will be

17    due.  And so we ask for that relief because clearance of the

18    rigs that are currently in customs may happen any day now

19    and so we want the ability to pay for these duties.

20          THE COURT:  Okay.  All right.  The relief is

21    granted on an interim basis, the $1.5 million.

22          MR. BRIEFEL:  Thank you, Your Honor.  All right.

23    Moving next to the next item on the agenda is the NOL motion

24    that was filed at Docket Number 7.

25          As we explain in our papers, the NOL motion does

Page 113

1    not seek any substantive relief; rather, the motion is

2    purely procedural and only seeks to establish procedures to

3    allow the Debtors to monitor and object as is necessary to

4    certain transfers of the Debtors' equity into declarations

5    of worthlessness in order to protect the Debtors' tax

6    attributes.

7             We think the relief here is necessary on an

8    interim basis just because we think certain changes of

9    ownership that may happen within the Debtors' corporate

10   structure and that the NOL motion is trying to prevent may

11   certainly happen during the interim period, and so that's

12   the reason we're trying to obtain that relief in the interim

13   basis.

14            I will note for Your Honor, I'm sure you saw that

15   there was a revised order that was docketed this morning at

16   Docket Number 39.  Initially the proposed order reflected a

17   change to the procedures that we had received and discussed

18   with one of our main equity holders.  And as I'm sure you've

19   seen, that modification in the order made clear that there

20   was no requirement to file a declaration of status of

21   substantial shareholder for any equity holders of the

22   Debtors that were listed in the petitions for Celsius

23   Network, Limited.  That was the change that we had discussed

24   with one of our equity holders.

25            But subsequent -- I apologize for -- subsequent to

Page 114

1    the filing, we had a conversation with the Office of the

2    United States Trustee about that change, and my

3    understanding is that they would rather leave that change

4    out and maintain that requirement to file a declaration of

5    status for any equity holders.

6           We are fine with that change, Your Honor, and I

7    understand that counsel for the equity holders with whom we

8    had a conversation does not intend to oppose that today.

9    And so we are planning, with Your Honor's permission, to

10   submit a revised order after the hearing reflecting that

11   change and for entry by the Court after the hearing.

12          THE COURT:  All right.  Ms. Cornell?

13          MS. CORNELL:  Yes, Your Honor.  That is my

14   understanding as well, and we have no objection to the

15   motion or the proposed order.

16          THE COURT:  All right.  Does anybody else want to

17   be heard?  All right.  It's granted then.

18          MR. BRIEFEL:  Thank you, Your Honor.  The last

19   item on the agenda is the Debtors' motion filed at Docket

20   Number 6 that seeks entry of an order restating and

21   enforcing the worldwide automatic stay, antidiscrimination

22   provisions and ipso facto provisions of the Bankruptcy Code.

23          The Debtors' operations span over a hundred

24   customers and the Debtors' customers and contract

25   counterparties are located in various foreign jurisdictions

1   and may be unfamiliar with the Chapter 11 process and the

2   Bankruptcy Code.  As a result, the Debtors are seeking an

3   order enforcing the automatic stay to make clear what the

4   stay is and what actions it prohibits.

5          In addition, upon the commencement of the Chapter

6   11 cases, counterparties to contracts with the Debtors could

7   attempt to terminate these contracts pursuant to an ipso

8   facto provision in contravention to Section 362 and 365 of

9   the Bankruptcy Code and governmental units may also seek to

10   terminate certain licenses that are required for the

11   Debtors' business operations in violation of Section 525 of

12   the Bankruptcy Code.

13          Your Honor, you also probably saw this morning we

14   filed a proposed order at Docket Number 43 that reflected a

15   comment that we received this morning from the SEC making

16   clear that Paragraph 4 of the proposed order does not go

17   beyond the scope of Section 525, and we wanted to be clear

18   that governmental units are precluded from interfering in

19   any way with property of the Debtors' estate on account of

20   the commencement of the Chapter 11 cases, the Debtors'

21   insolvency or the fact that the Debtors have not paid a debt

22   that is dischargeable in the Chapter 11 cases.

23          I will note, Your Honor, before concluding that we

24   are not seeking to expand or enlarge any of the rights that

25   are afforded to the Debtors under the Bankruptcy Code but

Page 116

1    simply, you know, to seek authorization to serve a notice to

2    creditor -- to creditors, I apologize, so that we can better

3    ensure their compliance with the Bankruptcy Code.

4            We're also attaching, as I'm sure you've seen, the

5    relevant extracts of the Bankruptcy Code as attachments to

6    the proposed order so that anyone who may not be familiar

7    with the Bankruptcy Code has these provisions readily

8    available.

9            Other than that, Your Honor, we have not received

10   any other comments or objections, including from the United

11   States Trustee.  And so unless the Court has any further

12   questions, we respectfully request entry of the proposed

13   order.

14           THE COURT:  Does anybody else wish to be heard?

15   All right.  The motion's granted.  Thank you very much.

16           MR. BRIEFEL:  Thank you, Your Honor.  So I believe

17   with this, unless the Court has anything else, that ends our

18   agenda for today.

19           THE COURT:  Mr. Nash?

20           MR. NASH:  Good afternoon, Your Honor, and thank

21   you very much for patiently wading through that with us.  I

22   have nothing further.  I'm just, you know, stepping up to

23   say thank you, and if we want to talk about one, we'll come

24   back or whatnot.

25           THE COURT:  That's what we want to talk about now.

Page 117

1     Give me a second here.  Let me switch screens.  Do you have

2     a request for a specific date?  I'm looking at my calendar.

3     But do you have a specific date that you have in mind?

4              MR. NASH:  We don't, Judge.  Just, you know,

5     directionally, would you want to bring us back approximately

6     21 days from now or more like 30?

7              THE COURT:  It would be Monday, August 8th.

8              MR. NASH:  Okay.

9              THE COURT:  And let me ask, I don't know, you

10    know, there were close to 200 people at one point.  We're

11    down to 186 who are logged on.  I don't know how many people

12    in Europe, for example, have logged on.  I'm mindful of the

13    time differences.  So I would be inclined to schedule the

14    hearing for 10 a.m. on Monday, August 8th.  Does that work

15    for you?

16             MR. NASH:  It doesn't work for me, Your Honor.

17    But it does work for my partner, Mr. Kwasteniet and perhaps

18    it works for Mr. Sussberg.  So we can accommodate that date

19    if we want to keep that date.

20             THE COURT:  You tell me what you would like.

21             MR. NASH:  Well, I know I could do Wednesday,

22    August 10th, Your Honor, if that happens to be available.

23             THE COURT:  All right.  Let me look again.  I've

24    got to just switch.  I could schedule for Wednesday, August

25    10th at 11 o'clock.  I have another hearing at 10:00.  But

Page 118

1    we could do this at 11:00.

2              MR. NASH:  That'd be great, Your Honor.  Thank you

3    very much.

4              THE COURT:  All right.  Bear with me again.  So

5    we'll -- I think we should plan on going forward with the

6    hearing on August 10th at 11 a.m. on Zoom.

7              I am trying to get people to come back into the

8    courtroom, but having some difficulty at having that

9    accomplished.  It usually results in a very quick settlement

10   of whatever it is I'm trying to set for a hearing.  So, but

11   I think for the second day on these motions, I think all of

12   my colleagues, we're inclined to do all first day motions on

13   Zoom, even post-pandemic, if we reach that point.

14             So we'll go forward with Zoom.  If anybody

15   believes there are any matters coming up at which

16   evidentiary hearings are required, it's my strong preference

17   to do that in the courtroom, if possible.  But otherwise we

18   will continue with Zoom for now.  So you can give -- file a

19   notice of that hearing, Mr. Nash.

20             Again, if there are any other issues that really

21   require very prompt attention, you know, if there are any

22   disagreements about any of the forms of orders that you're

23   working out or anything like that, if you contact my

24   courtroom deputy, I'm usually able to set a hearing the same

25   day and we'll keep this moving along.

Page 119

1            MR. NASH:  Appreciate that, Judge.

2            THE COURT:  All right.  Anybody have anything else

3    they want to address?  I'll be looking for the final forms

4    of orders to be entered.  Orders should be provided to the

5    Court in Word format and they'll get entered, okay?

6            MR. NASH:  Thanks again, sir.  Thank you, sir.

7            THE COURT:  Thank you to Mr. Nash and to your

8    colleagues as well who have spoken today.  Okay.  We're

9    adjourned.

10            MR. NASH:  Thanks, Judge.

11            MR. BRIEFEL:  Thank you.

12

13            (Whereupon these proceedings were concluded at

14    4:54 PM)

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                            Page        Line

5    Motion for Joint Administration Granted   54          24

6    Application to Retain Stretto Granted     58          10

7    Wages Motion Granted                      86          21

8    Interim Relief Granted                   112          21

9    NOL Motion Granted                       114          17

10   Order Restating and Enforcing

11   Worldwide Automatic Stay Granted         116          15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 121

1                    C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  July 20, 2022

[& - 5]                                                                          Page 1

**&**

**&**   6:3 8:8,15,23
10:23 51:5 84:11
105:16

**1**

**1**   18:3
**1,750,000,000**
18:15
**1.5**   106:24 110:21
111:1,4,9,13,20
112:21
**1.61**   27:21 28:9
**1.7**   34:5
**1.9**   18:22
**10**   19:25 22:5
35:21 117:14
120:6
**10,100**   36:21
**100**   31:13,13,14
32:7,15 34:8,9,13
35:4 41:5
**100,000**   34:11
**10001**   6:17
**10004**   1:14
**10014**   7:4
**10022**   6:6
**1007**   49:3,12 50:4
74:23
**107**   100:23 101:2
103:15,18
**10964**   9:15
**10:00**   117:25
**10:41**   9:23
**10q**   42:10
**10th**   117:22,25
118:6
**11**   2:4 12:24 13:7
13:12,14 25:4
31:22 36:4,8
37:11 40:2 56:3
93:17,21 97:21
98:3 99:25 100:2
104:10 106:7

**115**:1,6,20,22
117:25 118:6
**11.7**   93:13
**112**   120:8
**112,000**   36:14
**114**   120:9
**115**   32:20
**11501**   121:23
**116**   120:11
**11:00**   118:1
**12**   44:7,7 45:11
**120**   22:5
**12151**   121:7
**12th**   12:16 83:5
**13**   37:17
**13th**   18:14 106:19
**14**   53:11 84:25
**14,560,000,000**
18:14
**14.2**   36:18
**14.23**   93:3
**14th**   10:11 18:14
**15**   3:12 37:24 39:1
40:2 97:20 120:11
**15,000**   36:24
**15.8**   41:15,16,19
**156**   55:4
**16**   4:14 105:24
**17**   4:18 110:9
120:9
**17th**   10:12
**18**   1:16 3:22 98:19
**180**   21:15 22:19
79:10,11
**186**   117:11
**18th**   8:4
**19**   2:25 31:4 84:15
86:22
**197**   14:22

**2**

**2**   18:4 41:3,3
**20**   3:7 87:1 111:22
121:25

**200**   117:10
**200,000**   35:4
**201**   7:3
**2011**   36:20
**2015.3**   4:5 104:8
**2016**   102:23
**2017**   105:10
**2020**   111:14,22,23
**2021**   31:5,20
32:19 41:4
**2022**   1:16 18:11
18:13 27:15 36:5
36:20 39:21 40:17
42:4 53:11 121:25
**2023**   36:15,22
**21**   2:19 31:4 54:10
58:13 90:9 108:17
109:19 117:6
120:7,8
**22**   9:14 11:22
18:10 41:2,5
52:21 53:11,15
84:23 111:5,7
**22-1094**   8:3
**22-10964**   1:3
**23**   11:16 53:15
**23,000**   35:8,9
**24**   94:16 120:5
**25**   52:23
**250**   55:7
**250,000**   55:9
**26**   10:11
**27**   27:15 93:12
**27th**   27:21
**28**   55:4
**2:00**   1:17 8:4

**3**

**3**   23:2 41:3 70:16
71:18 81:23
**3,114**   36:19
**3.2**   28:15
**3.7**   90:21 92:8

**3.76**   87:9 90:8
93:10 95:10
**30**   18:11,13 61:11
80:21 104:3,8,13
117:6
**300**   121:22
**300,000**   34:7,7,9
35:3 60:23 61:16
71:4,10,11
**330**   121:21
**341**   104:3,8,13,15
104:20
**345**   62:3,3 65:14
69:4
**35**   85:2
**35,000**   29:11
63:14
**362**   115:8
**365**   115:8
**37**   87:3
**370**   84:25
**38**   98:20
**39**   113:16

**4**

**4**   2:10 23:22 37:22
37:25 93:25
115:16
**4.3**   18:7,9
**40**   43:13 58:15
69:15 70:9,14
73:23
**41**   10:12
**411**   35:8,13
**43**   115:14
**43,000**   36:13
**44**   104:8
**45**   69:3,6
**47**   36:5
**4:54**   119:14

**5**

**5**   4:24 23:22 27:8
72:2 79:11

| | |
|---|---|
| **50** 22:5 41:13 | **97** 19:2 |
| **500** 41:1 | **98.5** 36:8 |
| **503** 3:4 87:8 88:20 | **a** |
| **50751** 55:6 | **a&m** 52:24 |
| **525** 115:11,17 | **a.m.** 117:14 118:6 |
| **54** 120:5 | **ability** 18:8 24:25 |
| **55** 6:16 | 25:25 26:1,9,11 |
| **57** 55:6 | 34:22 37:2 42:1 |
| **576** 32:12 | 66:14 75:15 88:2 |
| **58** 21:21 120:6 | 106:7 108:3 |
| **58,000** 21:23 | 109:10,10 112:19 |

**able** 20:2 22:22
24:11 26:17 28:22
29:20 42:19 46:25
48:10 50:3 51:13
52:4 55:18 60:13
63:3 67:18 97:1
118:24

**6**

**6** 5:5 72:22 114:20
**6.52** 90:13
**6.6** 28:16
**6003** 53:6 54:8
110:20
**601** 6:5
**648** 27:18,19
**668,000** 85:7
**673** 106:13

**absence** 82:5,6
**absent** 25:16
**absolutely** 18:1
74:16
**academic** 30:14
45:19
**accelerate** 107:16
**acceptable** 71:18
71:23 83:25
**access** 21:11 22:5
24:11 56:20,23
64:25 65:4 66:14
99:20
**accidentally** 61:6
**accommodate**
117:18
**accommodating**
11:4,8
**accomplished**
118:9
**account** 3:6 20:2
20:11,16,18,25
21:8,9,22 22:22
22:24 26:8,19
29:15 31:24 34:8

**7**

**7** 2:5 30:21 84:13
107:19 112:24
**700** 80:22
**72** 41:5
**765** 35:15,18
**77** 37:21

**8**

**8** 4:6 34:4
**80,000** 107:7
**800** 19:4
**86** 120:7
**8th** 117:7,14

**9**

**9** 3:4 34:14 87:8
88:20
**90** 41:6
**900** 18:24
**93** 36:6
**95** 79:5

35:4,5 40:11 63:2
73:7 77:24 82:3
87:7 115:19
**accounts** 18:21
19:14,19,22 20:5
23:25 25:24 29:3
29:5 32:1,3 34:6
34:11 37:20 59:16
59:19,21,23,24
60:4,9 62:3,14,24
66:25 78:3
**accredited** 39:23
62:4
**accrual** 110:18
**accrued** 111:2
**accurate** 9:12
18:8 121:4
**accurately** 59:3
**achieve** 51:13
**acknowledged**
66:23
**acquired** 32:19
**acquisition** 73:8
**act** 22:23
**action** 38:8 39:5
49:14 102:25
**actions** 38:21 39:3
49:13,16 67:10
79:1 82:2 111:18
115:4
**active** 34:6,8
82:15
**actively** 83:9
**activities** 30:16
59:14 60:7
**acts** 38:2
**actual** 55:8
**acutely** 22:6
**ad** 82:12 85:13
**add** 89:18
**added** 60:14 72:4
72:23

**adding** 70:23 71:2
106:13
**addition** 87:10
115:5
**additional** 25:3
39:12 43:25 55:15
81:11 85:2 88:17
92:25 106:14
**additionally**
22:11
**address** 9:24 15:4
23:4 39:14 46:16
46:19 48:9 54:13
57:20 58:25 70:13
74:6,6,16 85:18
88:10 92:21 109:6
112:7 119:3
**addressed** 9:23
10:9 33:2 75:25
**addresses** 98:23
99:9
**addressing** 8:19
11:24
**adds** 99:19
**adjourned** 119:9
**adjusted** 97:5
**adjustments**
98:11
**administer** 106:7
**administration**
2:4 54:23 98:3
120:5
**administrative**
2:18 3:5,11 87:10
97:24
**admitted** 53:11,13
**advance** 11:10
44:6 104:20
**advising** 52:23
**advisor** 11:20
**affairs** 4:5
**affidavits** 99:2

affiliate 72:11
affiliated 8:9
affiliates 70:20,21
  70:23 75:1
afforded 115:25
affords 13:14
afternoon 8:2,7
  8:11 9:13 10:24
  11:1 12:7,9 45:9
  51:4 80:8 84:10
  105:4 116:20
agenda 52:19,20
  54:7,22 55:2
  58:12 84:9,13
  86:25 97:19 98:18
  103:24 105:2,19
  105:23 110:8
  112:23 114:19
  116:18
agent 2:9 17:1
  55:4,5,17 56:25
  58:10
agents 56:12 57:1
aggregate 35:13
  36:6 95:10
ago 19:8 22:13
  26:4 28:17 31:22
  35:3,24 92:9
  105:9
agree 17:9 65:9
  69:2 91:21 95:10
  96:7 102:11
agreed 51:16
  55:21,23 56:1
  69:17 70:13 72:14
  100:6
agreeing 85:24
agreement 56:12
  56:20 57:5,6,10
  66:19 69:9,10
  84:5 102:13
agreements 26:20
  57:4,7 76:2,7,13

76:16 77:12
ahead 10:25 12:5
  15:12 17:13 22:25
  23:19 27:6 29:18
  29:18 30:6 39:25
  42:23 43:1 47:15
  48:11 49:9 52:17
  53:17 54:4,18
  57:20 58:24 59:4
  68:22 71:25 72:20
  74:17 77:22 95:8
  104:15 105:12,21
  106:25 107:6,8
  110:6
albeit 25:8
alex 11:13
alison 6:10 8:17
  84:8,11
allegations 38:16
allow 13:1 113:3
allowed 34:23
  60:21 110:15
alluded 50:4
altered 56:21
alvarez 11:19
  52:22
amenable 95:18
  96:18
amended 2:3
amount 18:13
  24:22 27:3,18
  35:5 40:8 60:22
  92:17 106:23
  107:2 108:2 110:1
  111:1,2,6
amounts 76:20
  85:23 87:6 94:2,5
  95:14,25 96:5
  106:10 107:25
  112:9,10,11
analogize 66:10
analysis 78:15

anger 12:20 13:2
angry 12:17
announce 60:13
answer 20:22
  46:23 61:24
answering 13:13
anti 5:3
anticipate 20:21
  45:24 48:10 59:18
  98:14
anticipated 77:4
anticipating 50:7
antidiscrimination
  114:21
anybody 16:24
  42:24 53:9 58:8
  61:3,3 65:6 79:23
  83:17 86:20 89:19
  91:19 97:2,3,14
  97:16 100:17
  114:16 116:14
  118:14 119:2
anymore 28:11
  65:16
anytime 66:13
apocalypse 65:19
apologies 16:23
  89:15
apologize 17:2
  29:16 108:10
  113:25 116:2
appear 8:23 9:18
appearances 8:5
  8:16
appearing 7:8
  48:4
appears 9:23 78:6
  105:7
applicable 62:1
application 2:7
  58:9 120:6
applications 99:3

apply 65:15 77:3
appointed 99:24
appointing 14:5
appointment 2:8
  55:4
appreciate 11:5
  15:5 16:6,9 44:11
  44:15 50:19 55:1
  90:4 119:1
appreciated 77:16
appreciation 16:2
  51:9
apprising 42:11
approach 69:19
appropriate
  45:12 61:20 73:13
  96:13,23
approval 37:15
  60:2 110:19
approve 25:25
  97:4 109:16,24
approved 55:14
  57:12 84:5 98:12
approving 2:8
  3:20 4:21 5:4 26:9
  58:3 96:13 97:22
  110:1
approximate
  111:2
approximately
  18:10,22 19:2
  20:7,9 21:4 27:18
  27:21 28:15 29:11
  32:12,20 34:5,7
  35:7,8,9 36:6,8,14
  36:18,19,21,23
  37:22,24,25 41:3
  41:12,15 43:13
  63:13 84:25 85:2
  85:6 87:23 93:3
  93:12,13 110:21
  117:5

april 39:21
arbitration
  102:18,20
areas 76:3 93:7
argued 100:19
argument 78:23
  79:2
arisen 99:12
arising 23:16
arrange 94:17
arrangement
  20:14,25
arrangements
  22:14 27:20
arrive 87:13
arrows 39:1 40:7
  43:8,11,14 68:3
  100:16 102:17,19
asked 62:22 66:3
  66:9 75:13
asking 33:11,22
  37:20 91:24 92:1
  106:20 108:1
aspect 57:16
  87:23 93:10
aspects 45:8 54:11
  82:24
asserts 45:4
assess 17:22
asset 18:6 37:18
  41:17
assets 4:2 14:2
  17:17,19 18:7,9
  18:10,13,15,16,19
  19:8,14,20 20:11
  20:12 21:3,5,8,10
  26:5,21 27:10,12
  28:3,9,13,18,21
  29:6,23 30:10
  32:21 34:17 37:17
  37:21 38:1,4,5
  40:18 41:5 43:21
  45:10,13,19 46:7

49:2 59:8,12
  60:17 62:9,12
  63:8,16 67:11,15
  68:18 72:3,6,10
  74:25 75:5,20
  78:13 79:3,6,8
  88:13 89:17 92:20
  106:6
associated 64:4
  87:17
assume 53:17
  65:15
assuming 58:19
  65:7,15 84:4,4
  97:1
assure 20:23,24
attaching 116:4
attachments
  116:5
attempt 54:16
  115:7
attention 11:13
  12:9,12,14 14:15
  14:24 17:16 25:17
  40:17 50:8 77:21
  118:21
attorneys 6:4,15
  7:2 13:1 23:9
attributable 40:5
  41:14
attributes 113:6
august 31:4,4,20
  31:25 106:18
  117:7,14,22,24
  118:6
australia 85:1
authorities
  112:15
authority 25:17
  65:16 84:16 86:5
  88:5 107:21
authorization
  98:21 116:1

authorize 72:5
authorized 59:17
  72:24
authorizes 107:15
authorizing 2:8
  2:13,22 3:2,15,17
  3:19 4:9,17 87:5
  105:25 110:10
automatic 5:2
  114:21 115:3
  120:11
available 11:9
  15:21 17:24 21:1
  32:25 39:18 53:3
  90:1,4 104:14
  116:8 117:22
avenue 6:5 47:2
  92:18
average 41:1
avoid 54:9 88:6
avoidance 72:5
  102:25
avoiding 53:6
award 38:17
aware 22:7 39:4
  49:15 52:8,12
  96:11 100:20

**b**

b 1:21 2:14,24 3:4
  4:10 6:15 8:13
  47:19 55:6 80:9
  80:11,21 87:8
  88:20 100:23
  101:2 103:18
back 24:7 27:12
  27:25,25 28:10,25
  29:2 30:13 37:14
  42:14 45:13 47:10
  49:20 61:2,16
  66:5 68:21 73:15
  74:21 79:5 88:24
  103:7 107:3
  111:22 116:24

117:5 118:7
background
  42:18 53:21 99:4
bag 44:22
bailing 41:25
bailout 41:23
bakery 65:2
balance 34:1 35:8
  105:19
balances 2:19
  34:8,11
bank 41:10 43:22
  59:17 62:13 82:6
  82:12
bankruptcy 1:1
  1:12,23 5:4 21:20
  38:25 56:14 104:7
  114:22 115:2,9,12
  115:25 116:3,5,7
banks 62:4
bar 42:4
bare 54:9
base 18:6 41:17
based 39:22 56:13
basically 26:22
  64:19
basis 42:10,10
  53:23 59:13 61:19
  73:20 84:24 86:2
  86:14 87:10 90:9
  90:13 97:4,16
  98:6,11 100:8,25
  103:4 110:20
  111:7,8 112:2,4
  112:21 113:8,13
beach 64:21
bear 118:4
beginning 68:15
  84:13
begins 105:5
behalf 8:12 10:15
  22:16 51:6 80:9
  88:13

**believe** 22:21 29:7
46:7 53:2 55:5
58:6 67:1,2,15
68:9 70:11 71:19
71:20 72:21 73:20
82:25 89:4 91:25
92:16,23 93:4
95:4 98:1 99:18
101:6 106:10
108:23 116:16
**believes** 109:19
118:15
**belongs** 91:8
**beneficial** 55:20
**benefit** 14:3 16:24
17:15 30:22 40:14
55:16 61:17 70:21
75:6 86:5 95:25
**benefiting** 91:17
**benefits** 2:24
84:18 85:8 86:9
90:25
**bespoke** 35:25
**best** 18:8 62:17
63:20 68:16 91:17
92:18 95:3
**better** 68:12 72:12
72:13 108:25,25
116:2
**beyond** 76:4 90:1
115:17
**bid** 32:24 33:3
**big** 21:16 22:24
101:11
**biggest** 63:17
**billion** 18:7,9,10
18:22 27:21 28:9
28:18 41:13
**bit** 17:19,20 21:20
23:21 27:8 30:22
32:8 40:8 48:16
49:17 58:5 81:12
93:9 99:4

**bitcoin** 32:9 36:12
36:18,21,24 37:3
40:24 72:24 73:6
73:12 79:25 93:4
**bitcoins** 36:19
**blackline** 93:24
94:20
**bless** 86:6
**blew** 54:20
**blockchain** 25:22
26:2,7 78:19
**blood** 84:21
**blowback** 45:1,2
**blue** 33:10
**board** 44:8
**bold** 50:6
**bond** 4:13 82:12
106:2,4,11 107:21
107:25 109:18
**bondholder** 82:6
**bonuses** 85:13
**border** 52:3
**borrow** 34:25
**borrowed** 27:13
82:7
**borrower** 27:17
44:1
**borrowers** 24:4
36:5
**borrowing** 31:19
35:23,25
**borrowings** 27:19
28:16
**bottom** 31:3 42:3
**bought** 73:9
**bowling** 1:13
**box** 53:2 64:9
**boys** 56:9
**breakdown** 37:18
**breathing** 83:6
**bridge** 18:20
**brief** 56:4 103:15

**briefel** 6:11 8:18
105:1,4,5,9,13,15
105:16,22 106:23
106:24 107:1,7,9
107:23 108:6,10
109:6,8 110:3,6,7
110:25 111:6,10
112:7,8,22 114:18
116:16 119:11
**briefing** 103:20
**briefs** 103:17,21
**bring** 22:3,8
27:25 45:13 64:1
69:3 77:20 117:5
**bringing** 25:16
**brings** 103:24
**broad** 14:24
**broadly** 82:23
**broken** 18:19
**broker** 52:9
**brokerage** 4:11
59:21 60:4,9
106:2
**brought** 22:12
**bruh** 11:7
**budget** 77:2,4
**build** 33:12 73:9
93:12
**building** 106:14
**buildout** 81:6
**bumped** 61:6
**bunch** 103:1
**business** 2:16
17:20 23:25 24:17
30:9,22 31:6,7,10
31:13,14,15,20
32:9,15 33:4
34:15,15 35:21,22
35:25 36:9,10,24
37:5 45:16 49:2
68:14,17 73:3,19
75:2 81:7,11,13
82:25 84:19,21

87:6,14 94:22
95:2,3,3,4,22
106:6,14,16
110:12 115:11
**buy** 14:11 46:3
**buying** 60:7

**c**

**c** 2:15 4:11 6:1 8:1
103:15 121:1,1
**calendar** 117:2
**call** 34:24 79:3
**called** 63:16
**calls** 24:5,8,10
25:12
**canada** 85:1
**candidates** 55:12
**cap** 41:4 71:4,10
85:15,25 86:2
**capital** 43:8,11,14
68:3 78:1 80:20
**capped** 60:23
**capping** 61:15
**caps** 85:24
**carefully** 39:6
**carries** 102:8
**carved** 56:16
101:6
**carveout** 57:14
**case** 1:3 3:10 8:3
10:7,13,16,18
12:10 13:5 15:4
16:18 20:23 22:12
22:15,17 23:14
25:4 30:15 33:25
37:14 39:1 43:11
47:21 49:1,7
54:10 55:7,8,14
55:20 56:1,16,18
57:13 63:11 68:2
68:15 80:19 82:4
90:20 91:3 95:12
97:19,23

**cases** 2:4 32:5
46:20 49:24 50:11
52:3,6 54:15 55:6
55:17 56:3,24
82:9,16 94:7
97:21 98:1,3 99:5
99:25 100:2 101:3
104:10 106:8
110:13,18 115:6
115:20,22
**cash** 2:14 29:21
30:2 33:6,25 34:1
47:22,25 58:12,15
59:2,7,8,12,15
60:10 67:7 68:24
70:3,19 73:21
74:13,19 75:1
76:25 77:1 80:12
81:20 82:18 83:13
83:18 97:12
**cashflow** 73:10
**category** 51:21
87:16 94:1
**cause** 43:19
**caused** 13:3 29:9
**caution** 10:16
**cautiously** 11:9
**cease** 49:14
**cede** 84:3,7
**cel** 38:1
**cellphone** 9:2
**celsius** 1:7 8:4,8
9:14 11:15 13:3,6
13:12,22 14:2,11
24:20,24 25:3,8
26:6,21,21 27:10
27:11,12,13,17,19
27:20 31:4,7,9,12
31:17,20,24,25
32:2,3,6,7,8,9,11
32:12,12,14,16,19
33:1,2,12,16,24
34:5,19,20 35:13

35:15,24 36:6,10
36:11,12,18 39:9
39:12 41:23,24
43:5,12,13 44:8
52:24 55:11 64:18
65:21 66:18,19,24
67:2,14,21,21,23
72:25 73:3 78:18
78:21 79:6 80:23
81:12 84:21 88:13
89:1,2,2,7,14
113:22
**celsius'** 34:22
41:14
**center** 87:22,23
87:24 88:9 89:9
93:6,22
**cents** 44:18
**ceo** 11:14 66:9
**certain** 2:14 3:3
3:10,19 4:11,17
4:22 24:24 39:5
39:18 60:21 82:24
88:20,21 89:16
99:6,11,13 106:2
110:18 113:4,8
115:10
**certainly** 15:3,5
15:18 21:7,12
22:19,20 47:1,3
48:2 50:10 57:17
62:2 63:1 65:11
70:6 91:7 97:10
103:10,13 109:16
109:24 113:11
**certificate** 100:18
**certified** 121:3
**cetera** 26:23
78:19
**chain** 31:11
**chambers** 10:8,17
11:3 16:15 74:6
83:24

**chance** 48:8 74:17
**change** 39:17
57:11 70:15 71:17
72:2,16,22 75:7
75:14 82:1 94:4
96:22 109:11
113:17,23 114:2,3
114:6,11
**changed** 58:5,6
**changes** 58:22
69:16 70:12 71:15
73:21 82:21 83:13
113:8
**chapter** 2:4 12:24
13:7,12,14 25:4
39:1 40:2 56:3
93:17,21 97:21
98:3 99:25 100:2
104:10 106:7
115:1,5,20,22
**characterization**
94:5
**characterized**
40:19
**charge** 34:25
**chart** 31:2 33:8,20
42:2 81:9 88:25
**chose** 93:20
**circumstance**
45:17 72:10
**circumstances**
41:8 60:1 101:8
**cite** 29:11
**citizen** 101:5
**claim** 43:13 56:2
94:5
**claimant** 91:8
**claimants** 3:4,4
**claims** 2:9 3:3
13:19 17:1 55:4,5
55:17 56:11,14,23
56:25 57:1,2 58:9
70:23 87:7,7,8,8

88:21,21 94:2,11
**clarifying** 60:16
**class** 68:16
**clean** 70:17 71:20
74:2
**clear** 13:22 15:1
25:21 65:13 67:12
79:8 92:17 104:12
113:19 115:3,16
115:17
**clearance** 112:17
**cleared** 112:16
**clearly** 25:11
78:17 111:15
**clerk** 8:2,10,14,21
9:1
**clerks** 105:7
**clicking** 9:5
**clients** 36:1
**climate** 40:19
**clock** 51:11
**close** 12:8 20:9
42:6 79:3 117:10
**closed** 44:17
80:19
**closely** 16:3 17:23
49:6
**club** 56:9
**code** 5:4 52:10
62:7 63:5 64:10
65:13,15 101:9,10
101:10,10,12
114:22 115:2,9,12
115:25 116:3,5,7
**cofounder** 11:14
**cofounders** 11:14
**coin** 24:20,21
25:24 26:14,14
30:13,17,18 36:7
42:10,10
**coinbase** 43:4
**coins** 25:6 26:7
34:19,21 63:14

64:21
**cold**   32:20 64:15
68:16,18
**collaboration**
89:24
**collapse**   40:5,6
41:12,15,21 43:3
43:8
**collapses**   43:19
**collateral**   19:3
24:6,11,20,21,24
24:25 25:3,6,13
27:14,22 28:16
35:1,14,18 36:7
37:25 40:9 43:9
43:25 44:2,3,4
76:25 77:1
**collateralization**
28:2 45:14
**colleague**   8:17,18
23:15 84:8 104:25
105:18
**colleagues**   8:24
11:24 15:6 33:14
46:19 50:13,17
51:3 85:8 89:23
106:15 118:12
119:8
**colloquy**   51:7,22
**come**   15:4 24:7
28:25 37:14 50:9
51:21 59:11 62:10
64:13 68:4,9
73:15 78:23 92:9
93:16 96:21 97:1
104:21 116:23
118:7
**comes**   73:2 78:25
**comfort**   67:22
77:9 106:21 108:2
108:15
**comfortable**
29:23 65:12

**coming**   118:15
**comingled**   19:19
20:14 78:14
**commenced**
102:20
**commencement**
3:21 115:5,20
**commend**   82:18
**comment**   10:4
51:11 115:15
**commentary**
41:23 99:6
**commented**
100:16 102:7
**comments**   9:22
47:20 48:20,24
49:8 50:19 57:23
80:13,15 85:17
89:22 116:10
**commission**   57:1
**committee**   14:5,6
14:7,10 15:6,7
22:10 45:23,24
46:1,15,15 47:1
48:10,13,14,17
65:10,11,18 67:25
72:13 73:13 76:14
76:18 77:9 81:24
91:18 94:14,15
96:17 98:10,14
99:24 101:19,21
102:1,6,14 103:3
108:24 109:1
**committees**   82:12
**common**   4:23
81:3,3
**communicate**
13:14 46:18
**communication**
24:14 50:22
**communications**
24:8,13 99:14

**community**   7:9
14:12 15:16 16:8
18:5 19:7 44:24
46:3 53:23
**compagna**   11:18
11:18,20 52:21,21
53:1,10,13,14,25
84:23
**compagna's**   52:25
**companies**   52:23
62:15 84:20
**company**   12:16
12:25 19:2 27:24
31:12,18 32:21
38:2,23 39:13
40:15 43:23 45:4
66:15 68:10 69:8
75:6 76:12 83:8
84:22 92:15 93:20
102:22
**company's**   12:21
23:21,23 41:17
62:18
**compared**   26:14
59:13
**compensated**   76:8
**compensation**
2:23 56:2 84:17
85:8,14
**competing**   52:6
52:16
**competitive**   55:11
**complete**   87:22
93:5,23
**completed**   87:23
93:7
**completely**   41:22
66:3 91:22
**completing**   73:7
**completion**   88:4,6
93:18
**complex**   87:14
97:21

**compliance**   39:15
69:4 85:5 116:3
**complicated**
78:15
**compliments**   51:9
**comply**   69:4
**component**   65:4
**compromises**   52:9
**computer**   73:5
**concept**   44:10
63:24 70:25 96:23
**concern**   13:18
14:24 24:9 25:9
25:10 43:20 49:23
60:18 63:6 67:5,5
99:17
**concerned**   21:8
24:18,19 25:2,5
48:25 65:20 75:15
78:10 111:25
**concerns**   15:8
21:12 50:5,8,12
52:16 72:18 75:11
75:23 82:20 95:2
**concluded**   119:13
**concluding**
115:23
**conditions**   78:16
**conducted**   31:18
35:24
**conducts**   31:10
**confidence**   40:10
43:5,20
**confident**   52:4
64:22
**confidentiality**
49:21 50:6
**confirm**   71:10
78:1 79:20
**conflicting**   52:5
**confused**   12:19
**conglomerate**
81:12

[connected - court]                                                    Page 8

connected 64:14
64:15
connection 9:15
29:12,13,21 30:2
30:20 33:2,23
34:3 35:14 37:25
47:22 56:2 74:13
consensual 83:10
consent 99:10
109:21,23
consequences
40:10 43:10
consequently 63:3
consider 46:14,16
92:19
considerable 93:4
93:18
considerate 92:17
considerations
52:16
considered 30:16
considering 75:17
consist 38:1
consistent 15:14
86:14
consolidated 3:15
3:18
constituents 60:3
constructed 91:15
91:16
construction
87:18,21 88:1
91:12,13 92:18
93:5,14 106:15
constructive
78:24
consult 109:20
consulting 60:2
contact 118:23
contagion 40:10
context 59:10
77:5 93:9

continue 2:13,16
2:24 4:11 21:9
43:9 52:13 60:21
84:18 88:5 106:1
110:15 118:18
continuing 39:13
59:18 90:5
contract 56:15,20
56:22 114:24
contracting 88:12
contractors 85:3
contracts 4:4 57:2
115:6,7
contravention
115:8
contributed 41:10
control 28:1,3,21
63:19 65:24 67:15
68:6 81:2
controlled 81:1
controlling 104:6
conventional 77:2
conventionalize
35:2
conversation
52:13 67:12 114:1
114:8
conversations
21:25 58:16 62:20
67:24,25 68:20
cooperatively
39:10,14
copy 9:25 16:19
18:1 74:3 83:25
cornell 7:6 11:7
48:5,6,7,12,21,22
49:11 50:3,19,20
50:25 51:1 57:17
57:21,22,25 58:25
61:24 67:8 69:23
69:25 70:1,10
71:8,8,17,19,24
72:16,19 74:3,14

74:15,18 77:19,23
78:5 79:17,19,23
80:2,4,5 83:21
86:16,18 89:24
90:15,17,17 91:21
92:2 95:10,20
96:9,10,25 97:7,8
98:7,8 100:24
101:13,14,22,25
102:2,10 103:2,19
104:18,19 108:5,8
108:11,12 110:4,5
111:11,12 112:3
114:12,13
cornell's 95:1
corner 9:6
corporate 30:23
33:8 81:3,9 99:14
99:15 113:9
corporation 89:15
correct 71:7,13,14
73:16 79:12 86:1
90:10 101:15
104:19 107:22
111:10
correctly 26:19
85:21 90:8
corresponding
42:7
correspondingly
34:23
cost 92:16
counsel 8:8 15:7
22:15 23:14 46:15
61:4 75:9 84:11
99:24 102:12
105:16 114:7
counsels 101:14
counterparties
67:2 114:25 115:6
counterparty
36:3 63:2

countries 34:13
85:1
country 121:21
couple 15:17
34:10 41:8 42:21
43:18 111:12
course 8:20 10:13
30:15,16 45:18
52:13 54:7,12
59:19 84:19 86:10
87:6 95:9 106:14
110:12,14 112:8
court 1:1,12 8:19
9:7,8,13,16,19,22
10:24 12:5 14:17
14:19 15:2 16:11
16:14,21 17:4
18:1 19:10,12
20:24 21:7,20
22:9 23:13,19
24:7,15 25:17,18
26:18 27:6 28:24
29:15,18 30:6
32:22 33:6 35:17
38:7,12,15,21
39:17,25 42:17,23
46:12 47:14,15,23
47:24 48:2,7,19
49:8,22 50:2,10
50:25 51:2 52:17
53:9,14 54:1,18
54:24 56:4 57:8
57:25 58:8,24
61:3,10,23 62:21
64:22 65:5,22
66:16,21 68:22,25
69:11,20,22 70:9
70:14 71:3,6,17
71:21,25 72:16,20
73:4,14,17,24
74:2,5,15 75:22
76:16 77:8,18,22
78:11 79:10,13,17

80:3,6,10 82:13
82:21 83:12,17
84:4 85:21 86:3
86:16,20 88:22
89:5,18 90:8,11
90:15,20 91:19
93:24 95:20 96:11
96:14,15,16,19,21
96:25 97:9,14
98:5,7,9,16 99:17
99:23 100:1,4,15
101:20,24 102:1,4
102:11 103:11,16
104:18,23 105:3,5
105:11,14,21
106:23,25 107:6,8
107:20 108:5,8
109:6,15 110:4,6
110:25 111:8,11
112:1,7,20 114:11
114:12,16 116:11
116:14,17,19,25
117:7,9,20,23
118:4 119:2,5,7
**court's** 8:19 10:13
80:17
**courtroom** 8:3
9:16,19 14:21
103:6 118:8,17,24
**cover** 16:17,17
20:3 58:23 67:10
83:24
**coverage** 4:12
42:16 56:17
106:14,18
**covers** 63:5
**crafted** 99:18
**created** 66:22
89:16
**creative** 78:23
**credibility** 50:15
**credit** 101:8

**creditor** 9:24 24:9
99:1,13,20,21
100:7 101:5 116:2
**creditors** 3:16,19
3:21 10:5 14:6
15:2 17:12 31:1
42:13 48:16 55:7
55:8 94:11 95:25
98:18 99:14
101:19,19,21
116:2
**creditworthiness**
36:2
**critical** 3:3 10:3
18:5 33:11 34:2
53:24 85:3,10
86:25 87:7,15,16
87:24 88:6,15,17
88:18 89:10 90:20
91:2,5,6,7,20
95:24 96:12 97:5
97:15
**cross** 52:3 53:4
**crucial** 110:14
**crypto** 13:10
15:25,25 16:2
18:14,22,23 19:3
20:10,12,13,25
21:10 22:23 26:20
27:2,3,12 28:3,9
28:18 29:2 32:21
34:16 37:6 38:1
38:23 41:2 43:10
45:19 63:8 64:11
65:19,19 66:6
67:11,15,18 68:7
68:24 69:5 71:12
74:25 75:20 78:20
**cryptocurrencies**
60:8
**cryptocurrency**
18:13,18,25 20:1
20:10 21:3,5,22

26:3 29:23 37:21
38:2,5 39:9 40:20
45:13 50:1 54:3
59:8 60:16 62:2,9
62:12 63:19 64:3
72:3,6 79:23 95:3
**crystal** 13:22
**curious** 92:7
**currency** 13:21,25
15:20 64:5
**current** 4:3 23:21
23:23 40:19 56:15
60:8,8 70:7 77:11
108:20
**currently** 32:9,22
36:13 49:15 87:11
87:22 92:16 93:2
93:3,7 106:10
110:2 112:15,18
**curtailed** 59:13
**custodial** 20:18,25
21:5 77:24
**custodian** 29:12
29:14
**custodians** 29:1,6
**custody** 19:14,16
19:21,22 20:2,5
20:11,14 21:8,22
22:6,22 27:12
28:21 29:3,5
37:20,23 62:24
65:24 66:8,19,25
68:7 78:13
**custom** 112:5
**customary** 97:21
**customer** 13:17
13:18 14:7 23:25
24:17 31:5,21,23
32:1 35:10 43:24
45:1,24 46:1
62:23
**customer's** 26:8

**customers** 12:17
13:15,20,25 14:3
15:9,9,17,23 16:4
19:25 20:24 21:7
21:23 22:17 23:10
25:1,23 26:20
30:25 31:7 34:12
34:18,24 35:1,7,9
35:12 37:2 40:11
42:11 43:22 44:17
44:19,20,21 45:6
46:5,17,21 47:3
48:16 66:18,24
78:15 79:6 81:15
114:24,24
**customs** 110:22
111:4,4,13,14,21
112:10,15,16,18
**cuts** 83:15
**cutting** 68:16
**cypress** 61:1
79:21
**cypriot** 61:18

**d**

**d** 2:16 4:12 8:1
120:1
**data** 81:7
**date** 13:20 17:18
18:7,9,17 19:1
27:17,24 28:14
31:19 32:11 35:6
35:19 36:8,18
48:13 81:23 82:2
87:12 93:13 94:3
102:12,14 103:3
103:19 104:9,21
107:18 111:3
117:2,3,18,19
121:25
**dates** 103:8,9,14
**day** 2:1 9:15
11:21 29:8 33:6
36:19,24 41:13

47:6 53:1,24
54:15 79:16 93:4
94:22 95:16
100:10 101:23
106:19 112:18
118:11,12,25
**days** 36:17 51:12
54:10 69:3,6 90:9
94:4,4 104:3,3,8,9
104:13,13 108:17
109:20 117:6
**de** 40:7
**deadline** 101:16
104:2,4
**deadlines** 102:12
**deal** 26:17 34:3
47:24 63:13 78:24
101:2
**dealing** 22:16,17
65:21 72:9 112:1
**dealings** 17:12
**dealt** 56:7,8 57:11
63:6 101:9 103:18
**death** 99:7,15
**debt** 14:8 30:25
82:6,6,6,10,12
115:21
**debtor** 1:9 3:17
6:4 10:4 19:15,15
19:18,21,22 31:3
31:15 32:16 33:9
33:9,17,17,18,18
33:25 36:10,10,25
38:8,22,24 49:19
50:6 61:4 62:23
62:25 63:7 70:20
70:21,22,23 72:11
72:25 75:1,5,5,13
75:15,16 76:2
86:4 88:16 89:2,8
89:11,15 90:23
91:25 92:2,5,16
92:19 94:8 95:4,5

98:21 99:20 104:1
104:21 109:4,19
111:13
**debtor's** 22:15
47:19 100:8
101:14
**debtors** 2:3,12,13
2:21,22 3:1,2,9,14
3:15,17,18,19 4:1
4:8,9,16,20 5:1
8:9,12 10:21
11:20 19:18,23
22:2 23:14 29:1
31:2 33:16,16
38:22,23 39:17
46:17 49:22 51:6
58:12 59:2,2,8,16
60:17,20,22 61:1
61:17 63:15 70:6
70:20 72:6,7,23
74:24 75:1,9,19
76:2,5 80:19
82:18,25 83:2
84:12,16,25 85:4
85:6 86:25 87:4,5
87:15,20 88:1
91:1 93:17,25
94:10 97:19,22
98:18 99:8 100:1
102:12 104:4,6
105:17,23,25
106:6 107:16,17
108:16,18 109:9
110:8,11,15,17
112:14 113:3,4,5
113:9,22 114:19
114:23,24 115:2,6
115:11,19,20,21
115:25
**debtors'** 2:7
**decentralized**
27:19

**decide** 15:11
46:19 95:6 103:17
**decided** 66:18
**decision** 40:15
44:9 83:2
**deck** 16:15,16,20
17:21 20:9 88:24
**declaration** 11:15
11:20,22 29:9
52:20,25 53:4,7
53:10,13,14,15,18
53:21,24,25 54:2
56:6 84:23 113:20
114:4
**declarations** 4:22
56:5 113:4
**declaratory** 22:3
**dedicated** 46:16
67:24
**deemed** 70:21
**defaults** 29:4
**defer** 109:8
**defi** 27:18 28:15
**define** 76:7
**definitely** 15:22
41:8 43:6
**delaware** 81:16
88:14 89:8
**delays** 87:25 88:6
**deleting** 73:18
**delinquency**
111:18
**delinquent** 112:12
**dennis** 6:19 7:9
8:11 47:13,17
61:5,5,8 80:8
**dennises** 61:11
**dental** 15:23
**deny** 26:1,9
**department** 7:1
**depending** 36:2
**deployment** 24:1
27:5 30:9 37:12

60:6
**deposit** 26:20
31:13 32:15 64:9
78:15
**deposited** 27:4
44:13 62:13
**depositing** 63:7
**depositors** 31:22
78:2,5,7,13
**depository** 59:17
**deposits** 25:24
26:14,15,24 42:7
**depreciation**
18:16,18
**deputy** 8:3 103:6
118:24
**describe** 29:21
**described** 60:6
86:7
**describes** 59:7
**describing** 28:7,8
29:9 65:9
**description** 17:8
58:24
**designed** 62:16
**desist** 49:15
**despite** 20:19
**detail** 29:21 91:23
92:25
**details** 50:4
108:23
**determinative**
23:11
**determine** 42:19
**developed** 32:10
62:15 77:6
**developing** 77:7
**developments**
41:9
**devices** 9:3
**dial** 74:9
**dialogue** 90:5

difference 89:6
differences 117:13
different 62:14 64:13 75:5 81:10 81:13,14 82:4 92:12,13,14 95:23 108:13 111:17
difficult 44:8
difficulty 118:8
digital 26:5 41:5
diligently 75:9 92:3
dip 76:25 77:2
direct 47:4 85:14
directed 72:24
directing 2:4 87:5
directionally 117:5
directly 10:17 40:4,6 82:14
director 11:19 52:22
directors 38:9
disagreements 118:22
disappointing 64:17
disbursements 79:20,20
dischargeable 115:22
disclose 102:20 105:6
disclosed 43:12 57:7 63:1
disclosure 39:6 42:10,15 43:4 52:6
disclosures 50:14 57:13
discretion 90:23

discrimination 5:3
discuss 20:5 74:18 103:14
discussed 51:18 55:22 72:13 87:19 92:22 107:9 113:17,23
discussion 51:22
discussions 22:11 29:25 51:15 52:1 60:12 69:6 87:1 100:5
dispositive 26:15
disrupting 93:19
distressed 52:23
distribute 30:20
distributed 45:5
distribution 28:23
distributions 83:2 96:2
district 1:2 38:9 47:10
dive 52:19
diverted 88:16
dividended 33:1
doc 2:5,10,19,25 3:7,12,22 4:6,14 4:18,24 5:5
docker 102:13
docket 10:11,12 10:13,14 11:15,22 17:5,24 21:24 52:21 53:11 56:16 56:17 58:13,14 69:9,15 84:15,23 86:21 87:1,3 97:20 98:19,20 105:24 110:9 112:24 113:16 114:19 115:14
docketed 113:15

doctrine 91:2
documentation 19:18 22:21
documented 76:21
documents 99:2 99:20
dog 83:22
doing 13:23 17:16 25:12,14,15,16 27:2,5 30:10,11 37:13 44:20 52:10 60:6 76:8 79:15 96:6
dollar 21:13,14 60:22 62:3
dollars 13:21 15:20 21:16 28:18 65:13 71:5,14 79:10
domain 23:9
don't 101:11 102:20 107:1,24 108:19,23 117:4,9 117:11
doubt 72:5
dovetailed 80:16
dow 40:25
downside 80:1
dramatic 13:5
draw 11:12 50:7
dropped 41:5
drops 24:24
due 100:22 106:17 106:18 107:17,25 108:3,16 109:17 110:2,22 111:1 112:9,17
dunne 7:9 61:8,10 74:11,13,15 77:18 80:6,7,8 83:15,22
duties 110:22 111:4,13 112:10

112:19
duty 111:4,14,21
dynamic 39:8

**e**

e 1:21,21 6:1,1 8:1 8:1 120:1 121:1
earlier 18:11 48:24 49:14 53:2 58:14 62:22 70:7 71:2 72:23 74:22 75:3,13 87:20 104:3,13
early 41:11 43:23 66:16
earmarked 88:11 88:12
earn 34:15,18 37:22 38:5 39:22 78:16 79:7
earnest 93:15
easier 69:18
easy 42:2
ecf 10:1,10,10,12 16:20 19:24 53:11 53:15,15 70:9,14 86:21
echo 51:7 57:23 89:23
economic 13:10
ecosystem 62:15
ecro 1:25
ed&f 59:22
edge 68:16
effect 20:20 67:3
effectively 43:22
effectuate 64:2
efficient 22:1 98:2
efficiently 55:19
effort 54:21
efforts 33:12
either 10:14 38:22 108:1

electronic  9:3
  10:7,18
electronically
  64:13
ellis  6:3 8:8,16,23
  10:23 51:5 84:11
  105:16
email  9:23,24,25
  9:25 10:3,7 13:16
  46:16,18 73:23
  74:5,6 83:24 94:1
  109:22
emails  21:24
  46:18
emergency
  100:15
employ  84:25
employee  2:23,24
  84:18 85:7,22
employees  13:3
  76:3 84:20 85:23
  99:7
employment
  89:16
enable  33:11
enabling  25:8
encourage  42:24
  47:3 50:12,17
encumber  26:22
endeavor  46:6
endeavoring
  43:23
endemic  83:4
ends  116:17
enforcing  5:2
  114:21 115:3
  120:10
engage  15:15
  22:10
engaged  32:22
  51:8,25 95:4
engagement  52:24
  55:25 58:3

engineering  85:5
enlarge  115:24
ensure  116:3
enter  58:19 98:5
  108:4 109:2,5
entered  56:12
  100:8 108:19
  119:4,5
enterprise  80:25
  92:24 93:11
enterprises  36:12
entities  33:9,10
  70:24 75:6,15
  81:14 89:1 104:6
entitled  30:13
  34:20 95:6 96:1
entity  31:5,6,10
  31:17 79:21 81:8
  81:17,18 88:14,16
  89:8,8,8,10,12,15
  89:15 91:6 92:12
entries  19:5 76:22
entry  2:3,7,12,21
  3:1,9,14 4:1,8,16
  4:20 5:1 58:2
  82:22 85:20 87:4
  97:22 100:14
  104:1,17 105:24
  107:12 110:10,24
  114:11,20 116:12
environment
  13:10,10 16:2
  40:20,21 41:7
  43:18
envision  32:25
envisioning  77:3
epic  57:5
episode  64:17
equal  96:1
equipment  73:5,8
equitably  45:5
equity  6:15 8:13
  47:19 82:8,9

113:4,18,21,24
  114:5,7
equivalent  21:14
  21:14
errand  46:4
escalate  99:10
escrowed  111:24
essential  106:5
essentially  14:7
  60:9
establish  113:2
established  32:10
establishing  3:10
  46:16 53:6
estate  27:25 60:19
  60:20 79:4,8,9
  91:17 115:19
estimated  110:21
  111:1
et  26:23 78:19
ether  29:11 63:14
  79:24
ethereum  40:24
  63:14 64:19
eu  51:25 98:24
europe  117:12
european  52:1
evaluate  91:18
  108:24
evaporation
  41:12
event  34:2 61:13
  67:3 78:6 108:2
events  17:20 29:9
  40:1
everybody  12:23
  12:23 104:22
everyone's  15:9
evidence  53:8,12
  53:13
evidenced  13:2
evidentiary  84:24
  118:16

exacerbated
  12:20
exactly  63:22
examine  53:4
example  40:15
  62:23 101:3
  117:12
examples  49:4
excellent  97:18
  104:24
exceptionally
  67:16
excess  28:2 85:15
  85:23
exclusion  96:1
exclusive  56:20
exclusivity  56:21
excuse  107:1,1
executory  4:4
exercise  30:14
exist  64:20
existed  82:1,10
existence  57:7
existing  2:16 10:3
  25:23 26:8 32:1
  44:1,2 45:11 63:5
  86:9,14 108:4
exit  44:18
expand  115:24
expect  14:6 15:22
  21:17 36:20,23
  50:10 82:15
expectation  13:18
expected  87:24
expecting  76:24
expeditiously
  14:9
expenditures  4:3
expense  2:18 3:5
  22:15 87:11
expenses  2:24
  59:19 60:25 84:18

expensive 61:19
experience 52:23
  55:20
experienced
  55:11
expert 26:3
explain 33:13,14
  106:9 112:25
explanation 95:7
  95:7
exposure 42:1
  43:11
expressed 15:8
expressing 13:18
expressly 107:14
extend 69:8
extending 4:2,5
  104:2,4
extension 69:10
  103:25 104:12
extensive 60:11
extent 11:11
  15:10 21:1 22:24
  23:15 24:3 26:7
  26:16 32:23 37:4
  37:9 46:24 53:3
  55:16 70:17 76:12
  108:21
external 26:5
extracts 116:5
extremely 67:23

**f**

f 1:21 7:9 121:1
face 24:10
facilitate 98:2
facility 61:1 66:11
  66:13 73:10 91:8
  91:11
facing 31:6,21
fact 55:8 67:22
  91:15 92:15 94:21
  115:21

facto 5:3 114:22
  115:8
factor 42:11
failed 49:12
failure 82:2
  110:16
fair 10:2 66:10
  73:12 76:23
fairly 21:9
fall 80:19 81:6
familiar 12:22
  40:16,17 43:6
  116:6
families 13:4
fan 101:11
far 34:16 38:24,25
  80:20
fashion 11:5
favorite 94:11
fear 13:3 49:21
federal 39:16
fee 99:2
feedback 19:7
  45:1 51:12 98:14
feel 28:21 46:22
  96:5 99:18
feelings 12:18
fees 4:11,18 106:2
  110:11
felt 28:7
fiat 13:21,25
  15:20
field 52:14
fifty 3:18
figure 13:17 81:21
file 3:17 4:2,5
  10:6,15 16:19
  17:2,3 52:20 69:9
  83:2 93:21 100:4
  102:12 104:2,4
  113:20 114:4
  118:18

filed 10:1,6,10,10
  10:11,18 11:15,20
  24:13 38:8,12,13
  38:14,24 39:3
  52:21,25 53:11
  56:15,17 58:5,13
  59:7 69:15 70:7
  72:23 84:15,23
  87:1,2 93:17
  97:20 98:19,19
  99:12 100:10
  102:2 104:20
  105:23 110:9
  112:24 114:19
  115:14
filing 10:7,18
  12:22,24 27:11
  45:11 50:22 51:18
  55:23 58:7 92:6
  97:25 100:8
  101:16 103:20
  104:10 114:1
filings 99:22
filling 10:6
final 2:13,22 3:2
  3:10 4:9,17,21
  72:17 73:2,15
  83:20,23 87:22
  90:13 93:6 100:9
  105:24 107:18
  110:10 111:7
  119:3
finalizing 73:8,9
finally 88:20
  107:13
finance 27:19
  88:20
financial 4:5,6
  11:19 40:19 42:9
  42:15 104:5
financing 32:10
find 19:6 47:3
  49:17 50:3 52:4

63:2 65:22,23
  66:1 107:4
fine 44:20 48:1
  54:1 72:7,25
  97:14 98:8 107:6
  114:6
fines 110:17
finish 19:20 67:7
  103:8
fireblocks 63:17
  63:17,19,22 66:7
firm 23:13 46:17
  50:24
first 2:1 7:9 9:15
  11:21 29:8 33:6
  44:17,19 47:6
  51:12 53:1,24
  54:10,15,22 59:15
  70:15 74:15 77:25
  89:1 100:17,19
  112:9 118:12
fit 62:12 100:23
fix 13:19
fixes 80:15 83:3
flag 68:14
flagged 55:22
fleshing 52:14
flexibility 89:25
  109:14
flipside 27:8
flow 33:15,21
  59:1
flowing 82:14
flows 81:18
focus 16:8 18:5
  80:10
focused 27:12
  30:9 41:25 67:24
  81:19
fold 33:4
folks 14:15 17:16
  19:6 30:13,22
  34:25 67:23 76:1

[follow - good]                                                                                    Page 14

**follow** 17:22
26:18
**following** 87:1
**fool's** 46:4
**force** 13:24
**forcing** 13:20
**foregoing** 121:3
**foreign** 3:3 49:16
87:7 88:21 91:9
101:3,5,7,19
111:18 114:25
**foresee** 59:25
**form** 3:20 5:4
26:8 57:12 58:14
69:14 83:20,25
**format** 119:5
**formed** 45:24
48:14
**former** 105:6
**forms** 2:16 64:13
118:22 119:3
**forth** 84:22 94:2
104:7
**forum** 13:14
15:15
**forward** 13:15
14:5,10 15:16
17:12 32:2 33:22
45:16,22,23 59:12
73:20 75:7,19
77:7 78:8 83:9
90:5,7 92:24
97:16 98:15
110:16 118:5,14
**found** 11:22 94:24
**founders** 81:2
**founding** 67:21
**four** 20:7,9,11
21:4,13,21
**fourth** 93:6,8
**framework** 39:8
**frankly** 16:23
23:6 30:3 44:25

61:21 78:25 82:5
**fraud** 38:8 39:2,5
**free** 10:14 26:22
78:18
**freeze** 19:24
**frequently** 98:10
**friday** 9:22
**front** 18:2 28:10
53:15
**frozen** 21:9 22:25
**frustration** 12:20
13:2 22:20 46:22
**full** 44:23
**fully** 77:6 93:22
93:22
**function** 25:22
26:1 61:17 94:2
**functions** 85:5
**fund** 22:6 59:19
60:25 81:6
**funded** 30:25
**funds** 33:15,19,21
36:1 59:1 65:14
73:20
**further** 10:4
26:23 33:15 58:17
60:24 65:9 67:25
68:19 69:6 70:17
72:9 73:11,21
103:14 116:11,22
**future** 17:11
59:25 75:16 81:23
90:24

**g**

**g** 8:1
**game** 14:16
**gates** 12:15 44:9
44:16
**gdpr** 98:24
**general** 14:16
41:7 42:13 43:17
49:9

**generally** 40:22
62:11 70:4
**generate** 34:23
73:6
**generated** 12:10
38:2 99:5
**gerber** 102:22
**getting** 15:19
21:23 25:17 60:2
75:12,13
**girls** 56:9
**gist** 38:16,18,19
56:22
**give** 15:3 17:17
48:8 49:4,13
51:12 63:25 74:16
77:4 80:17 93:9
94:15,22,24 95:13
95:15 117:1
118:18
**given** 16:7 53:4
60:5 65:18 80:24
87:14 94:13 97:24
99:5 108:18
**gives** 13:12 37:2
**giving** 16:6 46:10
77:8
**gk** 81:8
**gk8** 31:15 32:18
32:19,20,23 68:14
68:18 72:11 81:18
**glad** 17:6
**glenn** 1:22 9:14
**global** 87:14
**gm** 102:25
**go** 10:25 12:5
14:19,25 15:12
16:14 17:13 22:25
23:19 27:6 29:18
29:18 30:6 31:10
33:16 39:25 42:17
42:23,25 47:15
48:11 49:9 51:16

52:17 53:16 54:4
54:12,18 57:20
58:24 59:4 64:6
68:22 70:3 71:25
72:20 73:20 74:17
77:8,22 82:19
95:8 97:16 105:11
105:21 106:25
107:6,8 110:6
115:16 118:14
**goal** 13:19 14:2
16:3 45:22
**goes** 32:24 33:16
36:20,22 74:21
96:16
**going** 10:1,20
13:23 14:11 15:23
16:16 17:11,21
20:16,22 22:4
23:11,20 25:14,16
26:15 33:13,14,15
33:19,22 34:14
37:17 39:6 45:16
45:16,17,20,25
46:2,6,8,25 47:7
47:11 49:6 50:15
51:3 53:17 56:14
59:12 60:14 67:10
71:11,21 73:15
74:16 75:7,17,19
77:7 78:8 82:8
84:3,7,8 88:9
89:12,20 90:6
91:16 92:12,24
96:22 101:20,22
103:17 106:20
109:22 110:8,16
118:5
**golden** 74:8
**good** 8:2,7,11 9:13
10:24 11:1,1
25:19 26:11 28:22
47:8 48:5,7 51:4,5

54:5 59:6 67:16
73:25 80:7 84:2
84:10 92:14 105:4
110:3 116:20
**goods** 87:11
**google** 50:5
**gotten** 66:5
109:23
**govern** 76:2,13
**governance** 81:4
**governmental**
115:9,18
**governments**
111:18
**grant** 65:7 100:24
**granted** 54:24
58:10 86:23
104:23 112:21
114:17 116:15
120:5,6,7,8,9,11
**granting** 2:5,9,17
2:19,25 3:5,7,11
3:22 4:6,13,18,24
5:5 103:4,11
**granularity** 30:2
30:4
**graph** 40:23
**grasp** 92:14
**grave** 13:18
**great** 44:3 47:10
69:12 70:15 72:1
72:21 74:3 75:18
84:6 118:2
**greater** 24:21
**greatly** 11:5
**green** 1:13
**greg** 8:2 42:19,20
42:21
**grounds** 100:23
**group** 49:18
**growth** 88:3
**guard** 64:7

**guess** 38:15 46:8
78:1 82:23
**guide** 17:21
**guided** 65:17
**guidepost** 98:1
**gyrations** 21:10

**h**

**hack** 67:14,22
**hacks** 67:20
**half** 27:16 28:17
111:16
**hand** 9:6 18:23
21:4 25:2,5 38:4
47:11 52:7 69:19
69:19 112:13
**handle** 45:10
62:17 75:18
**handoff** 63:23
**happen** 84:4
112:18 113:9,11
**happened** 10:1
39:20 63:22
**happening** 12:9
20:3 25:21 44:17
63:21
**happens** 103:5
117:22
**happy** 43:15 49:4
53:19 54:12 58:18
62:6 70:3 85:18
103:15
**hard** 18:1 59:1
88:13
**harder** 40:22
49:17
**harm** 53:7 54:10
68:24
**harvesting** 30:10
**hate** 99:7,16
**head** 22:8,12
**headline** 23:23
**hear** 15:10 42:22
57:17 65:6 67:8

67:11 100:24
102:15
**heard** 15:10,24
58:8 65:7 67:6
74:11 80:6 81:15
82:21 83:18 86:17
86:21 89:19 90:16
91:19 97:2,15
100:10,16 101:13
101:17 108:8
114:17 116:14
**hearing** 2:1,3,7,12
2:21 3:1,9,14 4:1
4:8,16,20,21 5:1
8:3,6,20 9:7,17,18
9:20 11:4,10,18
14:21,23 16:19,24
17:3 51:14 58:4
66:17 70:18 73:22
86:22 92:8 94:18
94:18 96:7,8 97:3
97:13,16 99:17
100:11 101:17,23
102:17 103:18,21
106:20,22 107:18
108:23 114:10,11
117:14,25 118:6
118:10,19,24
**hearings** 2:1
118:16
**heavily** 65:17
**hedge** 36:1
**held** 19:14,15,20
19:22 20:1 21:5
22:22 29:3,6
34:17 37:22,23
38:5 62:24
**help** 50:14
**helpful** 41:20
46:12 50:21
**high** 14:13,18
15:16 43:19 63:25

**highest** 42:5
**highlight** 40:3
78:8 90:19
**highly** 55:10
**highs** 41:6
**hindsight** 40:14
**historical** 76:18
86:10,15
**historically** 31:18
37:12 59:9 60:5
75:19 77:11
**history** 32:4
**hit** 40:22
**hoc** 82:12 85:13
**hold** 19:18 20:10
20:13 42:17 63:8
65:14 73:7 89:17
103:8 104:6
**holder** 94:5
**holders** 8:12
47:18 80:9 82:9
94:1 113:18,21,24
114:5,7
**holding** 29:5
31:11 44:22 49:20
106:22
**holds** 89:9
**home** 98:23 99:9
**hon** 1:22
**honor** 2:14 8:22
10:22 11:3,17,23
12:1,6,15,22 13:6
16:6,25 17:2,14
17:15,25 18:20
20:13,17,22 21:1
23:4,20,25 26:16
27:7,11,24 29:7
29:16,19 30:7
34:4 35:2 36:9
37:5,15,18 39:5
39:24 40:3,16,23
41:2 43:6 44:11
45:20 46:9 47:9

47:13,21 48:5,15
48:15 49:4,14
50:24 51:4 52:8
52:18 53:19,22,25
54:5,11,14,22
55:1,10 57:21
58:2,11,19,22
59:7,15 60:2,10
60:24 61:13 62:7
63:9,20 64:19
66:2 67:9,13 68:1
68:14,21,23 69:2
69:7,13,17,25
70:4,10,16,17
71:8,15,19 72:1
72:22 73:16,22
74:9,10,14 76:11
76:15,23 77:17,19
78:9,19 80:5,7
81:8 82:4,11
83:11,15 84:2,7
84:10 85:19 86:1
86:18,24 90:10,17
95:18 96:9,20
97:8 98:4,8,13,17
100:13 101:14
103:13,23 104:16
104:19,24 105:4
105:20 106:9
107:5,13 108:6,11
109:8 110:5,7,14
110:19 111:12
112:22 113:14
114:6,13,18
115:13,23 116:9
116:16,20 117:16
117:22 118:2
**honor's** 11:3 12:3
48:24 57:23 77:20
86:8 109:2 114:9
**hope** 19:6 36:23
48:14 83:6

**hopefully** 47:5
64:9 70:13 83:3
83:10,21
**hosting** 43:7
**hot** 64:14
**hour** 92:7
**hours** 94:16
**hudson** 6:16
**hundred** 15:17
34:10 44:18
114:23
**hundreds** 12:8
35:6,11
**hunt** 83:22
**hyde** 5:25 121:3,8

**i**

**identifiable** 3:20
20:15 51:23 64:4
**identification**
101:8
**identified** 61:16
68:18
**identify** 17:9
**identifying** 98:22
98:25 102:23
**ii** 2:17 3:17 5:4
**iii** 3:6,19 5:5
**il** 2:5,9,25 3:4,11
4:5,13,18,24 89:4
89:5,14
**illustrate** 27:15
**images** 9:9
**imagine** 12:15
48:19
**immediate** 41:20
54:9
**imminent** 53:7
**immune** 40:21
**impact** 22:24
44:23 88:1
**impacted** 43:4
**impactfully** 12:13

**imperative** 88:5
**implementing**
97:23
**import** 110:22
111:13,14,21
112:5,10
**importance** 16:18
91:22
**important** 27:24
30:11 36:9 40:3
44:10 51:21 62:19
63:24 67:12 68:2
73:19 76:17 81:8
82:15 92:11 109:9
**importing** 112:14
**improves** 37:10
**inactive** 59:23
**inadvertently**
82:1 86:6
**incidents** 29:10
**inclined** 58:19
117:13 118:12
**include** 33:5
109:4
**included** 107:20
**including** 51:8
53:6 85:1 88:18
116:10
**inclusion** 42:11
**income** 4:3
**incorporated**
89:22 104:11
**increase** 40:11
86:10
**increasingly** 44:6
**incredibly** 11:4
**incrementally**
68:19
**incumbent** 14:9
**independent** 85:3
**indicate** 83:24
109:23

**indicated** 75:13
**indicates** 19:17
**indiscernible** 10:2
22:16 50:2 59:3
62:5 77:13 101:2
**individual** 48:23
49:5 50:9
**individuals** 84:25
98:23 99:9
**indulgence** 80:17
**indulging** 16:7
46:10
**industrial** 41:1
**industry** 39:9
90:24
**inevitably** 22:4
**inform** 19:6
**information** 3:20
39:11 48:15 49:3
49:13,18,20,24
50:23 51:19,23
52:9,11 56:1,24
72:14 74:22,24
75:2,12 90:3,6,21
91:9,23,24 92:1,4
92:9 94:25 98:22
98:25 100:5 101:4
101:11 104:5
108:18
**informed** 99:16
**infusion** 73:11
**inherited** 102:22
**initial** 89:3 104:5
**initially** 58:7
113:16
**inquiries** 39:11,13
**insider** 85:13,13
85:22 86:12
**insolvency** 42:12
43:8 65:25 67:4
78:7 115:21
**installments** 73:9

instance 22:1
106:13
instances 98:23
institutional 24:4
31:19 35:22,23
36:1,3,5
institutions 65:14
insurance 4:10,12
105:23 106:1,4,11
107:17 108:9,13
108:14,15,21,21
109:3,18
intend 10:6 13:24
14:1 30:18 33:4
114:8
intended 91:5
intense 12:11
intentions 20:20
intercompany
2:17,18 33:7
60:11 61:14,21
70:19 72:5 75:11
76:1,13,19 77:5
80:13
interest 12:11,11
15:2 23:6 25:20
97:25 99:25 100:3
104:7 110:18
interested 14:16
15:19,23 18:12
48:17
interesting 30:12
36:17 37:6 45:20
interfaced 31:24
interfacing 89:11
interfere 9:4
interfering
115:18
interim 2:12,21
3:2,9 4:8,16,20
60:21,23 61:21
65:10 71:6,7 72:7
72:15 77:13 85:7

85:10,15,24 86:1
86:19 87:10 90:9
95:9 96:4 97:4,22
98:6,11 100:8,25
103:4 105:24
106:12,21 107:12
107:14,15 109:11
109:14 110:10,20
110:23,24 111:2,8
112:2,4,21 113:8
113:11,12 120:8
intermediate
31:11
internet 49:25
64:15,16
intersection 52:5
introduce 11:24
invested 93:13
investigations
39:15
investing 60:8
investment 40:14
93:11,18
investments 67:17
80:22 87:21
investor 39:23
investors 36:3
39:19 41:18 43:10
involved 63:15
82:5 83:9 102:15
involving 55:12
64:3
ipso 5:3 114:22
115:7
irate 12:17
irreparable 53:7
54:10 68:24
isolated 20:14
israel 32:17
israeli 88:14
89:14
issue 22:7,13,16
52:2,3 56:8 57:4

61:13 62:5,10
63:10,13 68:2
74:21 78:8 80:3
95:5,23 97:3
99:12 103:15
issues 11:10 15:4
16:16 17:11 23:11
23:16 29:11 30:12
45:20 52:16 55:17
66:17,23 67:1,4
70:2,6 74:19
80:18 81:22 82:13
88:6 90:19 118:20
issuing 24:5 25:12
it'd 69:18
it'll 15:20 17:23
84:5
item 54:22 55:2
58:12 84:9,13
86:24 97:19 98:17
103:24 105:22
110:8 112:23
114:19
items 84:13 105:1
iteration 70:7
iv 3:20

j

jeopardize 88:2
jersey 38:9
john 6:19 8:11,11
47:13,13,17,17
48:1,3
joins 82:13
joint 2:4 54:23
120:5
jones 41:1
joshua 6:12 8:22
judge 1:23 9:14
11:1,2,12 13:16
13:23 14:4,13
15:13 16:13,22
18:3,4,7 19:5 20:6
21:16,18,23 23:1

23:15,18 24:5,12
25:11,20 26:3,13
27:1 28:14 30:21
30:24 31:2,7,11
31:20 32:6,14
33:24 34:10,14
35:19,21 36:5,16
36:24 37:8,11,17
38:3,11,20 39:20
40:2 42:2 43:2
44:7 45:8 47:7
57:12 68:4,6
100:17 102:22
117:4 119:1,10
judgment 22:3
95:5,22 109:9
july 1:16 8:4
10:11 18:14 36:4
36:8 53:11 121:25
jump 11:25
jumping 54:6
june 12:16 27:15
27:21 41:2,4,9
43:6,24 44:6,7,7
45:11 83:5 93:14
jurisdictions
114:25
justice 7:1

k

keep 20:16 30:18
65:16 117:19
118:25
keeping 59:1
keeps 59:4
keips 86:7
kerps 86:7
key 17:9,10 23:2,7
34:15 35:21 63:2
64:4,6 65:1 66:12
66:14 81:22
keys 50:16 63:13
63:23,24 64:7,18
66:6,7

kicking 52:19
kids 65:2
kind 16:4 23:22
  30:14 31:3 37:4,4
  64:5 80:12,15
  82:19 94:21
kinds 39:2 64:6
kingdom 85:2
kirkland 6:3 8:8
  8:15,23 10:23
  50:21 51:5 54:7
  76:1 84:11 105:16
knew 92:8
know 9:2,25 12:1
  14:8 15:24 16:7
  16:16 17:8 18:4,8
  18:12 19:8 20:18
  20:23 21:18,19,24
  22:1,6 23:13 26:3
  26:13 27:16 28:2
  28:5,7,12,20
  29:25 30:8,13,16
  31:6 32:4,23 33:7
  33:24 34:2 35:3
  35:11 37:16 38:4
  38:25 39:7,20,20
  40:4,13 42:5,8,14
  43:5,14 44:12,25
  45:15 50:15 51:17
  52:2,10 55:18,19
  60:5 61:6 62:4,10
  62:11,12,23 64:23
  65:1,4,8,18,20
  66:22 68:3,5 70:5
  74:5 75:4,25
  76:21 77:2 78:23
  79:25 81:13,15,22
  81:24 82:2,6 83:3
  83:22 90:3 91:5,7
  91:9,10,14,14,15
  91:16 92:12,20
  94:7,9,15,23 95:2
  95:16 101:6 107:5

108:2,20 110:2
116:1,22 117:4,9
117:10,11,21
118:21
knowledge 44:23
  99:10
known 92:5
  108:16
knows 82:11
kwasteniet 6:9
  8:17 29:20 30:3
  47:12 51:4,5
  52:18 53:19 54:5
  54:19,25 58:1,11
  59:6 61:5,11 62:6
  63:9 64:23 66:2
  66:20 67:9 68:23
  69:1,12,21 70:11
  70:15 71:4,7,13
  72:1,21 73:5,16
  73:18,25 74:3,8
  74:12 76:11,23
  77:16 78:4,12
  79:12,14 117:17

**l**

laboring 102:9
laboriously 46:11
lack 40:10 43:19
  64:25
laminate 64:8
landed 80:12
language 51:15
  58:5,6 60:14 72:9
  72:17 75:10,14
  80:15 82:21 83:23
  97:1,11
lapse 108:17
large 15:2 21:13
  46:20 50:18
largely 18:17
  59:23 108:15
larger 82:8 95:11

largest 3:18 15:9
  36:11 80:20
latent 88:21
latest 58:21
latham 100:18
law 45:21 51:25
  101:3,4,7 105:7
laws 39:16
lawsuit 38:20
lawyers 10:15
lead 10:20 31:2
  45:18 63:10
leading 12:22
  18:25 27:23 32:20
  36:17 40:1 45:11
  73:1
leads 52:24
leadup 12:24
leakage 61:14
leaking 60:19
learned 66:5
  108:22
learning 55:19
leases 4:4
leave 44:19 114:3
led 17:21 40:11
ledanski 5:25
  121:3,8
left 9:6 11:11
  32:16 42:3 44:22
legal 17:9,10
  20:17,20 22:13
  23:2,7,11 30:12
  30:14 45:20 63:20
  66:17,21,23 81:14
  81:22 121:20
lender 24:4 44:3
lending 31:9,10
  31:20 35:23,25
  59:16
letter 55:25
  102:12

letters 10:9 19:23
  49:15
letting 16:9
level 13:2 14:13
  14:18 15:16 18:16
  24:24 40:12 42:5
lexington 6:5
liabilities 4:2
liability 55:24
  83:3
licenses 115:10
lie 90:25
lien 3:4 77:1 87:8
lieu 3:16
life 24:23 84:20
lift 22:5
light 15:14 25:4
  75:7
limit 54:8 75:10
  85:25
limitation 55:24
  71:2
limited 12:25 13:1
  27:3 31:12,17,21
  31:25 32:1,6,11
  32:13,14,17 33:1
  33:3 35:25 113:23
limits 77:12
line 9:4 42:19,25
  53:2 61:4,11
  120:4
lines 66:4 81:11
  81:13 97:6
linking 41:23
liquidate 24:11,25
  60:3
liquidated 18:23
  18:24 19:3 25:7
liquidates 44:4
liquidating 24:6
  25:13 92:19
liquidation 13:24
  102:22

list 3:15,18 91:4
  92:7 94:1,13,22
  95:13 96:13,15,15
listed 113:22
listen 17:23
listening 12:6,23
  14:15 15:7 16:24
  30:24 46:22
literally 12:7 14:7
  34:12 37:2
litigation 102:24
little 14:8 17:19
  17:20 21:19 23:20
  27:8 28:19 30:1,4
  32:8 34:7 49:17
  52:8 56:10 69:18
  70:25 81:10 88:23
  93:9
live 69:18
lived 67:17
llc 1:7 8:4,8 9:14
  31:4,8,9 32:2,3
  36:11 72:25 88:13
  88:15 89:2,7
llcs 81:16
llp 6:14 8:12
  47:18
loan 19:4 24:20
  24:22,23 25:1,7,9
  35:11 37:25 40:14
loans 24:1 25:13
  27:17 35:1,8,12
  35:14 36:3 70:22
  70:24 75:14,16
  80:14
local 55:6
located 114:25
location 9:10
lock 66:11,12
lockbox 68:8
lockboxes 67:3
locker 66:10,12

logged 117:11,12
long 15:25 30:25
  77:8 88:2 105:9
longer 39:21
  42:22 60:6,7
look 14:4,14
  15:17 31:1,2 38:3
  45:23 78:20 83:8
  90:5 95:21 96:21
  98:14 100:21
  102:7 117:23
looked 17:4 86:4
looking 33:8 49:6
  49:20 61:18 62:12
  78:9 88:24,25
  93:24 109:4 112:4
  117:2 119:3
looks 81:12 94:21
lose 19:1 45:18
losing 44:4
loss 19:2 41:14
  67:14
losses 40:4,6
  41:18
lost 14:1 21:18
  29:12 30:16 40:7
  41:2,19 46:1
  63:12,13,23 64:18
  66:6 68:4
lot 14:15 21:24
  22:14,20 41:16,25
  44:5 46:21 49:19
  49:24 51:17 59:9
  67:22 68:9 75:10
  79:13 80:12 82:19
  90:21,22,23 91:9
  95:11 99:5 102:5
  103:18
loud 67:11
lower 9:6 44:9
loyal 44:20
luna 40:5 41:11
  41:15,19,21,24,25

42:1 43:3,3

**m**

macro 16:2 41:7
  43:18
macroeconomic
  13:9
madison 56:8
mail 99:7,16
mailing 3:16
main 89:9 113:18
maintain 2:15
  4:13 59:16,21
  66:7 86:13 106:2
  114:4
maintained 81:20
major 75:23
majority 15:22,23
  38:4
makers 36:2
making 24:3
  50:16 52:15 78:2
  79:1 81:19 90:1,4
  98:10 115:15
man 18:3 59:22
managed 59:8
management 2:14
  3:11 10:4 29:22
  30:2 33:7 47:22
  47:25 58:13,15
  59:2,7 60:10 62:9
  67:7 70:3 72:3
  73:21 74:13,19
  80:12 81:20 82:18
  83:13,18 97:12,19
  97:23
manages 81:13
managing 11:19
  52:22 59:11
manner 3:21 5:4
march 18:11,12
  18:17
margin 24:3,5,8
  24:10 25:12

maria 1:25
marked 40:18
market 16:2
  18:15,17 24:21,23
  27:21 28:4,6
  32:20,22 35:15
  36:2,7 37:6,9
  40:20,22 41:2,4
  41:13,24 43:5
  49:21 56:13 73:12
  75:8
marketing 85:4
marketplace
  44:24
markets 22:23
  54:3 65:20
markup 69:19
marsal 11:19
  52:22
martin 1:22
mashinsky 11:14
  11:15 53:15,18,21
  54:1
massive 40:18
masumoto 11:8
match 64:6
matrix 3:16 98:18
  99:1,13,20,22
  100:7
matter 1:5 14:23
  105:7
matters 54:17
  118:15
mattress 64:10
maximize 14:2
  83:8
maximum 80:14
mean 17:9 33:16
  40:7 64:19 65:13
  81:22 95:21 109:8
meaningful 28:1
  30:17

**meaningfully**
59:13
**means** 82:7 94:6
**media** 12:12,13,13
13:3 41:23 42:9
42:10,15 45:1
99:6
**meet** 91:1
**meeting** 104:3,8
104:13,20
**mention** 77:25
**mentioned** 35:23
49:14 74:22 75:3
77:24 87:20 89:20
105:18 106:15
107:24
**merely** 86:13
**met** 91:3
**mg** 1:3
**mg.chambers**
74:7
**middle** 31:3
**midst** 93:17
**milbank** 6:14 8:12
47:18 80:8
**million** 18:24 19:2
19:4 21:15 22:19
27:18,20 28:15,16
28:19 32:12,20
34:5 35:9,13,15
35:18 36:6,8
41:15,16,19 43:13
79:10,11 80:21,22
87:9 90:9,14,21
92:8 93:10,12,13
95:11 106:24
110:21 111:1,4,5
111:7,9,20,22
112:21
**mind** 20:7 62:9
117:3
**mindful** 54:7
117:12

**mine** 8:17,18
36:21,23 37:2
63:6 67:5
**mined** 36:18,19
72:24
**mineola** 121:23
**minimal** 99:19
**minimis** 40:7
**minimum** 54:9
**mining** 31:14 32:7
32:8,9,10,12
33:12,17,24 35:22
36:9,10,11,12,13
36:14,18,24 37:5
72:25 73:3,8,19
81:6,7,17 85:4
87:21,24 88:9,11
88:13 89:1,2,3,7,9
89:14 91:8,11
92:15,23 93:3,6
93:22 95:2,3
106:16 108:19
112:13
**minings** 87:18
**minor** 11:11
**minute** 35:24
**minutes** 60:15
**misleading** 41:22
**missed** 17:6 35:20
**misses** 30:24
**missing** 65:4
74:22
**mission** 85:3
**mitigated** 83:4
**modification**
113:19
**modifications**
58:17
**modify** 4:12 86:5
108:3
**modifying** 86:9
**mold** 62:13

**moment** 13:23
29:24 30:5 35:2
**monday** 117:7,14
**money** 19:1 22:20
35:5 37:8 40:8
41:17 44:12 63:4
79:13 81:5 82:7
90:22,22,23 92:6
92:17 95:11
**monitor** 113:3
**month** 42:6
**months** 18:10,25
31:22 87:24 91:13
93:21
**moot** 30:13
**morning** 13:16
48:5,7 58:14 70:8
98:19 100:16
113:15 115:13,15
**motion** 2:3,12,21
3:1,9,14 4:1,8,16
4:20 5:1 29:22
30:3 33:24 34:3
47:6 51:18 54:23
55:23 58:13 59:7
59:10 60:11 74:23
83:19 84:14,15,16
84:22,24 85:12,16
86:21,22,22,25
87:4 89:21 90:20
91:2,20 92:6
96:12 97:5,15,20
98:18,21 99:13
100:4,7,9,10,15
100:20 101:16
102:2 103:17,20
103:20,25 104:1
104:11 105:23
107:21 108:14,15
109:16 110:9,10
111:15 112:23,25
113:1,10 114:15
114:19 120:5,7,9

**motion's** 116:15
**motions** 9:15 22:5
33:6 48:23 49:5,9
50:9 53:1,24
74:21 90:2 102:8
118:11,12
**motors** 102:21
**move** 17:12 22:25
37:16 39:24,25
45:22 53:7 54:24
67:6 92:20
**moving** 112:23
118:25
**muffin** 65:2
**mute** 9:2,4,5,5
42:18,20,22 61:7
**muted** 42:22,25
61:4

---
**n**
---

**n** 6:1 8:1 120:1
121:1
**name** 9:11 61:5
**names** 89:1 98:25
**narrowly** 109:3
**nash** 6:8 8:7,7,15
8:15 10:22,22,24
11:1 12:5,6 14:18
14:19 15:5,12,13
16:12,22 17:4,14
18:4 19:10,11
20:6 21:15 22:25
23:1,17,20 24:12
24:16 25:18,20
27:1,6,7 29:7,16
29:19 30:7 33:23
35:19 38:7,11,14
38:19 39:4,20
40:1 42:17,23,24
43:1,2 46:12 47:7
50:13,17 51:2
60:6 62:22,25
66:16,23 67:6
68:15 79:22 84:2

84:6 88:23 93:2
99:5 116:19,20
117:4,8,16,21
118:2,19 119:1,6
119:7,10
**nash's** 51:9 79:5
81:9 92:22
**nation** 101:5
**nature** 17:19
87:14
**nearing** 88:4
93:18
**nearly** 44:14
80:21
**necessarily** 21:17
53:20 94:8
**necessary** 13:11
13:12 15:10 44:9
45:3 103:14 113:3
113:7
**necessity** 91:2,10
**need** 43:25 44:1
49:12,22,23 53:6
53:16,20 60:8
62:3 64:3,3 73:12
74:24 75:4 82:20
91:1,10 95:7
103:7 108:20
109:10,13
**needed** 54:9 64:11
92:6,8
**needs** 15:11 34:1
49:18 51:19 64:5
73:11 75:2 91:15
109:19
**negatively** 88:1
**negotiations** 83:9
**neither** 95:21
**network** 1:7 8:4,8
9:14 31:4,8,12,17
31:21,25,25 32:2
32:3,6,11,13,14
32:16 33:1,2

35:24 80:23
113:23
**never** 13:11 62:4
67:14,14
**new** 1:2,14 6:6,17
7:4 23:25 24:1,1,1
30:9 32:3 38:9
42:7,11 45:21
47:10 54:9 60:6
62:19 70:18 72:22
108:4,19,20,21,24
**news** 26:11
**nice** 105:14,15
**night** 16:15
**nil** 60:9
**nobody's** 64:20
**noise** 83:4
**nol** 112:23,25
113:10 120:9
**non** 31:15 32:16
33:9,16,17,18
38:22,23 39:22
59:2 60:17,20,22
70:20,21,23 72:6
72:11 75:1,5,15
76:2,5 85:13,13
85:22 88:16 89:14
**nondisclosure**
52:7
**note** 10:5 52:20
54:6 67:13 89:20
107:13 113:14
115:23
**noted** 85:8,12
93:2 100:11
**notes** 17:23
111:18
**notice** 3:10 5:5
11:4 42:21 55:3,5
97:23 116:1
118:19
**noticed** 9:17
25:23

**noticing** 2:9 58:10
**notification** 4:21
**notifications** 9:3
**notifying** 3:21
**novel** 23:8 62:10
**november** 41:4
**number** 8:3 10:11
10:12 11:15,22
15:19 42:7 55:7,8
56:11 84:13 87:17
97:25 105:24
107:4,19 110:9
112:24 113:16
114:20 115:14
**ny** 1:14 6:6,17 7:4
121:23
**nysb.uscourts.g...**
74:7

---

**o**

**o** 1:21 8:1 121:1
**o'clock** 117:25
**object** 107:11
113:3
**objection** 82:20
86:18,22 114:14
**objections** 53:10
116:10
**objective** 15:21
**obligations** 2:15
3:6 4:10 27:22
105:25
**observation** 12:4
21:18
**observing** 14:21
**obtain** 113:12
**obtained** 9:24
**obviating** 82:20
**obviously** 14:23
65:17 71:21
**october** 32:19
**odd** 13:8
**offer** 53:17,17

**offers** 92:24
**office** 11:7 16:14
48:3,6,25 50:11
51:10 55:22 57:22
58:16 61:2,16
69:3 70:1 71:9
72:12 76:14 79:24
85:16 90:18 91:4
96:10 97:11 102:8
107:10 108:12
109:20,24 114:1
**officer** 9:19
**officers** 38:9
**official** 9:8 14:5
16:3 46:5 99:24
**oh** 16:12 21:15
28:11 108:10
**okay** 8:21 16:14
23:19 42:23 57:25
58:1 67:5 68:22
69:1,7,12,21
72:20 73:18,25
77:15 78:20 83:24
84:1 86:20 89:5
89:18 90:15 94:12
95:6,8 97:17
98:12,16 102:14
102:16 103:5,9,9
103:12,22 104:23
106:25 107:6
110:2 111:8
112:20 117:8
119:5,8
**old** 121:21
**once** 15:6 30:19
47:1 78:18 87:23
96:17 98:9
**ones** 95:22 96:4
108:4
**open** 15:2,7 29:15
31:24 32:3 34:6
35:8 44:21 45:25
46:4 68:13 70:2

opened 24:1
opening 16:9
31:23 99:5
operable 92:16
operate 2:14
36:14 84:22 88:2
operates 24:17
36:11,13 56:13,13
operating 59:16
59:19 60:25 89:17
operation 36:19
61:18
operational 32:9
93:20
operations 17:19
23:21,24 30:8
33:4,13 87:16
88:11,19 89:9
114:23 115:11
opinion 102:21,23
opinions 101:1
103:1
oppenheimer
59:22
opportunity
11:23 13:7,13
15:3,15 16:1,7
45:21 46:10
oppose 114:8
optimistic 11:9
82:23
option 15:21
order 2:3,7 3:14
4:1 5:1 16:4 24:25
45:3 47:22 55:13
57:12,15 58:2,14
58:15,17,20 60:15
60:21 64:2,11
65:8 69:13,15
70:5 73:1,3,15,22
80:12 81:21 83:13
83:20,25 85:20
87:2,4 89:22

91:10 95:9 97:12
97:13,22 98:5,20
99:23 100:5,14
104:1,17 107:12
107:14,15 108:15
109:3 110:19,24
113:5,15,16,19
114:10,15,20
115:3,14,16 116:6
116:13 120:10
ordered 87:12
orders 2:13,22 3:2
3:6,10 4:9,17,21
51:15 54:15 58:4
71:22 90:2 105:25
110:10 118:22
119:4,4
ordinarily 102:8
ordinary 30:16
45:18 59:19 84:19
86:10 87:6 106:13
110:11
organizational
33:8,20 88:25
organized 11:5
originally 56:20
ought 51:20 95:22
outset 11:2 30:23
45:23 48:12 53:8
54:6
outstanding 3:6
28:15 106:11
112:11
overall 49:1 51:16
93:1,6
overarching 50:8
74:19
overlap 23:17
overlapped 80:15
overlapping
55:16
overseas 112:14

oversight 39:7
overview 17:17,20
30:22,23 63:25
owe 35:13 111:20
111:22
owed 27:19 36:6
85:23 87:6 94:2,5
owes 32:12
owned 36:25
owner 78:20,21
ownership 113:9
owns 31:13 32:7
32:15,15 33:18
81:12,16

**p**

p 6:1,1 8:1 78:1
pace 40:12
page 18:4 23:2
27:7 30:21 34:4
34:14 35:21 37:11
37:17 40:2,23
81:23 120:4
pages 23:22
paid 71:11 76:8
79:24 88:12
111:14,21,23
115:21
pandemic 118:13
paper 59:3 64:8
papers 19:17
26:19 43:12 63:1
86:4 106:9 112:25
paragraph 70:16
71:18 72:2,22
93:25 107:19
115:16
parameters 73:13
77:12
pardon 31:5
parent 73:11
80:23 81:16,18
82:15

part 43:24 56:19
62:21 73:10,19
93:2 102:17
107:24
partially 36:4
participant 39:22
participants
14:22
participate 8:24
participating
11:17
particular 11:7
24:9 46:18 51:15
51:15 54:11 64:5
91:11
particularly
49:25 75:18 82:18
96:3 101:18
parties 15:1 18:23
19:16,21 27:14
29:4,4 62:24 63:8
67:17 77:7 83:7
97:25 100:21
101:18
partner 8:16
29:20 47:11
100:19 117:17
partners 7:9 8:24
87:15
party 9:5,9 20:24
28:4,12,18 29:1,6
29:12,13 31:21
45:15 53:3 63:16
65:24 67:20 99:25
100:3 102:24
passionate 12:17
16:8
pat 6:8 8:7,15
10:22
path 13:15 14:9
15:16
pathway 83:7

patiently 116:21
pause 13:11 39:11
  39:12 44:23 45:3
  45:9 78:1,1 83:5
paused 12:16
pay 2:22 3:3 4:9
  4:11 34:23 56:25
  79:22 84:16 85:6
  85:12,14 87:5
  88:20 94:11,21
  95:14,15 96:5
  105:25 106:2
  107:21 109:13,22
  109:23 110:11,15
  110:16 112:4,19
payable 71:13
  110:12,12
paying 12:8 14:15
  17:16 40:17 88:5
  89:12 110:15
payment 4:17
  109:17 112:16
payments 33:11
  34:2 59:20 76:2
  77:10 85:25 88:9
  88:10,15 90:6,22
  91:11 92:12 95:24
  95:24 107:16
  108:16 109:19
  111:16
payroll 59:20
  60:25
peak 41:4
penalties 110:17
pending 100:8
people 10:14 12:6
  12:8 14:20 15:3
  18:12 22:5,14,21
  47:2 63:11 64:6,8
  66:1 77:4 117:10
  117:11 118:7
people's 20:19
  79:15

percent 20:8,10
  20:11 21:4,13,22
  31:13,13,15 32:7
  32:15 37:21,23,24
  38:1 41:6 79:6,11
percentage 15:18
  20:8,12 21:3
perception 41:24
perfectly 94:9
perform 2:16
performance
  40:25
period 41:13
  60:23 61:22 65:10
  71:6,7 72:7,15
  77:13 85:7,11,15
  85:25 95:10 96:4
  109:11,14 110:23
  111:2 113:11
permission 8:20
  12:2,4 69:2 114:9
permit 11:2,12
  12:4
permits 101:12
permitted 9:18
person 9:16,24
  10:3
personal 13:4
  98:22,25
personally 3:20
  47:9 51:23
perspective 41:16
  47:21 62:7,18
perspectives
  80:11
petition 13:20
  17:18 18:6,9,17
  18:25 25:25 26:8
  26:14,14,24 27:4
  27:16,23 28:14
  31:19 32:11 35:6
  35:19 36:17 38:13
  45:15 59:12 72:3

82:2,2 86:14
  87:12 94:3 104:9
  111:3
petitions 113:22
phone 30:22
physical 64:10
pick 23:3 51:3
  84:8
piece 64:8
pitches 55:13
place 14:4 15:6
  22:10 29:24 44:23
  45:10 47:1 49:25
  65:10 68:20 76:18
  86:11 96:17 98:10
  102:1,6 103:3
  109:1
placed 28:13
  67:19
plaintiff 102:24
plan 14:10,13,16
  16:17 17:13 28:23
  30:20 33:2 37:5
  73:11 83:10 97:10
  118:5
planning 8:23
  79:22 114:9
plans 8:5 36:13
  86:5
plant 93:22
platform 25:3
  26:6 27:4 28:4,5
  28:12 32:21 35:16
  36:1 43:20,21
  44:13,19 45:13
  46:2 57:3 88:18
platform's 45:6
platforms 28:19
  43:5
play 82:8,9,15
pleading 22:3
please 8:6 9:2,11
  42:18 47:15 57:20

pleased 28:20
  60:12
pledge 34:20
  45:25 78:18
pledged 68:5
plus 13:17 34:13
pm 1:17 8:4
  119:14
podium 47:11
  84:3,7 104:25
point 14:23 19:12
  20:4,23 23:3 24:7
  32:2 37:13 39:18
  59:23 67:10 69:24
  73:10 79:5 80:24
  107:10 111:20
  117:10 118:13
pointed 102:21
points 67:13
  77:20 92:21
policies 4:10 62:1
  63:6 106:1,4
policy 106:18
  108:19,20,24
  109:4,12
popped 61:6
popular 34:17
portion 30:17
  57:18
position 36:23
  102:6
positioned 68:10
positions 27:13
  60:3
possession 28:1
  65:24
possibility 42:12
  45:14
possible 16:5
  39:21 51:13
  118:17
possibly 74:20

post  24:20,21 25:3
  25:24 26:8,13,24
  27:4 43:25 59:12
  72:3 82:2 86:13
  118:13
posted  19:24
  21:24 24:24 25:6
  25:7 27:14,21
  28:16 35:1,15
  36:7
postpetition  2:18
potential  36:25
  37:7 68:17 93:20
potentially  95:25
practice  39:17
  75:2 76:18 86:11
practices  75:19
  86:15
pre  26:14
precise  26:2
precisely  83:16
precluded  115:18
precludes  100:3
  101:7
preference  118:16
preferences  54:17
preferred  4:23
  6:15 8:13 47:19
  80:9,11,18 82:8,9
preferred's  47:20
prefers  47:23
prejudice  79:1
preliminarily
  48:9
preliminary  9:22
  26:13
premature  22:18
premium  106:17
  109:13,17
premiums  107:22
  108:16
preordain  14:14

prepare  3:15
prepared  97:4
  100:24 108:17
  109:2
prepetition  2:15
  2:23 3:3 4:10
  59:13 84:17 85:22
  85:23 87:6 94:11
  95:24 106:1
present  11:13
  24:18
presentation
  16:25 20:4 23:3
  23:12 32:8 45:9
  53:8 59:5 67:7
  70:6 81:9 92:22
  105:6
preservation
  106:5
preserve  27:10
  28:22 45:4
press  40:19 42:16
  99:6
pretty  52:14
  62:10
prevent  113:10
prevented  78:2
preview  73:1
previewed  85:16
  89:21 99:4 104:10
previously  87:19
  92:22
price  25:8 40:23
prices  37:9
primarily  18:24
  39:15
primary  31:1,5
principally  81:6
principals  99:15
principle  71:22
  72:17,18
print  64:8

prior  27:11 55:23
  58:3,7 87:12
  104:10 107:18
  108:22
priority  3:5 87:11
private  64:6,7,25
proactive  27:9
probably  12:13
  18:20 21:13 22:12
  24:18 30:1,19
  34:9 63:10 105:10
  115:13
problem  28:11
problems  95:21
procedural  113:2
procedures  3:11
  4:22 97:20,24
  98:1,2,11 113:2
  113:17
proceed  12:2
proceeding  9:7
  12:7 42:12 43:7
proceedings
  13:12,19 63:21
  65:25 119:13
  121:4
proceeds  20:15
  32:25
process  15:3
  32:22,24 48:18
  50:16 55:12 88:1
  89:25 90:3 115:1
processes  86:11
product  34:17
products  88:19
professional
  22:10
professionals
  65:11 77:9 102:6
  102:15
profile  43:19
program  4:13
  21:6 34:16,18,25

35:23 37:17,22,23
  38:3,6,17 39:22
  43:20 78:13,16
  79:7 106:3 107:17
  107:17 108:4
programming
  86:13
programs  2:25
  39:18 84:19 86:9
  86:14 106:5,11
  108:1 109:11
progress  51:17
prohibited  9:9
prohibition  51:24
prohibits  115:4
project  88:4,7
  93:1,17
prompt  118:21
promptly  48:14
  67:18
proper  101:18
properly  82:3
property  21:2
  62:24 79:4,8
  106:6 115:19
proposals  55:13
propose  59:24
  70:16 73:22
proposed  8:8
  11:19 33:15 41:23
  57:14 69:7 70:4
  72:9 83:14 84:11
  87:2 97:13 98:20
  99:21,23 105:16
  113:16 114:15
  115:14,16 116:6
  116:12
proposing  55:3
  60:20 76:4
proprietary  62:16
propriety  57:10
prospects  82:24

**protect** 44:1,2
  101:4 113:5
**protections** 5:3
**protects** 101:4
**protocols** 64:7
**provide** 26:20
  47:5 55:15 56:23
  59:10 76:6,13,17
  78:17 85:3 88:18
  92:25 93:25 99:21
  109:21
**provided** 16:15
  19:18 34:19 37:24
  70:19 119:4
**provides** 61:2
  83:6 84:24 94:9
  107:14
**providing** 91:25
**provision** 55:24
  56:21 115:8
**provisions** 5:3
  49:21 114:22,22
  116:7
**public** 10:14
  12:10,11 23:9
  43:19 50:24 52:11
  64:4 99:19
**publicized** 41:11
  42:9
**publicly** 12:25
  13:1 56:17
**publish** 99:9
**publishment**
  51:24
**pulled** 29:2
**pulling** 27:12
**purchase** 4:12
  81:7
**purely** 113:2
**purpose** 13:20
  60:24
**pursuant** 20:13
  21:5 27:20 38:5

  98:23 99:23 115:7
**put** 17:1 44:23
  45:9 57:14 64:9
  77:12

**q**

**q2** 36:14
**qualified** 39:19
  55:10 62:4 65:14
**question** 20:17,22
  26:18 28:24 29:2
  35:20 47:5,14
  48:9 57:9 61:24
  86:3,8 88:23
**questions** 12:18
  13:14 17:9,10
  19:7,13,24 23:2,4
  23:7 37:15 39:14
  39:23 46:9,23,24
  47:4,4 54:11
  62:22 66:3 75:24
  76:9 85:18 88:8
  98:4 100:13
  104:16 116:12
**quick** 50:5 118:9
**quickly** 22:12,23
  88:10 92:10
**quite** 37:7 48:16
  56:8 94:24 101:1

**r**

**r** 1:21 6:1 8:1
  121:1
**raise** 80:20 99:16
**raised** 21:12 81:5
**raises** 82:12
**raising** 50:12
**rapid** 40:11
**ratably** 45:5
**rational** 99:19
**reach** 47:2 69:9
  118:13
**read** 19:17 24:9
  26:19 39:6 42:2
  54:1

**readily** 64:4 116:7
**reading** 26:2
  42:14 59:3 86:4
  94:3
**real** 23:10
**realities** 82:1
**reality** 44:16 45:3
**realize** 16:1
**really** 23:22,24
  40:9 41:9 59:10
  61:17 66:22 67:4
  71:15 75:2,3 76:4
  90:4 91:10 92:11
  93:14 102:5,5,14
  102:15 103:3
  118:20
**reason** 13:6 23:12
  43:15,17 62:21
  67:1 110:23
  113:12
**reasonable** 45:12
  100:1
**reasons** 49:19
  89:16
**rebounds** 37:6
**recall** 24:14 27:1
  42:13
**receive** 32:24 56:2
  83:1 91:24
**received** 9:22
  13:16 39:12 42:15
  91:4,4 99:13
  113:17 115:15
  116:9
**receiving** 12:12
  16:8 99:7,15
  100:22
**recognition** 43:7
**record** 9:9,12
  26:12 47:17 56:10
  61:9 67:23 80:8
  84:11 100:12
  105:16 121:4

**recording** 9:4,8
  26:6
**recover** 20:2 25:8
  63:3
**recovering** 44:18
**recovery** 13:21,25
  15:20 16:1 37:1
**red** 33:9
**redact** 3:19 98:22
  98:24
**redacted** 99:23
  100:5
**redaction** 100:7
**redline** 69:19
  70:18 73:23 74:2
**redlines** 58:4
**reduction** 18:16
  18:22
**refer** 32:17 53:16
**referred** 15:24
  66:8 68:15 71:2
**reflected** 69:13
  113:16 115:14
**reflecting** 114:10
**regard** 39:7 86:12
**registered** 34:5
**registers** 56:24
**regular** 103:6
**regularly** 75:5
**regulations** 98:24
**regulators** 39:10
  39:14 52:1
**regulatory** 39:7,7
  39:8,12 49:13,14
  49:16
**rehypothecate**
  34:20
**reimbursable**
  2:24 84:18
**reiterate** 48:23
**relate** 39:15 74:20
  88:19

related 2:5,9,15
2:19,25 3:7,12,22
4:6,13,18,24 5:5
40:6 70:24 80:24
85:7 100:2 112:11
relates 18:17
28:25 33:11 91:6
relating 112:13
relation 10:15
93:10 106:15
relationship
66:21
relationships
63:18
relative 12:21
41:17,17
relatively 23:8
40:7 41:21 51:14
relayed 49:3
relevant 26:15
32:5 37:3 70:22
70:23 76:15 116:5
relief 2:5,10,19,25
3:7,12,22 4:6,14
4:18,24 5:5 11:21
33:22 34:1 53:5
53:24 54:9,16
65:7 82:17,22
85:9 86:19 99:8
100:7,9,25 103:4
103:11 106:12,21
107:24 108:1
112:1,17,20 113:1
113:7,12 120:8
reluctant 46:13
remain 22:23
26:24 82:23
remaining 15:25
73:8 105:1
remains 22:24
68:7 78:12
remarks 16:10

remember 14:4
100:17
remind 47:15
remit 110:11
remote 9:17
remove 45:14
render 30:12
rendering 45:19
renew 4:11
renting 66:10
reorganization
14:1,10 16:5
30:20 33:5 46:2
82:24
reorganize 46:8
repay 75:16
repayment 37:3,4
replicate 61:19
report 28:20 66:4
68:21
reports 4:6 104:5
represent 47:18
60:24
representations
57:24 101:15
representative
16:4 46:5
representing 7:9
47:16
reputable 66:15
reputations 44:25
request 55:25
58:2 72:4,15
85:19 100:1,14
104:12,17 107:21
116:12 117:2
requested 86:19
99:8 100:6,7
requesting 53:5
54:16 100:4
106:12 110:19,23
requests 39:11,15
43:24 54:8

require 56:14
118:21
required 55:5
94:13 99:8 115:10
118:16
requirement
113:20 114:4
requirements
52:6 62:1
requires 52:7
requisite 108:23
reserve 103:20
reserved 79:15
resolution 52:4
resolve 72:18
94:17,18
resolved 11:9
17:11 70:11
respect 4:23 19:13
25:23 32:23 43:12
48:22 49:1,5,11
50:1,9 51:19 58:9
58:15 59:15 62:8
66:18 74:19 75:20
80:13 82:17 83:18
86:21 88:9 91:20
95:23 100:23
104:5 107:14
109:18 111:19
respectfully 85:19
98:5 100:14
104:17 116:12
respects 13:8
respond 21:17
39:11 46:20
responses 47:5
66:4
responsive 91:25
94:24
restart 25:14
restating 5:2
114:20 120:10

restriction 51:24
61:20
restrictions 62:8
result 115:2
resulted 41:12
results 118:9
resume 25:16
retail 13:17,17
24:4 31:6,7,10,22
31:23 34:15,24
35:1,7,9,12 46:21
retain 55:3 58:9
78:5 120:6
retained 55:15
57:11 81:2
retention 55:3
57:20 86:12
return 48:13
56:25 67:18,18
revenue 88:3
review 56:5,7
reviewed 54:14
57:13 76:9
revised 58:14,20
65:8 69:14 71:22
87:2 97:12 98:20
113:15 114:10
revisions 65:9
rewards 34:24
38:3
ride 44:21
riding 15:24
rig 81:17
right 9:13 10:20
10:24 16:11 17:3
25:12,18 30:4
31:9,14 38:10,11
39:23 40:1 42:4
43:19 51:2 53:9
53:10 54:18,20
63:21 66:22 68:11
70:14 71:3,6,25
73:7,17 79:17

80:3 81:10 83:17
83:19 86:16 96:5
97:15 98:9 100:4
103:9,21 105:13
105:22 106:25
107:2,8,20,23
110:6,7 111:6
112:20,22 114:12
114:16,17 116:15
117:23 118:4
119:2
**rights** 66:24 79:15
81:4 115:24
**rigs** 36:13 81:7
112:13,16,18
**rings** 36:14
**risk** 28:5,5 40:20
40:21 42:11 44:3
45:15
**road** 121:21
**robert** 11:18
52:21
**robust** 48:17
**role** 26:9 81:25
82:8,16
**ross** 6:9 8:17
47:12 51:5
**roughly** 79:5
**rule** 4:5 21:2 53:6
54:8 55:6 104:7
106:12 110:20
**rules** 55:6
**ruling** 22:4 97:3
**rulings** 120:3
**run** 41:10 43:22
44:3
**running** 93:3
**rushing** 87:22

**s**

**s** 6:1 8:1
**s&p** 41:1
**safe** 29:24 64:9
66:11

**safeguard** 27:10
28:22 67:11
**safeguarding**
30:10
**safely** 62:16
**safer** 68:12,19
**safety** 13:4,4
43:21
**salaries** 2:23
84:17
**sales** 111:22 112:5
**sanguine** 44:14
**satisfaction** 19:3
**satisfactory** 110:4
**satisfied** 57:18,24
107:11 109:21
**satisfy** 25:1,13
43:24,25
**savvy** 49:25
**saw** 38:7 53:2
61:12 81:8 113:14
115:13
**scenario** 28:8
**schedule** 77:4
103:21 117:13,24
**scheduled** 99:14
103:25 106:20
**schedules** 4:2,3,3
99:1,22 104:2,14
104:20
**scheduling** 103:18
**scope** 60:13 85:9
95:11 97:24
115:17
**screen** 9:6 14:21
**screens** 117:1
**sdny** 59:18
**seal** 51:18 96:16
100:18
**sealed** 51:20
**sealing** 100:9,9,24
101:11 102:7
103:1

**search** 50:5 55:12
**sec** 115:15
**second** 14:25
31:16 42:4 65:5
100:10 101:23
106:19 111:20
117:1 118:11
**section** 62:3 70:18
115:8,11,17
**secure** 17:18 25:7
27:22,25 28:17
**secured** 36:4,4
**securities** 38:8,15
39:2,4,16 59:22
**security** 9:19
38:17,17 64:7
67:16
**see** 16:20 17:5
21:7 23:7,10,12
24:16 48:8 64:24
65:3 72:17 76:15
79:2 81:23 82:9
83:22 89:19 92:9
97:2 103:2,5,19
103:21 105:14,15
109:15
**seeing** 24:14
44:21 83:20
**seek** 11:21 84:16
87:4 88:20 97:22
98:24 113:1 115:9
116:1
**seeking** 2:3,7,12
2:21 3:1,9,14 4:1
4:8,16,20 5:1 85:6
85:12,14 86:2,5,9
87:9,10 90:12,13
111:7 115:2,24
**seeks** 98:21 104:1
105:24 110:10
113:2 114:20
**seen** 16:21 38:24
65:8 71:20 113:19

116:4
**sees** 80:18
**segment** 92:23,23
**segments** 34:15
35:22
**segue** 51:5
**selected** 22:16
55:11
**self** 66:8
**sell** 34:20 72:24
73:12 78:18
**selling** 60:7
**selloff** 40:18
**sells** 73:6
**send** 46:18 97:12
**sense** 19:19 25:2
60:1 80:18 82:5
**sensitive** 100:21
101:3,6
**sensitivity** 52:8
**sent** 10:8,17,18
**sentence** 71:1
**separate** 3:16
51:18 81:17 100:9
**separateness**
81:19
**separates** 112:5
**series** 6:15 8:13
47:19 71:16 80:9
80:11,20,21
**serious** 57:9
**serve** 59:10 116:1
**served** 60:5 91:17
**serves** 53:4
**service** 99:2
100:18
**services** 76:1,5
85:4 88:18
**set** 84:22 93:8
94:2 101:16 102:2
102:13 103:9
104:7 118:10,24

settlement 118:9
seven 8:9 13:17
  36:17 94:4,4,22
  104:3,13
severance 85:13
shame 61:10
shara 7:6 48:5
  57:22 69:25 71:8
  90:17 96:9 108:11
share 51:9 55:19
  56:1 90:5 95:1
shared 49:18
shareholder
  113:21
shareholders 6:15
shares 8:13
sharing 52:9
  91:23
she'll 103:7
sheet 34:1 101:9
short 11:4 16:15
  94:16
shorten 83:12
shortly 17:24
show 26:7
showing 25:24
  101:7
shown 33:9,10,17
shows 14:21 40:23
  78:21
shy 50:12
side 21:19,25 22:7
sides 52:15
signature 59:17
  59:22 121:7
signed 14:22
  22:21 57:2
significant 12:10
  12:11,12 13:17
  23:17 39:8 43:10
  60:19 82:14 87:21
silence 12:21

silos 81:17
similar 38:21 39:2
  48:25 55:13,17
  57:2,5,6 70:25
  97:12
simon 6:11 8:18
  105:1,8,16
simplify 60:13
simply 116:1
single 63:10
  109:12
sir 19:11 119:6,6
sit 29:23 88:14
site 93:2,11
  108:19
sites 106:15
sits 88:14
sitting 20:15,25
  27:4 28:3 44:12
  112:15
situation 66:6
  69:17 93:16
situations 99:11
six 28:19
size 97:24
sketched 56:11
skipping 23:2
sleep 63:12
slide 16:15,16,20
  23:22 27:8 37:11
  37:18 88:24
slow 90:21 92:4,5
slowly 50:23
small 15:2 20:12
  21:3 35:11
smaller 107:2
smallest 15:8
smooth 51:14
social 12:13 13:3
  41:22 42:9 44:25
  99:6
sofas 103:25

sold 32:25
solicited 48:10,13
solution 66:8
  99:19
solutions 68:12
  121:20
solve 95:20
somebody 47:4
  61:12 63:16 64:1
  64:20 78:22 79:1
somewhat 28:25
  38:2 46:11
sonya 5:25 121:3
  121:8
soon 22:9 112:16
sooner 22:2,8
sorry 16:12 35:19
  57:21
sort 22:3 55:18,19
  65:1 77:3 86:12
  95:23
sound 9:9
sounds 13:5 110:3
source 37:1 87:25
southern 1:2
  47:10
span 114:23
speak 9:11 40:8
  44:22 50:8 57:9
  61:15 77:18
speaking 8:6 9:5
  23:22 27:9 34:4
  42:18,19 62:11
special 22:15
specialized 62:16
specific 20:15
  28:5 33:24 40:13
  41:8 43:18 49:9
  62:8 91:24 101:8
  117:2,3
specifically 40:8
  49:12 52:25 70:4
  98:22 102:23

speed 55:18 74:9
  75:12
spell 83:6
spend 68:25
spending 82:19
spent 63:11 64:21
  68:9 90:23 93:14
spike 76:19
spoke 72:11
spoken 119:8
spread 34:12
stability 83:1
stage 66:25 77:14
  87:25
stake 63:16
stakeholders
  14:12 23:10 28:23
  37:1 68:21 83:1,8
stakehound 63:16
  63:21 66:5
staking 24:2
stand 59:9 69:23
  70:2
standpoint 64:18
start 13:13 62:6
started 33:25
  102:19
state 9:11 25:11
  39:16 49:14
stated 54:17 66:16
statement 4:4
  49:3 56:4 78:6
statements 99:1
  99:22 104:2,14
states 1:1,12 7:1,2
  11:6 36:12 48:6
  51:10 57:22 60:12
  70:1 71:9 85:16
  90:18 96:10
  102:19 104:11
  107:10 108:12
  111:15 114:2
  116:11

stating  99:14
stats  36:16
status  2:18 23:21
  23:23 30:8 93:1
  108:13 113:20
  114:5
statute  61:25
statutory  85:15
  85:24,25 86:2
stay  5:2 22:5
  114:21 115:3,4
  120:11
step  99:19
stepping  116:22
steps  17:18 27:9
  29:19,22 45:12,12
  68:17
stock  4:23,24 81:3
stolen  64:20
stop  26:9 65:5
  77:13 94:3
storage  32:21
  62:2,8 64:10
  66:10,11,12,13,15
  68:12,16,19 69:5
store  63:18 64:16
  66:7 68:20
stored  63:19
  64:12
story  53:22,23
straight  78:14
strategy  88:3
streamline  53:8
street  7:3
stretto  2:8 16:25
  17:7 55:2,3,10,14
  55:21 56:6,11,22
  56:24 57:1,4,10
  57:19 58:6,9
  120:6
stretto's  56:15
  58:3

strike  55:24 72:14
striking  70:22
strong  118:16
structure  30:23
  31:1 33:8 47:20
  49:2 113:10
stuff  66:15
subject  28:4 51:24
  67:21 83:20 97:3
  110:16
submit  58:13,20
  70:17 83:23
  114:10
submitted  56:6,6
  58:3,21
submitting  3:16
subsequent  58:16
  113:25,25
subset  35:11
subsidiaries  32:17
subsidiary  36:11
  61:1
substantial  63:3
  65:23 83:1 87:17
  104:7 113:21
substantive  113:1
succeed  14:11
  46:2
successfully  106:7
sudden  76:19
suffered  40:4,6
  67:14
suffice  64:17
sufficient  82:25
suggestion  12:1,3
  47:8 58:19
suite  121:22
sum  30:7 63:3
  99:18
summer  19:15
superpriority
  2:17

supplement  4:12
supplemental
  50:14
support  11:21
  17:13 53:1 56:6
  61:2,16 82:22
  83:13
sure  9:2 20:21
  30:24 33:21 41:11
  45:10 48:12 50:18
  52:15 54:11 61:12
  62:20 69:5 81:19
  81:25 86:6 90:24
  91:3 92:2 93:19
  94:6 95:1,12
  100:11 104:14
  113:14,18 116:4
surety  4:13 106:2
  106:4,11 107:17
  107:21,25 108:4
  109:18
surprise  45:2
sussberg  6:12
  8:22,22 117:18
sustained  41:18
switch  117:1,24
system  2:14 10:7
  10:19 59:3
systems  67:20

t

t  121:1,1
tahiti  64:21
tailor  54:16 85:9
tailored  109:3
take  8:5 10:20
  13:20,25 17:23
  24:19 33:23 46:11
  47:8 67:22 102:6
  105:1
taken  17:18 27:17
  29:19,22 45:12
talk  21:21 23:20
  31:15 32:7 33:19

50:13,17 60:10
  73:12 74:17 81:22
  103:8 116:23,25
talked  35:3 97:6
talking  21:16
  25:15 27:7 35:21
  37:19 42:25 63:11
  66:9 72:2
talks  37:11
tasked  52:18
tax  113:5
taxes  4:17 110:9
  110:11,15,16
  111:5,14,21,22
  112:5
team  50:18,20
  52:24 54:7 89:24
technical  64:2
technology  62:16
  88:19
telephone  94:18
  96:7
telephonically  6:8
  6:9,10,11,12,19
  7:6,8
tell  28:10 29:8
  53:22,22 54:19
  63:20 89:3,5
  91:23 94:10 96:4
  101:1,20 102:4
  117:20
tens  12:7
tense  24:19
term  30:25 88:2
terminate  115:7
  115:10
terminating  59:24
terms  17:8,12
  18:21 19:7 30:7
  34:18 37:3,21
  62:13 68:23 73:21
  78:16 79:2,3 93:1
  93:11

**terra** 40:5 41:11
41:14,19,21,24,25
42:1 43:3,3
**testify** 53:3
**tether** 18:24,24
19:3
**texas** 87:18 89:10
**text** 9:25 10:2
**texts** 10:9
**thank** 8:10,14,21
8:24 9:12 11:3,6
15:13 23:1 25:18
42:23 43:2 46:9
47:7 50:25 51:1
52:17 54:25,25
57:21,24,25 58:1
58:1,11 59:6 67:9
69:1,12,25 74:9
74:18 77:23 80:2
80:5,7 83:11 84:2
84:6 86:19,24
89:24 96:20 98:13
98:16,17 103:13
103:23 104:24
105:2,3 107:9
110:3,5,7 111:12
112:22 114:18
116:15,16,20,23
118:2 119:6,7,11
**thanks** 38:7 47:9
72:1 119:6,10
**that'd** 118:2
**theory** 73:6
**thereto** 2:15
**thing** 13:9 25:21
79:19 94:21
**things** 12:25
25:14,15 33:10
34:22 37:12,13
46:13,25 51:18
52:12 55:21 57:19
64:3 69:23 70:2
76:24 77:25 92:13

**92:14 102:5**
111:13
**think** 10:2 17:10
17:14 19:22,23
20:9,17 21:20
22:9 23:10 24:12
29:20 30:1,3
36:16,25 37:5,7
37:19 38:11,19
40:3 44:10 45:2,7
45:8 46:20,24
47:8 48:17,24
49:17,19,22 50:14
51:13,16,19 53:20
55:15,20 60:13
61:8,20 62:25
64:23 65:22 69:20
70:7 72:25 74:5,8
76:17 77:8 78:22
79:3,7 80:14
81:25 82:7 83:4
88:22 91:17 92:11
95:7 96:3,13,23
96:25 101:12
103:7 106:19,24
107:2,4,7,24
109:3,9,13 113:7
113:8 118:5,11,11
**third** 8:18 18:23
19:16 27:14 28:4
28:12,18 29:1,3,4
29:6,12,13 45:15
62:24 63:7,16
65:24 67:17,20
**thought** 21:19
22:7 54:9 66:25
72:12
**thousand** 15:17
34:10
**thousands** 12:8
35:7,12
**threats** 99:7,15
100:22

**three** 39:1 40:7,13
41:13 43:8,11,14
54:2 59:21 68:3
93:7 100:16
102:17,19
**thursday** 28:10
**tied** 64:14
**time** 4:2,5 8:5
9:11 23:10 36:14
41:6 48:20 52:5
57:24 59:1 63:11
68:1,9,25 78:3
80:25 82:19,25
92:19 94:16 98:15
100:10,17,19
101:18 105:9
106:19 111:24
117:13
**timeframe** 41:9
**timeline** 91:14
**times** 17:5 51:8
54:2 64:12
**title** 26:21 34:19
68:7 78:6,12,17
78:18
**today** 8:20,23
9:17 10:21 11:2
11:21,25 12:2
16:19 17:5,11,17
17:19 19:20 24:9
25:16 30:18 37:8
40:17 43:16,17
48:4 52:19 54:8
59:9 60:19 65:9
65:20 66:17 72:23
77:6 79:1 81:1,25
82:17,22 83:14
93:5 103:6,9
105:19 114:8
116:18 119:8
**today's** 54:22
99:17

**token** 38:1
**told** 38:14 62:25
109:22
**tomorrow** 65:21
95:14 96:4
**top** 20:7 41:5
68:16 82:13
**topic** 62:19 67:12
79:16
**total** 80:24 87:9
90:11 111:2
**track** 26:12,16
42:1 59:1,4 67:23
76:12
**tracked** 81:20
**tracking** 80:13
**trade** 14:8 87:15
91:8 94:1
**traded** 57:3
**trading** 56:14
60:7
**traditional** 12:12
40:18 42:9
**transaction** 32:4
63:15 64:2 81:1
**transactions** 2:17
26:6 33:7 70:19
72:6
**transcribed** 5:25
**transcript** 121:4
**transcripts** 54:14
**transfer** 26:5,23
34:19 72:10 74:25
**transferred** 26:21
29:13 32:1 62:25
75:21 76:20 78:21
79:6
**transferring**
60:16 68:18 74:25
75:4
**transfers** 4:22
59:4 60:11,22,25
61:14,21 75:11

76:19 77:5 78:17
80:14 113:4
**transit** 87:11
**transparency**
16:18 23:7 49:12
50:15 74:21 80:14
91:22
**transparent** 45:25
46:4,25
**treasury** 59:16,18
**treated** 42:13
**trickling** 50:23
**tried** 85:9
**trillion** 41:3,3,4
**trouble** 88:24
**trough** 25:7 44:4
**true** 26:24 50:11
80:25 91:14
109:11 121:4
**truly** 20:18,19
**trust** 20:19 22:22
68:8 78:24 102:25
**trustee** 7:2 29:25
48:6 51:10 52:10
57:18,22 58:16
60:12 61:15,25
63:6 65:6,12,18
68:1 69:8,23 70:1
71:9 72:4 76:17
77:10 85:17 87:2
89:21 90:18 93:25
94:14,15,24 95:6
95:13 96:10,16
97:11 99:24 100:6
101:10 104:11
107:10 108:12
109:20,24 114:2
116:11
**trustee's** 11:6
48:3 55:22 69:3
72:12 76:14 80:16
**try** 17:13 102:11

**trying** 54:2,8
77:14,14 86:13
92:3 109:12 112:3
113:10,12 118:7
118:10
**trypot** 59:12
**tuesday** 28:9
100:16
**turn** 69:14 104:25
**turnaround** 95:16
**turning** 23:2
30:21 34:14 58:11
**turns** 90:2 97:18
**twitter** 41:22
**two** 10:9 14:20
26:4 27:16 28:17
35:24 40:13 55:12
55:17,21 64:3
77:25 87:23 88:25
89:1 91:13 93:21
102:3 112:5
**type** 37:4
**typical** 12:24

**u**

**u.k.** 80:22 81:16
81:18 82:15 98:24
**u.s.** 1:23 13:21
15:20 29:25 57:17
58:16 59:17 60:23
61:15,20,25 63:5
65:6,12,18 68:1
69:3,8,23 71:5,14
72:4,11 76:14,17
77:10 80:16 81:15
81:16 85:1 87:2
89:21 93:25 94:14
94:15,24 95:6,13
96:16 97:11 99:24
100:6 101:4,10
109:20,24
**uh** 28:10
**uk** 31:12,17,21,25
32:1,6,11,13,14

33:1,3 35:25
51:25 52:1
**ultimate** 28:23
**ultimately** 30:19
85:10 89:12
**unable** 21:10
**unanimously** 44:8
**unaudited** 18:7
**uncertainty** 39:9
56:19
**unclear** 111:16
**underperformed**
40:25
**underpinning**
53:5
**understand** 14:20
19:14 21:12 22:19
22:20 38:16 44:14
52:15 54:3 56:22
62:2 63:9,24,25
66:2 68:6 73:14
77:10,14 79:23
81:5 85:21 88:22
90:2,8 91:10,12
92:3 94:9,20
107:11 110:25
112:3 114:7
**understandable**
25:9 60:18
**understandably**
24:18,19
**understanding**
88:24 108:13
111:24 112:9
114:3,14
**understood** 33:21
76:11 77:16
103:23
**underway** 91:12
93:14
**underwhelming**
40:25

**undisputed** 3:5
**undoubtedly**
15:18
**unequivocally**
78:17
**unexpired** 4:4
**unfamiliar** 115:1
**unfortunate**
93:16
**unique** 92:23
**united** 1:1,12 7:1
7:2 11:6 36:12
48:6 51:10 57:22
60:12 70:1 71:9
85:2,16 90:18
96:10 102:19
104:11 107:10
108:12 114:2
116:10
**units** 115:9,18
**universe** 23:9
**unlock** 63:2 64:11
65:1
**unpaid** 111:3
**unredacted** 99:21
**unregistered**
38:17
**unrelated** 22:12
**unrepresented**
46:17
**unseal** 100:4
**unsecured** 3:18
14:6,8 36:4 42:13
78:7
**untenable** 44:7
**unusual** 21:20
**unwound** 27:13
**upside** 79:25
**urgently** 94:17
**usc** 55:4
**usd** 71:11 79:21
**use** 34:1,18,20
59:18 60:4,8

61:21 63:15 76:25
78:18
**useful** 17:15 18:21
19:6 37:18
**user** 18:21
**users** 26:5 34:5,8
**uses** 73:5
**ust** 14:5
**usual** 23:25 30:9
45:16
**usually** 94:10,13
94:24 118:9,24

## v

**v** 3:21
**vacation** 103:6
**vague** 108:18
**valid** 25:9
**valuable** 37:1,7
37:10 45:19 46:7
**value** 14:2 18:15
18:18 21:10,13,14
24:21,23 27:22
29:5 35:15 36:7
41:3,13 44:5,12
60:19 61:14 65:23
80:25 82:14 83:8
87:25 92:24 93:4
106:5
**valued** 35:17,18
71:10
**varick** 7:3
**variety** 64:16
**various** 110:17
114:25
**vast** 15:22 38:4
**vat** 112:6
**vendor** 33:11 34:2
87:7,7 88:15 90:6
91:2,6,7,20 95:24
97:5,15
**vendors** 3:3,4
59:20 86:25 87:16
88:6,12,17,21

89:10,13 90:6,20
91:5 96:12
**verify** 68:8
**veritext** 121:20
**version** 9:8 58:20
58:21,21 71:20
72:22 73:23 99:21
**versus** 52:7 112:5
**video** 53:2
**view** 12:21 26:12
37:13 44:9 45:12
98:1
**violation** 115:11
**violence** 100:22
**virtually** 11:17
63:18
**visibility** 49:1,11
**voice** 15:10
**volatile** 22:23
28:6
**voyager** 23:14,16
38:23 55:14,25
56:7 57:11,13
81:10,11

## w

**wading** 116:21
**wages** 2:23 84:13
84:15,17 86:21
120:7
**wait** 21:21 22:4
33:19 70:5
**wake** 41:20
**walk** 58:18 60:15
69:16
**walking** 65:2
70:12
**wallet** 68:16
**wallets** 26:6 64:12
64:13,15
**walls** 64:14
**want** 9:21 10:16
15:1,3 19:19
22:22 39:5 45:1

46:17 48:8,20
50:7 51:7,9 56:4
56:17 57:20 63:12
65:3,6,11,22,23
68:3 70:5 71:9
72:10,13 73:15
74:16 77:25 79:19
79:24 86:5,16,20
89:18 90:15 93:19
94:10,11,22 95:14
95:15 97:14
101:13 102:1,5,11
102:15,20 103:3
108:8 109:6,23
112:2,19 114:16
116:23,25 117:5
117:19 119:3
**wanted** 16:9 23:8
31:24 33:21 48:23
52:20 53:22 54:6
57:23 74:18 77:18
77:23,24 78:8
79:18 80:6,10
90:19 100:11
115:17
**wanting** 100:18
**wants** 13:22 26:22
65:6 89:19 97:2
**war** 102:9
**way** 16:12 20:16
24:16 44:5 47:3
59:11 77:8 86:10
88:16 101:9
109:16 115:19
**ways** 64:16
**we've** 11:9 15:17
17:18 21:19,21,25
28:8 29:25 30:9
30:10 34:9,9
40:22 43:2,3,3
46:7 51:16,17
58:15,21 59:11
60:11,14 67:19

68:4 69:3,6,7,17
70:11,12 90:20
99:18
**web** 56:13
**website** 16:25
17:1,7,22
**wednesday** 48:14
117:21,24
**week** 68:3 92:9
102:17 103:7
**weekend** 50:22
51:8,11 75:24
76:10
**weeks** 12:21 26:4
27:16,23 28:17
46:14 102:3
**welcome** 15:14
52:12
**welcomes** 13:6
**went** 42:21 89:25
90:1
**whatnot** 116:24
**whichever** 47:22
**white** 8:2 42:21
**who've** 57:2 62:15
**wholly** 36:25
**wide** 21:9
**widespread** 41:22
**wiles** 23:15 57:12
**wind** 98:10
**window** 65:2
**winds** 65:25
**winter** 15:25
**wirtz** 6:10 8:17
84:8,10,11 86:1,8
86:24 89:4,7,20
90:10,13 92:21
95:18 96:18,19,20
96:24 97:9,10,16
97:18 98:9,13,17
103:10,11,13,23
104:24 105:18

**wish** 13:9 58:8
64:22 80:25 91:19
116:14
**wishes** 53:3 83:18
**withdrawal** 43:24
**withdrawals**
12:16 18:21 19:25
40:12 42:5 78:2
**word** 119:5
**wordsmith** 96:22
**wordsmithing**
71:1
**work** 14:9 16:3
17:25 39:13 50:16
50:16 54:3 77:7
83:21 92:3 96:19
97:1,6,10 102:4
103:2,2,19,19
117:14,16,17
**worked** 58:7 75:9
75:23 83:23 92:25
**working** 39:10
40:2 50:18,23
51:10 52:24 92:3
93:5,8 98:15
104:21 118:23
**works** 69:5
104:22 105:20
117:18
**world** 15:18 34:12
37:6 66:1 79:2
94:10
**worldwide** 5:2
65:19 87:15
114:21 120:11
**worry** 99:10
**worrying** 63:12
**worth** 110:21
**worthlessness**
4:23 113:5
**worthwhile** 22:2
**would've** 13:11

**wrapping** 45:7
**written** 69:8
77:12
**wrong** 40:14
**wrote** 102:21,23

| x |
|---|

**x** 1:4,10 56:2
120:1
**xclaim** 56:12,13
56:15,23,23,25
57:3

| y |
|---|

**yards** 6:16
**yeah** 20:6 59:6
69:1,12 71:13
78:12 102:10
107:23 110:3
112:8
**year** 31:25 80:19
105:7 111:16
**years** 22:13 52:23
**yesterday** 10:12
105:11
**yield** 34:23,24
**york** 1:2,14 6:6,17
7:4 47:10

| z |
|---|

**zoom** 9:18 11:13
14:21 94:18 118:6
118:13,14,18