**Hearing Date: August 8, 2022, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: August 5, 2022, at 4:00 p.m. (prevailing Eastern Time**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AN ADVISORY AGREEMENT WITH ROD BOLGER PURSUANT TO SECTIONS 363(B) AND 503(C)(3) OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into an Advisory Agreement with Rod Bolger Pursuant to Sections 363(b) and 503(c)(3) of the Bankruptcy Code* (this "Motion") will be held on **August 8, 2022, at 10:00 a.m., prevailing Eastern Time** (the "Hearing"). In accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only"

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

appearance before the Court, need to make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*,  No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served so as to be actually received by **August 5, 2022, at 4:00 p.m., prevailing Eastern Time**, by (i) the entities on the Master Service List available on the case website of the above-captioned debtors and debtors in possession (the "Debtors") at  https://cases.stretto.com/celsius  and  (ii) any  person  or  entity  with  a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated: July 25, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**Hearing Date: August 8, 2022, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: August 5, 2022, at 4:00 p.m. (prevailing Eastern Time**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR**
**ENTRY OF AN ORDER AUTHORIZING THE DEBTORS**
**TO ENTER INTO AN ADVISORY AGREEMENT WITH ROD BOLGER**
**PURSUANT TO SECTIONS 363(B) AND 503(C)(3) OF THE BANKRUPTCY CODE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

**Relief Requested**

1.    By this motion (the "Motion"), the Debtors seek entry of an order, substantially in

the form attached hereto as **Exhibit A** (the "Order"), authorizing the Debtors to enter into an

Advisory Agreement with Rod Bolger for a period of at least six weeks.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's
principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05,
Hoboken, New Jersey 07030.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York
(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the
*Amended Standing Order of Reference* from the United States District Court for the Southern
District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court
entering a final order in connection with this Motion to the extent that it is later determined that
the Court, absent consent of the parties, cannot enter final orders or judgments in connection
herewith consistent with Article III of the United States Constitution.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 363(b) and 503(c) of
title 11 of the United States Code (the "Bankruptcy Code"), rule 6004 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(a) of the Local Bankruptcy
Rules for the Southern District of New York (the "Local Rules").

## Background

5.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are
one of the largest and most sophisticated cryptocurrency based finance platforms in the world and
provide financial services to institutional, corporate, and retail clients across more than
100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which
users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans
using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius
has more than 1.7 million registered users and approximately 300,000 active users with account
balances greater than $100.

6.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary
petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts

and circumstances of these chapter 11 cases is set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] (the "Mashinsky Declaration") and the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "Campagna Declaration").[2]  As described in more detail in the Mashinsky Declaration, the Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

7.    The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) and under the *Order Directing (I) Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 53].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### Mr. Bolger's Employment with the Debtors and the Advisory Agreement

**I.    The Need for Stability.**

8.    Following a tumultuous series of events—the onset of "crypto winter" and its corresponding extreme market volatility, the lingering effects of the COVID-19 pandemic, rampant inflation, and the adverse effects of the war in Ukraine on the world economy—the Debtors are working in earnest to stabilize their business.  These chapter 11 cases allow the Debtors

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Mashinsky Declaration or the Campagna Declaration (together, the "First Day Declarations"), as applicable.

to evaluate strategic paths forward and implement a plan that will maximize the value of its business and generate meaningful recoveries for all stakeholders as quickly as possible.

9.      On June 30, 2022, Mr. Bolger gave notice to the Debtors that he was voluntarily terminating his employment (the "Termination Notice") and would no longer would serve as their Chief Financial Officer ("CFO").  In accordance with his Termination Notice and the terms of his Employment Agreement (as defined below), Mr. Bolger is required to give the Debtors eight weeks' notice, which he has done, and he is continuing to serve as an employee of the Debtors. On July 11, 2022, the Debtors promoted Chris Ferraro to the position of CFO.

10.     Because of Mr. Bolger's familiarity with the Debtors' business, the Debtors have requested, and Mr. Bolger has agreed pending the Court's approval, to continue providing advisory and consulting services to the Debtors pursuant to an Advisory Agreement (the "Advisory Agreement").  As CFO for the Debtors during the extreme market volatility in 2022, Mr. Bolger led efforts to steady the business, guided the financial aspects of the business, and acted as a leader of the company.  Through the Advisory Agreement, the Debtors will be able to continue utilizing Mr. Bolger's institutional knowledge and services for at least two additional months for the benefit of their business and their estates as they continue to transition roles and responsibilities to their new CFO.  The Debtors recognize that they need Mr. Bolger's services and expertise as they manage their transition into chapter 11 and begin negotiating a path forward.  His institutional knowledge and experience concerning the unique features of cryptocurrency are invaluable.

11.     Recognizing the negative impact to the Debtors' business if Mr. Bolger were to abruptly discontinue providing services to the Debtors, the Debtors believe that entry into the Advisory Agreement is a proper exercise of their business judgment, is justified by the facts and

circumstances of these chapter 11 cases, is in the best interests of their estates, and will benefit all

stakeholders in these chapter 11 cases.

## II.     The Employment Agreement.

12.     Mr. Bolger currently is party to an employment agreement with Celsius Network

LLC to act as the CFO of Celsius Network Limited (the "Employment Agreement").  The material

terms of his Employment Agreement, attached hereto as **Exhibit B**, are summarized as follows:

- Services:  Mr. Bolger performs such duties and exercises such supervisions with regard to the business of the Debtors as may be prescribed from time to time by the CEO of Celsius Network Limited.  He promotes the interests of the Company and devotes substantially all business and professional time, attention, energy, skill, learning, and best efforts to the business.

- Fees and Expenses:  In consideration for the services rendered, Mr. Bolger receives:  (i) a base salary of $750,000 per annum, (ii) performance-based cash bonus of up to 75% of the annual base salary, (iii) CEL Tokens subject to vesting requirements, and (iv) restricted stock under an equity incentive plan, subject to vesting requirements.[3]

- Restriction on Information Sharing:  Mr. Bolger must keep confidential, and not use, disclose and/or make available, directly or indirectly, to any third party any Confidential Information (as defined in the Employment Agreement) without prior written consent.

- Non-Competition:  For six months following the end of his employment, Mr. Bolger agreed to not work for any competitor of the Debtors, including in any limited capacity such as a consultant.

## III.    The Advisory Agreement.

13.     Should the Court approve entry into the Advisory Agreement, it is the intent of the

Debtors and Mr. Bolger that he transition to an advisory role as a "Contractor" pursuant to the

terms set forth in the Advisory Agreement, attached hereto as **Exhibit C**.  Given Mr. Bolger's

---

[3]    As stated in the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 19], the Debtors are no longer issuing CEL Tokens as part of an Employee's compensation package.

institutional knowledge and familiarity with the Debtors' business, the Debtors have requested, and Mr. Bolger has agreed, to continue to provide advisory and consulting services to the Debtors until September 16, 2022, with a possibility of extension, pursuant to the Advisory Agreement. The Debtors believe that the advisory services to be provided by Mr. Bolger, as set forth in the Advisory Agreement, will be invaluable at this critical transition time in their business.  The material terms of the Advisory Agreement are summarized as follows:[4]

- **Term of Advisory Agreement**:  The Advisory Agreement will be entered in to on the date the Court approves this Motion, or shortly thereafter, and will run through and including September 16, 2022, unless Mr. Bolger and the Debtors mutually agree to have the term renewed on a monthly basis thereafter; *provided* that the Debtors may terminate this Agreement upon 7 days' written notice after August 23, 2022.

- **Advisory Services**:  Mr. Bolger will make himself reasonably available on a substantially full-time basis to provide services reasonably requested by the Company related to the Company's accounting, auditing, and financial reporting systems and other matters requested by the Debtors.

- **Fees and Expenses**:  In consideration for the advisory services rendered by Mr. Bolger, the Debtors agree to pay Mr. Bolger the sum of CAD $120,000 per month, prorated for partial months.  The first payment is made in advance and the subsequent payments are to be made in arrears.

- **Restriction on Information Sharing**:  Mr. Bolger will keep confidential, and will not use, disclose and/or make available, directly or indirectly, to any third party any Confidential Information without the prior written consent of the Debtors.

## **Basis for Relief**

## IV.    **Execution of the Advisory Agreement Reflects the Debtors' Sound Business Judgment.**

14.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

---

[4]    To the extent of any conflict between the Advisory Agreement and this Motion, the terms of the Advisory Agreement will control.

estate." To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); *In re MF Global Inc.*, 535 B.R. 596 (Bankr. S.D.N.Y. 2015) (utilizing the "good business reason" standard).

15. The business judgment rule shields a debtor's management's decisions from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a Debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

16.     The Debtors believe that execution of the Advisory Agreement and the payments thereunder are proper exercises of the Debtors' business judgment, are in the best interests of their estate, and in the best interests of all stakeholders in these chapter 11 cases. *First*, the Debtors submit that the terms of the Advisory Agreement are appropriate and typical for a company of the size and sophistication of the Debtors, and the terms are consistent with the terms of Mr. Bolger's existing Employment Agreement. *Second*, the Debtors will receive tangible benefits to their business by executing the Advisory Agreement with Mr. Bolger. The Advisory Agreement allows the Debtors to utilize Mr. Bolger's services in an efficient manner and for a limited period of time.

17.     Based upon the foregoing, the Debtors submit that execution of the Advisory Agreement with Mr. Bolger is an exercise of sound business judgment, in the best interest of the Debtors and their estates, and should be approved.

**V.     The Advisory Agreement Does Not Provide for Payments Prohibited by Section 503(c) of the Bankruptcy Code.**

**A.     The Advisory Agreement Does Not Constitute a Retention Payment Subject to Section 503(c)(1) Nor a Severance Payment Subject to Section 503(c)(2).**

18.     The Advisory Agreement, and payments thereunder, do not constitute either a retention plan or a severance payment, and thus, are not subject to sections 503(c)(1) or (2) of the Bankruptcy Code. The requirements set forth in section 503(c)(1) apply only to retention plans and do not apply to incentive plans that provide compensation to employees who contribute to preserving value and achieving financial objectives. *See* 11 U.S.C. § 503(c)(1); *In re Global Homes Prods., LLC*, 369 B.R. 778, 787 (Bankr. D. Del. 2007). In *Pilgrim's Pride*, the court determined that section 503(c)(1) was inapplicable because the agreements were not for the purpose of retaining the individuals. *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 235 (Bankr. N.D. Tex. 2009).

8

19.    Here, with respect to the Advisory Agreement, the Debtors will not make any payments to Mr. Bolger solely because he remains employed by the Debtors—in fact, under the terms of the Advisory Agreement, he will operate as an independent contractor and thus not as an employee.  He will provide, for the limited duration of the Advisory Agreement, valuable services for the Debtors during this transition in chapter 11.  The negotiated compensation is not being paid for the purpose of retention; rather, it reflects the new arrangement that Mr. Bolger and the Debtors have reached.

20.    Nor is section 503(c)(2) applicable here as no severance is being paid.  In *Pilgrim's Pride*, under a similar set of facts, the court analyzed whether two postpetition consulting agreements were subject to section 503(c)(2) of the Bankruptcy Code.  *Id*.  The court found that the payments proposed were not intended as severance and did not have "more than a tangential relationship to the termination" of the two individuals, taking into account that the individuals had already been paid severance properly pursuant to section 503(c)(2).  *Id*.  The court concluded that the consulting agreements were only required to comply with section 503(c)(3) of the Bankruptcy Code.  *Id*.

21.    Here, as in *Pilgrim's Pride*, the Debtors have proposed to enter into the Advisory Agreement postpetition with a former full-time executive-level employee and the Debtors are obtaining valuable services as consideration for the payments under the Advisory Agreement. Thus, the Advisory Agreement does not constitute severance and is only subject to the requirements of section 503(c)(3) of the Bankruptcy Code.  Furthermore, notwithstanding any entitlement to severance Mr. Bolger may have had in his original Employment Agreement, Mr. Bolger has resigned from his role as CFO, and consequently is not entitled to any severance payments.

B.      **Entry into the Advisory Agreement is Justified by the Facts and Circumstances.**

22.      Section 503(c)(3) of the Bankruptcy Code does not preclude approval of the Advisory Agreement.  This "catch all" provision of the 2005 amendments to compensation procedures in chapter 11 cases prohibits, in relevant part, transfers made outside the ordinary course of business and not justified by the facts and circumstances of the case.  4 *Collier on Bankruptcy* ¶ 503.17 (15th ed. rev. 2009).  Section 503(c) does not, however, "foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006).  In line with *Pilgrims' Pride*, and because Mr. Bolger as CFO was an "insider" under section 101(31) of the Bankruptcy Code, the Debtors have analyzed the Advisory Agreement under section 503(c)(3) of the Bankruptcy Code because it is not an ordinary course transaction. *See In re Pilgrim's Pride*, 401 B.R. at 235 (finding the standard for approval under section 503(c)(3) is higher than the business judgment test because if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of section 503(c)(3) would be redundant); *see also In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (collecting cases where courts held that the standard created by the "facts and circumstances" language of section 503(c) is no different from the business judgment standard under section 363(b)).

23.      Courts in this district that have analyzed the prohibition on "other transfers" to certain categories of employees set forth in section 503(c)(3) of the Bankruptcy Code have analyzed whether the decision to use estate property outside of the ordinary course of business is based on the debtor's business judgment and therefore justified by the facts and circumstances of the case. *See In re Residential Cap., LLC*, 491 B.R. 73, 85 (Bankr. S.D.N.Y. 2013) (applying the

*Dana* factors to find payments were justified by the facts and circumstances of the case); *In re Velo*

*Holdings Inc.*, 472 B.R. 201, 213 (Bankr. S.D.N.Y. 2012) (same); *In re Borders Grp., Inc.*, 453

B.R. at 474 (same).

24.     The court in *Dana* set forth several factors that courts typically consider when

determining whether the "business judgment" standard is met for section 503(c)(3) purposes:

- whether the plan proposed has a reasonable relationship to the results to be obtained;

- whether the cost of the plan is reasonable in light of the debtor's assets, liabilities, and earnings potential;

- whether the scope of the plan is fair and reasonable or whether it discriminates unfairly;

- whether the plan comports with industry standards;

- whether the debtor undertook due diligence in investigating the need for a plan, the employees that should be incentivized, market standards; and

- whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

358 B.R. at 576-577.  Here, those standards have been met.

25.     ***First***, the Advisory Agreement has a reasonable relationship to the results sought

to be obtained.  The Advisory Agreement is designed to support the Debtors' efforts to stabilize

their business by gaining the services of an experienced individual with an institutional knowledge

of the Debtors' business in the limited capacity the Debtors require.

26.     ***Second***, the Advisory Agreement is reasonable in light of the Debtors' assets,

liabilities, and earning potential.  The total expected cost of the Advisory Agreement is

approximately CAD $120,000 a month for at least six weeks, which provides the Debtors with Mr.

Bolger's much-needed accounting and financial expertise during unprecedented times for the

Debtors, and is *de minimis* in comparison with the Debtor's overall asset picture of approximately $6.0 billion. Further, entry into the Advisory Agreement in connection with Mr. Bolger's departure as CFO will generate cost savings as the Debtors will not be obligated to pay his full annual salary or any other benefits he would ordinarily be entitled to as an employee of the Debtors.

27.   **Third**, the Advisory Agreement does not discriminate unfairly. Mr. Bolger's institutional knowledge is unique among the Debtors' employees. The services Mr. Bolger will provide during the effective period of the Advisory Agreement are necessary during these chapter 11 cases and enable the Debtors to stabilize their business. Mr. Bolger was selected based upon the nature of his as-current full-time position and the Debtors' need to continue filling that role, at least in the near future. Thus, the Debtors have not arbitrarily selected Mr. Bolger or unfairly discriminated in choosing to execute the Advisory Agreement with him.

28.   **Fourth**, the Advisory Agreement comports with industry standards. The Debtors are receiving fair consideration, through Mr. Bolger's advisory services, in exchange for payments under the Advisory Agreement. The payments under the Advisory Agreement are not meant to be a windfall for Mr. Bolger, but rather to ensure that he is adequately compensated for his services during the effective period of the Advisory Agreement. The Debtors therefore respectfully submit that the Advisory Agreement reflects prevailing market conditions.

29.   **Fifth**, the Debtors exercised proper diligence in determining whether the Advisory Agreement was necessary. Specifically, the Debtors' management team extensively discussed the importance and terms of the Advisory Agreement. This Advisory Agreement is the culmination of a negotiation with Mr. Bolger and the Debtors, in their reasonable business judgment.

30.   **Finally**, although the Debtors have not engaged or sought to retain independent compensation legal counsel with respect to the Advisory Agreement, the Debtors submit that the

absence of this factor does not influence the ultimate outcome of the section 503(c)(3) inquiry. As held by the court in *Borders*, non-satisfaction of the final *Dana* factor is "not fatal" to a proposed incentive plan. 453 B.R. at 477; *see also In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (finding that absence of independent counsel not an impediment to approval of an incentive plan).

## Motion Practice

31.    This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

32.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

33.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law,

or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

34.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to any statutory committee appointed in these chapter 11 cases; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

35.     No prior request for the relief sought in the motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated: July 25, 2022

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**ORDER AUTHORIZING THE DEBTORS TO**
**ENTER INTO AN ADVISORY AGREEMENT WITH ROD BOLGER**
**PURSUANT TO SECTIONS 363(B) AND 503(C)(3) OF THE BANKRUPTCY CODE**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing the Debtors to enter into an Advisory Agreement with Rod Bolger, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

were appropriate under the circumstances and no other notice need be provided; and this Court

having reviewed the Motion and having heard the statements in support of the relief requested

therein at a hearing before this Court (the "Hearing"); and this Court having determined that the

legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

HEREBY ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      The Debtors are authorized to enter into the Advisory Agreement with Rod Bolger

and to make any and all payments to Rod Bolger under the Advisory Agreement.

3.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

4.      Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any

particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Order or the Motion;

(e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual,

common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors

expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all

such liens.  Any payment made pursuant to this Order is not intended and should not be construed

as an admission as the validity of any particular claim or a waiver of the Debtors' rights to

subsequently dispute such claim.

    5.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

    6.      The Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Employment Agreement**



**EMPLOYMENT AGREEMENT**

Date: February 13, 2022

Name: Rod Bolger
Phone: (647) 625-3763
Email: bolgerrod@gmail.com

Dear Rod Bolger,

We are pleased to extend you this offer of employment in Celsius Network LLC (the "**Company**").  This letter agreement sets forth the terms of your employment, which, if you accept by countersigning below, will govern your employment with the Company (the "**Employment Agreement**").

    1.   **Employment Period, Position, Duties, Obligations and Consents.**

        1.1.   *Employment Period.* Subject to the terms and conditions of this Employment Agreement, your employment shall commence on **February 14, 2022** (the "**Commencement Date**") and continue until the Date of Termination (as defined below) (such period, the "**Employment Period**").

        1.2.   *Position*. As of the Commencement Date and during the Employment Period, you will serve as the **Chief Financial Officer** of Celsius Network Limited ("**Parent**"), a company incorporated under the laws of England and Wales and the indirect parent of the Company, and all of its subsidiaries (including without limitation the Company, but excluding any publicly listed subsidiary or any other subsidiary which, due to operational and/or regulatory reasons, Celsius Network Limited may decide to operate with a separate management team), and will perform such duties and exercise such supervision with regard to the business of the Company as are commensurate with such positions, including such duties consistent with your position as may be prescribed from time to time by the **Chief Executive Officer** of Celsius Network Limited (the "**Supervisor**").  In your capacity as Chief Financial Officer, you shall report directly and solely to the Supervisor and, if reasonably requested by the Supervisor, you hereby agree to serve (without additional compensation) as an officer and/or director of any affiliate or subsidiary of the Company (the "**Company Group**").

        1.3.   *Duties*. During the Employment Period, you shall have such responsibilities, duties, and authority as are commensurate your position, subject at all times to the control of the Supervisor, and shall perform such services as customarily are provided by an executive of a company with your position and such other services consistent with your position, as shall be assigned to you from time to time by the Supervisor.  During the Employment Period, you shall (i) use your best endeavors to promote the interests of any member of the Company Group and to protect the good name of any member of the Company Group and not perform any act that may bring any member of the Company Group into disrepute and (ii) devote substantially all of your business and professional time, attention, energy, skill, learning and best efforts to the business and affairs of the members of the Company Group, consistent with your right to take paid vacation time pursuant to the

Rod Bolger Initials _____

Company's policies and subject to any illness; provided, however that you will be permitted to engage in certain limited outside business interests consistent with and as more fully described in Section 8 of **Appendix A**.

1.4    *Obligations and Consents.*

(a)    In the event you discover that you have, or might have at some point in the future, any direct or indirect personal interest in any member of the Company Group's business (other than as a result of your engagement hereunder) or a conflict of interest with your employment duties and functions, you shall immediately inform the Company upon such discovery.   You shall not engage, directly or indirectly, in any business, professional or commercial occupation outside your employment with the Company, whether or not such occupation is rendered for any gain, without the prior written approval of the Company, and subject to the terms of such approval (including as set forth in Section 8 of **Appendix A**). Without limiting the foregoing, you shall be subject to and comply with any Conflicts of Interest and Outside Business Interests policies adopted by the Company. You shall not, directly or indirectly, accept any commission, rebate, discount or gratuity in cash or in kind, from any third party which has or is likely to have a business relationship with any member of the Company Group.

(b)    You hereby represent that no provision of any law, regulation, agreement or other source prohibits you from entering into this Employment Agreement and fulfilling all its terms.

(c)    You hereby undertake to comply with all Company Group policies, procedures and objectives, as in effect from time to time and as applicable to you.

(d)    You hereby agree that your primary work location shall be remote. You are aware of the need for travel outside of the United States of America, for short or long periods, and hereby agree to perform such travel and stay inside and outside of the United States of America as may be necessary to fulfill your duties hereunder.

(e)    You consent, of your own free will and although not required to do so under law, that the information in this Employment Agreement and any information concerning you gathered by any member of the Company Group, will be held and managed by the Company Group or on its behalf, inter alia, on databases according to law, and that the Company Group shall be entitled to transfer such information to third parties, in the United States of America or abroad (including to countries which have a different level of data protection that existing in the United States of America). The Company undertakes that the information will be used and transferred for legitimate business purposes only. Without derogating from the generality of the above, such purposes may include human resources management and assessment of potential transactions, to the extent required while maintaining your right to privacy.

(f)    You agree that any member of the Company Group may monitor your use of their Systems (as defined below) and copy, transfer and disclose all electronic communications and content transmitted by or stored in such Systems, in pursuit of any member of the Company Group's legitimate business interests, all in accordance with any policy of any member of the Company Group as in force from time to time and subject to applicable law. For the purposes of this Section, the term "**Systems**" includes telephone, computers, computer system, internet

Rod Bolger Initials

server, electronic database and software, and other similar devices, whether under your direct control or otherwise.

(g) You and the Company hereby agree that the consideration furnished under this Employment Agreement, the discussions and correspondence that led to this Employment Agreement, and the terms and conditions of this Employment Agreement are private and confidential. Except as may be permitted or required by applicable law (including securities laws or pursuant to the request of any regulatory authority), regulation, or stock exchange requirement, neither you nor the Company may disclose the above information to any other person or entity without the prior written approval of the other, except that you shall be entitled to disclose such information to your immediate family, legal, tax, and financial advisors; <u>provided</u>, <u>that</u>, in each such case, the person to whom such disclosure is made agrees to keep the disclosed information confidential.

2.   **<u>Compensation</u>**. Your compensation will be as detailed in **<u>Appendix A</u>** to this Employment Agreement, which forms an integral part hereof.

3.   **<u>Confidentiality, Non-Competition, Non-Solicitation, Work Product and Non-Disparagement Undertaking</u>**.

Upon the signing of this Employment Agreement, you will sign a Confidentiality, Non-Competition, Non-Solicitation, Work Product and Non-Disparagement Undertaking in the form attached hereto as **<u>Appendix B</u>**, which constitutes an integral part hereof. Your employment compensation has been calculated to include special consideration for your commitments under **<u>Appendix B</u>**.

4.   **<u>Termination of Employment</u>**.

4.1.   *Death or Disability*. Your employment shall terminate automatically upon your death.  If you become subject to a "Disability" (as defined below) during the Employment Period, the Company shall give you written notice of its intention to terminate your employment.  For purposes of this Employment Agreement, "**Disability**" means your inability to perform the essential functions of your duties hereunder, with or without accommodation as required by applicable law, by reason of any medically determinable physical or mental impairment, as determined by the Company in its discretion, for a period of six (6) months or more in any twelve (12) month period.

4.2.   *Cause*.  Your employment may be terminated at any time by the Company for "Cause" (as defined below).  For purposes of this Employment Agreement, "**Cause**" shall mean your (i) commission of, conviction for, plea of guilty or nolo contendere to a felony or a plea of guilty to an indictable offence, a crime involving moral turpitude, (ii) engaging in conduct that constitutes fraud, theft or embezzlement, (iii) engaging in conduct that constitutes gross negligence or misconduct, (iv) breach of any material terms of your employment, (v) failure to substantially perform your duties, (vi) breach of any material policy or procedure of any member of the Company Group that has caused or could reasonably be expected to cause harm to any member of the Company Group, or (vii) failure to cooperate with any investigation or inquiry by the Board of Directors of the Company or any applicable regulatory authority.  A termination your employment for Cause under clauses (iv), (v), (vi) or (vii) above shall not be deemed to be a termination for Cause unless (x) the Company provides written notice to you of the facts alleged by the Company to constitute Cause prior to such termination, and (y) if curable you have been given an opportunity of no less than 10 days after receipt of such notice to cure the circumstances alleged to give rise to Cause.

4.3.    *Termination without Cause*.  The Company may terminate your employment hereunder without Cause at any time.

4.4.    *Voluntary Termination*.  Your employment may be terminated at any time by you for any reason upon eight (8) weeks' prior written notice to the Company; provided, that, the Company may, at any time during such eight (8) week period, relieve you from all or any of your duties for all or part of the remainder of such period. This may include a requirement that you must stay away from all or any of the Company's premises and/or will not be provided with any work and/or will have no business contact with all or any member of the Company Group's agents, employees, customers, clients, distributors and suppliers. Whether or not you are relieved of any duties during such eight (8)-week period, you will continue to be paid your Annual Base Salary (as defined in **Appendix A**) in accordance with this Employment Agreement and other benefits, your employment will not be terminated by any removal of duties, your employment will continue during such period and you will continue to be bound by your obligations under this Employment Agreement, all until the expiration of such eight (8)-week period.

4.5.    *Notice of Termination*.  Upon the termination of your employment by the Company for any reason, all positions you hold with any member of the Company Group shall immediately terminate. Any termination by the Company for Cause or without Cause, or by you for any reason, shall be communicated by Notice of Termination.  For purposes of this Employment Agreement, a "**Notice of Termination**" means a written notice that (i) indicates the specific termination provision in this Employment Agreement relied upon, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of your employment under the provision so indicated, and (iii) if the "Date of Termination" is other than the date of receipt of such notice, specifies the termination date (and, if such termination is purported to be for Cause by the Company, is otherwise in accordance with the timing and procedures set forth in Section 4.2 hereof).  The failure by the Company to set forth in the Notice of Termination any fact or circumstance that contributes to a showing of Cause, if such Notice is in otherwise in accordance with the timing and procedures set forth in Section 4.2 hereof, shall not waive any right of the Company hereunder or preclude the Company from asserting such fact or circumstance in enforcing the Company's rights hereunder.

4.6.    *Date of Termination*. "**Date of Termination**" means (i) if the Company or you terminate your employment, the date designated by the Company or you, as applicable, in the Notice of Termination as your last day of employment in accordance with the terms of this Employment Agreement, or (ii) if your employment is terminated by reason of death, the date of death.

4.7.    *Return of Assets*. No later than the Date of Termination (or at such other time as directed by the Company), you shall immediately return to the Company each and every asset (including without limitation hardware, documents and information) in your possession or control which belongs, or has been entrusted, to the Company.

4.8.    *Return of Passwords and Codes*. Furthermore, upon the Date of Termination (or at such other time as directed by the Company), you shall provide the Company with a list of all passwords, write-protect codes and similar access codes used in the context of your work.

Rod Bolger Initials

DocuSign Envelope ID: 185A1764-D672-4989-9AB8-23EA6BF3F5A3
22-10965-mg    Doc    Filed 07/25/22    Entered 07/25/22 22:55:45    Main Document
Pg 28 of 51

5

5.    **Obligations of the Company upon Termination**.

5.1    *Without Cause*. If during the Employment Period, the Company terminates your employment without Cause as defined in this Agreement (other than due to death or Disability), then, in addition to the Accrued Obligations (as defined below) and the rights expressly provided under Section 3 and Section 4 of **Appendix A** with respect to a termination without Cause, you will receive the greater of (i) the payment you would receive if the Company adopts a severance plan for the executives of the Company as may be in effect at the time of termination, and (ii) a lump sum payment in cash equal to six (6) months of your then applicable annual base salary (the "**Severance Benefits**"); provided, however, that in the event you experience a Qualifying Termination Event, as defined below, within twelve (12) months following, on, or three (3) months before, a Change in Control (as defined in the Plan) of Parent, then the annual base salary in subsection (ii) herein shall be increased to twelve (12) months of your then applicable annual base salary. Payment of the Severance Benefits shall be subject to your execution and non-revocation of a release of all employment-related claims in form and substance reasonably satisfactory to the Company, with such release to be provided to you within five (5) days after your termination of employment, to provide you with the right to review such release for twenty-one (21) days after it is provided to you (as specified therein) and to include a seven (7) day revocation period.

For purposes of this Employment Agreement, the "**Accrued Obligations**" shall mean (A) the Annual Base Salary through the Date of Termination and (B) the amount of any unpaid expense reimbursements to which you may be entitled pursuant to this Employment Agreement; <u>provided</u>, <u>that</u>, the Accrued Obligations shall be paid no later than the fifteenth (15th) day of the third (3rd) month following the end of the calendar year that contains the Date of Termination.

5.2    *Any Other Termination*.  If your employment shall be terminated by the Company for Cause or due to your death or Disability or by you for any reason (other than due to a Qualifying Termination Event), then the Company will provide you only with the Accrued Obligations.  Thereafter, except as provided under Section 3 of **Appendix A**, no member of the Company Group shall have any further obligation to you or your legal representatives or heirs, as applicable.

5.3    *Full and Final Satisfaction*. The termination arrangements set out in this Section 5 fully satisfy any member of the Company Group's obligations to you in respect of the termination of your employment and you will not be entitled to further notice of termination, severance pay, incentive compensation, damages or other compensatory payments under common law or contract.

6.    **General**.

6.1.    *Withholdings Taxes*.  Any member of Company Group, as applicable, may withhold from any amounts payable under this Employment Agreement such federal, state, local and other taxes as may be required to be withheld pursuant to any applicable law or regulation or any deductions or customary contributions to the cost of employee benefits, if any.

6.2.    *Indemnification*.  You will be entitled to indemnification (and advancement of expenses) by the Company (and its affiliates) to the maximum extent permitted by applicable law in accordance with the indemnification (and advancement of expenses) provisions contained in the Company's (and its affiliates, as applicable) organizational documents and any separate indemnification agreement that will be entered into with you.

Rod Bolger Initials

6.3.    *Amendment and Waiver*. The provisions of this Employment Agreement may be amended or waived only with a prior written consent signed by you and the Company and no course of conduct or failure or delay in enforcing the provisions of this Employment Agreement shall be construed as a waiver of such provisions or affect the validity, binding effect or enforceability of this Employment Agreement or any provision hereof.

6.4.    *Successors and Assigns*. This Employment Agreement is personal to you and without the prior written consent of the Company shall not be assignable by you otherwise than by will or the laws of descent and distribution. This Employment Agreement shall inure to the benefit of and be enforceable by your legal representatives. You shall not be entitled to any payment, right or benefit which is not expressly mentioned in this Employment Agreement, including, without limitation, any payments, rights or benefits of any current or future general or special collective labor agreements or arrangements or extension orders, any custom or practice, and/or any other agreements between any member of the Company Group and its employees, unless required under law.

This Employment Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns.  The Company will require any successor (whether direct or indirect, by purchase, amalgamation, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Employment Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  As used in this Employment Agreement, "**Company**" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid that assumes and agrees to perform this Employment Agreement by operation of law, or otherwise.

6.5.    *Entire Agreement*. This Employment Agreement, including **Appendices A and B**, once signed by you, shall contain the entire understanding between the Company and yourself with respect to your employment by the Company and all prior negotiations, agreements, offer letters, commitments and understandings (whether written or oral) not expressly contained herein shall be null and void in their entirety.

6.6.    *Governing Law*. This Employment Agreement and your employment by the Company shall be governed by and construed in accordance with the laws of the state of New York without giving effect to any choice of law or conflicting provision or rule that would cause the laws of any jurisdiction other than the state of New York to be applied.

6.7.    *Background Check*. You acknowledge that the Company has initiated a background and reference check on you as allowed by applicable legislation (the "**Background Check**"), the results of which are expected to be received within no more than thirty (30) days of the Commencement Date. Any findings of such Background Check which would bring the Company to believe, in its reasonable discretion, that hiring you, or your continued employment with the Company, may be detrimental to any member of the Company Group, its reputation, or its ability to conduct its business as currently conducted or planned to be conducted from time to time, shall entitle the Company to immediately terminate your employment within ten (10) days of the Company's receipt of such Background Check or to immediately rescind the Company's offer of employment prior to the Commencement Date.

Rod Bolger Initials

6.8.    *Severability*.  You agree that it is the desire and intent of the Company and you that the provisions of this Employment Agreement be enforced to the fullest extent permissible under the laws applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Employment Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable under any present or future law, and if the rights and obligations of you or the Company under this Employment Agreement will not be materially and adversely affected thereby, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Employment Agreement or affecting the validity or enforceability of such provision in any other jurisdiction; furthermore, in lieu of such invalid or unenforceable provision there will be added automatically as a part of this Employment Agreement, a legal, valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Employment Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

6.9.    *Notices*.  Any notice provided for in this Employment Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested) or sent by reputable overnight courier service (charges prepaid) to the recipient at the address below indicated or at such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.  Notices will be deemed to have been given hereunder and received when delivered personally, five (5) days after deposit in the U.S. mail and the next business day after deposit for overnight delivery with a reputable overnight courier service.

If to the Company, to:
Ron Deutsch
Celsius Network LLC
121 River Street, Ste PH05
Hoboken, NJ 07030
U.S.A.
Email: legal@celsius.network

If to you, to:
Your home address most recently on file with the Company.

6.10.    *Survival of Representations, Warranties and Agreements*.  All provisions which by their terms survive the cessation of this Employment Agreement and your employment shall survive the cessation of the same.

6.11.    *Descriptive Headings*.  The descriptive headings of this Employment Agreement are inserted for convenience only and do not constitute a part of this Employment Agreement.  All references to a "Section" in this Employment Agreement are to a section of this Employment Agreement unless otherwise noted.

6.12.    *Construction*.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the

construction of the general statement to which it relates. The language used in this Employment Agreement shall be deemed to be the language chosen by you and the Company to express your and the Company's mutual intent, and no rule of strict construction shall be applied against you or the Company.

6.13.    *Counterparts*.  This Employment Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

6.14.    *Section 409A*.  Notwithstanding anything herein to the contrary, this Employment Agreement is intended to be interpreted and applied so that the payment of the benefits set forth herein either shall either be exempt from the requirements of Section 409A of the U.S. Internal Revenue Code of 1986, as amended and any rules and regulations promulgated thereunder (collectively, "**Section 409A**"), or shall comply with the requirements of Section 409A.  Payments upon termination of your employment that constitute a "deferral of compensation" within the meaning of Section 409A may only be made upon a "separation from service" as determined under Section 409A.  Each payment under this Employment Agreement or otherwise shall be treated as a separate payment for purposes of Section 409A.  In no event may you, directly or indirectly, designate the calendar year of any payment to be made under this Employment Agreement or otherwise which constitutes a deferral of compensation.  All reimbursements and in-kind benefits provided under this Employment Agreement shall be made or provided in accordance with the requirements of Section 409A.  To the extent that any reimbursements pursuant to this Employment Agreement or otherwise are taxable to you, any reimbursement payment due to you shall be paid to you on or before the last day of your taxable year following the taxable year in which the related expense was incurred; provided, that, you have provided the Company written documentation of such expenses in a timely fashion and such expenses otherwise satisfy the Company's expense reimbursement policies.  Reimbursements pursuant to this Employment Agreement or otherwise are not subject to liquidation or exchange for another benefit and the amount of such reimbursements that you receive in one taxable year shall not affect the amount of such reimbursements that you receive in any other taxable year.  Notwithstanding any provision in this Employment Agreement to the contrary, if on the date of your termination from employment with the Company, you are deemed to be a "specified employee" within the meaning of Section 409A using the identification methodology selected by the Company from time to time, or if none, the default methodology under Section 409A, any payments or benefits due upon a termination of your employment under any arrangement that constitutes a deferral of compensation shall be delayed and paid or provided (or commence, in the case of installments) on the first payroll date on or following the earlier of (i) the date which is six (6) months and one (1) day after your termination of employment for any reason other than death, and (ii) the date of your death, and any remaining payments and benefits shall be paid or provided in accordance with the normal payment dates specified for such payment or benefit.  Notwithstanding any of the foregoing to the contrary, no member of the Company Group and its respective officers, directors, employees, or agents make any guarantee that the terms of this Employment Agreement as written comply with, or are exempt from, the provisions of Section 409A, and none of the foregoing shall have any liability for the failure of the terms of this Employment Agreement as written to comply with, or be exempt from, the provisions of Section 409A.

**PLEASE READ THIS EMPLOYMENT AGREEMENT CAREFULLY AND RETURN IT SIGNED TO THE COMPANY.**

**[Signature Page Follows]**

IN WITNESS WHEREOF, you and the Company have executed this Employment Agreement as of the date written below.

CELSIUS NETWORK LLC

By: _____

DocuSigned by:

*Trunshedda Ramos*

CCBFBB4B0006437...

**Name: Trunshedda Ramos**
**Title: Chief Human Resources Officer (CHRO)**

**SOLELY FOR PURPOSES OF SECTION 1.2, AND SECTION 4 OF APPENDIX A:**

**CELSIUS NETWORK LIMITED**

By: _____

DocuSigned by:

2ADC7A9BFB044C0...

**Name:**
**Title:**

**EXECUTIVE**

_____

DocuSigned by:

E5FA85F4EEDF4DF...

Rod Bolger

**APPENDIX A**

**Compensation**

1.    **Base Salary**. During the Employment Period, you shall receive an annual base salary as follows: (i) **$750,000 dollars (USD)** during the first twelve month period of your employment hereunder; (ii) **$780,000 dollars (USD)** during the second twelve month period of your employment hereunder; and (iii) thereafter, an annual base salary of **$820,000 dollars (USD)** (subject to any possible salary increases from time to time thereafter at the Company's sole discretion), in each case less all applicable withholdings, which shall be paid in cash in accordance with the customary payroll practices of the Company as in effect from time to time (the "**Annual Base Salary**").

2.    **Bonus**. During the Employment Period, with respect to each completed fiscal year, you shall be eligible to receive performance-based cash bonus compensation with the following targets: (i) for the fiscal year ended December 31, 2022, a target of 75% of your Annual Base Salary, (ii) for the fiscal year ended December 31, 2023, a target of 75% of your Annual Base Salary, and (iii) for the fiscal year ended December 31, 2024, a target of 100% of your Annual Base Salary, in each case, taking into consideration your performance, as well as the performance of your team and the company overall, payable at such times and in such amounts as the Company determines in its sole discretion and subject to your Employment Period continuing up to and including the applicable payment date. The first bonus payable pursuant to this Section shall not take place prior to January 2, 2023, in any event, and shall be paid on the same schedule offered to similarly situated executives of the Company, expected to take place in January of each year.

3.    **Tokens**. As soon as practicable following the Commencement Date, the Company shall grant you a total number of **800,000 CEL Tokens** (the "**Tokens**"). You represent and warrant that you are an "accredited investor," as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933. The Tokens shall vest from your Commencement Date as follows: 266,000 Tokens will vest and be payable to you on January 2, 2023; 267,000 Tokens will vest and be payable to you on January 2, 2024; and 266,000 Tokens will vest and be payable to you on January 2, 2025, in each case subject to your continued employment with the Company on any vesting date (subject to the proviso below).  Tokens transferred to you will be subject to a one-year lockup under Rule 144 for each installment from the date of payment and you acknowledge and agree that all consideration paid in Tokens hereunder will be subject to all other applicable legal restrictions and holding periods as if such tokens were subject to applicable securities laws and regulations.  In the event of your termination of employment with the Company for any reason, all unvested Tokens as of the time of such termination shall be canceled and forfeited for no consideration immediately upon such termination; provided, however, that if your employment is terminated by the Company without Cause (as defined in this Agreement), then, (i) in the event any such termination without Cause occurs during fiscal year 2022, then 133,000 Tokens shall immediately be vested on such termination date (and any and all other Tokens shall not vest or be deemed vested and shall be forfeited for no consideration), (ii) in the event such termination without Cause occurs after January 3, 2023 but prior to January 2, 2024, then in addition to any Tokens that vested prior to January 3, 2023, an additional 133,000 Tokens shall immediately be vested on such termination date (and otherwise any and all Tokens that have not vested prior to January 3, 2023 shall not vest or be deemed vested and shall be forfeited for no consideration), and (iii) in the event such termination without Cause occurs after January 3, 2024 but prior to January 2, 2025, then in addition to any Tokens that vested prior January 3, 2024, an additional 133,000 Tokens shall immediately be vested on such termination date (and otherwise any and all Tokens that have not vested prior to January 3, 2024 shall not vest or be deemed vested and shall be forfeited for no consideration).  In addition, in lieu of the foregoing acceleration, in the event that a Change in Control (as defined in the Plan) of Parent occurs at a time when any of the Tokens are unvested, in the event your

employment is terminated as a result of a Qualifying Termination Event, as defined below, that occurs within twelve (12) months following, on, or three (3) months before, the closing of such Change in Control, then 100% of such unvested Tokens shall vest, effective as of immediately prior to the date of such Qualifying Termination Event, subject to your delivery to the Company of a general release of claims in substantially the form provided by the Company that becomes effective and irrevocable within 60 days following your termination (or such shorter time specified by the Company). Notwithstanding anything to the contrary herein, in the event of your termination without Cause, you will be entitled to receive the greater of (a) the token payment you would receive if the Company adopts a severance plan for the executives of the Company as may be in effect at the time of termination, and (b) the token compensation included in this Section 3.

4.    **Equity.** The Company will procure as promptly as practicable that its Parent shall grant you an equity award (the "**Award**") in the form of Restricted Stock under the Parent's 2021 Equity Incentive Plan, as in force from time to time (the "**Plan**"), subject to the terms of the Plan and the terms and conditions set forth in the Award agreement (which will not be inconsistent with the terms of this Agreement) and the terms of this Agreement. The Award shall be for 650 Restricted Stock in total, which will vest as follows: (a) 218 of these Restricted Stock shall vest on January 1, 2023; and (b) the remaining 432 of these Restricted Stock shall vest monthly in equal parts thereafter (12 Restricted Stock per calendar month), with the first vesting to take place on February 1, 2023, and continuing until December 31, 2025, subject to your continued employment with the Company on any vesting date.  If your employment is terminated by the Company without Cause prior to the fourth anniversary of the Commencement Date, then, in addition to any Restricted Stock that has vested prior to such termination date, the lesser of (1) the remaining unvested Restricted Stock under this Section 4, and (2) 81 Restricted Stock shall vest on such termination date.

In addition, in the event that a Change in Control (as defined in the Plan) of Parent occurs at a time when any of the Restricted Stock detailed in this Section 4 are unvested, in the event your employment is terminated as a result of a Qualifying Termination Event, as defined below, that occurs within twelve (12) months following, on, or three (3) months before, the closing of such Change in Control, then 100% of such unvested Restricted Stock shall vest, effective as of immediately prior to the date of such Qualifying Termination Event, subject to your delivery to the Company of a general release of claims in substantially the form provided by the Company that becomes effective and irrevocable within sixty (60) days following your termination (or such shorter time specified by the Company). A "**Qualifying Termination Event**" shall mean a termination of your employment following the closing of such Change in Control (X) without Cause by the Company, or (Y) by you as a result of Good Reason. For purposes hereof, "**Good Reason**" means (A) a material reduction in your Annual Base Salary or (B) the material diminution in your title, duties, responsibility or authority less than those set forth in this Agreement; provided however, that a change in your position following a Change in Control shall not constitute Good Reason so long as you retain substantially the same duties and responsibilities of a division, subsidiary or business unit that constitutes substantially the same business of the Company following the Change in Control.  Notwithstanding the foregoing, in order to establish Good Reason for terminating employment, you must deliver written notice to the Company of the existence of the condition giving rise to Good Reason within ninety (90) days of the initial existence of such condition, the Company must fail to cure the condition within thirty (30) days thereafter, and your termination of employment must occur no later than thirty (30) days following the expiration of that thirty (30) day cure period.

Notwithstanding anything to the contrary herein, in the event of your termination without Cause, you will be entitled to receive the greater of (I) the equity payment you would receive if the Company adopts a severance plan for the executives of the Company as may be in effect at the time of termination, and (II) the equity compensation included in this Section 4. Your entitlement to equity compensation shall be

Rod Bolger Initials

further subject to the execution of any documents as required by Parent and the receipt of all approvals required under any applicable law.  You will be fully responsible to report and pay any and all tax-related charges to any tax authority, subject to the Company's compliance with all applicable tax withholding and reporting requirements under any applicable law. In the event of your termination of employment with the Company for any reason, all Restricted Stock that have not vested as of the time of such termination shall be canceled and forfeited for no consideration immediately upon such termination, other than as expressly set forth in this Section 4.

5.    **Benefits**.  During the Employment Period, you shall be eligible to participate in all retirement, compensation and employee benefit plans, practices, policies and programs provided by the Company to the extent applicable generally to other executives of the Company, subject to the eligibility criteria set forth therein, as such may be amended or terminated from time to time.

6.    **Vacation**. During the Employment Period, you shall be entitled to annual paid vacation in accordance with the policies of the Company applicable generally to other executives of the Company with respect to paid vacation or other time off.

Accumulation, if any, of annual vacation will be in accordance with the Company's policy as will be in effect from time to time in the Company's sole discretion.

7.    **Expenses**. During the Employment Period, you shall be entitled to receive reimbursement for all reasonable, out-of-pocket business expenses actually incurred by you in the performance of your duties hereunder, subject to your providing the Company with all necessary documentation of such expenses in accordance with the Company's policies.

8.    **Outside Business Interests**.  During the Employment Period, you shall be permitted to manage your personal finances, and to participate in charitable and not-for-profit (e.g., community or religious) activities, so long as such activities do not interfere with your duties under your Employment Agreement, and subject to your compliance with any applicable Company policy, including without limitation conflicts of interest and outside business activities policies.

Unless otherwise reasonably determined by the Company due to any change in circumstances or information not known to the Company as of the date hereof, the following outside business interests shall not be deemed in violation of the terms of employment:[1]

1. Your relationship with Carriage House (a high-net-worth family office being formed), with whom Kevin Cooper (a financial advisor based in Uxbridge Ontario Canada) is also associated.  You represent that Carriage House is being formed to cater to certain high net worth families as a private banking family office, and you have been assisting Mr. Cooper in the strategic formation and build out of Carriage House.  You will be permitted to retain equity interests in Carriage House (and perhaps subsidiaries) as well as be a board member and provide limited services that in each case do not interfere in any way with your duties to the Company or its affiliates or your obligations under this Agreement.  You agree to endeavor to encourage Carriage House to work with Celsius to the extent Carriage House incorporates crypto in their clients' investment strategies, subject in each case to the approval of your Supervisor and the Conflicts Committee of the Company.

---

[1] Subject to the review and approval by Celsius' Conflicts of Interest Committee.

Rod Bolger Initials

2. You may continue to pursue an opportunity with The Jumptuit Group, an Artificial Intelligence data technology company founded by Don Leka. Your investment in Jumptuit includes stock options. You shall only be permitted to hold a passive investment interest or options and you will neither become an employee of Jumptuit or its affiliates nor will you become an advisor or independent contractor to that company or its affiliates or otherwise be engaged to provide services.

**APPENDIX B**

**Confidentiality, Non-Competition, Non-Solicitation, Work Product and Non-Disparagement Undertaking**

I, Rod Bolger, am employed by Celsius Network LLC ("**Company**") pursuant to an employment agreement to which this Confidentiality, Non-Competition, Non-Solicitation, Work Product and Non-Disparagement Undertaking ("**Undertaking**") is attached as **Appendix B** ("**Employment Agreement**"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Employment Agreement.

I acknowledge that in the course of my employment with the Company, I will become familiar with a range of Confidential Information (as defined below) and that my services are of particular and special value to the Company. In consequence, I undertake the following towards the Company Group.

1. **Confidential Information and Confidentiality**.

    1.1.  I am aware that I may have access to or be entrusted with information (regardless of the manner in which it is recorded or stored) relating to the business interests, methodology or affairs of any member of the Company Group, or any person or entity with whom or which any member of the Company Group deals or is otherwise connected and which, for the avoidance of doubt, includes the terms of the Employment Agreement, other than the terms of this Undertaking ("**Confidential Information**"). For the purposes of this agreement, Confidential Information includes, but is not limited to:

        1.1.1.  Technical information of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as manufacturing and/or research processes or strategies; computer product, process and/or devices; software product; and any other databases, methods, know-how, formulae, compositions, technological data, technological prototypes, processes, discoveries, machines, inventions, and similar items;

        1.1.2.  Business information of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as information relating to any member of the Company Group's employees (including information related to performance, skill sets, and compensation); actual and anticipated relationships between any member of the Company Group and other companies; financial information; information relating to customer or vendor relationships; product pricing, customer lists, customer preferences, financial information, credit information; and similar items; and

        1.1.3.  Information relating to future plans of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as marketing strategies; new product research; pending projects and proposals; proprietary production processes; research and development strategies; and similar items.

    1.2.  During the Employment Period and at all times thereafter I shall keep confidential, and shall not use, disclose and/or make available, directly or indirectly, to any third party any Confidential Information without the prior written consent of the Company. To the extent applicable, in accordance with the Defend Trade Secrets Act, 18 U.S.C. § 1833(b), and other applicable law, nothing in this Undertaking, the Employment Agreement, or any other agreement or policy of any member of the Company Group shall prevent me from, or expose me to criminal or civil liability under federal or state trade secret law for, (i) directly or indirectly sharing any Company Group trade secrets or other Confidential Information (except information protected by the Company Group's attorney-client or work product privilege) with an attorney

Rod Bolger Initials _____

or with any federal, state, or local government agencies, regulators, or officials, for the purpose of investigating or reporting a suspected violation of law, whether in response to a subpoena or otherwise, without notice to the Company, or (ii) disclosing the Company Group's trade secrets in a filing in connection with a legal claim; provided, that the filing is made under seal.  Further, nothing herein shall prevent me from discussing or disclosing information related to my general job duties or responsibilities and/or to employee compensation.

1.3.   Without derogating from the generality of the foregoing, I confirm that:

1.3.1.   Except in the proper performance of my employment duties, I shall not copy, transmit, communicate, publish or make any commercial or other use whatsoever of any Confidential Information or Work Product (as defined below), without the prior written consent of the Company.

1.3.2.   I shall exercise the highest degree of care in safeguarding the Confidential Information and Work Product against loss, misuse, espionage, theft or other inadvertent disclosure and in maintaining its confidentiality.

1.3.3.   Upon termination of my employment, or at the earlier request of my Supervisor, I shall deliver to the Company all Confidential Information and Work Product and any and all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or Work Product that have been furnished to me, prepared by me or came to my possession or control, howsoever, and I shall not retain copies thereof in whatever form.

2.   **Non-Competition and Non-Solicitation**.

I hereby acknowledge that during the Employment Period that I will receive Confidential Information of the Company Group.  I acknowledge and agree that the Company would be irreparably damaged if I were to provide services to any person or entity competing with the Company Group or engaged in a similar business and that such competition by me would result in a significant loss of goodwill by the Company Group.  I hereby covenant that throughout the Employment Period and for a period of six (6) months thereafter:

2.1.   I shall not (and shall cause any person or entity controlled by me not to), directly or indirectly, in any capacity whatsoever, whether independently or as an equity holder, director, employee, consultant, officer, partner, member, agent, representative or otherwise, carry on, set up, own, manage, control, operate, participate in, be employed by or in service with, consult with, be interested in or any other manner engage in, a business anywhere, which competes with, or proposes to compete with any member of the Company Group, including, without limitation, in any activity in the field of borrowing or lending of cryptocurrencies; provided, that, nothing herein shall prohibit me from being a passive owner of not more than two percent (2%) of the outstanding stock of any class of a corporation which is publicly traded so long as none of such persons has any active participation in the business of such corporation.

2.2.   I shall not, whether directly or indirectly, through another person or entity, in any way:

2.2.1.   canvass, solicit, or endeavor to entice from any member of the Company Group, or otherwise have any business dealings with, any person or entity who or which at any time during my employment was or is:

       2.2.1.1. a supplier to, investor, customer, partner, joint venturer or licensor of any member of the Company Group or other commercial contractor of whatever nature;

       2.2.1.2. in the habit of dealing with any member of the Company Group;

       2.2.1.3. an employee, agent, officer, consultant, advisor or other independent contractor of or provider of services to any member of the Company Group; or

       2.2.1.4. negotiating or discussing becoming any of the above; or

    2.2.2. otherwise interfere with the relationship between any of the persons or entities listed in Section 2.2.1 and any member of the Company Group (including by assisting another to interfere in such relationship).

   2.3. I acknowledge that my obligations under this Section 2 are reasonable in light of my position and duties within the Company and the nature of the Company Group's business, the unique and valuable resources that the Company will invest in my training.

**3.** **Proprietary Rights**. I recognizes that the Company Group possesses a proprietary interest in all Confidential Information and Work Product and has the exclusive right and privilege to use, protect by copyright, patent or trademark, or otherwise exploit the processes, ideas and concepts described therein to the exclusion of me, except as otherwise agreed between the Company and I in writing. I expressly agree that any Work Product made or developed by me or my agents during the course of my employment, including any Work Product which is based on or arises out of Work Product, shall be the property of and inure to the exclusive benefit of the Company Group. I further agree that all Work Product developed by me (whether or not able to be protected by copyright, patent or trademark) during the course of my employment with the Company, or involving the use of the time, materials or other resources of any member of the Company Group, shall be promptly disclosed to the Company and shall become the exclusive property of the Company, and I shall execute and deliver any and all documents necessary or appropriate to implement the foregoing.

As used herein, the term "**Work Product**" means all inventions, financial & investment data and analytics, business development, acquisitions & mergers, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade names, logos and all similar or related information (whether patentable or unpatentable) that relates to any member of the Company Group's actual or anticipated business, research and development or existing or future products or services and that are conceived, developed or made by me (whether or not during usual business hours and whether or not alone or in conjunction with any other person) while employed by the Company together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing.

**4.** **Mutual Non-Disparagement**. During the Employment Period and at all times thereafter, neither me nor my agents shall directly or indirectly issue or communicate any public statement, or statement likely to become public, that maligns, denigrates or disparages any member of the Company Group or, any of the Company Group's officers, directors or employees, and no member of the Company Group nor any of its officers or directors shall directly or indirectly issue or communicate any public statement, or statement likely to become public, that maligns, denigrates or disparages me. The foregoing shall not be violated by truthful (i) responses to legal process or governmental inquiry or (ii) private statements to any member of the Company Group or any of the Company Group's officers, directors or employees; provided, that, with respect to clause (ii), such statements are made by me in the course of carrying out my duties pursuant to the Employment Agreement.

5. **No Conflicting Obligations**.

I have not and will not, at any time during the Employment Period, use or disclose Confidential Information in such manner that may breach any confidentiality or other obligation I owe to any former employer or other third party, without their prior written consent.

I warrant that I have not made, and will not make, any agreement in conflict with this paragraph or Section 3 above.

6. **Notice to Offerors**.

I agree that if, during my employment with the Company or the period of the restrictions set out in Section 2, I receive an offer of employment or engagement from any entity other than a member of the Company Group, I will provide a copy of this Undertaking to the offeror as soon as is reasonably practicable after receiving the offer and will inform the Company of the identity of the offeror.

7. **General**.

7.1.  If I breach any of the provisions of this Undertaking, the Company shall have the right and remedy to seek to have the provisions specifically enforced by any court having jurisdiction, it being acknowledged and agreed by me that the services being rendered hereunder to the Company Group are of a special, unique and extraordinary character and that any such breach may cause irreparable injury to the Company Group and that money damages may not provide an adequate remedy to the Company Group.  Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity.  Accordingly, I consent to the issuance of an injunction, whether preliminary or permanent, consistent with the terms of this Undertaking (without posting a bond or other security) if the Company establishes a violation of this Undertaking, in accordance with applicable law.

7.2.  If, at any time, the provisions of this Undertaking shall be determined to be invalid or unenforceable under any applicable law by reason of being vague or unreasonable as to area, duration or scope of activity, this Undertaking shall be considered divisible and shall become and be immediately amended to only such area, duration and scope of activity as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction over the matter, and the Company and I agree that this Undertaking as so amended shall be valid and binding as though any invalid or unenforceable provision had not been included herein. In addition to the foregoing, and not in any way in limitation of any right or remedy otherwise available to the Company, if the Company determines in good faith that I violated the terms of this Undertaking, any Severance Benefits, if any, then or thereafter due from the Company to me shall be terminated immediately and the Company's obligation to pay and my right to receive such Severance Benefits shall terminate and be of no further force or effect, unless a court with jurisdiction over the matter subsequently determines that I did not violate such section and, subject to any defenses or claims of the Company, orders the Company to remit all or a portion of the Severance Benefits to me.

7.3.  My undertakings hereunder are in addition to, and do not derogate from, any obligation to which I may be subject under applicable law or any Company Group policy or agreement.

7.4.  My undertakings hereunder will be applicable to me during the Employment Period and thereafter. Notwithstanding the aforesaid, the effect of my undertakings under Section 2 above shall be for the period specified in such Section.

Rod Bolger Initials

DocuSign Envelope ID: 1B5A1F64-D672-4989-9AB8-22EA6DF2F5A3

7.5.  This Undertaking shall be governed by and construed in accordance with the laws of the state of New York without giving effect to any choice of law or conflicting provision or rule that would cause the laws of any jurisdiction other than the state of New York to be applied.

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS UNDERTAKING AND HAVE HAD THE OPPORTUNITY TO REVIEW ITS PROVISIONS WITH ANY ADVISORS AS I CONSIDERED NECESSARY AND THAT I UNDERSTAND THIS UNDERTAKING'S CONTENTS AND SIGNIFY SUCH UNDERSTANDING AND AGREEMENT BY SIGNING BELOW.

**[Signature Page to Follow]**

Rod Bolger Initials

IN WITNESS WHEREOF, the Company and I have executed this Undertaking as of the date written below.

**CELSIUS NETWORK LLC**

By: *Trunshedda Ramos*
—DocuSigned by:
——CCBFBB4B0006437...
   **Name: Trunshedda Ramos**
   **Title: Chief Human Resources Officer (CHRO)**

**EXECUTIVE**

—DocuSigned by:
——E5FA85F4EEDF4DF...
Rod Bolger

Rod Bolger Initials

**Exhibit C**

**Advisory Agreement**

July 19, 2022

Rod Bolger
9 Dunbar Rd.
Toronto, ON M4W2X5
Canada

Dear Rod,

This agreement (the "Agreement") sets forth the terms and conditions of the independent contractor relationship between Rod Bolger ("Contractor") and Celsius Network LLC (the "Company").

1. Fees/Services.  During the Term, Contractor shall receive the Fees for providing the Services as set forth on Exhibit A attached hereto, which may be amended or supplemented by the parties in writing from time to time.

2. Term.  The term of this Agreement will commence July 18, 2022 (the "Start Date") and will terminate September 16, 2022, unless Contactor and the Company mutually agree to have the term automatically renew on a monthly basis thereafter; provided that the Company may terminate this Agreement upon seven (7) days' written notice and Contractor may terminate this Agreement upon seven (7) days' written notice after August 23, 2022.  The period of time between the Start Date and the termination of Contractor's services under this Agreement will be referred to herein as the "Term."  Contractor's relationship to the Company shall terminate at the end of the Term without any further obligation from the Company to Contractor, whether pursuant to statute, contract, common law or otherwise.

3. Independent Contractor Status.  Contractor shall be an independent contractor of the Company. Nothing in this Agreement is intended to, or shall be deemed or construed to, create any partnership, agency, joint venture, or employment relationship between or among Contractor on the one hand, and the Company or any of its affiliates, or any of their respective officers, directors, partners, principals, owners, members, employees, agents, or representatives (collectively, with the Company, the "Company Parties"), on the other hand.  Contractor's relationship to the Company and the Company Parties shall only be that of an independent contractor and Contractor shall perform all services pursuant to this Agreement as an independent contractor.  The Company and the Company Parties shall not, with respect to Contractor's services, exercise or have the power to exercise such level of control over Contractor as would indicate or establish that a relationship of employer and employee exists between Contractor and the Company or the Company Parties.  However, Contractor's services are subject to the approval of the Company and shall be subject to the Company's general right of supervision to secure the satisfactory performance thereof.

4. Taxes.  The Company will issue, or cause to be issued, Contractor a tax form(s) T4A (or other similar form) which reflects any Fees paid to Contractor.  Notwithstanding the foregoing, neither the Company nor any of the Company Parties make any representation to Contractor concerning the tax consequences of the Fees.  Neither the Company nor any of the Company Parties shall withhold or deduct from the Fees any amount in respect of taxes, income taxes, employment taxes, or withholdings of any nature on behalf of Contractor.  It is intended that the Fees shall constitute

1

revenues to Contractor that Contractor shall be solely responsible for the withholding and payment of any foreign, federal, provincial, local, or other income, payroll, employment, or other taxes. Contractor shall be solely responsible for withholding and paying all foreign, federal, provincial, and local taxes, including income taxes, business taxes, estimated taxes, self-employment taxes, and any other taxes, fees, additions to tax, interest, or penalties (collectively, all of the foregoing, "Taxes") which may be assessed, imposed, or incurred as a result of or relating to this Agreement or any amounts received by Contractor from the Company or the Company Parties. In the event the Company or any of the Company Parties are required to make any payments which are Contractor's obligations under this Agreement, or to the Canada Revenue Agency or any other taxing authority in respect of any Taxes, Contractor shall, upon receipt of written notice from the Company, remit to the Company an amount equal to such payments, within ten (10) business days from such notice.

5. No Benefits. Contractor shall not be eligible to receive compensation or benefits other than the Fees. Contractor will not be eligible to participate in any benefit plans or programs that the Company Parties offers to any employees, including medical/dental/vision insurance, prescription drug insurance coverage, life insurance, disability insurance, accident insurance, paid time off, pension, retirement, social security, savings, RRSP, unemployment, workers' compensation, or reimbursements (collectively, all of the foregoing, "Benefits"). Without limiting the foregoing, no Company Party shall reimburse Contractor for any expense, liability, or obligation. Contractor shall be required to obtain appropriate levels of insurance coverage, at Contractor's own expense, relating to Contractor's performance of services under this Agreement. Contractor shall obtain Optional Insurance from the Workplace Safety & Insurance Board ("WSIB"), and shall furnish a valid Clearance Certificate issued by the WSIB upon the Company's request.

6. Acknowledgement. Contractor acknowledges and agrees that Contractor's employment relationship with the Company was terminated prior to the date of this Agreement and Contractor is not owed any compensation, bonus, equity or equity-based compensation, employee benefits, payment for any employment taxes, accrued vacation, severance payments or other payments or benefits of any kind, or otherwise, from the Company or any of its affiliates in respect of Contractor's employment with the Company.

7. Continuing Obligations. Contractor hereby (a) reaffirms Contractor's restrictive covenant obligations under any agreement, plan, policy or arrangement with the Company or any of its subsidiaries or affiliates as may be in effect from time to time (including, without limitation, any confidentiality, intellectual property, non-competition, non-solicitation, non-disparagement) that Contractor is subject or bound (collectively, the "Continuing Obligations"), the terms of each of which are fully incorporated herein by reference, and (b) understands, acknowledges and agrees that such Continuing Obligations survived the termination of Contractor's employment and will survive the termination of the Term and remain in full force and effect in accordance with all of the terms and conditions thereof.

8. Confidential Information. Without derogating from any of the Continuing Obligations and in addition thereto, Contractor acknowledges that, during the Term, Contractor will become familiar with a range of Confidential Information (as defined below) and that Contractor's services are of particular and special value to the Company. Contractor acknowledges that Contractor may have

2

access to or be entrusted with information (regardless of the manner in which it is recorded or stored) relating to the business interests, methodology or affairs of the Company and any of its affiliates and subsidiaries (collectively, the "Company Group"), or any person or entity with whom or which any member of the Company Group deals or is otherwise connected and which, for the avoidance of doubt, includes the terms of this Agreement (collectively, "Confidential Information"). In exchange for the consideration set forth in this Agreement and for other good and valuable consideration, during the Term and at all times thereafter Contractor shall keep confidential, and shall not use, disclose and/or make available, directly or indirectly, to any third party any Confidential Information without the prior written consent of the Company. Without derogating from the generality of the foregoing, Contractor confirms that: (i) except in the proper performance of Contractor's services hereunder, Contractor shall not copy, transmit, communicate, publish or make any commercial or other use whatsoever of any Confidential Information or Work Product (as defined below), without the prior written consent of the Company; (ii) Contractor shall exercise the highest degree of care in safeguarding the Confidential Information and Work Product against loss, misuse, espionage, theft or other inadvertent disclosure and in maintaining its confidentiality; and (iii) upon termination of the Term, or at the earlier request of the Company, Contractor shall deliver to the Company all Confidential Information and Work Product and any and all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or Work Product that have been furnished to Contractor, prepared by Contractor or came to Contractor's possession or control, howsoever, and Contractor shall not retain copies thereof in whatever form. For purposes of this Agreement, "Confidential Information" includes, but is not limited to: (i) technical information of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as manufacturing and/or research processes or strategies; computer product, process and/or devices; software product; and any other databases, methods, know-how, formulae, compositions, technological data, technological prototypes, processes, discoveries, machines, inventions, and similar items; (ii) business information of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as information relating to any member of the Company Group's employees (including information related to performance, skill sets, and compensation); actual and anticipated relationships between any member of the Company Group and other companies; financial information; information relating to customer or vendor relationships; product pricing, customer lists, customer preferences, financial information, credit information; and similar items; and (iii) information relating to future plans of any member of the Company Group, its customers or other third parties that is in use, planned, or under development, such as marketing strategies; new product research; pending projects and proposals; proprietary production processes; research and development strategies; and similar items.

For purposes of this Agreement, "Work Product" means all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade names, logos and all similar or related information (whether patentable or unpatentable) that relates to any member of the Company Group's actual or anticipated business, research and development or existing or future products or services and that are conceived, developed or made by Contractor (whether or not during usual business hours and whether or not alone or in conjunction with any other person) while providing services hereunder together with all patent applications, letters patent, trademark, trade name and service mark applications or

3

registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing.

9.  <u>Non-Disparagement</u>.  Without derogating from any of the Continuing Obligations and in addition thereto, during the Term and at all times thereafter, neither Contractor nor Contractor's agents and/or representatives shall directly or indirectly issue or communicate any public statement, or statement likely to become public, that maligns, denigrates or disparages any member of the Company Group or, any of the Company Group's officers, directors or employees. The foregoing shall not be violated by truthful (i) responses to legal process or governmental inquiry or (ii) private statements to any member of the Company Group or any of the Company Group's officers, directors or employees; <u>provided</u>, <u>that</u>, with respect to clause (ii), such statements are made by Contractor in the course of carrying out my duties pursuant to the Employment Agreement.

10.  <u>Whistleblower Protections</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement will be interpreted so as to impede Contractor (or any other individual) from (i) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement, or as required by law or legal process, including with respect to possible violations of law, (ii) participating, cooperating, or testifying in any action, investigation, or proceeding with, or providing information to, any governmental agency, legislative body or any self-regulatory organization, including, but not limited to, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, (iii) accepting any U.S. Securities and Exchange Commission Awards, or (iv) making other disclosures under the whistleblower provisions of federal law or regulation. In addition, nothing in this Agreement or any other agreement or Company Group policy prohibits or restricts Contractor from initiating communications with, or responding to any inquiry from, any administrative, governmental, regulatory or supervisory authority regarding any good faith concerns about possible violations of law or regulation. Contractor does not need the prior authorization of the Company to make any such reports or disclosures and Contractor will not be not required to notify the Company that such reports or disclosures have been made.

11.  <u>Defend Trade Secrets Act</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that— (A) is made—(i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

12.  <u>Equitable Relief</u>.  If Contractor breaches any of the provisions of <u>Sections 7</u>, <u>8</u> or <u>9</u> above, the Company shall have the right and remedy to seek to have the provisions specifically enforced by any court having jurisdiction, it being acknowledged and agreed by Contractor that the services being

4

rendered hereunder to the Company Group are of a special, unique and extraordinary character and that any such breach may cause irreparable injury to the Company Group and that money damages may not provide an adequate remedy to the Company Group. Such right and remedy shall be in addition to, and not in lieu of, any other rights and remedies available to the Company at law or in equity. Accordingly, Contractor hereby consents to the issuance of an injunction, whether preliminary or permanent, consistent with the terms of this Agreement (without posting a bond or other security) if the Company establishes a violation of Section 7, 8 or 9, in accordance with applicable law. For the avoidance of doubt, the provisions of Sections 7, 8 and 9 shall survive the termination of the Term.

13. Reasonableness. If, at any time, the provisions of Sections 7, 8 or 9 shall be determined to be invalid or unenforceable under any applicable law by reason of being vague or unreasonable as to area, duration or scope of activity, this Agreement shall be considered divisible and shall become and be immediately amended to only such area, duration and scope of activity as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction over the matter, and the Company and Contractor agree that this Agreement as so amended shall be valid and binding as though any invalid or unenforceable provision had not been included herein. It is also agreed that each member of the Company Group will have the right to enforce each and all of Contractor's obligations to that member under this Agreement.

14. Limits of Authority. Contractor has no right or authority, express or implied, to act on behalf of, assume, or create any obligation or responsibility, or otherwise bind, any of the Company Parties in any way. Contractor shall not make any contrary representation to any third party.

15. Compliance with Policies. As an independent contractor of the Company, Contractor will perform Contractor's duties and responsibilities diligently, loyally, in accordance with the terms of this Agreement, and in compliance with applicable law and all of the Company Entities' policies, practices, and procedures (including in relation to COVID) that apply to the Company's independent contractors, as they may be adopted or amended from time to time in the Company's sole discretion.

16. Indemnity. Contractor agree to indemnify the Company Parties, and hold them harmless, from and against any and all claims, liabilities, and expenses (including attorneys' and accountants' fees, costs, and expenses) resulting from, arising out of, or relating to any (a) services performed by Contractor, except to the extent performed by Contractor in good faith pursuant to the terms of this Agreement, and/or (b) breach of this Agreement. Contractor's indemnification obligations include any losses or expenses incurred by the Company Parties (including attorneys' and accountants' fees, costs, and expenses) in connection with (i) any claim that any Benefits or Taxes should have been paid or provided to Contractor, or withheld or contributed for the benefit of any of Contractor, (ii) any violation of federal, provincial, or local laws applicable to Contractor or the services hereunder, and (iii) all damages to persons or property (including to Contractor or Contractor's property) that occur as a result of the acts or omissions of Contractor.

17. Representations. Contractor represents and warrants that Contractor's acceptance of this offer, and Contractor's performance of the obligations under this Agreement, do not conflict with or violate the terms of (a) any agreement by which Contractor is bound, including any covenants or obligations to

any other employer, entity or person; or (b) any order, rule, law, regulation, or other legal requirement or obligation applicable to Contractor.

18. <u>Entire Agreement</u>.   This Agreement replaces and supersedes any and all previous or existing agreements, arrangements, negotiations, conversations or understandings, oral or written, between Contractor and any of the Company Entities relating to the terms and conditions of Contractor's engagement; <u>provided</u>, <u>however</u>, that the restrictive covenants set forth in this Agreement are in addition to and complement, and are not in substitution of and do not replace or supersede, any confidentiality, trade secrets, non-disparagement, inventions and patent rights restrictions or any other similar restrictions by which Contractor is currently bound or by which Contractor may be bound in respect of the Company Group.   This Agreement contains the entire agreement and understanding of the parties, and the terms and conditions of Contractor's engagement can be modified only in an agreement signed by Contractor and an officer of the Company.

19. <u>Amendments and Waivers</u>.   No provision of this Agreement may be amended, modified, waived, or discharged except as agreed to in a writing signed by both Contractor and an officer of the Company. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

20. <u>Governing Law</u>.   This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario, Canada without giving effect to any choice of law or conflicting provision or rule that would cause the laws of any jurisdiction other than the Province of Ontario to be applied.

21. <u>Severability/Modification</u>.   If any provision of this Agreement is determined to be unenforceable as a matter of governing law, a reviewing court of appropriate jurisdiction shall have the authority to "blue pencil" or otherwise modify such provision so as to render it enforceable while maintaining the parties' original intent (as reflected herein) to the maximum extent possible.   Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof is declared invalid, the remaining provisions shall nevertheless remain in full force and effect.

22. <u>D&O Coverage</u>.   For the avoidance of doubt, nothing in this Agreement alters or amends any director and officer coverage or other insurance coverage that Contractor may be entitled in connection with Contractor's employment with the Company.

23. <u>Assignment</u>.   This Agreement may be assigned by the Company and upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such assigned party.   Contractor may not assign Contractor's rights and obligations under this Agreement.

24. <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument.   Facsimile, PDF, and other true and accurate copies of this Agreement shall have the same force and effect as originals hereof.

*                         *

To accept this engagement, Contractor must sign and date this Agreement below and return this document to the Company no later than _____, 2022 (after which date this offer will be null and void).  By signing below, Contractor agree to all of the terms and conditions provided herein.


CELSIUS NETWORK LLC

By:_____          _____
    Name:                                                    Date
    Title:


_____          _____
ROD BOLGER                                               Date

## EXHIBIT A

**Fees**:          Monthly Fee:  CAD $120,000 (prorated for partial months); with the Monthly Fee in respect of Contractor's service from the Start Date through August 23, 2022 to be paid in advance as soon as practicable following the Start Date (but subject to repayment by the Contractor should Contractor's service terminate for any reason prior to August 23, 2022), and any future Monthly Fee thereafter payable monthly in arrears.

**Services**:          Contractor will make himself reasonably available on a substantially full-time basis to provide services reasonably requested by the Company related to the Company's accounting, auditing, and financial reporting systems and other matters requested by the Company.