| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS LLP** |
| 601 Lexington Avenue | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| New York, New York 10022 | 300 North LaSalle Street |
| Telephone:   (212) 446-4800 | Chicago, Illinois 60654 |
| Facsimile:    (212) 446-4900 | Telephone:   (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Proposed Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re Docket Nos.: 19, 20, 21, 22,** |
| | ) | **23, 53, 185, 187, 189, 241, 371,** |
| | ) | **400, 401, 402, 413, 428** |
| | ) | |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS
TO CERTAIN OF THE DEBTORS' FIRST AND SECOND DAY MOTIONS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this omnibus reply to the objections[2] (the "Objections") to, and in further support of:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The Objections include: (a) *Objection of the Texas State Securities Board to Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 371] (the "Texas SSB Objection"); (b) *Objection of the United States Trustee to Debtors' Motions for Entry of Orders: (I) Permitted the Sale of the Debtors' Mined Bitcoin in the Ordinary Course, and (II) Approving Procedures for De Minimis Asset Transaction*s [Docket No. 400] (the "U.S. Trustee Omnibus Objection"); (c) *The Official Committee of Unsecured Creditors' Limited Objection to the Debtors' Cash Management Motion* [Docket No. 401] (the "Committee Cash Management Objection"); (d) *The Official Committee of Unsecured Creditors' Limited Omnibus Objection to Certain of Debtors' First and Second Day Motions* [Docket No. 402] (the "Committee Omnibus Objection"); (e) *Limited Objection of the United States*

(a) *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 19] (the "Wages Motion"); (b) *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors, Foreign Vendors, 503(B)(9) Claimants, and Lien Claimants, (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 20] (the "Critical Vendors Motion"); (c) *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 21] (the "Cash Management Motion"); (d) *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject, Assume, or Assume and Assign Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 185] (the "Contract Procedures Motion"); (e) *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 187] (the "Mined Bitcoin Motion"); and (f) *Debtors'*

---

*Trustee to Debtors' Motion for Entry of Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (III) Granting Related Relief* [Docket No. 413] (the "U.S. Trustee Wages Objection"); (f) *The Official Committee of Unsecured Creditors' Objection and Reservation of Rights to Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of the Debtors' Mined Bitcoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 428] (the "Committee Mined Bitcoin Objection"); and (g) *The Official Committee of Unsecured Creditors' Objection to the Debtors' De Minimis Sales Motion* [Docket 429] (the "Committee De Minimis Objection").

*Motion to Approve Procedures for De Minimis Asset Transaction*s [Docket No. 189] (the "De Minimis Assets Motion").

Further, to the extent that any letters filed on the docket of these chapter 11 cases purport to be objections, to the extent they are considered objections, the Debtors respectfully request that such objections be overruled for the reasons discussed herein.

**Background**

1. The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries. Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral. Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

2. On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 18, 2022, the Court entered an order [Docket No. 53] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 241]. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

3

3.  A description of the Debtors' business, the reasons for commencing the chapter 11 cases, and the relief sought from the Court to allow for a smooth transition into chapter 11 are set forth in the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed on July 14, 2022 [Docket No. 23] (the "Mashinsky Declaration"), and in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed on July 14, 2022 [Docket No. 22] (the "Campagna Declaration"), incorporated herein by reference.[3]

4.  Contemporaneously herewith, the Debtors have filed the *Notice of Budget and Coin Report* [Docket No. 447] (the "Budget and Coin Report"). Among other things, the Budget and Coin Report details the current status of the Debtors' mining activities.

## Preliminary Statement

5.  The Debtors file this reply in support of the Wages Motion, Critical Vendors Motion, Cash Management Motion, and Mined Bitcoin Motion (collectively, the "Contested Motions") and in response to the Objections.[4] The relief requested in these motions is intended to minimize adverse effects on the Debtors' business and allow the Debtors to monetize certain assets. The Debtors have been working constructively, and corresponded on dozens of calls and copious emails, with advisors to the Committee, the U.S. Trustee, and other parties in interest to answer questions and resolve concerns raised in the Objections. As a result, the Debtors plan to

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Mashinsky Declaration or the Campagna Declaration (together, the "First Day Declarations"), or the relevant motion, as applicable.

[4] With respect to the Contract Procedures Motion and the De Minimis Assets Motion, the Debtors worked with the Committee and the U.S. Trustee and have agreed to modifications to the proposed orders that the Debtors believe will resolve the issues raised in the U.S. Trustee Omnibus Objection and the Committee De Minimis Objection and all other objections to the Contract Procedures Motion and De Minimis Assets Motion. The Debtors will file the revised proposed orders prior to the hearing scheduled for August 16, 2022.

file revised proposed orders in advance of the hearing reflecting resolutions to the vast majority of, if not all, the issues raised in the Objections.

## Reply

I. **The Relief Requested in the Wages Motion Satisfies the Applicable Standards Under the Bankruptcy Code and Is to the Benefit of All Parties in Interest.**

6. In the U.S. Trustee Wages Objection, the U.S. Trustee asserts that the Debtors have not met their burden of demonstrating that paying the Non-Insider Severance Benefits, ad hoc bonus programs, and payments above the Statutory Cap are "necessary" to facilitate the continued operation the Debtors business. The Debtors have provided substantial additional information to the U.S. Trustee to support the necessity of paying the Non-Insider Severance Benefits and reiterate these arguments herein.

7. Following discussions with the U.S. Trustee, the Debtors elected to not seek authority to continue the ad hoc bonus programs or to seek authority to make payments above the Statutory Cap. The Debtors agreed to pay certain former employees Non-Insider Severance Benefits and as of the Petition Date, the Debtors estimated that they owed 19 former employees an aggregate amount of $409,000 in Non-Insider Severance Benefits. The Debtors have removed certain former employees from the list of proposed recipients of Non-Insider Severance Benefits and have agreed to not seek to pay any amounts above the Statutory Cap. As a result, the Debtors now seek to pay only 12 former employees, none of which are "insiders," an aggregate amount of approximately $166,000, with no employee receiving an amount above the Statutory Cap. None of the former employees who the Debtors seek to pay Non-Insider Severance Benefits to have received any other payments that would be subject to the Statutory Cap. Paying Non-Insider Severance Benefits, in compliance with the Statutory Cap, is a sound exercise of the Debtors' business judgment and is permissible under the Bankruptcy Code.

8. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "articulate some business justification, other than mere appeasement of major creditors." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Additionally, the Court may authorize payments of claims under section 105(a) of the Bankruptcy Code, which empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This "doctrine of necessity" is designed to foster a debtor's rehabilitation, which is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. at 176.

9. The Debtors' decision to pay certain Non-Insider Severance Benefits reflects the Debtors' sound business judgment and the Debtors submit that paying Non-Insider Severance Benefits up to the Statutory Cap is consistent with the priority scheme set forth in section 507(a)(4) of the Bankruptcy Code. Under 507(a)(4) of the Bankruptcy Code, "wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual" are afforded priority up to the Statutory Cap. Each of the former employees receiving Non-Insider Severance Benefits signed a separation agreement that included a severance payment within 180 days of the Petition Date. None of these individuals received other prepetition wages, and so the Debtors propose to pay severance obligations to these individuals in accordance with the priority afforded to such severance claims under the Bankruptcy Code.

10. The Debtors and the Committee have resolved the issues raised in the Committee Omnibus Objection related to the Wages Motion,[5] which are primarily based on the Committee's

---

[5] Subject to the Committee accepting the Debtors' assertion that none of the parties receiving Non-Insider Severance Benefits are "insiders" as that term is defined in section 101(31) of the Bankruptcy Code. The

6

concern that one individual slotted to receive Non-Insider Severance Benefits may be an "insider" based on his title. The Debtors no longer seek to pay this individual any Non-Insider Severance Benefits, and, therefore, believe all of the Committee's objections to the Wages Motion have been resolved.

11. Therefore, the Debtors request the Court overrule the U.S. Trustee Wages Objection, and to the extent the Committee's objections to the Wages Motion are not consensually resolved by the hearing on the Contested Motions, the Committee's objections to the Wages Motion, and enter the revised proposed order.

II. **The Relief Requested in the Mined Bitcoin Motion Is in the Best Interests of Parties in Interest and is Permissible under the Bankruptcy Code.**

12. As reflected in the revised proposed order to be filed on the docket, the Debtors seek, out of an abundance of caution, authority for Debtor Celsius Mining LLC ("Mining") to sell the Bitcoin generated from its mining activity (the "Mined Bitcoin") for U.S. dollars ("USD"), as the Debtors did in the ordinary course (as used in section 363(c)(1) of the Bankruptcy Code) before the Petition Date. Contrary to the U.S. Trustee's objection, the Debtors have provided sufficient information for the Court to determine that the sale of Mined Bitcoin is in the ordinary course for the Debtors' businesses.

13. As stated in the Mashinsky Declaration, the Debtors' "primary operations consist of . . . Bitcoin mining through Mining." Mashinsky Decl. ¶ 42. The Debtors operate one of the largest mining enterprises in the United States. *Id*. ¶ 65. In 2021, the Debtors generated approximately 3,114 Mined Bitcoin. *Id*. ¶ 66. As of August 9, 2022, the Debtors have generated

---

Committee also objected to the payment of Non-Insider Severance Benefits in excess of the Statutory Cap. The Debtors are not seeking to pay any individuals in amounts above the Statutory Cap.

7

approximately 2,950 Mined Bitcoin year to date, and on average, are generating 350–450 Mined Bitcoin per month for 2022. Consistent with this rate, from the Petition Date through August 9, 2022, the Debtors have generated approximately 390 Mined Bitcoin, and, as of August 9, 2022, have approximately 484 Mined Bitcoin (and counting) on hand.[6] Operationally, as of the Petition Date, Mining owned approximately 80,850 mining "rigs," approximately 43,632 of which were in service. Mashinksy Decl. ¶ 67. As of the end of July 2022, approximately 58,000 of the Debtors' rigs were in service generating Mined Bitcoin.[7]

14. Section 363(c)(1) of the Bankruptcy Code plainly authorizes a debtor in possession to sell estate property in the ordinary course without the need for a notice or hearing. While not defined in the Bankruptcy Code, the Second Circuit utilizes a two-part test that considers (1) whether the transaction in question is of the sort commonly undertaken by companies in the relevant industry (the "Horizontal Test") and (2) whether a hypothetical creditor would expect the nature of the economic risk when they entered into contracts with the Debtors (the "Vertical Test"). *See In re Lavigne*, 114 F.3d 379, 384-85 (2d Cir. 1997) (citing *In re Roth Am., Inc.*, 975 F.2d 949, 952-53 (3d Cir. 1992)). Certain aspects of the unresolved objections seek information well in excess of the Debtors' burden to show that the sale of the Mined Bitcoin is ordinary course for the Debtors. Rather, the Debtors have provided detailed descriptions in the Mashinsky Declaration and the Budget and Coin Report, as highlighted and summarized above. The Debtors submit that the factual record before the Court provides ample basis to conclude that the sale of the Mined Bitcoin is one commonly undertaken by cryptocurrency companies and that a reasonable creditor would expect the Debtors to do, as determined by comparing with the Debtors' prepetition conduct.

---

[6] Budget & Coin Report, at 3 (reporting approximately 350 Mined Bitcoin on hand, as of the end of July 2022).
[7] Budget & Coin Report, at 3.

8

15. Mining has primarily used the USD proceeds of the Mined Bitcoin to pay its own operating expenses and, secondarily (if at all), to pay certain capital expenses. In 2022, the majority of the USD proceeds from the sale of Mined Bitcoin were used for Mining's operating expenses. The revised proposed order will reflect the mechanism by which Mining historically sold Mined Bitcoin for USD. Namely, Mining transferred Mined Bitcoin to Debtor Celsius Network Limited ("CNL"), the only Celsius entity with a trading platform, CNL then sold the Mined Bitcoin for USD, and the proceeds thereof were then transferred into Mining's operations deposit account. The sole purpose of the relief requested in the Mined Bitcoin Motion is to allow for the sale of Mined Bitcoin for USD to be used to fund Mining's operational expenses. Stated differently, the Debtors do not seek authority from the Court to restart any customer facing operations, such as its trading and lending platform, or any deployment or investment of cryptocurrency assets. The revised proposed order will also include language the Debtors believe is responsive to the concern of the Texas State Securities Board in connection with the unlawful sale of securities. The Debtors believe that these revisions to the proposed order resolve all unresolved objections. Thus, to the extent there are any unresolved objections that have not been rendered moot by the revised proposed order, the Debtors ask the Court overrule the objections and enter the revised proposed final order.

**III.    The Relief Requested in the Cash Management Motion is Necessary and Appropriate.**

16. The Debtors seek to maintain their Cash Management System in the ordinary course of business, as any interruption would have an immediate and significant adverse effect on the Debtors' operations and ability to preserve assets to the detriment of their estates and stakeholders. Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *See In re Baldwin-United Corp.*,

79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); *see also Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (same).

17.     The Committee is the only party that objected to the Debtors' motion, and did so on the bases that: (a) the Court should prohibit transfers between Debtors and non-Debtors; (b) the Court should restrict Intercompany Transaction between Debtors; (c) the Court should prohibit cryptocurrency transactions absent further Court order; and (d) the Court should grant the Committee notice and consultation rights for transfers under the cash management order. The Debtors have worked with the Committee to resolve many of these points, and have agreed to seek second interim relief rather than final relief to provide the parties with additional time to reach consensus on the outstanding issues prior to a final hearing.

18.     With respect to the first, second, and fourth points raised by the Committee in its objection, as requested, the Debtors have added language to the second interim order providing that all Intercompany Transactions will be subject to a budget and that the Committee will receive certain consent and notice rights with respect to certain Intercompany Transactions or amounts that exceed the proposed budget. As discussed with the Committee, the Debtors cannot cease Intercompany Transactions between Debtors and non-Debtor affiliates in their entirety because the funding provided by these transactions is necessary to maintain the non-Debtor affiliates' business operations. With respect to the third point raised by the Committee, the Debtors did not seek relief in their Cash Management Motion to continue transfers of cryptocurrency because such actions do not require court approval. Nevertheless, the Debtors chose to provide an overview of how

10

cryptocurrency interacts with the Debtors' Cash Management System in its motion to provide the Court and stakeholders with a complete picture of the Debtors' operations. The Debtors will continue to be transparent with the Committee, and, in such vein, have agreed to provide the Committee with tracking information for all future cryptocurrency movements. To the extent objections to the Cash Management Motion are not consensually resolved by the hearing on the Contested Motions, the Debtors ask the Court overrule the objections and enter the revised proposed interim order.

**IV.     The Relief Requested in the Critical Vendors Motion Is Necessary and Appropriate.**

19.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (authorizing debtor to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (authorizing the payment of prepetition claims to suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to use their business judgment in making this determination. *See In re Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). The Committee recognizes as much when it notes that "there must be a sound business purpose" for making prepetition payments to Vendors. Committee Omnibus Objection ¶ 9. Further, under section 105(a) of the Bankruptcy Code, courts may use their power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176.

11

20.     The Committee's main objection to the Debtors' Critical Vendors Motion is that, according to the Committee, its professionals have not received sufficient diligence regarding the Trade Claims that the Debtors seek to pay. Committee Omnibus Objection ¶ 10. The Debtors, however, are actively engaging with the Committee and are providing the Committee with diligence as quickly as possible under the circumstances. Moreover, the Debtors believe that they have provided the Committee with most, if not all, of the diligence requested with respect to the Debtors' Vendors. The Debtors are continuing to engage with the Committee and are willing to provide the Committee with a list of all of the Debtors' Vendors that they seek to make payments to pursuant to the Critical Vendors Motion.

21.     The Committee further asserts that even though payment of prepetition Trade Claims is routinely granted, the Debtors should not receive the benefit of such relief because the Debtors' "business practices are unlike other industries for which there is precedent supporting the requested relief." *Id.* While the Debtors' business is certainly an innovative one, there is nothing unprecedented about the nature of the Vendors or the Trade Claims that the Debtors need to pay in order to prevent disruption to critical business operations. Like many other businesses—particularly enterprises in the software and technology space—the Debtors pay Vendors to provide critical software, IT, and related services. In fact, the Debtors' Vendors comprise, to a large extent, software providers and providers of related technological services. Further, like other businesses engaged in growth and expansion, and as the Debtors described transparently and in detail in their Critical Vendors Motion, the Debtors' Vendors also include companies and individuals providing construction and related services necessary to complete the build-out of a proprietary mining center (the "Mining Center"). There is nothing unprecedented or unusual about the construction of the

Debtors' Mining Center. Accordingly, the Committee's objection on this ground is without merit and should be rejected.

22. The Committee requests that the Debtors' proposed final Critical Vendors order be modified such that the Debtors are required to (a) receive prior written consent from the Committee before making any payments above $10,000 in the aggregate to any Vendor, and (b) maintain a matrix of all payments made in satisfaction of prepetition Trade Claims, which must regularly be updated and provided to the U.S. Trustee and counsel to the Committee. *Id.* ¶ 11. As noted above, the Debtors have worked closely and in good faith with the Committee's advisors since they were engaged. Consequently, the Debtors have already agreed to maintain a matrix of payments and to provide such matrix every two weeks to the U.S. Trustee and the advisors to the Committee. The Debtors cannot, however, agree to the Committee's request that they be required to receive prior written consent before making any payments above $10,000 in aggregate to any Vendor. The Debtors have a global operation and requiring them to seek prior written consent before making payments above this cap is an unreasonable interference in the Debtors' business judgment that will severely disrupt operations. For these reasons, the Debtors ask that the Court overrule the Committee's objection and enter the revised proposed final order.

## Conclusion

23. For the foregoing reasons, as well as the reasons set forth in the Contested Motions, the Debtors request that the Court (a) overrule the Objections, (b) enter the proposed Orders, and (c) grant such other and further relief that the Court deems just and proper.

*[Remainder of page intentionally left blank]*

| | |
|---|---|
| New York, New York<br>Dated: August 14, 2022 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:     (212) 446-4900<br>Email:            jsussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:     (312) 862-2200<br>Email:            patrick.nash@kirkland.com<br>                      ross.kwasteniet@kirkland.com<br><br>*Proposed Counsel to the Debtors and*<br>*Debtors in Possession* |