

# PROOF OF PUBLICATION

Sep-06, **20**22

I, Edgar Noblesala, in my capacity as a Principal Clerk of the Publisher of The New York Times a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on

Sep 6, 2022, NYT & Natl, pg B3

Sworn to me this 6th day
of September, 2022

Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: | ) | Chapter 11 |
|---|---|---|
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF AUCTION FOR THE POTENTIAL SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for the purchase of certain of the Debtors' assets and assumption of certain liabilities of the Debtors consistent with the bidding procedures (the "Bidding Procedures")[2] approved by the United States Bankruptcy Court for the Southern District of New York (the "Court") by entry of an order on September 1, 2022 [Docket No. 687] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

**Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Stretto, Inc. by calling (855) 423-1530 (Domestic) or (949) 669-5873 (International) or visiting the Debtors' restructuring website at (https://cases.stretto.com/celsius).**

**PLEASE TAKE FURTHER NOTICE** that any person or entity interested in purchasing the GK8 Assets may submit a non-binding Indication of Interest to the Debtors any time prior to the Final Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that the Final Bid Deadline is **September 21, 2022**, at **4:00 p.m. (prevailing Eastern Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors may conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **September 23, 2022, at 10:00 a.m. (prevailing Eastern Time)**, via remote video.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of the Sale (if any) at the Sale Hearing, which is presently scheduled to commence on **October 6, 2022, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **September 29, 2022, at 4:00 p.m.** (prevailing Eastern Time).

**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The Sale Order (if any) is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse Agreement (in the case where a Stalking Horse Bidder is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if a Stalking Horse Bidder is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Assigned Contracts arising after the Effective Date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. All rights of any party to set off any claims, debts or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the Effective Date pursuant to the Sale Order. Other than as expressly set forth in the Stalking Horse Agreement (or another Successful Bidder's purchase agreement, as applicable) with respect to Assumed Liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates. To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Effective Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the assets prior to the Effective Date. For the avoidance of doubt, the Successful Bidder shall assume all liabilities of GK8, whether or not such liabilities are directly or indirectly related to any of the Debtors. The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement but for the foregoing protections against potential claims based upon "successor liability" theories.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, in their reasonable business judgment and subject to the exercise of their fiduciary duties, and in consultation with the Consultation Parties, to modify the Bidding Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, are available: (a) free of charge upon request to Stretto, Inc. (the notice and claims agent retained in these chapter 11 cases) by (a) calling (855) 423-1530 (Domestic) or (949) 669-5873 (International); (b) visiting the Debtors' restructuring website at (https://cases.stretto.com/Celsius); or (c) for a fee via PACER by visiting (https://www.deb.uscourts.gov/).

New York, New York, Dated: September 1, 2022

*/s/ Joshua A. Sussberg*, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com -and- Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*), Ross M. Kwasteniet, P.C. (admitted *pro hac vice*), 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: patrick.nash@kirkland.com, ross.kwasteniet@kirkland.com, *Proposed Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

# White House Reveals $50 Billion Blueprint To Bolster Chip Makers

FROM FIRST BUSINESS PAGE

The fund, which was approved by Congress in July, was created to encourage U.S. production of strategically important semiconductors and spur research and development into the next generation of chip technologies. The Biden administration says the investments will lessen dependence on a foreign supply chain that has become an urgent threat to the country's national security.

"This is a once-in-a-lifetime opportunity, a once-in-a-generation opportunity, to secure our national security and revitalize American manufacturing and revitalize American innovation and research and development," Ms. Raimondo said. "So, although we're working with urgency, we have to get it right, and that's why we are laying out the strategy now."

Trade experts have called the fund the most significant investment in industrial policy that the United States has made in at least 50 years.

It will come at a pivotal moment for the semiconductor industry.

Tensions between the United States and China are rising over Taiwan, the self-governing island that is the source of more than two-thirds of the most advanced semiconductors. Shortages of semiconductors have also helped to fuel inflation globally, by increasing delivery times and prices for electronics, appliances and cars.

Semiconductors are crucial components in mobile phones, pacemakers and coffee makers, and they are also the key to advanced technologies like quantum computing, artificial intelligence and unmanned drones.

With elections fast approaching, the Biden administration is under pressure to demonstrate that it can use this funding wisely and lure manufacturing investments back to the United States. The Commerce Department is responsible for choosing which companies receive the money and monitoring their investments.

In its strategy paper, the Commerce Department said that the United States remained the global leader in chip design, but that it had lost its leading edge in producing the world's most advanced semiconductors. In the last few years, China has accounted for a substantial portion of newly built manufacturing, the paper said.

The high cost of building the kind of complex facilities that manufacture semiconductors, called fabs, has pushed companies to separate their facilities for designing chips from those that manufacture them. While many leading companies, like Qualcomm, Nvidia and Apple, design chips in the United States, they contract out their fabrication to foundries based in Asia, particularly in Taiwan. The system creates a risky source of dependence for the chips industry, the White House says.

The department said the funding aims to help offset the higher costs of building and operating facilities in the United States compared with other countries, and to encourage companies to build the larger type of fabs in the United States that are now more common in Asia. Domestic and foreign companies can apply for the funds, as long as they invest in projects in the United States.

To receive the money, companies will need to demonstrate the

AGENCE FRANCE-PRESSE — GETTY IMAGES

Making chips in Jiangsu, China. The country accounts for much of newly built manufacturing, a U.S. report said.

long-term economic viability of their project, as well as "spillover benefits" for the communities they operate in, like investments in infrastructure and work force development, or their ability to attract suppliers and customers, the department said.

Projects that involve economically disadvantaged individuals and businesses owned by minorities, veterans or women, or that are based in rural areas, will be prioritized, the department said. So will projects that help make the current supply chain more secure, for example by providing another production location for advanced chips that are currently manufactured in Taiwan. Companies are encouraged to demonstrate that they can obtain other sources of funding, including private capital and state and local investment.

The Commerce Department is setting up two new offices housed under the National Institute of Standards and Technology to implement the programs.

One of the department's biggest challenges will be ensuring that the government funds add to, rather than displace, money that chip making companies were already planning to invest. Companies including Global Foundries, Micron, Qualcomm and Intel have announced plans to make major investments in U.S. facilities that may qualify for government funding.

The chips bill specifies that companies that accept funding cannot make new, high-tech investments in China or other "countries of concern" for at least a decade, unless they are producing lower-tech "legacy chips" destined to serve only the local market.

The Commerce Department said it would review and audit companies that receive the funding, and claw back funds from any company that violates its rules. The guidelines also forbid recipients from engaging in stock buybacks, so that taxpayer money doesn't end up being used to reward a company's investors.

"We're going to run a serious, competitive, transparent process," Ms. Raimondo said. "We are negotiating for every nickel of taxpayer money."

In addition to the new prohibitions on investing in chip manufacturing facilities in China, officials in the Biden administration have agreed that the White House should take executive action to scrutinize outbound investment

*Countering China, and reducing dependence on Taiwan.*

in other industries as well, Ms. Raimondo said in the interview.

But she said that the administration was still working through the details of how to implement such a policy.

Earlier versions of the chips bill also proposed setting up a broader system to review investments that U.S. companies make abroad to prevent certain strategic technologies from being shared with U.S. adversaries. That provision, which would have applied to cutting edge technologies beyond the chips sector, was ultimately stripped out of the bill, but officials in the Biden administration have been considering an executive order that would establish a similar review process.

The United States has a review system for investments that foreign companies make in the United States, but not vice versa.

Meanwhile, the Biden administration has taken steps to restrict the types of advanced semiconductors and equipment that can be exported out of the United States.

In statements last week, Nvidia and Advanced Micro Devices, both based in the Silicon Valley, said they had been notified by the U.S. government that exports to China and Russia of certain high-end chips they produce for use in supercomputers and artificial intelligence were now restricted. These chips help power the kind of supercomputers that can be used in weapons development and intelligence gathering, including large-scale surveillance.

Ms. Raimondo declined to discuss the export controls in detail but said the department was "constantly evaluating" its efforts, including how best to work with allies to deny China the equipment, software and tooling the country uses to enhance its semiconductor industry.

# Trying to Sell That Peloton Bike You Bought During the Pandemic? So Is Peloton.

FROM FIRST BUSINESS PAGE

far.

Peloton has offered a cautionary tale about quickly changing consumer habits. At the height of the pandemic, its business soared as gyms shuttered and Covid restrictions kept people at home. But many who bought Peloton bikes at their peak popularity are now returning to gyms and busy schedules, and some are regretting what might be their most expensive pandemic-era purchase. Sites like Facebook, Craigslist and eBay are flooded with posts offering used Peloton bikes, shoes and weights.

At the same time that many consumers are trying to sell used equipment, Peloton is looking to sell used inventory as well. In August, Peloton ran a 10-day test of its certified pre-owned bike program, which allowed consumers to buy secondhand bikes through the company. On a call with analysts last week, Barry McCarthy, Peloton's chief executive, said the program was a top priority for the business.

The focus on resale comes as Peloton's sales continue to plummet. Last week, the company reported a $1.2 billion quarterly loss. It has lost money for six straight quarters. Mr. McCarthy, who stepped into his role in February, is working to cut costs and earn a profit. In recent months, the company has slashed jobs and closed stores. Mr. McCarthy has said reaching "value-minded" consumers, including by reselling used bikes, will be key for the company's growth.

But it's competing with a crowded third-party market. Christine Bass, an avid Peloton rider and a moderator of the Facebook group "Peloton Buy Sell Trade," which has more than 200,000 members, has seen an increase in posts selling bikes this summer and noticed that posts selling bikes for $600 or $700 often get a lot of interest. Ms. Bass said that earlier in the pandemic, when customers faced long delivery delays for new Peloton bikes, people were listing used bikes on Facebook for thousands of dollars — sometimes at higher prices than new ones.

Now she sees people post: "I'm using it as a clothes hanger. Need it gone now!"

On eBay, sales of Peloton bikes increased 80 percent between July 2020 and July 2022, according to a spokeswoman for the site.

Peloton has been exploring a resale program for some time. John Foley, its former chief executive and a founder of the company, said on a call with analysts in September 2020 that Peloton was planning to offer a certified pre-owned option in the future. The company moved forward with plans to buy back customers' bikes, offering them a $700 credit toward a Bike+, which is an upgraded bike with additional features, as well as other incentives, like free pickup and a yoga set. Then in November that year, Mr. Foley told analysts that the company did not have enough inventory to move forward with a certified pre-owned bike program at that time. He said that fewer people than expected had sold back their bikes.

**A cautionary tale about fast-changing consumer habits.**

Peloton paused the trade-in program this past June.

"It's in Peloton's interest to try to control the secondary market," said Sucharita Kodali, an analyst at Forrester. By buying back equipment, Peloton takes used bikes away from the peer-to-peer market. Then the company can decide when and where to resell them, all while building a direct relationship with new customers and understanding who is buying their merchandise, she said.

When Peloton sells a bike, even a lower-priced used one, it is not just selling a piece of equipment. It is also gaining a potential customer for its all-access workout program, which costs $44 per month. Peloton's subscriptions grew 27 percent over the past year, to about three million. (That number is roughly flat from the previous quarter.) A spokesman for Peloton said that the certified pre-owned program was meant to reach customers with both its equipment and its software.

Subscribers are paying Peloton the same recurring fee, Ms. Kodali said, whether they are riding a new model or a used one. "That fee is very lucrative because it's very scalable," she said. Mr. McCarthy said last week that he considered Peloton's content, which includes instructor-led classes and scenic rides, the company's "singularly unique competitive advantage."

Peloton faces some challenges specific to its business, but it's not the only company struggling to adapt to shifting consumer habits. Companies like Target and Walmart have seen profits drop this year, and many companies are stuck with excess merchandise not just because of inflation but also because consumers are focusing more on "going-out categories," as Brian Cornell, Target's chief executive, said in May.

In spite of Peloton's runaway success in 2020, the pandemic was bad for the company, said Simeon Siegel, a retail analyst at BMO Capital Markets. "If not for the pandemic, Peloton would have been a steady grower that would have not sought to conquer the world," he said.

A spokesman for Peloton said the company, having completed its 10-day trial run of the certified pre-owned bike program, aimed to expand the program across the country. In the meantime, many customers will continue to turn to third-party sites to offload their bikes.

Not everyone has a tough time selling Peloton equipment: Last month Kaylee Caspers, 22, was able to find a buyer for her used Bike+ in Fargo, N.D., within a few days on Facebook. She attributed the quick sale to the apparent scarcity of exercise bikes in her area. When she was looking for a Peloton in 2020, there was "absolutely nothing in the area," she said, adding, "It's definitely not like New York or L.A."

But many are having to eat a large part of the cost of their pandemic purchase. In the New York area last month, Olivia Hilton, 27, was able to make a sale after lowering her price to $1,200 from $1,500 in a Facebook post.

Ms. Hilton, a nurse living on Long Island, bought a Bike+ and accessories in 2020 using a health care worker discount. "I spent three grand on this bike that collected dust," she said.

"I felt a little bit guilty about selling the bike," she said. But she would tell others in her situation: "You tried. Move on. Get the thing out of your house if you don't want it anymore."

*UCC Public Sale Notice*

Please take notice that Jones Lang LaSalle, on behalf of Motcomb Estates Ltd., a United Kingdom corporation, in its capacity as administrative agent ("Administrative Agent" or "Secured Party"), offers for sale at public auction on December 14, 2022 at 12:00 p.m. (prevailing Eastern Time) at the offices of JONES LANG LASALLE AMERICAS, INC., 330 MADISON AVENUE, 4TH FLOOR, NEW YORK, NEW YORK 10017, and via WebEx virtual link to the live auction, in connection with the Uniform Commercial Code, all of the right, title and interest of NCPMB, LLC ("Debtor") in and to (a) 100% of the limited liability company interests in Next Century Partners LLC, a Delaware limited liability company (the "Pledged Entity"), and (b) all related rights and property relating thereto (the foregoing, collectively, the "Collateral").

The Pledged Entity owns 100% of the limited liability company interests in Next Century Partners, LLC ("Fee Owner" or "Mortgage Borrower"). The principal asset of the Pledged Entity is those certain interests in the real property, together with those certain buildings and improvements located thereon and all appurtenant property rights related thereto, located at 2025 Avenue of the Stars, Los Angeles, California 90067 and more commonly known as Century Plaza (the "Property").

Secured Party made a loan (the "Mezzanine Loan") to Debtor pursuant to that certain Third Amended and Restated Second Mezzanine Loan and Security Agreement dated as of September 1, 2020 (the "Mezzanine Loan Agreement"). In connection with the Mezzanine Loan, Debtor granted to Secured Party a first priority lien on the Collateral pursuant to the Mezzanine Loan Agreement.

The Secured Party is offering the Collateral for sale in connection with the foreclosure on the pledge of such Collateral. The Mortgage Borrower is a borrower under a certain senior loan (the "Mortgage Loan"), in the original principal amount of $1,110,280,000.00 (for the avoidance of doubt, which amount does not include accrued interest, reductions from refinancing or sale proceeds, default interest, late fees, enforcement costs or any additional amounts comprising the Mortgage Loan as of today's date) that is secured by that certain Construction Deed of Trust, Security Agreement, Assignment of Leases and Fixture Filing (as has been amended from time to time). The Mezzanine Loan is subordinate to the Mortgage Loan and other obligations and liabilities of the borrowers thereunder or otherwise affecting the Properties.

The sale of the Collateral will be subject to all applicable third-party consents and regulatory approvals, if any. Without limitation to the foregoing, please take notice that there are specific requirements for any potential successful bidder in connection with obtaining information and bidding on the Collateral, including but not limited to, (1) that each bidder must comply with the restrictions applicable to the sale of the Collateral under the Third and Amended and Restated Intercreditor Agreement dated as of September 1, 2020 (the "Intercreditor Agreement"), and (2) that each bidder must deliver such documents and pay such amounts as required by the Intercreditor Agreement and the applicable governing documents relating to the Collateral. In addition to the foregoing, the Successful Bidder shall, as a condition precedent to the consummation of the transfer of the Collateral on the Collateral Closing Date, satisfy the Qualified Transferee requirements as more particularly set forth in the Third Amended and Restated Operator-Lender Recognition Agreement dated as of September 1, 2020 and the Hotel Management Agreement referenced therein. These documents have been made available on the Datasite and should be reviewed by interested parties.

The Collateral is being offered as "as-is, where-is", with no express or implied warranties, representations, statements or conditions of any kind made by the Secured Party or any person acting for or on behalf of the Secured Party, without any recourse whatsoever to the Secured Party or any other person acting for or on behalf of the Secured Party and each bidder must make its own inquiry regarding the Collateral. Any participant that satisfies the conditions precedent to participation set forth in the Terms of Public Sale may bid at the auction. The winning bidder shall be responsible for the payment of all transfer taxes, stamp duties and similar taxes incurred in connection with the purchase of the Collateral.

The Secured Party reserves the right to (i) credit bid; (ii) reject all bids (including without limitation any bid that it deems to have been made by a bidder that is unable to satisfy the requirements imposed by the Secured Party upon prospective bidders in connection with the sale or to whom in the Secured Party's sole judgment a sale may not lawfully be made) and terminate or adjourn the sale to another time, without further publication or notice; (iii) accept a lower bid if the bid is on terms Secured Party determines is more favorable to Secured Party or is from a bidder that, in Secured Party's determination, offers a more certain likelihood of execution; and (iv) impose any other commercially reasonable conditions upon the sale of the Collateral as the Secured Party may deem proper.

Each prospective bidder (other than the Secured Party or its affiliate) will be required to represent in writing to the Secured Party that such bidder (i) has the financial ability to tender the required deposit and the purchase price for the Collateral; and (ii) will comply with the Pledged Entity's governing documents and the relevant loan documents, including, among others, the requirements to participate in the sale as more specifically set forth in the Intercreditor Agreement or the Terms of Public Sale. **Meeting any requirements of the foregoing shall be at the sole responsibility, risk, cost, and expense of a prospective bidder.**

Further information concerning the Collateral, the requirements for obtaining information and bidding on the interests and the Terms of Public Sale can be found at (losangelesmixeduseuccsale.com) or by contacting Brett Rosenberg by telephone at (212) 812-5926 or by email at brett.rosenberg@am.jll.com.

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: FIRST GUARANTY MORTGAGE CORPORATION, *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 22-10584 (CTG) ) (Jointly Administered)

**NOTICE OF DEADLINES FOR THE FILING OF (I) PROOFS OF CLAIM, INCLUDING REQUESTS FOR PAYMENT PURSUANT TO SECTION 503(B)(9) OF THE BANKRUPTCY CODE, (II) ADMINISTRATIVE CLAIMS, AND (III) REJECTION DAMAGES CLAIMS**

**THE CLAIMS BAR DATE IS OCTOBER 14, 2022**
**THE GOVERNMENTAL CLAIMS BAR DATE IS DECEMBER 27, 2022**
**THE ADMINISTRATIVE CLAIMS BAR DATE IS OCTOBER 14, 2022**
**PLEASE TAKE NOTICE OF THE FOLLOWING:**

***Deadlines for Filing Proofs of Claim and Administrative Claims Arising Prior to the Administrative Claim Deadline.*** On August 31, 2022, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 382] (the "Bar Date Order") establishing certain dates by which parties holding prepetition claims against the above-captioned debtors must file (a) proofs of claim ("Proofs of Claim"), including claims by governmental units, claims arising under section 503(b)(9) of the Bankruptcy Code, and Rejection Damages Claims, and (b) requests for payment of Administrative Claims (as defined herein) arising on or prior to the Administrative Claims Deadline (as defined herein).in the chapter 11 cases of the following debtors and debtors in possession (collectively, the "Debtors").

***The Bar Dates.*** Pursuant to the Bar Date Order, ***all*** entities (except governmental units), including individuals, partnerships, corporations, joint ventures, estates, and trusts who have a claim or potential claim against the Debtors that arose or are deemed to have arisen prior to June 30, 2022, no matter how remote or contingent such right to payment or equitable remedy may be, ***including*** requests for payment under section 503(b)(9) of the Bankruptcy Code, MUST FILE A PROOF OF CLAIM on or before **October 14, 2022, at 5:00 p.m., prevailing Eastern Time** (the "Claims Bar Date"). Governmental units who have a claim or potential claim against the Debtors that arose or are deemed to have arisen prior to the Petition Date, no matter how remote or contingent such right to payment or equitable remedy may be, MUST FILE A PROOF OF CLAIM on or before **December 27, 2022, at 5:00 p.m., prevailing Eastern Time** (the "Governmental Bar Date").

Administrative Claims Bar Date. Parties asserting Administrative Claims against the Debtors' estates arising or deemed to be arisen on or prior to September 30, 2022 (the "Administrative Claims Deadline") (but excluding claims for fees and expenses of professionals retained in these proceedings and claims asserting priority pursuant to section 503(b)(9) of the Bankruptcy Code), are required to file a request for payment of such Administrative Claim arising or deemed to be arisen on or prior to the Administrative Claims Deadline with the Court on or before **October 14, 2022, at 5:00 p.m., prevailing Eastern Time** (the "Administrative Claims Bar Date").

Amended Schedules Bar Date. All parties asserting claims against the Debtors' estates that are affected by a previously unfiled Schedule or an amendment or supplement to the Schedules are required to file Proofs of Claim by **the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m., prevailing Eastern Time, on the date that is twenty-one days from the date on which the Debtors provide notice of a previously unfiled Schedule or amendment or supplement to the Schedules** (the "Amended Schedules Bar Date").

Rejection Damages Bar Date. All parties asserting claims against the Debtors' estates arising from the Debtors' rejection of an executory contract or unexpired lease must file a Proof of Claim by **the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, or (b) 5:00 p.m. prevailing Eastern Time on the date that is thirty days following entry of an order approving such rejection** (the "Rejection Damages Bar Date").

**ANY PERSON OR ENTITY WHO FAILS TO FILE A PROOF OF CLAIM, INCLUDING ANY REQUEST FOR PAYMENT UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE, OR WHO FAILS TO FILE WITH THE COURT AN ADMINISTRATIVE CLAIM ARISING OR DEEMED TO BE ARISEN ON OR PRIOR TO THE ADMINISTRATIVE CLAIMS DEADLINE, IN EACH CASE ON OR BEFORE THE APPLICABLE BAR DATE, SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION ON ANY CHAPTER 11 PLAN.**

***Filing a Proof of Claim.*** Each Proof of Claim must be filed, including supporting documentation, so as to be ***actually received*** by the Debtors' notice and claims agent, KCC, on or before the Claims Bar Date or the Governmental Bar Date (or, where applicable, on or before any other bar date as set forth herein) either 1) electronically through the interface available at www.kccllc.net/FGMC or (2) by first class, overnight U.S. mail, or by other hand delivery system at the following address: **First Guaranty Mortgage Claims Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245.**

***Contents of Proofs of Claim.*** Each Proof of Claim must: (i) be written in English; (ii) include a claim amount denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form provided by the Debtors or Official Form 410; and (iv) be signed by the claimant or by an authorized agent or legal representative of the claimant.

***Section 503(b)(9) Requests for Payment.*** Any Proof of Claim asserting a claim entitled to priority under section 503(b)(9) must also: (i) include the value of the goods delivered to and received by the Debtors in the twenty days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the 503(b)(9) claim is being asserted; and (iii) attach documentation of any reclamation demand made to the Debtors under section 546(c) of the Bankruptcy Code (if applicable).

***Additional Information.*** If you require additional information regarding the filing of a proof of claim, you may contact the Debtors' claims agent, KCC, directly by writing to First Guaranty Mortgage Claims Processing Center, c/o KCC, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245, or by contacting the Debtors' information line at (888) 647-1742 (US & Canada toll free), or (310) 751-2626 (International), or by email to FGMCinfo@kccllc.com.

***Claim Against Multiple Debtor Entities.*** Unless otherwise ordered by the Court, each Proof of Claim must state a claim against ***only one*** Debtor and clearly indicate the Debtor against which the claim is asserted. To the extent more than one Debtor is listed on the Proof of Claim, such claim may be treated as if filed only against the first-listed Debtor.

***Supporting Documentation.*** Each Proof of Claim must include supporting documentation in accordance with Bankruptcy Rules 3001(c) and (d). If, however, such documentation is voluminous, upon prior written consent of Debtors' counsel, such Proof of Claim may include a summary of such documentation or an explanation as to why such documentation is not available; *provided* that any creditor that received such written consent shall be required to transmit such writings to Debtors' counsel upon request no later than ten days from the date of such request.

***Receipt of Service.*** Claimants wishing to receive acknowledgment that their Proofs of Claim were received by KCC must submit (i) a copy of the Proof of Claim Form (in addition to the original Proof of Claim Form sent to KCC) and (ii) a self-addressed, stamped envelope.

Dated: August 31, 2022

**PACHULSKI STANG ZIEHL & JONES LLP,** */s/ Laura Davis Jones*, Laura Davis Jones (DE Bar No. 2436), Timothy P. Cairns (DE Bar No. 4228), Mary F. Caloway (DE Bar No. 3059), 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899 (Courier 19801), Telephone: (302) 652-4100, Facsimile: (302) 652-4400, Email: ljones@pszjlaw.com, tcairns@pszjlaw.com, mcaloway@pszjlaw.com -and- **DENTONS US LLP,** Samuel R. Maizel, Tania M. Moyron, 601 S. Figueroa Street, #2500, Los Angeles, CA 90017, Telephone: (213) 623-9300, Email: samuel.maizel@dentons.com, tania.moyron@dentons.com -and- David F. Cook, 1900 K Street, NW, Washington, DC 20006, Telephone: (202) 496-7500, Email: david.f.cook@dentons.com, *Counsel for Debtors and Debtors in Possession*

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: First Guaranty Mortgage Corporation (9575); and Maverick II Holdings, LLC (5621). The Debtors' mailing address is 5800 Tennyson Parkway, Suite 450, Plano, TX 75024.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: CELSIUS NETWORK LLC, *et al.*,[1] Debtors. ) Chapter 11 ) Case No. 22-10964 (MG) ) (Jointly Administered)

**NOTICE OF AUCTION FOR THE POTENTIAL SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for the purchase of certain of the Debtors' assets and assumption of certain liabilities of the Debtors consistent with the bidding procedures (the "Bidding Procedures")[2] approved by the United States Bankruptcy Court for the Southern District of New York (the "Court") by entry of an order on September 1, 2022 [Docket No. 687] (the "Bidding Procedures Order"). **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or the Bidding Procedures Order, the Bidding Procedures or the Bidding Procedures Order, as applicable, shall govern in all respects.

**Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Stretto, Inc. by calling (855) 423-1530 (Domestic) or (949) 669-5873 (International) or visiting the Debtors' restructuring website at (https://cases.stretto.com/celsius).**

**PLEASE TAKE FURTHER NOTICE** that any person or entity interested in purchasing the GK8 Assets may submit a non-binding Indication of Interest to the Debtors any time prior to the Final Bid Deadline.

**PLEASE TAKE FURTHER NOTICE** that the Final Bid Deadline is **September 21, 2022**, at **4:00 p.m. (prevailing Eastern Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors may conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **September 23, 2022, at 10:00 a.m. (prevailing Eastern Time)**, via remote video.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of the Sale (if any) at the Sale Hearing, which is presently scheduled to commence on **October 6, 2022, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, before the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bidding Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **September 29, 2022, at 4:00 p.m.** (prevailing Eastern Time).

**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT(S).**

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The Sale Order (if any) is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse Agreement (in the case where a Stalking Horse Bidder is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if a Stalking Horse Bidder is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Assigned Contracts arising after the Effective Date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. All rights of any party to set off any claims, debts or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the Effective Date pursuant to the Sale Order. Other than as expressly set forth in the Stalking Horse Agreement (or another Successful Bidder's purchase agreement, as applicable) with respect to Assumed Liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates. To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Effective Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the assets prior to the Effective Date. For the avoidance of doubt, the Successful Bidder shall assume all liabilities of GK8, whether or not such liabilities are directly or indirectly related to any of the Debtors. The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement but for the foregoing protections against potential claims based upon "successor liability" theories.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, in their reasonable business judgment and subject to the exercise of their fiduciary duties, and in consultation with the Consultation Parties, to modify the Bidding Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Motion, Bidding Procedures, and Bidding Procedures Order, as well as all related exhibits, are available: (a) free of charge upon request to Stretto, Inc. (the notice and claims agent retained in these chapter 11 cases) by (a) calling (855) 423-1530 (Domestic) or (949) 669-5873 (International); (b) visiting the Debtors' restructuring website at (https://cases.stretto.com/Celsius); or (c) for a fee via PACER by visiting (https://www.deb.uscourts.gov/).

New York, New York, Dated: September 1, 2022

*/s/ Joshua A. Sussberg*, **KIRKLAND & ELLIS LLP, KIRKLAND & ELLIS INTERNATIONAL LLP,** Joshua A. Sussberg, P.C., 601 Lexington Avenue, New York, New York 10022, Telephone: (212) 446-4800, Facsimile: (212) 446-4900, Email: jsussberg@kirkland.com -and- Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*), Ross M. Kwasteniet, P.C. (admitted *pro hac vice*), 300 North LaSalle Street, Chicago, Illinois 60654, Telephone: (312) 862-2000, Facsimile: (312) 862-2200, Email: patrick.nash@kirkland.com, ross.kwasteniet@kirkland.com, *Proposed Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.