**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Keith H. Wofford
1221 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admission *pro hac vice* pending)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois  60606
Telephone:  (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California  90071
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION AND RESERVATION OF RIGHTS TO THE MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification number are as follows: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or "**Celsius**") files this limited objection and reservation of rights to the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 546] (the "**Examiner Motion**"), and states as follows:[2]

### Preliminary Statement

1.      As more fully set forth below, since its formation, the Committee has worked tirelessly on various initiatives with the ultimate objective of reaching a resolution of these cases that will both maximize value and provide for distributions to account holders and unsecured creditors as quickly as possible.  The Committee supports greater transparency in these chapter 11 cases and, indeed, has successfully pushed the Debtors to be more transparent on a variety of fronts.  The Committee believes that the appointment of an examiner with an appropriate investigative scope can further this purpose.  Nonetheless, the Committee also believes that the scope and budget for any examination that is conducted by an examiner must be narrowly tailored so as avoid excessive costs and delays that will diminish recoveries and prolong the timetable of these cases.

2.      The Committee is therefore pleased to report that, following extensive discussions with the U.S. Trustee, and subsequently with the Debtors, the parties have reached an agreement regarding the Examiner Motion.  Earlier today, the Committee filed the *Notice of Filing Agreed Proposed Order Granting Examiner Motion* [Docket No. 752], which attaches an agreed proposed order granting the Examiner Motion ("**Agreed Proposed Order**") as Exhibit A thereto.  The Agreed Proposed Order limits the scope of the examination, which the Committee believes

---

[2]     Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Examiner Motion.

2

balances the need for transparency with the risks—including costs, delay, and distraction at this critical juncture—of a broad, open-ended examination. The Court should therefore approve the Examiner Motion on the terms set forth in the Agreed Proposed Order and overrule any joiners, objections, statements, that are not withdrawn prior to the hearing.

3.     In light of the allegations regarding Celsius's prepetition conduct and the Debtors' rapid descent into chapter 11, and the significant hardship that the "pause" and these cases continue impose on hundreds of thousands of Celsius users, there is no question that the Debtors' prepetition business practices warrant close scrutiny. Nor is there any question that these cases demand transparency above and beyond what typically passes in conventional chapter 11 cases. Indeed, the Debtors agreed to expansive reporting on their ongoing operation of their businesses, including monthly budgets and weekly reports of cash balances, cryptocurrency and other postpetition activities and affairs. [Docket No. 668].

4.     Since its formation, the Committee has undertaken a systematic investigation of the Debtors' prepetition business practices. That investigation has included close scrutiny of transfers to or for the benefit of insiders like Mr. Mashinsky, the Debtors' cryptocurrency and digital assets and how those assets are secured, the establishment of the Custody and Withhold accounts, and the mining business. The Committee has also commenced a wide-ranging investigation of potential claims and causes of action involving the Debtors, including against Mr. Mashinsky. To date, the Committee has already served a request for over 300 documents and plans to serve additional discovery in the near future. In particular, the Committee has served discovery on the Debtors and six of their top management on a wide range of topics. The Committee is also preparing to serve subpoenas on third parties who may have important information regarding the Debtors' prepetition activities. Once the Committee has the relevant information in hand, the

3

Committee plans to place Mr. Mashinsky and others under oath to determine what they knew and when they knew it.

5.       The Committee was formed just over a month ago, yet the results of its efforts, and the Committee's advocacy on behalf of account holders and unsecured creditors speak for themselves.

(a)      The Debtors have agreed to a comprehensive process to market their assets in whole or in part, which the Committee expects will maximize value and provide the best outcome for account holders.

(b)      While the marketing process is formalized, the Committee has engaged in preliminary discussions with numerous interested parties regarding potential transaction structures so such parties can ultimately present their proposals to the Debtors.

(c)      The Debtors withdrew a motion to retain their chief financial officer, which saved hundreds of thousands of dollars [Docket No. 379].

(d)      The Debtors stipulated to cooperate with the Committee's investigation under Bankruptcy Rule 2004 [Docket No. 616].

(e)      The Debtors have begun to regularly file reports detailing their coin holdings [Docket No. 447].

(f)      In an effort to preserve estate assets available for distribution, the Committee demanded that the Debtors restrict intercompany transfers that fund the mining business unless and until the Debtors demonstrate the viability of that business.

(g)      The Committee forced the Debtors to limit the sale of mined bitcoin [Docket No. 514.].

(h)      The Debtors agreed to substantial consent and notice obligations to the Committee under the bidding procedures to market and sell the GK8 assets, which will facilitate a competitive and transparent sale process to obtain the highest possible price [Docket No. 687].

6.       In addition, the Committee has sought to solicit the feedback of the major stakeholders and individual account holders.  The Committee established protocols for efficiently fielding inquiries from its constituency and all major stakeholders by taking the following actions,

AMERICAS 116788379 v13

among others (a) establishing a website (https://cases.ra.kroll.com/CelsiusCommittee) that provides the most important documents and allows creditors or account holders to submit inquiries, (b) responding to letters, (c) communicating through its twitter handle (@celsiusUcc), and (d) communicating regularly with all major stakeholders, including the ad hoc groups of custody and withhold account holders, the borrowers under Celsius' borrow program, and other parties.

7.    With this context in mind, the Committee determined that the appointment of an examiner with a wide-ranging scope as proposed in the Examiner Motion as filed was not in the best interests of account holders or unsecured creditors.

8.    The Committee's ongoing investigation has made significant progress but significant work remains.  A wide ranging examiner's investigation could therefore duplicate the investigation being conducted by the Committee, which would likely reduce recoveries.  The Committee is also concerned about any delay to the restructuring process (and ultimate distributions to account holders) that could result from the appointment of an examiner.  For example, the examiner in Residential Capital ultimately cost more than $89 million and took 10 months to complete its report, despite having a limited number of matters to investigate.  *See Residential Cap*., No. 12-12020, 87-88 (Bankr. S.D.N.Y. Aug. 23, 2013) [Docket No. 4891].  A chapter 11 plan in Residential Capital was not confirmed for more than six months after the examiner's report was filed on a confidential basis and almost eighteen months after the examiner's appointment.  *See Residential Cap*., No. 12-12020 (Bankr. S.D.N.Y. Dec. 12, 2013) [Docket Nos. 36898, 6065].  Account holders and unsecured creditors cannot afford for a similar outcome to happen here.

9.    With those concerns in mind, the Committee determined that it was a prudent exercise of its fiduciary duties to engage the U.S. Trustee regarding a consensual resolution.  Those

productive discussions resulted in an agreement regarding the appointment of an examiner with a proposed scope that is more appropriately tailored to the facts and circumstances of these cases (the "**Proposed Scope**").  The topics encompassed by the Proposed Scope, all of which have been the subject of significant public interest, consist of:

> (a)    an examination of the Debtors' cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition and whether different types of accounts are commingled;

> (b)    an examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account";

> (c)    an examination of the Debtors' procedures for paying sales taxes, use taxes, and value added taxes and the extent of the Debtors' compliance with any non-bankruptcy laws with respect thereto; and

> (d)    an examination of the current status of the utility obligations of the Debtors' mining business.

10.    After the Committee and the U.S. Trustee reached their agreement, the Debtors consented to that agreement as well.  As described in further herein, the Proposed Scope is appropriate under the facts and circumstances of these cases.  Accordingly, the Committee requests that the Court approve the Proposed Scope, without prejudice to the Committee's rights with respect to object to the identity of the proposed examiner and any subsequent work plan or budget.

## Background

11.    On July 13, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

12.    On July 27, 2022, the U.S. Trustee appointed the Committee.  *See* Docket No. 241. Thereafter, the Committee proposed to retain White & Case LLP as counsel, Perella Weinberg

AMERICAS 116788379 v13

Partners L.P. as investment banker, M3 Partners L.P. as financial advisor, and Elementus Inc. as crypto advisor. On August 8, the Committee filed *The Official Committee of Unsecured Creditors' Statement Regarding These Chapter 11 Cases* [Docket No. 390], which set forth the Committee's objectives in these cases, including to conduct an investigation of the Debtors and their businesses, maximize recoveries for account holders and unsecured creditors, and provide clear communication to account holders and other unsecured creditors.

13.    In early August 2022, the Committee commenced its investigation of the Debtors, their insiders, including Mr. Mashinsky, their prepetition business practices, and other matters that may be subject to challenge or claims for the benefit of account holders and general unsecured creditors. On August 19, the Committee served over 300 requests for production on Celsius and Mr. Mashinsky [Docket No. 578]. Since that time, the Debtors and Committee have engaged in extensive dialogue regarding the Committee's investigation, including the terms by which the Debtors would cooperate and support the Committee's investigation.

14.    On August 18, 2022, the U.S. Trustee filed the Examiner Motion seeking to appoint an examiner to investigate the affairs of the Debtors, including (a) "the Debtors' crypto holdings, including a determination as to where it is [sic] stored and whether different types of accounts are commingled," (b) the purpose of the "change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a 'Withhold Account,'" (c) "[t]he identification of the undisclosed third party loan party and what steps the Debtors took to neutralize their lost collateral," (d) "why was the $648 million repaid, collateral returned prepetition, and the terms of these loans," (e) "the terms of the $750 million intercompany revolver, including how [the Debtor] used the loan proceeds," (f) "the liquidation of the Tether loan," (g) "the GK8 acquisition," (h) "the Debtors' procedures for paying Sales, Use,

and VAT taxes," and (i) "the current status of the Debtors' mining business."  Proposed Order ¶ 3.

15.     The following state government agencies (the "**State Agencies**") filed joinders (the "**Joinders**") to the Examiner Motion: (a) the Vermont Department of Financial Regulation ("**Vermont Joinder**") [Docket No. 730], (b) the Texas State Securities Board ("**Texas Joinder**") [Docket No. 732], and (c) the State of Wisconsin, for its Department of Financial Institutions ("**Wisconsin Joinder**") [Docket No. 735].

16.     A self-styled *ad hoc* group of four (4) individuals who transferred cryptocurrency as collateral for loans provided by Celsius Lending, LLC (the "**Borrower Group**") filed a response to the Examiner Motion [Docket No. 746] (the "**Borrower Group Response**").  The Borrower Group has not, to date, filed a disclosure under Bankruptcy Rule 2019, and its response was filed after the deadline established by this Court's case management procedures and, therefore, is not timely.  In any event, as further described herein, the Borrower Group Response is a procedurally and substantively defective request for appointment of a chapter 11 trustee.  Similarly, an individual account holder served the Committee with a response with respect to the Examiner Motion, wherein he seeks the appointment of a chief restructuring officer or trustee.  While the Committee has engaged in discussions with that individual and looks forward to further engagement with him.  However, the Committee respectfully disagrees with his information objection to the Examiner Motion.

17.     Following the filing of the Examiner Motion, the Committee and U.S. Trustee engaged in dialogue regarding the motion and the relief requested.  Those productive discussions resulted in the Agreed Proposed Order filed by the Committee with the consent of the Debtors and the U.S. Trustee, which modified the proposed examination scope.

8

18.     The Agreed Proposed Order does not resolve all matters related to the appointment of an examiner.  For example, the Agreed Proposed Order does not specify the identity of the examiner, whom the Committee expects the U.S. Trustee to select in consultation with and following input from the Committee.  Additionally, the Agreed Proposed Order does not detail the work plan or budget for the proposed examination.  Rather, following entry of an order identifying the examiner, the Agreed Proposed Order contemplates that the examiner will submit a work plan and proposed budget to the Court.  The Committee intends to engage with the examiner regarding any proposed work plan or budget and, if necessary, the Committee is prepared to object to the proposed work plan and budget to ensure that the limited examination contemplated by the Agreed Proposed Order does not expand, unnecessarily deplete the Debtors' resources, or unduly delay these chapter 11 cases.  For the avoidance of any doubt, the Committee fully reserves its rights regarding those matters.

## <u>Argument</u>

**I.      The Court Should Limit the Scope of an Examiner in Accordance with the Agreed Proposed Order if an Examiner is Appointed.**

19.     Section 1104(c) of the Bankruptcy Code states as follows:

> If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if--
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

9

11 U.S.C. § 1104(c).   Even if the $5,000,000 threshold under section 1104(c)(2) is met, the appointment of an examiner is not mandatory and, rather, depends on the "facts and circumstances of a case" that "render the appointment of an examiner" appropriate.   *In re Residential Cap., LLC*, 474 B.R. 112, 120-21 (Bankr. S.D.N.Y. 2012).

20.     Here, the Committee believes that the scope originally proposed in the Examiner Motion was inappropriate under the facts and circumstances of these cases.   The scope, as originally proposed, would duplicate or replicate the work already undertaken by the Committee or other key stakeholders.   Among other things, the Committee has begun to investigate nearly all of the matters identified in the original proposed scope.   The Committee's proposed counsel have sent hundreds of informal due diligence requests to the Debtors, served formal Bankruptcy Rule 2004 requests for more than 100 categories of documents and testimony from a corporate representative witness, and has held numerous meetings with the Debtors' principals and advisors regarding various matters.   The matters that continue to be addressed by the Committee's ongoing investigation and diligence efforts to date include, for example, the Debtors' capital structure, the Debtors' Bitcoin mining business, the GK8 storage business, potential restructuring options, and the value, storage, and security of the cryptocurrency currently in the Debtors' possession.   To further facilitate those efforts, the Debtors and the Committee entered into a stipulation on August 28, 2022 [Docket No. 616], under which the Debtors agreed to accept service of the Rule 2004 request and provide written responses and document productions on a rolling basis as soon as reasonably possible.

21.     The Committee's efforts have already borne fruit, including with respect to the matters that prompted the U.S. Trustee to file the Examiner Motion.   Indeed, the Committee already has answers to many of the questions the U.S. Trustee raises in the Examiner Motion or

has served the Debtors with outstanding document requests related to those questions.[3]

(a)   **U.S. Trustee Question:** How much crypto is held and where and how is it stored? Are different types of accounts comingled together?

**Status of the Committee's Investigation:** The Debtors failed at the outset of these cases to appropriately identify the amount of cryptocurrency and other digital assets held by the estates and the manner in which those assets were held. At the insistence of the Committee, the Debtors filed a budget and coin report, which details the amount of cryptocurrency they hold by coin type as of the Petition Date [Docket No. 447]. Thereafter, the Committee engaged further with the Debtors regarding modifications to the report. As a result of those discussions—which remain ongoing—the Debtors have committed to provide the U.S. Trustee and the Committee with weekly updates for Bitcoin mined and sold pursuant to this Court's order [Docket No. 514] and to provide the cash budgets in a 13-week format and matrices of postpetition intercompany transfers and balances monthly and reports showing cryptocurrency holdings and their location weekly [Docket No. 668].

The Committee has learned as a result of its efforts in this regard that the Debtors' coins are primarily stored on workspaces owned by the cryptocurrency custody service provider Fireblocks, Inc. or an affiliate thereof. The Committee has conducted an investigation into the security of the account keys for the Debtors' private wallets and worked with the Debtors to bolster the protective measures taken with respect to those keys.

The Committee further understands as a result of its efforts that the Debtors receive cryptocurrency from account holders through that holder's unique "Bridge Wallet." A Bridge Wallet is an individual wallet that the Debtors' create to receive an individual's transfer of a particular type of cryptocurrency or cryptocurrencies. Each Bridge Wallet is tied to a particular individual and to a coin type unless the wallet supports multiple types.

Cryptocurrency is then transferred from the Bridge Wallet to an "Aggregator Wallet" (or omnibus wallet) at defined intervals and de minimis value thresholds where it is comingled with like cryptocurrency (*i.e.* all bitcoin deposited goes into a bitcoin Aggregator Wallet). An Aggregator Wallet is the Debtors' main wallet that corresponds to a type of cryptocurrency.

Finally, the Debtors transfer cryptocurrency from the "Aggregator Wallet"

---

[3]   The Committee reserves all rights with respect to any information provided in response to the U.S. Trustee's questions, which is subject to change as the Committee obtains further information in the course of its investigation.

into separate wallets for different purposes, such as deployment, custody, etc.

(b) **U.S. Trustee Question:**  At the outset of these cases, the Debtors did not provide any transparency regarding the change in April 2022 from the Earn Program to the Custody Service for some customers, and the Debtors did not disclose the existence of any "Withhold Accounts."  The April 2022 transactions raised several key questions, including the need to identify who holds what account and why is it particularly confusing for customers who had their accounts unilaterally changed by the Debtors prepetition?

**Status of the Committee's Investigation:**  The Committee has engaged in extensive dialogue with the Debtors, reviewed numerous documents, and conferred with its advisors regarding these key matters.  As a result of those efforts, the Committee now understands that the Custody and Withhold accounts were created in response to a Summary Cease and Desist Order issued by the New Jersey Bureau of Securities, which became effective on April 15, 2022.  Following the entry of that order, the Debtors stopped accepting new funds from non-accredited U.S. users into Earn accounts.

The Committee also understands that only account holders residing in certain states within the U.S. were offered the opportunity to participate in the Debtors' custody program.  Non-accredited investors in all other states were placed in Withhold accounts.

On September 1, 2022, the Debtors filed a motion seeking to release two types of assets from custody and withhold accounts:  (i) amounts directly transferred into custody accounts and (ii) amounts less than the $7,575 preference cap.  [Docket No. 670].  The motion does not seek to release the remaining amounts while further diligence is done with respect to certain legal issues that are part of the Committee's ongoing investigation.  The Committee has been engaged in extensive dialogue with the Debtors regarding these matters.  The Committee's analysis regarding the motion is ongoing.  In particular, the Committee's support for this motion remains subject to (i) further scrutiny of this motion and order to confirm that it includes the appropriate safeguards and (ii) receiving and evaluating the outstanding diligence items related to the custody and withhold accounts issue.  The Committee is also committed to ensuring the Debtors' motion and the other pending proceedings regarding these matters do not permit Mr. Mashinsky or other insiders to benefit from any custody or withhold accounts that they may hold.

(c) **U.S. Trustee Question:**  Who is the undisclosed third party loan party and what steps did the Debtors take to neutralize their lost collateral?

**Status of the Committee's Investigation**:  The Committee is aware of the identity of lender and has other information with respect to this loan.  The

AMERICAS 116788379 v13

Committee is currently investigating and has served Rule 2004 requests on the Debtors with respect to this loan and the steps the Debtors took to recover their lost collateral. The Committee intends to seek further discovery from that party in the near future.

(d) **U.S. Trustee Question:** Why was $648 million repaid and collateral returned prepetition? What were the terms of these loans? Who was a cosigner?

**Status of the Committee's Investigation**: The Committee understands that the Debtors repaid their loans that were over collateralized on the Petition Date. Repayment allowed cryptocurrency that was collateralized to be returned to the Debtors. The Debtors have provided the Committee with documents showing that loans were over collateralized prior to repayment. The Committee has served Rule 2004 requests regarding their decision to unwind and repay loans. The Committee has also requested a list of all individuals with authority to approve investment decisions and all policies related to risk management and investment decisions, among other things.

(e) **U.S. Trustee Question:** There needs to be more information regarding the $750 million intercompany revolver, including, the origins of the loan, terms of this loan, and the uses of the loan proceeds.

**Status of the Committee's Investigation:** The Committee has received a copy of the intercompany revolving credit agreement between Celsius Network Limited (as lender) and Celsius Mining LLC (as borrower), dated November 1, 2020. The Committee have received additional information about the revolver and is investigating the circumstances surrounding the intercompany revolver.

(f) **U.S. Trustee Question:** Why did Celsius liquidate its Tether loan at a $97 million loss within 90 days of the Petition Date?

**Status of the Committee's Investigation:** The Committee received a report dated June 12, 2022, that shows that the Tether denominated loan was backed by BTC collateral. As BTC prices declined, the Debtors faced a margin call (and potential liquidation of their BTC loan collateral) unless they posted additional collateral in support of the loan. The Committee understands that the Debtors agreed to an orderly liquidation and settlement of the loan to preserve remaining BTC collateral in excess of the loan amount while avoiding the requirement need to post additional collateral.

The Committee has served Rule 2004 request requesting all documents and communications regarding the Debtors prepetition transactions with Tether and Mr. Mashinsky's relationships with Tether.

13

(g)    **U.S. Trustee Question:**  There are no details regarding the GK8 acquisition to understand the proposed sale of only the equity interests less than a year later.

        **Status of the Committee's Investigation:**  The Committee understands that the Debtors purchased GK8 with the intention of integrating GK8 into the Debtors' operations.  GK8 provides "cold storage" solutions that provide the ability to execute transactions, while minimizing security risks. Although the Debtors have represented that they do not believe it is feasible to integrate GK8 into their business at this juncture, the Committee is investigating whether there is a basis for this position and whether there are other ways to maximize the value of GK8.

        The Committee negotiated bid procedures for the potential sale of GK8 that provide the Committee with input and consultation rights in the sale process and preserve the ability to collaboratively determine what sale transaction (if any) would maximize the proceeds for the estate.  Since then, the Committee has continued to have significant involvement in the Debtors' marketing process and have received details on the Debtors' outreach to prospective purchasers, the current status, and terms of bids received.

(h)    **U.S. Trustee Question:**  There is no information as to why Sales, Use, and VAT taxes have not been paid or if the money to pay these taxes is currently held in escrow.

        **Status of the Committee's Investigation:**  The Committee understands that Sales and Use taxes on rigs are generally due when rigs are installed or, alternatively, when such rigs sit in storage for specified periods of time. There is no money in escrow to pay such amounts.

(i)    **U.S. Trustee Question:**  The Committee is continuing to analyze and investigate the mining business and what equipment exists and whether any such equipment is operational, valuable, and/or in transit.

        **Status of the Committee's Investigation:**  The Committee received diligence regarding the number of rigs the Debtors have operational, in storage, at customs or in transit to the U.S., and not yet shipped as of August 2022.  The Committee is continuing to investigate the Bitcoin mining operations to evaluate their potential value and options with respect thereto.

22.    While the Committee has learned much as a result of its investigation, significant questions remain to be answered.  Further complicating matters, however, is the immense public interest in these cases and the understandable requests of the Committee's constituents for even greater public disclosure regarding the Debtors' business and the circumstances under which these

AMERICAS 116788379 v13

cases were filed.  The Committee, as the only fiduciary accountable solely to account holders and

unsecured creditors, has also been concerned that disputes regarding the Examiner Motion or an

unduly expansive examiner mandate could further undermine the confidence of account holders,

deplete the Debtors' liquidity, and result in undue delay.

23.    With this context in mind, the Committee determined that a consensual resolution

of the Examiner Motion would be beneficial to account holders and unsecured creditors.

Therefore, the Committee engaged in extensive dialogue—including numerous Zoom

conferences, telephone calls, and email correspondence—regarding the Examiner Motion.  Those

productive efforts resulted in the Agreed Proposed Order.  Under the Agreed Proposed Order, the

Committee, the U.S. Trustee, and the Debtors have agreed that, subject to Court approval, the

scope of the examination should consist of:

    (a)    an examination of the Debtors' cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition and whether different types of accounts are commingled;

    (b)    an examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account";

    (c)    an examination of the Debtors' procedures for paying sales taxes, use taxes, and value added taxes and the extent of the Debtors' compliance with any non-bankruptcy laws with respect thereto; and

    (d)    an examination of the current status of the utility obligations of the Debtors' mining business.

*See* Agreed Proposed Order ¶ 3.  An examiner appointed in accordance with the Agreed Proposed

Order furthers the Committee's objective of transparency while reducing duplication.  The

movant—the U.S. Trustee—has agreed to support the agreed proposed scope.  Following that

agreement, the Committee and the U.S. Trustee conferred with the Debtors who have also

confirmed that they do not oppose the resolution of the Examiner Motion negotiated by the

Committee and the U.S. Trustee.  In light of the foregoing, the Committee requests that the Court approve the Motion as set forth in the Agreed Proposed Order.

## II. The Joinders and Responses Requesting a Trustee Instead of an Examiner Should be Overruled to the Extent That They Conflict with the Agreed Proposed Order.

### A. The State Agency Joinders Do Not Conflict with the Agreed Proposed Order.

24. The Agreed Proposed Order should be entered notwithstanding the Joinders filed by the three State Agencies.  To the extent any of the State Agencies object to the Agreed Proposed Order, their objections should be overruled.

25. The proposed scope in the Agreed Proposed Order of the examiner is appropriate, and the Committee believes the facts underlying the allegations raised in the Joinders will be adequately addressed by the collaborative investigation, including the Vermont Joinder's allegations surrounding CEL tokens and the use of investor funds.  The State Agencies acknowledge that at least 40 state securities regulators are investigating the Debtors' securities activities, possible fraud, and other potential prepetition allegations.  *See* Vermont Joinder ¶ 7, Texas Joinder ¶ 9.  The Joinders state that the respective agencies have initiated their investigations, and have requested and received information and documentation from the Debtors.  Vermont Joinder ¶ 14, Texas Joinder ¶ 10.  Any concerns that are properly within the jurisdiction of the respective State Agency or other regulatory agency should continue to be addressed and investigated by such agencies, including during these cases.  Increasing the examiner's scope to investigate specific issues already being investigated by state agencies or securities regulators would be duplicative, costly, and inappropriate.  Such an investigation would be unduly broad, result in delay, and that it is inappropriate for the Debtors' estates to incur extra expense and subsidize the work of any government entity.

AMERICAS 116788379 v13

**B.     The Responses to Appoint a Trustee Instead of an Examiner are Untimely and Improper.**

26.     The Court should overrule or deny the untimely and procedurally defective Borrowers Group Response and any other objection seeking the appointment of a chapter 11 trustee.  While styled as a "Response" to the Examiner Motion, the Borrowers Group seeks substantive relief in the form of the appointment of a chapter 11 trustee instead an examiner. Similarly, the individual account holder's response also requests the appointment of a Chief Restructuring Officer or a bankruptcy trustee instead of an examiner.

27.     First, the request for appointment of a trustee is procedurally improper and untimely.[4]  The Court may appoint a trustee only upon a request of a party in interest or the U.S. Trustee "after notice and a hearing." 11 U.S.C. § 1104(a).  Additionally, such a request should be made by motion rather than as a response to the Examiner Motion.  *See* Fed. R. Bankr. P. 2007.1(a) ("In a chapter 11 reorganization case, a motion for an order to appoint a trustee or an examiner under §1104(a) or §1104(c) of the Code shall be made in accordance with Rule 9014"); Fed. R. Bankr. P. 9014(a) ("In a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.").

28.     The late request to appoint a chapter 11 trustee—just seven days before the hearing on the Examiner Motion without providing parties the ability to formally respond or produce

---

[4]     The Case Management Order provides "Any Objection to a Request for Relief must be filed by the following deadlines (each, as applicable, the "Objection Deadline"): a. in the case of a Request for Relief filed  21 or more days before the applicable hearing, 4:00 p.m. (prevailing Eastern Time), seven calendar days before the applicable hearing."  [Docket No. 528, ¶ 24(a)].  The Examiner Motion was filed on August 18, 2022 (27 days before the September 14 hearing), making the objection deadline August 7 at 4:00 p.m., Eastern Time.  The Borrowers Group Response was filed several hours after that deadline.  While it may be appropriate for the Court to consider late-filed responses under certain circumstances, those circumstances are not present in these cases.  The Borrowers Group's is represented by counsel and its lead attorney has been active on social media for weeks regarding his views regarding the Examiner Motion.  The Court, therefore, should not consider the late-filed Borrowers Group Response.

AMERICAS 116788379 v13

evidence—violates the procedural and notice requirements of the Bankruptcy Code and would deprive parties in interest their due process rights with respect to a critical issue in these cases. *See In re Rosenberg*, 495 B.R. 196, 201–02 (Bankr. E.D.N.Y. 2010).

29.     Nor is there any substantive reason to appoint a trustee or other similar entity in these cases.[5]  Approval of the requested relief does not preclude the appointment of a trustee at a later date.  Although section 1104(c) only permits appointment of an examiner if a trustee is not appointed, section 1104(a) contains no such prohibition for appointing a trustee.

30.     Nor is the appointment of a trustee at this time in the interest of account holders or creditors.  The appointment of a trustee would signal a fire-sale liquidation and destroy going concern value.  Indeed, a trustee would have the incentive to liquidate the Debtors' assets for cash because a trustee's commission is dependent on the amount of "all moneys disbursed or turned over in the case by the trustee to parties in interest . . . . "  11 U.S.C. § 326(a).  In other words, the appointment of a trustee may actually preclude the possibility of any kind of "in-kind" recovery.

31.     Third, the Borrowers Group asserts that a chapter 11 trustee is necessary to prosecute colorable claims against the "Debtors/management/third parties" based on an unfounded and misguided allegation regarding the Committee's proposed counsel.[6]  Borrowers Group Response at 2, ¶ 23.  This statement is a red herring, and the Debtors, the Committee, or any entity (such as a litigation trust) granted standing to pursue claims will be in a position to prosecute potential claims that arise from the Committee's or the examiner's investigation.  Therefore, the

---

[5]    Notwithstanding the foregoing, the Committee reserves the right to seek appointment of a trustee or to seek other relief should it determine that there is cause or it is in the best interests of the estate to do so.

[6]    The assertions regarding the Committee's proposed counsel are addressed in the *Declaration of Gregory F. Pesce in Support of the Official Committee of Unsecured Creditors' Application for Entry of an Order Authorizing the Employment and Retention of White & Case LLP as Counsel Effective as of July 29, 2022* [Docket No. 603, Ex. B], which the Committee's proposed counsel will further supplement as required during the pendency of these cases.

AMERICAS 116788379 v13

Borrowers Group Response and the individual account holder's informal response (which seeks

the appointment of a chief restructuring officer with the powers of a trustee for similar reasons)

should be overruled.

### III. The Committee Reserves its Rights with Respect to the Identity, Work Plan, and Budget of the Examiner to the Extent an Examiner is Appointed.

32.     Although the Committee and U.S. Trustee have agreed on the scope of the

examiner's investigation, no agreement has been reached on who will serve as the examiner, the

work plan, or the budget.  *See* Agreed Proposed Order, ¶ 7 ("For the avoidance of any doubt, the

rights of all parties in interest regarding the Work Plan and the Budget are reserved.").   The

Committee is concerned about the cost of an examiner and is prepared to object at the appropriate

time to the proposed work plan and fee cap if the proposal demands unnecessary expense from the

estate's limited proceeds.  As this Court is aware, an examiner can impose significant costs on an

estate:

| Case | Total Fees | Total Expenses | Total Compensation | Investigation Duration |
|---|---|---|---|---|
| **Washington Mutual, Inc.** (Bankr. Del. 2012) [Docket No. 10257] | $6,082,615.50 | $218,273.53 | $6,300,889.03 | 3 months (July 26, 2010 – November 1, 2010) |
| **RefCo, Inc.** (Bankr. S.D.N.Y. 2007) [Docket No. 6143] | $7,487,701.25 | $380,363.70 | $7,868,064.95 | 9 months, 3 weeks (June 22, 2006 – April 16, 2007) |
| **New Century TRS Holdings, Inc.** (Bankr. Del. 2008) [Docket No. 9266] | $19,711,917.21 | $711,266.48 | $20,423,183.69 | 8 months, 3 weeks (June 7, 2007 – February 29, 2008) |
| **Caesars Entertainment Operating Co.** (Bankr. N.D. Ill. 2016) [Docket Nos. 5624, 5626, 5628] | $53,067,508.62 | $1,724,450.17 | $54,791,958.79 | 11 months, 2 weeks (March 25, 2015 – March 15, 2016) |
| **Residential Capital, LLC** (Bankr. S.D.N.Y. 2014) [Docket No. 7256] | $87,135,122.01 | $3,346,047.03 | $90,481,169.04 | 10 months, 1 week (July 3, 2012 – May 13, 2013) |

AMERICAS 116788379 v13

| Lehman Brothers Holdings, Inc. (Bankr. S.D.N.Y. 2010) [Docket Nos. 23513, 27571] | $93,611,924.68 | $8,687,873.96 | $102,299,798.64 | 12 months, 2 weeks (January 20, 2009 – February 8, 2010) |
|---|---|---|---|---|

33.     Courts have imposed cost restrictions on examiners to ensure that estate resources are preserved.  *See, e.g., In re Keene Corp.*, 164 B.R. 844, 858 (Bankr. S.D.N.Y. 1994) (appointing examiner but setting budget of $100,000 and requiring examiner to submit preliminary report in 60 days); *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. June 16, 2021) [Docket No. 3094], Hr'g Tr. 172:10-11 (setting examiner's budget at $200,000).   Therefore, the Committee requests that the Agreed Proposed Order be entered and that its rights with respect to the identity of the examiner and terms of the work plan, including fees, be preserved.

## **Reservation of Rights**

Prior to filing this Objection, the U.S. Trustee, the Committee, and the Debtors agreed to the attached Agreed Proposed Order to resolve the Examiner Motion and the Committee's potential objections thereto.  To the extent the Court does not enter the Agreed Proposed Order, the Committee reserves its rights to object to the U.S. Trustee's request to appoint an examiner, including whether an examiner is required under section 1104(c) of the Bankruptcy Code and the proposed scope.  The Committee reserves all of its rights to supplement or amend this Objection, raise additional issues with the Examiner Motion at the hearing, and present evidence at the hearing.

## **Conclusion**

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court enter the Agreed Proposed Order granting the Examiner Motion and approve such other relief as may be just and proper.

AMERICAS 116788379 v13

Dated:  September 8, 2022
        New York, New York

Respectfully submitted,

/s/ *Gregory F. Pesce*

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Keith H. Wofford
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
      sam.hershey@whitecase.com
      kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admission *pro hac vice* pending)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
      gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

AMERICAS 116788379 v13