Immanuel Herrmann
*Pro se creditor*
immanuelherrmann@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Limited objection to the proposed draft order directing the appointment of an examiner**

I, Immanuel Herrmann, a Celsius Network LLC Creditor, respectfully file this limited objection to the proposed order contained in Exhibits A and B of D.E. 752, the "Notice of filing of Agreed Proposed Order Granting Examiner Motion," because of conflicts that White & Case has that are specifically related to the tracked redline edits in D.R. 752, Exhibit B, that were docketed on September 8 at 2:30pm.

I also continue to believe that a trustee / Chief Restructuring Officer is superior.

**BACKGROUND**

White & Case runs a professional, supportive, and helpful UCC, and I am appreciative of everything they have done on behalf of creditors so far.

However, I must respectfully point out that White & Case has disclosed in court filings that their firm represents Tether Intl. Ltd., and that the representation status is "open" [D.R. 603, schedules 1(c) and 2].

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

Tether is a shareholder of the Debtor, so the Debtor will not investigate the Tether loan. Tether is also a client of White & Case, and my question is how White & Case plans to aggressively investigate to determine whether the estate has a claim or preference action against Tether Intl. Ltd., regarding the loan and liquidation, and whether or not it was a properly perfected secured loan under United States law.

White & Case also previously represented WestCap Management, LLC on its investment as lead investor in the US$400 million Series B equity financing round of Celsius. "WestCap" is mentioned 28 times in D.R. 603, including in Schedule 2.

Due to Celsius' corporate structure, this may shift depositor claims to preferred shareholder claims. There are also concerns that there may have been due diligence failures in the Series B funding round by WestCap. My question is whether that now creates conflicts and/or litigation concerns.

I do not want this to cost depositors extra money and cost us our recovery, Your Honor. That is one big reason why I prefer a Chief Restructuring Officer to centralize matters of corporate control and investigation.

With that said, if we do have an examiner, I reluctantly ask you to expand the scope of the examiner in some small, targeted ways, with tight budget constraints, to make sure depositors don't lose out on any recovery dollars due to conflicts. I believe many of these items can be accomplished for $150,000 per item or less in legal fees; even less in some cases, and would encourage small, targeted requests that are extremely specific.

**If there must be an examiner, I ask that the scope of the examiner be modified in the following ways to address White & Case's conflicts and pave the way to increased recovery for depositors:**

1. **ADD: "An examination into whether the Tether loan was a secured loan with a properly perfected security interest, or an unsecured loan."** White & Case can investigate the rest of the details around the loan, in my opinion, but an independent outside expert needs to review this narrow question, write a legal opinion, and publish the results. I do not think this question will take more than, say, 50-100 hours of legal work to analyze, and then, the question becomes, how do depositers pursue recovery if White & Case cannot or will not. Which is a question for the court. Celsius lost $97 million on this loan liquidation and a lot of the bitcoin "hole" in the balance sheet is because Tether has depositors' bitcoin due to this liquidation; the balance sheet hole may grow dramatically

larger if the bitcoin price recovers over time. Depending on the results of this investigation, the estate may have a claim for recovery. I would expressly limit the scope and the budget for this question to writing a public legal opinion as outlined herein and ask that, to save resources, White & Case not issue a duplicate opinion on this matter.

2. **ADD: "An examination of whether the $750 million intercompany revolver moved depositor money to non-debtor entities, or other entities that would shift recovery from depositors to preferred shareholders."** White & Case can investigate the rest of the details around the revolver, in my opinion–no need for duplication–except, an outside expert needs to review their work and investigate this question, because it has implications for depositor recovery. I would expressly limit the scope and budget for this question to investigating how depositor money flowed to other entities where there are implications for which creditors recover from which entities.

3. **ADD: "An examination concerning whether Celsius' books and records reflected that they acted as a unitary company."** Celsius described themselves like a bank, and they may have used depositor funds as, essentially, a venture capital fund to grow their business. This means they may have put depositor funds into equity-like investments, including in *other Celsius entities and non-debtor affiliates,* while telling us they were "safer than a bank," and that there could not be a "run on the bank" because Celsius "never lends more than what it has … legally, we're not allowed to create money or do fractional reserve. So at any moment, we always have enough coins and enough collateral and so on to return all of the assets to all of our users." [Exhibit A] Yet in reality, rather than doing overcollateralized lending, I believe they may have been operating as a single company for all intents and purposes, treating users' deposits as a "slush fund" for their corporate expansion and mining company (which is related to item 2 above.) If they did this, learning the details may increase depositors' recovery. I have concerns about scope and budget creep on this item, yet, I do not know that White & Case can run an unconflicted investigation on this question given their past representation of preferred and common shareholders and the concerns around the Series B. So perhaps they can leave this item entirely to an examiner.

4. **ADD: "An examination of the circumstances under which non-accredited customers were 'grandfathered in' to the earn product on or around April 15, 2022,"** including a review of internal discussions on the matter, discussions with regulators, and legal opinions on the matter. This is crucial information to understand the background on how custody and withhold came to be within the context of earn, and I believe it may already be included in item ii in the current proposed order. However, I would ask to include this as a point of clarification

and for avoidance of doubt. Since the examiner is looking into issues of custody and withhold anyway, it seems more efficient to also have them investigate the facts and circumstances that led to non-accredited investors having their deposits "grandfathered in" to earn. In the end, understanding which assets are part of the estate and why, sooner versus later, will help figure out what's left, stop creditor infighting, and help us get on with the business of recovery.

With each item I am suggesting adding here, my goal is to resolve conflicts between classes of creditors, increase recovery for creditors, get White & Case untied on any conflicted matters, and moving the bankruptcy along.

**I am supportive of the UCC continuing to do the bulk of the investigations, and am especially interested in them continuing to investigate:**

1. **The identification of the undisclosed third party loan party** (which I believe is Equities First per media reports), and what steps the Debtors took to neutralize their lost collateral.

2. **"An examination of the GK8 acquisition."** This is just absolutely riddled with problems. As I pointed out in my "Limited Objection to the Debtor's Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of July 13, 2022" [D.E. 754], "I am concerned that the proceeds from the sale of GK8 may flow to the parent company Celsius UK, and that preferred shareholders (i.e. non-depositors) may have a claim against those assets to the detriment of depositors before those claims are heard." The $750 million in insurance that was claimed by AON and Celsius appears to have not existed [D.E. 754 - exhibit A]. A sale is pending, so this is a timely matter. An investigation into the GK8 acquisition, claims around $750 million in insurance via insurance giant AON, and where the money for the acquisition came from, and whether depositor funds were directly or indirectly used given Celsius' insolvency, are all important questions.

3. **The CEL token.** Information on the CEL token, and it needs to be investigated, can be found in D.R. 770, D.R. 730, and D.R. 88, among many other places.

**Please pave the way to appoint a trustee on an expedited basis, rather than an examiner**

An examiner can only examine, which is a problem. That is why I suggest a Trustee, who is a Chief Restructuring Officer, who can speak out instead of shrinking away, help quell customer distrust, and get us on the road to collaboration and recovery.

However, if the court is not ready for this step yet, I hope that Your Honor will order investigations where appropriate and then figure out a mechanism where, once the examiner's investigation concludes, causes of action can take place against entities in the interests of retail depositors.

## Responses to the UCC's specific objections

The UCC said in its proposed order: "The appointment of a trustee would signal a fire-sale liquidation and destroy going concern value."

I believe this is referring to distressed asset investors, who they believe will become skittish. My response to this is: This is only because, typically, in bankruptcy, a trustee means liquidation. I am calling for a Chief Restructuring Officer who would focus on maximizing value, not a liquidator.

The UCC said: "the appointment of a trustee may actually preclude the possibility of any kind of 'in-kind' recovery."

To the contrary, if the trustee is paid based on performance and delivering long-term value, they should enhance in-kind recovery. In fact, in an employment agreement, perhaps it could be worked out that depositors *would* be paid in-kind, by making that part of the CRO's remit, if it is deemed permissible by the court, rather than leaving that question in lingering doubt and uncertainty. On the other hand, hiring a trustee to just liquidate assets would be a terrible idea and I would oppose it, because it would destroy value.

The UCC said: a trustee would have the incentive to liquidate the Debtors' assets for cash because a trustee's commission is dependent on the amount of "all moneys disbursed or turned over in the case by the trustee to parties in interest . . . . " 11 U.S.C. § 326(a)

My response is: Under 11 U.S.C. 330, section 1, a trustee may be paid:

> **(A)** reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

**(B)** reimbursement for actual, necessary expenses.

I would ask that the order granting a trustee NOT incentivize the trustee to liquidate illiquid assets during a bear market or "crypto winter," which we are currently in. This would be akin to liquidating housing stocks in 2009–a windfall for vultures. I would compensate them as a business professional based on restoring short term liquidity and maximizing long term value, using criteria under 11 U.S.C. 330(3), subsections c and f, which compensates based on:

> **(C)** whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title (for liquidity provision of liquid assets, i.e. returning coins, only)

> **(F)** whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title (for dealing with all other long-term illiquid assets such as the mining operation via restricted stock, stock options, warrants, bonus plans, etc.)

When it comes to illiquid assets, I would pay the CRO based on long term recovery prospects and the ability to preserve equity assets or restructure and convert them into ongoing concerns, not short-term liquidation ability. As one example, the hypothetical plan I submitted for mining, [D.R. 755, exhibit A], was as a 100% equity deal with no, or minimal, cash changing hands, which is a good option within a bear market. Under such a plan, the CRO could receive restricted stock and/or stock options in a mining company as compensation for facilitating a machine and facility to equity swap with public mining companies.

11 U.S. Code § 326(a), referenced by the UCC, only appears to me to be a cap on compensation, not strictly define it, though I am not a lawyer; perhaps it does impact the timing of compensation, though I trust that an accommodation could be reached here or that your broad equitable powers could result in a compensation scheme that is in the best short and long-term interests of depositors.

## If there isn't a Chief Restructuring Officer, an examiner is needed to help with conflicts

As you can see, your honor, this is a messy situation.

We have the fox guarding the henhouse, with Alex Mashinsky still in charge of Celsius.

Our UCC's law firm has conflicts that require some limited examinations under the current setup (more than is currently proposed, which is why I added the items above.)

## Conclusion

It is absolutely inconcievable to me that Alex Mashinsky is still in charge of Celsius.

Because this is a crypto case, this situation is getting less outrage than it should. For whatever reason, the whole idea that crypto is "speculative" and "the wild west" is used as an excuse to excuse the inexcusable: blatant lies to investors and victimization.

Alex Mashinsky once said "there are no rules in this business." [Exhibit B] Yet, here we are, with him trying to use the rules of this court, and U.S. bankruptcy law, to protect himself from misleading investors. There may not be the same kind of regulations that there are with public companies or stock brokers here, to be sure, but lies and misrepresentations still matter.

I have been clear with the U.S. Trustee, with regulators, and other agencies, and I will be clear with you, Your Honor: This behavior of Alex Mashinsky is *nothing like* the behavior of the management of Voyager. Voyager made a stupid mistake, but they did not double down and compound that mistake *for years,* while lying to depositors.

Kirkland & Ellis would have you believe that Celsius' woes are due to market volatility outside of their control and that the two cases are caused by outside forces. They used a similar boilerplate presentation for Voyager and Celsius, albeit with some tweaks. Don't be fooled.

As the State of Vermont recently pointed out in D.R. 730, even during its Pause, Celsius doubled down on converting depositors assets into other things, while lying to us. "From May 2, 2022 through July 1, 2022," notes the Vermont Department of Financial Regulation, "Celsius increased its Net Position in CEL by an additional 40,089,731.33 CEL tokens, **with over half of this increase occurring after Celsius froze withdrawals on June 12, 2022**. The market price of CEL generally ranged between $0.155 and $2.077 during this period. Declaration of Ethan McLaughlin at ¶ 6g." This is just the latest in a slew of unconscionable revelations. Alex Mashinsky even sold CEL token AFTER the bankruptcy, while CEL token remains locked up and inaccessible for retail depositors in the app. Perhaps he could not help himself?! [Exhibit C]

This situation has many echoes of MF Global, on which you presided about a decade ago. On Friday, I met with James L. Koutoulas, Esq., who worked in your courtroom to

bring justice to MF Global victims. He says hi to you in Exhibit D. He agrees with me that Celsius depositors are flat-out victims, just like MF Global investors were victims. You did the right thing on MF Global. Now, I am asking you to do the right thing again. Please separate the speculative nature of crypto–which is volatile, but here to stay– from the basic, obvious wrongdoing that occurred in the Celsius case.

Thank you, your honor.

Silver Spring, MD
Dated: September 12, 2022

Respectfully submitted by:
s/ Immanuel Herrmann
Immanuel Herrmann
*Pro se creditor*

**EXHIBIT A: "CLIP: What's happens if there is a "Bank Run" on Celsius?"**
https://www.youtube.com/watch?v=GYQt-GwsCH0

See the full AMA here, timestamp of this question is 1:07:29
https://youtu.be/LaIfR4BuIno

<u>**Transcript**</u>

Zach: "What happens if there was a run on Celsius, like there would be on a run on a bank?"

Alex Mashinsky: "Yep, I'll take it. You got it? I'll take it. So, a run on a bank, normally, because banks have fractional reserve, they lend 20, 30, 50 times more than the money they have. There is a run on the bank. A run on a bank cannot happen at Celsius because Celsius never lends more than what it has, right? We cannot do it, we cannot legally, we are not allowed to create money or do fractional reserve. So at any moment, we always have enough coins and enough, eh, uh, collateral, and so on, to return all the assets, uh, to all of our users. And every day, we have a process, the daily reconciliation process, where our team, like, 20 or 25 people, get on a call and grind through all the tokens and all the coins and make sure that we have more coins than what we owe the community, right? That's our process, and no bank in the world can do that for you because they never have enough assets to return for you, if there is a run on the bank. Next question."

Questioner: "Right, cause, uh, I mean a bank is lending out, always, more than they have, that's their business model, and, yet again, we do the opposite. We're always lending out less."

Alex Mashinsky: "Deutsche Bank lent 50 dollars for every dollar they have. Celsius never lends more than 50 percent, right, or 75 percent of the assets we have. So, this is two orders of magnitude safer. Two orders of magnitude, right? 50%, meaning 0.5, one order of magnitude would make it 5%, or 5 times leverage, but Deutsche Bank is more than 50 times leverage. That's 2 orders of magnitude more risky. If they lose 2% of their assets, they're out of business. If Celsius loses 2% of our assets, nothing happens. You wouldn't even know about it because we have more than 2% just on our balance sheet."



**Exhibit B**

# No Rules, pt.1 : Pulling the Rug

MicroMoney, Sirin Labs, and the origins of Celsius Network

**Dirty Bubble Media**
Apr 21



Mashinsky's venture capital firm Governing Dynamics overlaid on the $AMM token chart

*"There are no rules in this business."- Alex Mashinsky\**

Around the same time Alex Mashinsky got his start with Celsius Network, he served as an advisor to two other cryptocurrency-related firms. These two firms, MicroMoney ($AMM token) and Sirin Labs ($SRN token), were both, in crypto-parlance, "rug pulls." Each offered an "initial coin offering" that was supposedly designed to generate funds

for business development. In practice, the price of both tokens skyrocketed and then crashed shortly after launch. Neither business appears to have delivered on any of the promises made. In the case of Sirin Labs, lawsuits and criminal charges have been pressed against the founders and key figures within the company.



Right: $AMM token price, Left: $SRN token price

While we have underlined previously documented Mr. Mashinsky's role in these two failures, we were missing one crucial piece of evidence: The blockchain trail demonstrating Mr. Mashinsky's direct participation in these rugpulls. After some digging, we believe we have identified at least one wallet controlled by Mr. Mashinsky that participated in both schemes.

# Follow the Money



Tracing back through Alex's wallets

We traced the activity of a wallet that both we and others have demonstrated is controlled by Mr. Mashinsky. We found that this wallet (we will call it Mashinsky-3) was

initially funded on 08/02/21 by 0xc33192 (Mashinsky-2). Mashinsky-2 had sold over 5.2 million Celsius tokens ($CEL) between August 2020 to August 2021. Incidentally, this number is close to our previous estimates of Mr. Mashinsky's selling during that period. Only a few individuals have owned this much $CEL token, adding further evidence that this wallet is controlled by Mr. Mashinsky.



$CEL token flows through Mashinsky-2

In turn, Mashinsky-2 was initially funded by 0x11729ac (Mashinsky-1). Mashinsky-2 also received over 5 million of its $CEL tokens directly from Mashinsky-1 over several transfers. We are confident that the Mashinsky-1 wallet belonged to a Celsius insider, as it received a transfer of 80,000,000 $CEL token in August of 2018; these tokens were then sent to the original Celsius Network treasury.

It turns out that Mashinsky-1 was our white whale wallet, as it had also handled significant amounts of both MicroMoney and Sirin Labs tokens.

# MicroMoney

MicroMoney.io was marketed as a cryptocurrency lending platform that offered both interest-paying accounts and crypto loans, focusing on markets in southeast Asia. According to MicroMoney's own blog, Mashinsky was an early investor who made a "generous contribution during our pre-sale." He then joined the project as a formal advisor prior to their ICO.



It all began with an extremely generous contribution during our pre-sale, and ever since then a relationship was formed. Today we are proud to introduce him as one of MicroMoney's most experienced and successful business advisors, Alex Mashinsky.

Alex brings with him a wealth of expertise, having founded seven companies, holding more than thirty patents, and having raised over $1 billion in funds with $3 billion in exits during his time as a venture fund manager. His educational background is equally as impressive, with a Bachelor of Engineering majoring in Electrical Engineering, Type 1 from The Open University of Israel in 1982. After that, in 1989, he went on to acquire a Bachelor of Science, majoring in Economics from Tel Aviv University.

From https://www.newsbtc.com/press-releases/mashinsky-governing-dynamics-partner-micromoney/

Mashinsky has not hid this relationship. In fact, his venture capital firm Governing Dynamics continues to list MicroMoney among its successful investments:



# MicroMoney

MicroMoney is an Open Source Credit & Big Data Bureau that connects new customers to all existing financial services.



The ties between Mashinsky and MicroMoney ran even deeper, as the CEO of MicroMoney was one of the original advisors to Celsius Network:



Only the best at Celsius. From archived version of Celsius Network's site in
early 2018.

On 10/11/17, Mashinsky-1 received 1,020 $AMM from 0xdf935. This appears to be a
MicroMoney insider contract that initially received 60,000,000 AMM from the
"Astronaut Capital Deployer." On 10/14/17, Mashinsky-1 received another 392,681 tokens
from the same wallet. Mashinsky-1 received its final transfer of 72,495 $AMM on
12/26/17 from 0xb76766bebe95139e3d7d8d1fb74b03f38361ad0f, which appears to be a
core $AMM wallet. Mashinsky-1 then proceeded to transfer all $AMM tokens out over a
period of roughly two weeks, sending 303,000 to OKex and 172,500 to the Etherdelta
exchange.



Transfers of $AMM through Mashinsky-1 (generated with
explorer.bitquery.io)

Now, we cannot say for sure when these tokens were sold, making it impossible to
exactly calculate the proceeds. Also, we cannot be certain that this is the only wallet
where Alex received $AMM tokens. However, if the tokens were sold on the same day as
the transfer to the exchanges, **we estimate that Mashinsky's gross proceeds were
~$436,000.**

# Sirin Labs

Sirin Labs was the brainchild of the now infamous entrepreneur <u>Moshe Hogeg</u>, currently under indictment in Isreal for multiple counts of fraud and sexual misconduct. Sirin Labs promised to develop a blockchain-based smartphone (yeah) using proceeds from its ICO. This, of course, went nowhere, leading to <u>multiple</u> <u>lawsuits</u>.

Similar to his role at MicroMoney, Alex Mashinsky served as an advisor to the ill-fated venture. Moshe Hogeg simultaneously served as an early advisor to Celsius Network.



Sirin Labs Advisor list (from https://icodrops.com/sirin-labs/)

Like MicroMoney, Governing Dynamics lists Sirin Labs among its successful ventures, trumpeting the over $130 million raised in the ICO.



Mashinsky1 received a total of 2.25 million SRN from two addresses. The first, 0xdd9a1ad transferred 1.5 million SRN to Mashinsky1 on 12/27/17. This address had purchased a total of 14.99 million SRN on 12/12/17 for 14,999 Eth (worth $9.8 million at the time, or $0.65/token). It is unclear who this wallet belonged to, as it received all funds from an upstream wallet that was funded from a number of different exchanges.



$SRN flows through Mashinsky-1

Mashinsky1 then transferred the $SRN tokens out in batches of 100k-200k at a time to an intermediate wallet, 0xf0c06b. These transfers took place on 12/27/17, 12/28/17, 12/30/17, 12/31/17, 1/2/18, 1/4/18, 1/6/18, and 1/8/18. The intermediate wallet sent the tokens to Liqui.io, a now-defunct Ukrainian crypto exchange that was one of the first to enable $SRN token sales. Per CoinGecko, $SRN sales began on 12/31/17 at around $1/token. By 1/8/18, the price had risen to $2.25/token.

After sending all of the initial 1.5 million $SRN out, Mashinsky1 then received 5 transfers of 150,000 $SRN from 0x59b681402 on 1/24/18, 2/25/18, 3/25/18, 4/25/18, and

5/27/18. This wallet appears to be owned by Sirin Labs, as it withdrew tens of thousands of Ether <u>directly from the Sirin Labs multisig contract</u>.

Each batch of 150k $SRN was sent to the same intermediary wallet and transferred to Liqui.io. Over this period, the token price maxed out at ~$3.25 on 1/23/18, then rapidly declined. By the time Mashinsky1 made its last transfer of $SRN, the price had crashed to $0.32.

Again, it is not possible to determine exactly how much was made on these sales. If the tokens were sold immediately on transfer to Liqui.io, we estimate the proceeds would have been around **$2.8 million.** Since we cannot attribute the upstream wallet that made the initial 1.5 mil $SRN transfer, we don't know whether Mashinsky put up funds to purchase these tokens. The second set of 750,000 $SRN transferred from the insider wallet may have been a payout for being an advisor to the company, but this is speculation on our part.

*EDIT: Originally reported this quote as: "There are no rules in crypto." This was inaccurate and has been corrected; Mr. Mashinsky was referring to crypto when he said "this business."

## Comments



Write a comment...

© 2022 Dirty Bubble Media · <u>Privacy</u> · <u>Terms</u> · <u>Collection notice</u>
<u>Substack</u> is the home for great writing



# Markets

# Celsius CEO Cashed in After Bankrupt Crypto Lender's Token Surged

This is the first time the address attributed to co-founder Alex Mashinsky was used since the company froze withdrawals and entered bankruptcy.

**By Krizstian Sandor**

🕐 Aug 9, 2022 at 3:33 p.m. EDT

Updated Aug 10, 2022 at 2:34 p.m. EDT





*Alex Mashinsky (Piaras Ó Mídheach/Web Summit via Sportsfile)*

While a group of traders has been busy pumping the bankrupt crypto lender Celsius Network's CEL token in a short squeeze, founder and CEO Alex Mashinsky cashed out some of his CEL token holdings, which have multiplied in value even as his company struggles.

Blockchain data shows a crypto address identified by crypto intelligence firms Nansen and Arkham Intelligence as Mashinsky's made its first transactions since late May.

The wallet sold CEL tokens in multiple transactions Saturday and Tuesday, swapping 17,475 CEL for $28,242 worth of ether (ETH) on the decentralized exchange UniSwap, according to blockchain data tracer Etherscan.



*The wallet labeled as Alex Mashinsky's made its first transactions since Celsius froze user withdrawals. (Nansen)*

The transfers were first spotted by a Twitter user who goes by the name alto.

Celsius and Alex Mashinsky did not respond to CoinDesk's emailed request for comment.

Mashinsky's transfers came as he and his beleaguered enterprise gear up for a second hearing in a federal bankruptcy court in New York next week. At the same time, the Unsecured Creditors Committee (UCC) formed to protect the interests of those who deposited money on the Celsius platform, is preparing to investigate Mashinsky and other insiders.





Celsius faced financial difficulties and froze withdrawals in June, then filed for
bankruptcy protection on July 13. The CEL coin issued by the crypto lending
platform as a utility token has also faces regulatory scrutiny from the U.S.
Securities and Exchange Commission (SEC) for not being registered as a
security.

Mashinsky is reportedly among the largest individual CEL holders after Celsius'
treasury. Long before its financial woes, Celsius publicly listed the largest CEL
owners on its web page. Mashinsky was found to hold more tokens than the
next four holders combined, Arkham reported in July in a lengthy investigation
into Celsius and Mashinsky using blockchain data.

Arkham identified multiple wallets owned by Mashinsky, which had regularly
sold large amounts of CEL tokens on various decentralized exchanges, totaling
$44 million over several years, the report added.

*Read more: Sky-High Yields and Bright Red Flags: How Alex Mashinsky Went
From Bashing Banks to Bankrupting Celsius*

The specific wallet that completed the transactions held about $1.1 million in
CEL tokens and some ETH and USDC at press time, according to Nansen's
portfolio tracker.

CEL has rallied in a community-driven short squeeze attempt. The token was recently changing hands around $2, which marks a whopping thirteenfold price increase since it hit 15 cents on the day when Celsius announced the suspension of customer withdrawals.

## Read more about

( Celsius )  ( Bankruptcy )  ( Alex Mashinsky )

| | | | | |
|---|---|---|---|---|
| ₿ | BTC | $21,709.75 | ▲ 0.67% | → |
| ◆ | ETH | $1,750.34 | ▼ 1.21% | → |
| ◆ | BNB | $293.84 | ▼ 1.36% | → |
| ✕ | XRP | $0.352695 | ▼ 1.65% | → |
| ◈ | BUSD | $0.999778 | ▼ 0.31% | → |
| | **View All Prices** | | | |

**Sign up for First Mover, our daily newsletter putting the latest moves in crypto markets in context.**

Email address

Sign Up

*By signing up, you will receive emails about CoinDesk product updates, events and marketing and you agree to our terms of services and privacy policy.*

## DISCLOSURE

*Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.*

*The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet*

*that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.*



### Krisztian Sandor

Krisztian Sandor is a reporter on the U.S. markets team focusing on stablecoins and institutional investment. He holds BTC and ETH.

Follow @sndr_krisztian on Twitter

# Trending

**1** **CoinDesk Podcast Network**

**Headlines - Top Stories of the Week 09-10-22**

Sep 11, 2022


**2** **Business**

**'Wall Street' Doesn't Need Bitcoin; Bitcoin Doesn't Need 'Wall Street'**

Sep 11, 2022


**3** **The Breakdown, With NLW**

**Crypto Isn't a Protest Tool; It's a Survival Tool**

Sep 11, 2022


**4** **Business**

**Vitalik Buterin Makes Surprise Appearance at Kyiv Tech Summit in Show of Support for Ukraine**

Sep 10, 2022




## About

About
Masthead
Contributors
Careers
Company News

## Stay Updated

Events
Newsletters
Follow

## Get In Touch

Contact Us
Advertise
Accessibility Help
Sitemap

## The Fine Print

Ethics Policy
Privacy
Terms Of Use
Do Not Sell My Personal Information

Please note that our privacy policy, terms of use, cookies, and do not sell my personal information has been updated.

The leader in news and information on cryptocurrency, digital assets and the future of money, CoinDesk is a media outlet that strives for the highest journalistic standards and abides by a strict set of editorial policies. CoinDesk is an independent operating subsidiary of Digital Currency Group, which invests in cryptocurrencies and blockchain startups. As part of their compensation, certain CoinDesk employees, including editorial employees, may receive exposure to DCG equity in the form of stock appreciation rights, which vest over a multi-year period. CoinDesk journalists are not allowed to purchase stock outright in DCG.

*©2022 CoinDesk*

English

  

   

**Exhibit D**

