Immanuel Herrmann
*Pro se creditor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS OBJECTION TO COURT FILINGS TAKING POSITIONS ON WHICH COINS ARE**

**CUSTOMER PROPERTY, D.R. NOS. 855, 737, 760, AND 662**

I, Immanuel Herrmann, a Celsius Network LLC *pro se* creditor, respectfully file this omnibus objection with respect to the following filings which take adverse positions with respect to the property rights of Earn customers:

1. The Debtors' Motion Seeking Entry of an Order (i) Permitting the Sale of Stablecoin in the Ordinary Course and (ii) Grinding related relief [D.R. 855]

2. The Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay [D.R. 737]

3. Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief [D.R. 670]

4. The Ad Hoc Group of Custodial Account Holders' Adversary Case #22-01142 Complaint for Declaratory Judgment [D.R. 662]

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

**Preliminary Statement**

One key goal of the Debtors in these chapter 11 cases seems to be to getting themselves off the hook for the regulatory mess they created. Another goal is to stew division and acrimony among creditor groups, when more unity, and dual focus on the misdeeds of Celsius management, along with recovery plans, could bring additional money to the estate and a better recovery for Creditors. Chipping away at the property rights of Earn customers also seems to be a goal.

I hope that now, with the resignation of Alexander Mashinsky, we can rethink–and "hit reset"–on some of these dynamics. As conversations pivot from distraction, disarray, and scandal, to plans for recovery, my earnest hope is that creditors can join together with the Debtors and chart a collaborative course toward a recovery that works for all depositors.

That said, with respect to the forgoing filings before this court and others that take positions with respect to the status of customer property, I must object to the release–or the sale–of any coins in the possession of the Debtor *that may be customer property* until such time as my property rights and the property rights of Earn customers more broadly are either adjudicated by this court or otherwise settled. (An exception would be CEL token treasury reserves, see, D.R. 901, Rebecca Gallagher's *objection the debtor's motion permitting the sale of stable coins.)*

There are strong legal arguments that Earn deposits **likely are** customer property and are not property of the estate. In addition, I have individual claims with respect to my account which I will outline in this filing–and there are other creditors similarly situated whose situations are not covered by the existing *ad hoc* groups.

Determination of whose coins are customer property and whether our property is commingled is a critical question in this case, which is why the examiner has been specifically tasked with it. Specifically, the order appointing an examiner [D.R. 820] includes:

> *i. An examination of the Debtors' cryptocurrency holdings, including a determination as to where the Debtors' cryptocurrency holdings were stored prepetition and are stored postpetition and whether different types of accounts are commingled.*
>
> *ii. An examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account."*

I believe that a full review of the facts is likely to show commingling across all programs, and that treating **all** customer deposits as customer property, will be the equitable–and legally correct–decision in this case. But the bottom line is, we need to examine first, to know what happened.

Alternatively, under new management, the Debtor could acknowledge that the contract was verbally modified enough times that all customer coins should be considered our property. Additionally, new management could acknowledge that unique circumstances like mine, where customers modified their terms with the Debtor ***in writing*** **and even signed** ***contradictory contracts*** abound.

Once it is clarified that coins are customer property, creditors can, understanding that not all of our coins are available for withdrawal and will not come back, settle equitably with the Debtor to allow for a reorganization that maximizes value to take place.

But unless and until all coins are declared by this court to be ***customer property*** or otherwise settled by mutual agreement*,* and since this case continues to have a big focus on differentiating between depoister types, I will submit my own property rights claims for consideration.

**The terms of service that I signed when I took and out and then repaid loans modified Celsius' agreement with me–leading them to them hold only bare title, as defined under 11 U.S.C. § 541(d)**

I have situation that is just one example of the numerous self-contradictory contract clauses that Celsius subjected its customers to, and outlines some of the challenges around determining property rights via Celsius' written contracts:

- On November 7, 2021, I borrowed $22,000 USDC (stablecoins) against 1.40763964 Bitcoin (collateral.)

- On November 12, 2021, I borrowed $30,600 USDC (stablecoins) against 25.93784811 Ethereumn (Collateral).

- On March 15, 2022, I repaid $30,600 in USDC (stablecoins) and my 25.93784811 Ethereum (collateral) was returned to my Earn account.

- On May 12, 2022 (27 days after US Customers were ostensibly banned from Earn), I repaid $22,000 in USDC (stablecoins) and my 1.40763964 Bitcoin (collateral) was returned to my Earn account. Notably this repayment occurred after the April 15th when Earn deposits were ostensibly prohibited from non-accredited U.S. investors.

To take out my loan, I was required to sign an agreement with Celsius [*Declaration of Alex Mashinsky,* D.R. 393, pages 949-967], which said, in part:

> *You hereby represent and warrant to us that, as of the Loan Effective Date and throughout the Loan Term:*
>
> *1. You are the **sole owner** of all Digital Assets used in connection with the Loan*

*(including the **Collateral** and any Margin Call delivery)*

*…and that…*

*Within ten (10) days of your full repayment of the Principal amount and all outstanding Obligations, Celsius **shall release all remaining Collateral** to your Celsius Account.*

*(Emphasis added.)*

I also certified to Celsius in my loan agreement that my crypto collateral was: "free from any claims, indebtedness, liens, or third-party interests." If the Debtor's position was that I did not own my Earn assets before I signed this contract, they certainly re-granted me all rights and title (except bare title) upon my signing the new contract.

My collateral was returned to my "Earn" account upon repayment of my loans. However, the written terms of my contracts with Celsius should lead to a ruling that Celsius only retained bare title to my collateral after I repaid my loans–they held my coins as a bailee or in trust, with only legal title and no equitable interest under 11 U.S.C. § 541(d).

After I'd paid off my Celsius loan, I was in constructive receipt of my collateral. The contract I had signed still followed my collateral; I had signed a new written agreement superseding the old one and changing my relationship with the Debtor. Celsius was just hanging onto my property until I got around to doing something with it such as withdrawing it to a hardware wallet or otherwise redeploying it. According to the contract I had signed, Celsius simply "release[d] all remaining **Collateral** to my Celsius Account" upon my loan repayment. Further, they did so without contractually specifying which *type* of account, or redefining my relationship with Celsius post-withdrawal, or re-asserting that "all rights and title" to my collateral returned to Celsius upon withdrawal–which leaves my coins legally orphaned and is, perhaps, a somewhat analogous

situation to the *withhold* group of customers.

The fact that, upon repayment, my collateral was placed into an Earn account (not by me, but by Celsius) was immaterial. After all, Celsius had to put my collateral *somewhere*, until I took possession of it. The terms of service merely said my collateral, which I had certified I was the sole owner of in my loan contract, would be "returned."

Courts have interpreted section 541(d) to "expressly" provide that "property in which a debtor holds only bare legal title is not property of the estate." [*Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); s*ee also In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010) (holding that property held in trust, escrow, or as part of bailment is not property of the estate.")].

When a debtor holds legal title to but does not have equitable interest in certain property, the debtor must turn such property over to the holders with such equitable interest in the property. [See *MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) "[w]here Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner."].

Additionally, a debtor who holds proceeds attributable to property owned by another holds only bare legal title to such property, and thus must turnover such *proceeds* to the interest holder of such property. Therefore, I am owed the *proceeds* from my coins if they have been converted into other property, dissipated, or are otherwise missing from the estate. [See, e.g., *In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of

participation ownership interest proceeds of a property sale because holder was beneficial

owner, and debtor only held legal title to the proceeds)].

One problem here, that I acknowledge, is that there is a slippery slope emerging with the

number of non-estate property claims in this case. As we all know, there are not enough coins

left in the estate to pay *everybody* back in full if the deposited coins are *everybody's* property.

Nonetheless, I believe that such a declaration that all deposits are customer property may be

the morally correct–and the legally correct–outcome to maximize depositor recovery and

fairness. Such a declaration would then let property holders settle with the Debtor and chart a

path forward. Should such a declaration not be forthcoming, however, I will assert my own

return of property claims in this case against the Estate, as outlined above.

**There are colorable claims that Earn coins are customer property**

Moving on to the general Earn program *overall*–and putting my unique claims aside–deciding

whether or not Earn deposits are customer property is one of the most central questions of this

case, and it is *far* from an easy or straightforward decision.

Through additional discovery and the examination, I believe we need to learn more about

whether Earn coins and Loans collateral are customer property.

There has yet to be a review of all versions of the terms and conditions which Your Honor wisely

ordered Celsius to provide, Celsius' solvency when those terms and conditions were changed,

the facts and circumstances around the launch of the Custody product, the written and oral

statements by Celsius, and whether Celsius changed terms and conditions knowing they were

insolvent, in preparation for bankruptcy.

Nor has there been a review of people similarly-situated to myself, who signed written contracts that contradicted our Earn contracts, and those US non-accredited investors who somehow had loan collateral "returned" to the Earn program from loans after April 15.

In addition, the Earn contract terms–as written–are far from clear and unambiguous, and there are steps that the Debtor and its executives took to build a relationship with customers that supersedes the plain text of the contract.


**Celsius, its executives, and others, were unjustly enriched. Their CEO published an explicit written promise of a fiduciary relationship with its depositors, which I relied upon in making my decision to deposit my crypto**

In New York, four factors have been set forth for evaluating whether a constructive trust should be imposed: "(1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." [See *Sharp v Kosmalski*, 40 NY2d 119, 121 [1976].]


Every week without fail, Mr. Machinsky did AMAs (Ask Me Anything videos.) In them, a recurring theme was how incredibly safe and *trustworthy* Celsius was.


Much of the time, we now know, Mr. Mashinsky and Celsius made ***promises*** about the products on offer. Not only did they misrepresent their financial condition; they profoundly misrepresented what the product *was* at the most fundamental level, and made promises that modified the relationship that depositors had with the company.


Everything from the way they talked about their operation–the ostensible mechanics of how things worked under the hood at the company, and the activities they engaged in as a business, was misrepresented. Again and again, on videos and in writing across the internet, we heard

about over-collateralized lending, military-grade security, and $750 million in insurance at Fireblocks.

There was even a video where Mr. Mashinksy talked about being responsible for people's life savings that I remember watching. I cannot find it now; perhaps it is hidden by the Debtor, but I believe it will be found and make it into the court record in due course.

One key document I relied on when making my decision to **transfer** my crypto to Celsius for safekeeping was a Medium posting that contrasted Celsius with its competitor, BlockFi. [Exhibit A]

In the article, Alex Mashinsky made an ***explicit promise of a fiduciary relationship*** touting how Celsius was ***completely different*** from its competitor, BlockFi. He explicitly told customers: Celsius has a "fiduciary" relationship with its users; but, on the other hand, its competitor BlockFi does not.

Notably, Celsius left this Medium post up, with its high ranking in search engine results, and continued to promote it, and other communications, to build trust in Celsius and bring in new customers.

I have spoken with several other depositors who relied on this document as well, when deciding to entrust their deposits with Celsius. Notably, the article is written in the first person voice of Mr. Mashinsky, and reads, in part (emphasis added):

> *In case there was confusion [in] the clause above, [BlockFi goes] on to state,"These Terms and the deposit relationship do not create a fiduciary relationship between us." In*

> *simpler terms, BlockFi is not bound to have a legal or ethical relationship with its depositors.*
>
> ***As the CEO of Celsius, I cannot imagine defining such an untrusting relationship between our community and our company. If you're interested, I encourage you to read our own terms and conditions to see how we are acting in your best interest.***
>
> **[See Exhibit A, item 1 for the full statement.]**

I relied on this written promise of a fiduciary relationship when deciding to deposit and keep my crypto with Celsius, among many other written and oral assurances.

I was also misled by descriptions by Celsius that coins are "your" coins–not just sometimes but **repeatedly and consistently**–and the misrepresentations went far beyond the financial condition of Celsius to the fundamental products and services we were being offered, and the type of relationship that customers and the company had. For more examples, see *Omnibus Objection of Cameron Crews*, D.R. 914, especially Exhibits B, C, D, and E, along with letters and filings this court receives.

Assurances and promises were ongoing and continued through the "run on the bank" period. On June 8, 2022, CFO Rod Bolger, in another Medium Post [Exhibit B] told depositors the following (emphasis added):

> Celsius was already focused on the elements I'd expect in a best-in-class financial institution. Even without the same regulatory framework yet enacted, many of those elements were already in place when I joined. **The company's strong liquidity framework, established practices around liquidity data, and modeling were elements that I was happy to find similar to other large financial institutions. *This put us in a strong position to weather the recent***

> *market turbulence and ensure that clients who needed to access their*
>
> *digital assets could get them free and clear.*

Less than a week later, Celsius froze withdrawals. Although on July 5, 2022, Celsius was **still** calling our coins "**your coins.**"



Source: [Wayback Machine, celsius.network, July 5, 2022](#).

The Custody *ad hoc* describes what Custody is, in their Adversary Case, D.R. 662,

> *"Custody" wallets, a common feature in the cryptocurrency industry, allow users to safely*
>
> *store their digital assets online while retaining title to such assets—as opposed to offline*
>
> *in cold storage where they could be subject to loss.*

On their website, Celsius described their services for *all customers* consistently with the Custody ad hoc's definition of Custody, albeit in layman's terms, rather than legal terms, as: a way to "keep **your crypto** safe, without worrying about lost seed phrases." A plain reading of "your crypto" is pretty simple: you (the depositor) hold the title.

**Unjust enrichment creates the impetus for a constructive trust**

With respect to my Earn deposits, and my loan collateral which Celsius returned to me
prepetition, Celsius promised a fiduciary relationship to me, and its depositors more generally,
and it used our coins to unjustly enrich executives, and the company, writ large. Our coins are
now scattered, from bitcoin mining machines in Texas, to Mr. Mashinsky's New York penthouse,
and they need to be reclaimed.

In New York, "a constructive trust may be imposed when property has been acquired in such
circumstances that the holder of the legal title may not in good conscience retain the beneficial
interest." [See *Sharp v. Kosmalski,* 40 NY2d 119 [1976].]

Constructive trust is "the formula through which the conscience of equity finds expression," and
thus "[w]hen property has been acquired in such circumstances that the holder of the legal title
may not in good conscience retain the beneficial interest, equity converts him into a trustee."
[See *Simonds v. Simonds,* 45 NY2d 233 [1978].]

In *Kliban v. Vishnev,* 2019 NY Slip Op. 30150(U), a constructive trust was imposed over the
proceeds of a fraud that had been dissipated. Meaning that, not only are these coins our
property, but, I believe that the proceeds from our coins, such as mining machines, transfers to
executives, and other improperly disposed of property should be returned to depositors after
discovery and an investigation.

As just two examples, I believe that Celsius executives engaged in fraud (in the case of Alex
Mashinsky), aiding and abetting fraud (in the case of Rod Bolder), and that property of Earn
customers under their control should be held in constructive trust as the property of the estate.
According to *Kliban v. Vishnev:*

*The elements of a cause of action sounding in fraud are a material misrepresentation of an existing fact, made with knowledge of the falsity, an intent to induce reliance thereon, justifiable reliance upon the misrepresentation, and damages" [Mitchell v Diji, 134 AD3d 779, 71:!0 [2d Dept 20 I 5]]*

*The elements of a claim for aiding and abetting fraud are the existence of an underlying fraud, knowledge of the fraud on the part of the aiding and abetting party and substantial assistance by the aiding and abetting party in achieving the fraud [Matter of Woodson (Clarke), 136 AD3d 691, 693 [2d Dept 2016]]. "Substantial assistance exists "where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated" [Stanfield Offshore Leveraged Assets, Ltd v Metro. Life Ins. Co., 64 AD3d 472, 476 (1st Dept 2009)].*

In addition to all of the claims under New York property law, non-accredited investors U.S. such as myself were prohibited from depositing new coins into the Earn product on April 15, 2022. Yet, both deposits, and loan collateral (including loan collateral that I signed an agreement regarding saying the coins were my property and that my collateral would be returned to be upon repayment) was somehow stored in an Earn account by the Debtor.

Please do the equitable thing and do not allow coins that should be held in trust for Earn customers such as myself to be dissipated until more discovery is completed and legal arguments are developed. ***Let's shift the focus onto bringing more assets into the estate, and a reorganization plan, rather than letting anything out of the estate, for right now.***

## Questions remain regarding Celsius' Custody program

It is not in dispute that Custody and Withhold assets ***are not*** likely property of the estate.

The problem with releasing these deposits now, however, is that I believe that Earn deposits and loan collateral likely *are not* estate property either, and now, I've shown how programs *are likely* commingled to a hopeless degree. Either all, most, or many depositors are similarly situated based on the facts and circumstances, and there are not enough coins to go around. I think a challenge for this court going forward will be figuring out if *all* deposits are customer property, or if only some are.

It is not disputed that the Custody program was created in response to interactions with regulators, rather than as a business strategy of the Debtor. "The Custody Service was created following adverse actions taken against the Debtors by state securities regulators *that jeopardized the Debtors' ability to continue to operate their business.*" [Custody Adversary Proceeding Complaint, D.R. 662.]

From what we know so far, the Custody program consists of a "workspace" in Fireblocks. ["Declaration of Shiran Kleiderman," D.R. 812]. A workspace, according to the declaration contains multiple digital wallets. So far, so good: segregated wallets in a segregated workspace. However, do we know where the coins in these wallets actually come from, and how often reconciliations were done, or if all transactions were reconciled?

According to Exhibit C, Custody balances for ETH, at a bare minimum, were topped up during "The Pause," presumably using assets from other sources (likely, Earn depositors' funds, which were trapped in DeFi–decentralized lending–contracts which had to be "unwound.") It certainly looks nothing like a "run on the bank," in the custody side of wallet, but, rather a dissipation of assets from Earn to Custody to "fill up" the wallet.

Remember, Your Honor, Custody was only around for 89 days–and one key question is whether the Custody service actually had proper separation from the Earn service day to day, including during busy periods with heavy withdrawals. So far, the limited evidence that we have indicates that it did not.

**Commingling of coins with respect withdrawals, and short term storage, needs to be examined**

One of the primary functions of Custody was as a "pass through" account, rather than a storage account. Specifically, in the United States, **only Custody** assets could be withdrawn from the platform–to hardware wallets–on and after April 15, per Celsius terms of Service.

The terms of use state that a user can withdraw via 2 methods, "(i) transfer to a Custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets" [See D.R. 393, *Declaration of Alex Mashinsky*, page 550]

For United States users, the **only** withdrawal option available for Earn customers was, in reality: "(i) transfer to a Custody Wallet." And for international users, the **only** withdrawal method was "(ii) a complete or partial withdrawal of Eligible Digital Assets."

Any external withdrawals to a hardware wallet, or another exchange, would have to "pass through" Custody first for all United States customers–in the 2-step process that I outline below.

> **Step 1:** A customer withdraws, or moves, their coins from Earn to Custody. This had to be done one coin at a time, manually, by the depositer. (Doing this should have resulted in those in crypto assets being moved from the Earn Workspace in Fireblocks to the Custody Workspace in Fireblocks, at the time of withdrawal.)

**Step 2:** A customer then withdraws their coins from Custody to their hardware wallet, in a second transaction. (This should have resulted in those crypto assets being moved from the Custody Workspace in Fireblocks, to the end user's hardware wallet–or, perhaps, to an intermediary wallet withdrawal wallet first, and then to the customer's hardware wallet.)

Again: If Custody was truly separate from Earn, the mechanical 2-step process above would have to have been followed for all U.S customer Earn withdrawals, and all withdrawals from United States customers to hardware wallets would have needed to originate from the Custody workspace in Fireblocks, and no other workspaces.

Conversely, all non-US customer withdrawals would need to originate from non-Custody workspaces in Fireblocks, since Custody was only available in the United States and Custody assets should not have been commingled with non-custody assets.

A Blockchain analysis submitted by Cameron Crews in his Omnibus Objection, D.R. 914, shows that this was not done in practice. The UCC's or the Examiner's professionals can double check, confirm, and submit more formal versions of the same thing.

If Celsius sent withdrawals from Earn accounts to customers' hardware wallets without going through Custody first–i.e. did not use this 2-step process–it effectively means that Earn and Custody coins were commingled pretty much all the time during the 89 days of the program's existence; U.S. users who were in the process of withdrawing to their hardware wallets were all legally **Custody** customers during that period of time while Celsius was processing their withdrawal (if only for a brief period of time, but sometimes withdrawals went on for days or weeks, or more in unique circumstances).

This court should keep in mind that Custody's "pass through" function may well have exceeded its "storage" function, in practical terms. The raw amount of coins (and value) that "passed through" the Custody program on their way to users' external wallets during the "run on the bank period" in particular, was likely many hundreds of millions of dollars in the final month alone. But more information is needed via discovery and professional analysis to know for sure.

Questions that are still unanswered include:

1. During the "run on the bank" period when around $1 billion was withdrawn in 1 month, was Custody underfunded or insolvent for periods of time? To determine this, I believe, we must measure the required balance daily for the Custody workspace to be solvent as: 100% of Custody deposits that are on deposit + 100% of pending Earn withdrawals not yet in the mechanical process of withdrawal to end users' wallets (but that had been withdrawn from Earn to Custody as step 1 in the 2-part analysis above).

2. If Custody was periodically insolvent and later "topped up" from Earn assets, what does that mean legally? What if assets were commingled and the risks for Custody and Earn users were essentially the same?

3. Do we know how often *per-coin* wallets were "topped up" from the Earn side of the balance sheet, to make sure there were "enough" coins in Custody, as balances swelled? The declaration was not specific as to frequency.

4. Does blockchain analysis show that Custody was *consistently* funded *with the correct coins in the correct amounts* and somewhat overfunded *with regards to each specific coin*?

5. When historical daily balances during the 89 days that the Custody product existed are compared to transactions on the blockchain, what does it show?

6. We already addressed the possibility that Earn coins were directly paying out Custody withdrawals in the U.S. during the withdrawal process. Did coins move the other way, as

well? When Earn withdrawals from international users surged during the "run on the bank," did Celsius ever pay out depositors from the Custody workspace due to insolvency issues or for the sake of convenience (i.e. to "rebalance" the accounts via paying out funds)?

7. How were loan repayments handled in the context of all of this?

8. Did Custody primarily serve as a "soft withdrawal" option in the final days and weeks, rather than for: safekeeping of their assets as an alternative to hardware wallet storage and a compliant product for U.S. non-accredited investors?

9. Were assets ever marked as in "Custody"--but were unavailable or unaccounted for on the correct blockchain, because they were in DeFi contracts, Wrapped Bitcoin, GBTC (Grayscale Bitcoin Trust), coins that didn't match deposits, or other assets that are not 1:1 like-kind with deposits?


While we have some limited information to go on, I do not believe the Declaration of Shiran Kleiderman [D.R. 812], especially in light of the Omnibus Objection of Cameron Crews [D.R. 914], is a substitute for more discovery and the fact-finding that examiner has already been asked to do by this court, not to mention possible scope expansions that may be warranted as more information comes to light. See Exhibit C for an analysis of 2 Custody Wallets, one for Ethereum and one for USDC, which shows an increase in balances in Custody **after** "The Pause."


### Closing argument

This objection is not meant to exhaustively prove that the contract was modified and how it was modified. It is merely to demonstrate that:

1. There is a reasonable basis under New York law to assert that Celsius created a fiduciary relationship with Earn depositors that went far beyond their latest Terms

and Conditions, and that ***our deposits should not be considered property of the estate until this court reviews the facts.***

2.   There is a reasonable basis to assert that people like me who had loans, paid them off, and received our collateral back have a different contractual relationship with Celsius than plain-vanilla Earn customers, because our executed loan contracts modified our Earn contracts by certifying that we were the **sole owners** of our deposited collateral; such treatment remains even after loan repayment, thus we retain property rights to our returned collateral (while Celsius retains only bare title), and we are entitled to a return of our collateral under 11 U.S.C. § 541(d).

3.   We are learning more about commingling between Custody and Earn via the examiner order.  The facts need to come out.

4.   If all coins are ruled to be customer property, the only fair solution is *pro rata* distribution denominated *in kind* along with efforts to recover dissipated and transformed property outside of the estate for the benefit of depositors.

5.   We need more information about how Custody did, or did not, serve as a "pass through" account, vs a storage account, for U.S. customers.

6.   Many depositors who may not be represented by a current *ad hoc* configuration nonetheless have excellent property rights arguments with respect to our coins. What are we going to do about that?

I wish Custody customers, Withhold Customers, and all Celsius customers, the best in reclaiming our property. However, returning Custody and Withhold assets before the examiner's report is released potentially deprives Earn customers of a return of ***our*** property. It ignores those who have not retained counsel to hire an *ad hoc* but have colorable claims regarding our property, such as those raised in this objection. Setting the stage to have Earn coins declared

*not customer property* gives us a potentially worse recovery regardless of what happens with other types of deposits, and less rights in this case, and it is premature.

**<u>Objection, Request for Information and Reservation of Rights</u>**

**The forgoing filings should be DEFERRED and quite possibly CONSOLIDATED into a broader, more comprehensive look at property rights and contracts across all Celsius programs.**

Today, I am asking you to order defer judgment while the examiner examines, and the UCC gathers more information, and to help me gain discovery on my own situation and the situations of those similarly-situated, including access to any discovery by the UCC and cooperation with the Debtor in my discovery requests.

In particular, I want to know:

1. If similarly-situated customers who paid off their loans after April 15 had their coins returned to Earn–or, if some had their coins returned to Custody or Withhold accounts. If there is any disparate treatment, I want to know what the Debtor asserts that the contractual and legal basis for any difference in treatment is.

2. Whether starting on April 15, 2022–when the Custody service launched–Celsius properly separated its programs insofar as initiating 100% of withdrawals for U.S. customers via the Custody workspace in Fireblocks. In addition to discovery and/or declarations from Celsius staff, additional Blockchain analysis is needed to confirm what took place.

3. I would like a copy of all materials related to the decision to "grandfather in" non-accredited U.S. customers to Earn customers on April 15.

4. I would like a copy of all versions of "settlement notices" that were sent to loan holders who paid off their loans under the "Early Repayment" clause of the loans contract to be filed with the court (if those have not already been provided.)

5. I would like to request copies of legal opinions, memoranda, and discovery that the UCC may have, or may create, with respect to the property claims of earn customers and whether they are Customer property, so that I may prepare my case without unnecessary duplication of resources.

6. I would to request that you order the Debtor to file a copy of all original (unedited) videos and all written content that Celsius has taken down during The Pause and postpetition. On information and belief, Celsius has been redacting and removing certain videos pre- and postpetiton, and taking down postings (including the BlockFi posting). [See: Letter to Re: Stop Celsius From Deleting Content And Muzzling Customer Voices, D.R. 202.] I ask you to order the Debtor to submit to this court a secure public data repository that contains all unredacted videos that have been edited or removed by the Debtor, and all posts that have been taken down, so that fraud and constructive trust claims under New York law can be pursued by creditors.


Finally, I am asking you to consider these issues (but not necessarily rule on them at this time):

1. How should this court mediate claims like mine? Perhaps, as in *Enron,* the examiner (or alternatively, the UCC) may serve as a good mediator between classes of creditors. I believe that due to an extreme level of misrepresentation, a high number of unique situations and corner cases, and gross mismanagement and disorganization by the Debtor, Creditors must acknowledge that the discussion starts, but does not end, with the written contracts we signed (and we must also acknowledge that some of us, like me, signed multiple contracts which contradicted each other). So, can we pursue "rough justice" as the UCC put it in a recent Town Hall, rather than litigating every last claim?

2. Discovery on my situation and the situations of those similarly-situated, and other corner cases, may be more efficient if consolidated rather than done one creditor at a time. Every week or so, I hear of a new situation. This court is will soon hear about "suspended" accounts. Soon, I believe liquidated loan holders who could not prevent liquidation during The Pause may present their case. Ideally, such discovery would be conducted by the UCC and/or the examiner to centralize fact-finding and help drive us to a resolution. How can we make the voices of creditors heard, work through enormously complex issues, and reach a fair resolution?

3. I would like to ask Your Honor to consider (but not decide right now) if there is a path forward such as declaring all depositors' coins to be customer property, along with substantively consolidating Celsius entities, so we can bring the focus back to where it should be–on restructuring–and bringing more assets back *into* the estate, which is in the best interests of all Creditors.

As a *pro se* filer, I have the advantage of just plainly stating some things, so I will state directly that I think substantive consolidation and a ruling that all deposited coins are customer property would likely be the best way to go here and go a long way toward getting us out of this mess. The representations Celsius make to its depositors make such a determination very justifiable in my view, based on the facts and circumstances, and in many ways, such a ruling would give us a fresh start and let us move forward.

All Celsius depositors were wronged, Your Honor. With 300,000 creditors in this case, outlining all of our stories, and situations, and the contracts we all signed, is impossible. I am concerned, about the Debtor's strategy to encourage creditor groups to fight amongst each other to litigate every last coin, and that doing so may simply deplete what remains, distract us from claims outside the estate, and make even those who partially "win" a little bit more in the end, lose.

While I earnestly hope that creditors can resolve our claims amicably and fairly, in light of these filings, I am asserting all rights to fight for my property today. I reserve the right to further object to the foregoing matters and to raise additional arguments in the future, either with respect to my individual situation based on my loan contracts, or with respect to the Earn program generally, and to object or intervene as a party in interest to assert the property rights to which I believe I am entitled.

Thank you, Your Honor.

Dated: September 29, 2022
Washington, D.C.

 */s/ Immanuel Herrmann*
Immanuel Herrmann
*pro se creditor*

# Celsius Network is Nothing Like BlockFi. Here's Why.

"Imitation is the sincerest form of flattery." — Charles Caleb Colton



Celsius Network    Follow
Mar 12 · 8 min read



Celsius Network was founded by an innovative team with a simple idea: financial services should only ever act in the best interest of their community. It's a vision we've kept and will continue to promote as our community grows and as competition increases. While other companies slowly enter this space hoping to disrupt the system and decentralize the big banks, it's absolutely vital that depositors understand where they are putting their funds, and what each company is promoting behind the scenes.

If a company isn't able to explain their business model or vision in clear and simple terms, it's a red flag that something *quite* isn't right. Our team is hard at work acting in your best interest; and like our team, our business model is also straightforward and transparent.

Through our platform, individuals and businesses are able to secure crypto-backed dollar loans starting at 4.95% per year, and crypto HODLers can create interest-earning accounts at rates up to 7.5% (7–10 times more than banks pay). We lend our community's assets to crypto exchanges and hedge funds looking to borrow coins. Up to 80% of all profits generated are given back to the community in the form of weekly interest which is distributed directly to our coin depositors. When we earn more, our community earns more, and THAT is doing what is in your best interest.

When BlockFi announced their new interest-earning accounts last week, many were quick to compare their services to the services offered by us at Celsius Network, but when you take a closer look, such comparisons don't hold up.

In the interest of the crypto community, I want to offer some advice I've learned from my own experience by sharing some *potential* red flags with the new BlockFi interest-earning accounts. It's easy to assume their promise of high interest rates is a move that acts in the best interest of the community, but underneath this, it looks like it might just be a covert means to attract attention and increase profits for their shareholders and investors. Here's why...

## 1. They might not accept responsibility if they don't act in your best interest.

BlockFi is more than willing to collect your crypto, but depositors should know BlockFi not *exactly* willing to accept responsibility if anything happens to it (even at their own expense). From BlockFi's terms of use:

> *"BlockFi and our third party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of deposits and withdrawals of cryptocurrency either temporarily or permanently. BlockFi is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of deposits or withdrawals."*

In case there was confusion the clause above, they go on to state, "These Terms and the deposit relationship do not create a fiduciary relationship between us." In simpler terms, BlockFi is not bound to have a legal or ethical relationship with its depositors.

As the CEO of Celsius, I cannot imagine defining such an untrusting relationship between our community and our company. If you're interested, I encourage you to read our own terms and conditions to see how we are acting in your best interest.

## 2. Their "compound interest" is essentially a way to charge withdrawal fees.

Over the years, banks have used "compounding interest" as a tool to entice individuals to deposit with their institution over the competition. It also incentivizes individuals to deposit more money as banks are likely to project higher returns on larger amounts over long periods of time—typically forecasted for 5, 10, or even 40 years. In both cases, compounded interest presents much greater advantages for the banks (and their shareholders) than it does for the depositors.

BlockFi recently announced they will be offering depositors compounded interest paid out monthly at rates of 6% with an annual yield rate of 6.2%. While it may sound exciting on the surface, the reality is that 0.2% compounded over 12 months isn't much to write home about—especially when you read the fine print from BlockFi's Terms of Service which states, "If you withdraw any assets from your Crypto Interest Account prior to the last calendar day of the month, you will incur an early withdrawal penalty equal to the amount of interest accrued during that month on the assets withdrawn."

So if you want to withdraw your funds during any of the other 29 days of the month, BlockFi uses your compounded interest as payment just so you can access your own money. Celsius does not charge any fees, there are no early termination penalties, and you'll never find a hidden "gotcha" clause.

## 3. Their interest rates are subsidized by their VCs.

One of the most alarming aspects of BlockFi's new interest-earning accounts is how they are funding their 6% interest rates and their extra 0.2% of compounded interest. In December, BlockFi CEO Zac Prince stated that their interest rates "will fluctuate and be subsidized in effect by our venture investors." So, if BlockFi's VCs ever choose to stop funding the project, it's possible that those rates could crash and burn harder than 2017.

Celsius is transparent with how our rates are determined; the process was built from the ground up to maximize return for our depositors. Our rates are subject to change on a weekly basis as they are calculated by the weekly demand for each coin combined with our promise that up to 80% of our profits are returned to the depositors. The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise.

## 4. They require a minimum for deposits and withdrawals.

If a financial institution requires customers to deposit a minimum amount, they see you as a dollar sign rather than as an individual worthy of financial independence. Why should the amount of money you have determine if you're able to earn interest on that money?

Celsius Network's mission is to bring the next 100 million people to the blockchain, and chances are 90% of them will have less than $500 to invest in crypto. We have no minimum requirement to create an account and make a deposit because our large depositors subsidize the small depositors. BlockFi requires a minimum of 1 BTC or 25 ETH to open an account with them, proving that crypto adoption and growing the community is not their core mission.



BlockFi also requires a minimum amount deposited before any withdrawals can be made. Their terms of service state, "If you are making a partial withdrawal, your Crypto Interest Account must retain a minimum deposit after your withdrawal has been processed that is greater than or equal to the Minimum Balance to continue earning interest."

So there's a minimum amount required to open an account and a minimum amount required to be left into your account just so you can access your own funds. You will not find any restrictions at Celsius; you can deposit and withdraw any amount at any time and you'll continue earning on the balance left in your account.

## 5. Your funds could get locked up, and you could be left waiting in the cold for quite some time.

On the surface, BlockFi boasts its commitment to transparency. A closer look at the fine print listed in their terms of service would suggest otherwise. For example, you could get locked out from your funds with withdrawal limits as they state, "Withdrawal limits based on frequency may apply from time-to-time and will be described in your Crypto Interest Account interface." They also note, "BlockFi reserves up to 7 days to process a client fund withdrawal." Based on how fast the cryptocurrency world moves, 7 days is an awfully long time to wait for approval to access your own money.

Unlike Celsius Network, which pays interest every Monday to our community, BlockFi doesn't exactly guarantee that same level of timeliness. "We will credit your Crypto Interest Account with the interest earned within five business days of the end of each calendar month." That difference of getting your money every week may actually be more than the compounding interest they offer you.

## In the end, go with what feels right.

I am a firm believer that competition is essential for innovation to flourish and I encourage companies to follow in our footsteps. Our goal is to level the financial playing field for all individuals by providing services and solutions that are fair and democratized rather than trying to increase profits for the 1%. At this stage, BlockFi is not doing enough for the cryptocurrency community to be compared to Celsius. If we want to take the power from the banks and give it back to the people, we need to support a platform that was designed to do just that from the ground up with a team proven to execute and scale.

From creating VOIP so voice calls will be free (over 3.5 billion people use VOIP) to bringing free LTE + WiFi to the NYC subways, I am proud to have a 30-year history of disrupting the "status quo" by taking power away from big businesses—like phone companies and governments—and bringing it back to the community to make the world a better place. When was the last time you paid for a local or international call? Soon we'll be asking the same question about paying bank fees or earning less than 5% in interest on our money. Celsius Network created MOIP (Money Over Internet Protocol)—my way of disrupting the banks and bringing the power of money back to the people, and it's nice to finally see that other financial institutions are starting to get the message and have tried to build platforms that are focused on the community as well.



## P2P = Power To The People

© 2018 Celsius Network Confidential

Help us grow the community by joining Celsius and spreading the word and your coins (try our CelPay service)! Together we can change the world and make it a better place. There is nothing better than feeling your existence on this planet matters and you can help make the world a better, more fair place.

## P.S. — Check out how every year there are fewer banks and less interest earned. Time for a revolution, no?



## About Celsius Network

Celsius Network is a democratized interest income and lending platform accessible via a mobile app. Built on the belief that financial services should only do what is in the best interests of the community, Celsius is a modern platform where membership provides access to curated financial services that are not available through traditional financial institutions. Crypto holders can earn interest by transferring their coins to their Celsius Wallet and borrow USD against their crypto collateral at interest rates as low as 5% APR.

Download the Celsius Network app and start earning interest on your crypto today ➡️ celsiusnetwork.app.link

## Stay Connected!

Follow Celsius Network on Facebook, Twitter, Telegram, LinkedIn, Reddit, Instagram, and YouTube.

**Exhibit B**



Celsius

Jun 8 ·
4 min
read
·

▶ Listen

# Get to Know Rod Bolger, Chief Financial Officer, Celsius



Rod Bolger, Chief Financial Officer, Celsius

Have you met our CFO, Rod Bolger, yet? We asked him a few questions to get to know him better.

**What were you working on before you joined the Celsius team?**

Prior to joining Celsius earlier this year, I spent more than 10 years at

the Royal Bank of Canada, most recently as its Chief Financial Officer. Before that, I was Chief Financial Officer for four different businesses of Bank of America. I also spent several years at Citigroup and PwC.

**You took your post as Chief Financial Officer on February 14. What drew you to Celsius?**

Having spent my career in traditional finance, I wanted to be part of bringing new technology and the next generation of financial services together in a new marketplace — digital assets. It's important to me that we reduce barriers for people to enter into financial service markets. As a proven leader in the space with significant backing, liquidity, and an incredibly exciting growth trajectory, I knew Celsius was the right home for me. Here, we are surrounded by many of the brightest minds shaping the industry.

**What stands out to you about Celsius?**

I was happy to see that Celsius was already focused on the elements I'd expect in a best-in-class financial institution. Even without the same regulatory framework yet enacted, many of those elements were already in place when I joined. The company's strong liquidity framework, established practices around liquidity data, and modeling were elements that I was happy to find similar to other large financial institutions. This put us in a strong position to weather the recent market turbulence and ensure that clients who needed to access their digital assets could get them free and clear.

On top of that, we had one of the most significant Series B fundraising rounds in the fintech and crypto markets — Celsius has strong backing from institutional investors that provide support both financially

and through their operational
expertise. This sets us apart and
affords us the ability to continue to
invest in technology and emerging
areas that meet the needs of our
customers.

But what truly stands out is customer
loyalty, a.k.a. the Celsius
Community. Our community truly
believes in crypto and in what we're
doing. We have a large user base with
over $10 billion in assets on our
platform. We take pride, and a lot of
care, in being ahead of all others in
this space.

**Celsius is committed to being the
company people can turn to in times
of market turmoil. What enables
Celsius to maintain strength amidst
such extreme volatility?**

Our users and our community come
first. I work closely with teammates
across the company, from Risk,
Security, Technology, Operations,
Treasury, Compliance, Finance,

Get started    Sign In

Search



**Celsius**

8.5K Followers

Earn, borrow, and pay on the
blockchain.

Follow

**More from Medium**

  in Au...

**Bitcoin
HODLers
seem to be...**

 Lightning ...

**Number of
People Go
Up, or Bitco...**



Regulatory and Legal; they ensure we are making decisions based on real-time updates.

The recent events surrounding LUNA/UST were a prime example of our team prioritizing our users and the safety of the assets. As we do with any platform or protocol deployment, we carefully evaluate the risks and merits based on market conditions and the information available. As always, our customers are our top priority. Celsius' Deployment and Risk Management teams are vigilant in reacting appropriately to changing market conditions, and once we recognized shifts in the stability of the Luna ecosystem, we moved quickly to ensure the safety of assets on our platform and to protect our customers.

**Celsius identified instability in the Luna/UST peg early, and acted swiftly to protect our customers.** We built a world-class risk management

 A… in Am…

**Digital payments from any…**

Celsius

**There's a Lot to Look Forward to…** 

Help  Status  Writers  Blog
Careers  Privacy  Terms  About
Knowable

team for precisely this reason.
Celsius' Rodney Sunada-Wong, Chief
Risk Officer, shares more here.

Our Risk Management team is
seasoned and has weathered
numerous storms in both TradFi and
crypto. The senior members are
from major financial institutions and
each averages over twenty-five years
of experience in their areas of
expertise — Market, Credit, Liquidity,
and Operational Risk. They worked
hand-in-hand with the Deployment
and Treasury teams to build risk
management tools, make risk
management decisions, and agree on
limits. This teamwork enables us to
handle volatile markets.

### What's ahead for Celsius?

We're in a strong position to grow as
the market recovers. We continue to
build new products that meet the
needs of our ever-expanding user
base.

Providing ease and leading functionality for our customers is at the heart of everything we do. This is what excites me and it's the reason I made the switch from traditional finance to Celsius.

## Exhibit C: Custody wallet balances before and after the pause for ETH and USDC

### Ethereum balances over time



### USDC balances over time

