| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Christopher S. Koenig |
| 601 Lexington Avenue | Dan Latona (admitted *pro hac vice*) |
| New York, New York 10022 | **KIRKLAND & ELLIS LLP** |
| Telephone:    (212) 446-4800 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile:    (212) 446-4900 | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| *Counsel to the Debtors and Debtors in Possession* | Facsimile:    (312) 862-2200 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF
JOSEPHINE GARTRELL IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'
KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Josephine Gartrell, hereby declare under penalty of perjury:

1.   I am a Senior Director at Willis Towers Watson US LLC ("WTW"). In September of 2022, Celsius Network LLC (one of the debtors and, together with the above-captioned debtors and debtors in possession in these chapter 11 cases, collectively, the "Debtors") engaged WTW to provide certain compensation consulting services.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

2. I am a compensation consultant for companies in and out of bankruptcy and am familiar with the prepetition and postpetition structure of the Debtors' compensation programs, including the Debtors' key employee retention plan (the "KERP"), as set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.[2] My team and I assisted the Debtors in developing the proposed KERP and advised them on, among other things, sizing, participation considerations, and structure of the KERP.

3. I submit this declaration in support of the Motion. Except as otherwise indicated, I have personal knowledge of all facts in this declaration, based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly sized companies, my research into the designs of retention plans approved in comparable chapter 11 proceedings, my significant experience in developing such programs, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the KERP is reasonable, consistent with market practice, and generally consistent with my consulting experience with similarly situated companies that have sought relief under chapter 11. If called upon to testify, I could and would testify competently to the facts and opinions set forth in this declaration.

## Background and Qualifications

4. I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif. I received my Bachelor of Arts in international business from San Diego State University in 1994. After working as an associate at Gibson, Dunn & Crutcher LLP in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

2

as an associate in the executive compensation practice, and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014.  I joined WTW in 2016, where I have been employed since.

5. WTW is an international professional services firm offering a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals.  WTW focuses on two key business segments:  health, wealth, and career & risk and broking.

6. My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation.  I routinely assist public and private companies in various industries with compensation philosophy, pay-competitiveness issues, incentive plan design, and other compensation-related analyses.  I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7. I am highly experienced in executive, management, and employee compensation, having over twenty years of experience in the field.  During my tenure at WTW, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and postpetition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees.  Specifically, I have led or co-led the review and design of key employee incentive plans, key employee retention plans, and other similar plans in a number of chapter 11 cases, including:  *In re Mallinckrodt plc*, No: 20-12522 (JTD) (Bankr. D. Del. Apr. 5, 2021); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. July 1,

2019); *In re FULLBEAUTY Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y.); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex.); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y.); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex.); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del.); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. June 13, 2018).

### WTW's Involvement with the Debtors

8. After WTW was engaged by the Debtors, I familiarized myself with the Debtors' operations, business, and restructuring efforts. At the outset of our engagement, the Debtors, the Debtors' other advisors, and WTW discussed the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs. WTW analyzed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

9. My team and I performed significant due diligence in helping the Debtors develop the KERP and closely collaborated with the Debtors' management and other advisors in reviewing and advising on the same. My team and I were provided information concerning the Debtors' historical compensation structure, recent financial and operational performance, and ongoing restructuring efforts. My team and I also discussed the rationale for the proposed KERP with the Debtors, the Debtors' advisors, and the special committee of the board of directors of Debtor Celsius Network Limited (the "Special Committee"). WTW's primary goal was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant

market data as well as my significant experience in designing comparable programs for similarly-situated companies, including companies in chapter 11.

### KERP Overview

10. The KERP provides fixed cash payments in three installments to select non-insiders[3] who I understand are essential to the Debtors' ongoing operations and pose significant retention risks during the pendency of the Debtors' chapter 11 process. The aggregate maximum award under the KERP is approximately $2.76 million, which may be allocated to certain key non-insider employees, as well as $200,000 in a KERP Reserve Pool.

11. The key terms of the KERP are as follows:

- ***Participants***: Limited to sixty-two non-insider key employees who will remain with the go-forward business, or approximately twenty-three percent of the Debtors' current workforce. Each Participant is a critical employee that performs, among other things, accounting, finance, engineering, compliance, legal, human resources, and other critical functions for the Debtors.

- ***KERP Awards and Payment Dates***: KERP awards represent fixed cash payments, payable as follows: fifty percent of payment paid on date of execution of the retention agreement ("KERP Effective Date"), subject to a clawback for termination for any reason other than without cause prior to the date that is six months following the Effective Date; twenty-five percent payable upon earlier of: nine months from the Effective Date or confirmation of a chapter 11 plan; and twenty-five percent payable upon the earlier of the first anniversary of the KERP Effective Date or confirmation of a chapter 11 plan based on continued employment of the Participant through the applicable payment dates (except as provided below). KERP awards are equal to thirty-five, twenty-five, or fifteen percent of the Participant's annual salary depending on whether the Participant is identified as most critical (thirty-five percent of base salary) or a Tier Two or Tier Three level of criticality, which would pay twenty-five and fifteen percent of such Participant's base salary, respectively.

---

[3] Based on my experience and discussions with the Debtors' advisors, I understand that an "insider" for purposes of the KERP refers to the definition under section 101(31) the Bankruptcy Code and that no Participant in the proposed KERP is an employee who: (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. My understanding is that, as a result, none of the Participants is an "insider" under the Bankruptcy Code.

5

- ***Termination of Employment***:  If a Participant voluntarily terminates employment or is terminated for cause prior to the end of the clawback or retention period, the Participant will be required to repay on an after-tax basis, any amounts subject to clawback and forfeit any unpaid KERP award.  If a Participant's employment is terminated due to death, disability, or by the Debtors without cause prior to the end of the clawback or retention period, the clawback will be waived and unpaid retention amounts will vest and be paid.

### Analysis of the KERP

12. In assessing the reasonableness of the KERP, I worked with my team to analyze the retention plans authorized and approved in the chapter 11 cases of the following twenty-six similarly-sized companies (the "Comparison Group") that filed chapter 11 petitions from 2017 through 2021 and had approximate prepetition annual revenues of $375 million to $1.5 billion: Aceto Corporation; AcuSport Corporation; Appvion, Inc.; Bristow Group Inc.; Brookstone Inc. (2018); Celadon Group, Inc.; Charlotte Russe Holding, Inc.; Ciber, Inc.; Claire's Inc.; Cloud Peak Energy Inc.; Fairway Group Holdings Corp.; FTD Companies, Inc.; Gander Mountain Company Inc.; Gordmans Stores, Inc.; Gymboree Group, Inc.; Ignite Restaurant Group; Legacy Reserves Inc.; Marsh Supermarkets; Nine West Holdings, Inc.; PHI, Inc.; RadioShack (General Wireless); RTW Retailwinds, Inc.; The McClatchy Company; Tuesday Morning Corporation; and Welded Construction, L.P.

13. In conducting this analysis, I also relied upon my significant consulting experience in the research and design of key employee retention plans generally at dozens of other companies.

14. The structure of the KERP comports with my general experience and the findings of my review of retention plans approved in similarly-sized companies.  Based on my experience, I also believe that when a reorganizing debtor lacks material prepetition non-equity incentive programs for critical employees (as is the case here), a cash-based KERP will align a debtor's compensation program with the prevailing market while in chapter 11.  Based on my experience, similarly-sized companies operating in the financial services, technology, or general industry

would not offer only base salaries as the sole form of compensation, and it is my opinion the Participants would very likely receive incentive opportunities should they leave the Debtors for other jobs. I note the following observations:

- No 2022 KERP Participant is an insider;

- The retention awards are limited to a subset of critical key employees whose continued employment is necessary to preserve and maximize the value of the Debtors' estates;

- The use of fixed cash retention payouts, expressed as a percentage of salary, is common in key employee retention plans;

- The retention awards expressed as a percentage of salary (*i.e.*, thirty-five, twenty-five, and fifteen percent for Tiers one, two, and three, respectively) are generally consistent with awards in comparable key employee retention plans;

- The installment payout feature is consistent with market practice as thirty-eight percent of key employee retention plans reviewed by WTW provided awards through installments;

- Companies providing for installment payments frequently provide for initial awards with a clawback and subsequent installment payments (*e.g.*, initial award representing a portion of the total award with a corresponding clawback and subsequent installment award(s) which make up all or a portion of the remainder of the total retention award value); and

- Accelerated vesting and payment of retention awards is common in the event of an involuntary termination.

15. My team and I also reviewed the annualized total cost of the KERP, which is consistent with other key employee retention plans analyzed by WTW.

| Plan Design | Celsius | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group | 90th Percentile in Comp. Group |
|---|---|---|---|---|---|
| Total Cost ($mm) | $2.760 M | $1.1 M | $1.5 M | $2.7 M | $4.4 M |
| Cost per Participant | $44,523 | $27,300 | $52,500 | $55,800 | $103,000 |
| Cost as a Percentage of Revenue | 0.37% | 0.16% | 0.22% | 0.32% | 0.39% |
| Cost as a Percentage of Assets | .06% | 0.17% | 0.30% | 0.55% | 0.88% |

16. Based on these cost analyses, I observed that the Debtors' KERP opportunities per participant generally were positioned, on average, between the twenty-fifth percentile and median of the market. Given this relationship, I believe the KERP opportunities are reasonable and appropriate in light of competitive market practice. Based on the market data my team and I reviewed, and my significant experience with postpetition non-insider retention programs in other matters, the structure of the KERP is also generally consistent from a key design perspective (such as the frequency of payments, participation levels, and use of cash) of similar non-insider award plans approved on a postpetition basis.

## Conclusion

17. Based on my education and my experience in these and in similar chapter 11 cases, I believe that the design, structure, cost, and award opportunities available under the KERP are reasonable given the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

| | |
|---|---|
| Dated: October 11, 2022<br>New York, New York | By: */s/ Josephine Gartrell*<br>Name:  Josephine Gartrell<br>Title:  Senior Director<br>Willis Towers Watson US LLC |