Dennis F. Dunne
Nelly Almeida
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 660-5219

Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

Joshua M. Mester (admitted *pro hac vice*)
**JONES DAY**
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Tel: (213) 489-3939
Fax: (213) 243-2539

*Counsel to CDP Investissements Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### REPLY IN FURTHER SUPPORT OF THE REQUESTING HOLDERS' MOTION FOR ENTRY OF AN ORDER DIRECTING APPOINTMENT OF AN OFFICIAL PREFERRED EQUITY COMMITTEE

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

## Table of Contents

**Page**

Preliminary Statement ................................................................................................1

Reply ........................................................................................................................5

   I.     Preferred Equity Holders Are Not Adequately Represented ...........................5

         A.     No Party In The Cases Represents The Interests Of CNL's Preferred Equity .................................................................................................5

         B.     The Requesting Holders And Their Counsel Do Not Provide Adequate Representation For Other Preferred Equity Holders ........................................8

   II.    CNL Is Not Hopelessly Insolvent .................................................................9

         A.     CNL Is Not Liable For Customer Claims.......................................................11

         B.     The Purported Intercompany Claim Against CNL Is Highly Dubious...........13

   III.   The U.S. Trustee Does Not Oppose Appointment Of An Official Preferred Equity Committee .........................................................................................14

Conclusion ..............................................................................................................15

## **Table of Authorities**

**Cases**                                                                                                                    **Page(s)**

*In re Ampex Corp.*,
    No. 08-11094 (AJG), (Bankr. S.D.N.Y., May 9, 2008) ...........................................14

*In re Eastman Kodak Co.*,
    No. 12-12020 (ALG) (Bankr. S.D.N.Y. Apr. 5, 2012)...........................................14

*In re Eastman Kodak Co.*,
    No. 01-16034, 2012 WL 2501071 (Bankr. S.D.N.Y. 2012)...............................5, 10

*In re Edison Bros. Stores, Inc*,
    No. 95-1354 (PJW), 1996 WL 534853 (D. Del. Sept. 17, 1996)...............................5

*In re Innkeepers USA Trust*,
    No. 10-13800 (SCC), (Bankr. S.D.N.Y. Sep. 21, 2010)...........................................14

*In re Kalvar Microfilm, Inc.*, 195 B.R. 599 (Bankr. D. Del. 1996) .......................................8

*In re Spansion*, 421 B.R. 151 (Bankr. D. Del. 2009).............................................................8

*In re SunEdison Inc.*, 556 B.R. 94 (Bankr. S.D.N.Y. 2017)..................................................10

*In re Tronox, Inc.*,
    No. 09-10156 (ALG), (Bankr. S.D.N.Y. Apr. 3, 2009 )...........................................14

*In re Williams Commc'ns Grp., Inc.*,
    281 B.R. 216 (Bankr. S.D.N.Y. 2002)......................................................... 6, 10, 14

*In re Voyager Digital Holdings, Inc.*,
    No. 22-10943 (Bankr. S.D.N.Y. Oct. 3, 2022) ......................................................15

Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Requesting Holders" and, together with the other holders of CNL's preferred equity, "Preferred Equity Holders"), as beneficial holders, or investment advisors or managers of beneficial holders, of Series B Preferred Shares issued by Celsius Network Limited ("CNL" and, together with its affiliated debtors in possession, the "Debtors"), hereby reply to (i) *Debtors' Objection to Motion For Entry of an Order Directing The Appointment of an Official Preferred Equity Committee* [Dkt. No. 1045] ("Debtors' Objection") and (ii) *The Official Committee of Unsecured Creditors' Objection to The Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, And CDP Investissements Inc. For Entry of an Order Directing The Appointment of an Official Preferred Equity Committee* [Dkt. No. 1048] ("UCC Objection" and, together with the Debtors' Objection, "Objections;" the Debtors and the Official Committee of Unsecured Creditors (the "UCC"), collectively, "Objectors").  In reply to the Objections and in further support of the *Motion for Entry of An Order Directing Appointment of an Official Preferred Equity Committee* [Dkt No. 880] (the "Motion"),[2] the Requesting Holders state as follows:

## Preliminary Statement

1.       The negotiating table has been set and Preferred Equity Holders do not have a seat.  The Debtors have asserted that certain issues critical to determining the recovery to Preferred Equity Holders will be addressed in the short term.  Both Objectors have stated that they are working to maximize recoveries for customers, seemingly without regard for fundamental legal principles or the interests of preferred equity.[3]  Nevertheless, they object to the

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or in the Objections, as applicable.

[3]  *See, e.g.*, UCC Obj. ¶ 18 ("It makes perfect sense for the Debtors to actively engage with the Committee to develop a viable exit from chapter 11 that will result in maximum recoveries to its

Preferred Equity Holders having a fiduciary to represent their interests including on these critical issues.

2.      Objectors make two principal arguments.  First, they argue that CNL's preferred equity is adequately represented because the (i) Debtors seek to maximize value for all stakeholders and (ii) Requesting Holders' mere involvement in these cases constitutes adequate representation.  Second, Objectors argue that the appointment of an Official Preferred Equity Committee is not warranted at this time because the Requesting Holders have not shown a substantial likelihood of recovery for Preferred Equity Holders by proving that the Debtors as a whole are solvent.

3.      Unlike the cases cited by Objectors finding that equity was adequately represented, the existing fiduciaries in these cases are not working to maximize value for the benefit of all stakeholders.  Instead, they are working to *divert* value away from CNL's stakeholders to customers.  This situation is antithetical to the Debtors exercising their fiduciary duties to *all* stakeholders.  By way of example, the Debtors did not consult with or even inform the Requesting Holders before agreeing with the UCC to schedule all customer claims against every Debtor and schedule them as undisputed.  The Requesting Holders learned of that agreement, which directly and adversely impacts Preferred Equity Holders, from an announcement by the UCC's counsel in open court.[4]  If an Official Preferred Equity Committee

---

customers."); 7/18/22 Hr'g Tr. at 14:1-3 ("[The Debtors'] goal is to maximize the value of Celsius' assets for the benefit of our customers."); *see also* 8/16/22 Hr'g Tr. at 28:2-4, 36:14-16, 42:4-19; Second Day Hr'g Presentation.

[4]  Following this announcement, counsel to the Requesting Holders immediately sought a meeting with the Special Committee regarding the Liability Issue (as defined herein) to educate them as to why customer claims do not exist at every Debtor.  Following that meeting, the Debtors filed their schedules indicating in the Global Notes (as defined herein) that they were ceding to the Requesting Holders their duty to object to such customer claims, which duty would exist if the Debtors were working to maximize value for the benefit of *all* stakeholders.

had been in place, the Debtors would have engaged with it in connection with this matter *before* reaching an agreement with the UCC, thus potentially avoiding this confounding decision and the need for time-consuming public disputes. Instead, the Debtors and the UCC are openly adverse, and the Debtors have abandoned their fiduciary obligations, to Preferred Equity Holders.

4.        Objectors also conflate the Requesting Holders' engagement of competent counsel with adequate representation of CNL's preferred equity. The Requesting Holders quickly saw that retention of counsel was of paramount importance for preserving corporate separateness among the Debtor entities. Notwithstanding the Requesting Holders' success in reserving all parties' rights on this issue, such *ad hoc* participation has not given, and will not give, CNL's preferred equity a meaningful voice on the threshold issues that need to be decided to assure a fair resolution of these cases for all stakeholders. An Official Preferred Equity Committee will ensure Preferred Equity Holders are given that necessary voice.

5.        Objectors argue that the appointment of an Official Preferred Equity Committee is not warranted because the Requesting Holders have not shown a substantial likelihood of recovery for CNL's preferred equity, which, they assert, cannot be accomplished until the resolution of certain fundamental legal issues (the "Fundamental Issues"), including, without limitation, whether (i) customers have claims against each Debtor (the "Liability Issue") and (ii) an alleged $9 billion intercompany claim of Celsius Network LLC ("LLC") against CNL (the "Intercompany Claim") is valid and, if so, its proper *quantum*. The relevant question is not, and should not be, *certainty* of recovery, nor is it whether the enterprise is solvent. Whether there is a substantial likelihood of meaningful recovery for ***CNL's preferred equity*** hinges on whether ***CNL*** appears to be hopelessly insolvent.

6.      Moreover, Objectors are surely putting the cart before the horse:  a necessary

prerequisite to a determination of whether there would be a meaningful recovery by CNL's

preferred equity here depends on the prior resolution of the Fundamental Issues.  Therefore,

denying Preferred Equity Holders meaningful and formalized participation in these cases through

a case fiduciary until ***after*** these issues have been resolved is unjustifiable, ineffective, and

unfair.  Without an official committee, with the attendant status and resources, Preferred Equity

Holders will be forced to litigate the Fundamental Issues against two united estate fiduciaries

with one arm tied behind their backs.  This is inefficient and inconsistent with fundamental

bankruptcy principles.  Preferred Equity Holders should not need to come before the Court every

time the Debtors fail to engage with them, while engagement with an official committee would

be required.

7.      The only two objections were filed by the Debtors and the UCC, who have taken

positions adverse to CNL's preferred equity on the Fundamental Issues.  Indeed, the United

States Trustee (the "U.S. Trustee"), tasked with safeguarding the integrity of the bankruptcy

process, has not objected and, in fact, filed a nearly unprecedented statement taking ***no position***

on the Motion.[5]

8.      For the reasons set forth herein and in the Motion, the Objections should be

overruled and the relief requested in the Motion granted.

---

[5]  *Statement of the United States Trustee to Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Dkt. No. 948] at 2, 5.

<u>Reply</u>

**I.      Preferred Equity Holders Are Not Adequately Represented.**

9.      Objectors assert that Preferred Equity Holders are adequately represented because (i) the Debtors are acting on behalf of all stakeholders and (ii) the Requesting Holders have retained competent counsel.  *See* Debtors' Obj. ¶¶ 21-23, 26; UCC Obj. ¶¶ 13-16.  These cases, however, are unlike those cited by Objectors:  in those cases, the case fiduciaries were looking for ways to unlock additional value.  But here, the Debtors and the UCC seek to reallocate value away from Preferred Equity Holders (stakeholders of the Non-Customer Facing Entities) to stakeholders of customer-facing entities.  In taking positions to this effect, the Debtors have effectively abandoned the legitimate interests of CNL's preferred equity.  And the retention of counsel by the Requesting Holders does not equate to "adequate representation" or excuse the requirement for "adequate representation" or else nearly every movant for an equity committee would face that same artificial roadblock.  Simply put, Preferred Equity Holders are not adequately represented in these cases.

**A.      No Party In The Cases Represents The Interests Of CNL's Preferred Equity.**

10.      In arguing that Preferred Equity Holders' interests are adequately represented by the Debtors and the UCC, Objectors cite to cases in which appointment of an official committee was denied, in part, because the equity holders' interests were aligned with those of other constituencies.  In those cases, however, the interests of equity holders were being advanced by other stakeholders' efforts to maximize value, whereas in these cases customers' interests with respect to the Fundamental Issues are in direct conflict with those of preferred equity.  *See, e.g.*, *In re Eastman Kodak Co.*, No. 01-16034, 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012) (emphasizing that "the other constituencies in the case have the same goals as a shareholders' committee"); *In re Edison Bros. Stores, Inc.*, No. 95-1354 (PJW), 1996 WL

534853, at *45 (D. Del. Sept. 17, 1996) (noting that bankruptcy court "refused to find management's loyalties to both creditors and shareholders relevant without specific facts" but "urge[d]" shareholders to put forth additional facts that may warrant change in its position); *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 222 (Bankr. S.D.N.Y. 2002) (finding that UCC had "sufficiently aligned or parallel interests" with equity holders "to preclude the need for an additional committee" because UCC sought to advance same legal arguments).

11.      The Fundamental Issues present questions of allocation, not maximization. Indeed, the Debtors have more than once stated that the Liability Issue is critical and needs resolving. *See, e.g.*, Global Note 2; First Day Hearing Presentation [Dkt. No. 45] at 3 ("Legal issues critical to the outcome of this case include . . . [w]hich Celsius entities do customers have claims against?"); 9/1/22 Hr'g Tr. 53:23-54:5 (explaining Liability Issue is "one of the most important issues that has to be decided in the case"). The UCC has affirmed that its purpose is to advocate for customer recoveries, which necessarily translates to the exclusion of any advocacy for Preferred Equity Holders. *See, e.g.*, 8/16/22 Hr'g Tr. at 42:4-19, 45:20-22.

12.      Because the Fundamental Issues relate to allocation of value, the UCC's positions necessarily oppose those of Preferred Equity Holders.[6] And the Debtors' position was made clear when the UCC's counsel announced that the Debtors had agreed with the UCC to list customer claims as undisputed against every Debtor.

---

[6] The UCC claims that it is aligned with CNL's preferred equity on making leadership changes, investigating potential causes of action, and the marketing process. UCC Obj. ¶ 21. Even on these issues, which are not as outcome-determinative as the Fundamental Issues, it is not clear that such alignment exists. For example, as set forth in the Motion, the Requesting Holders believe that the value of certain assets, such as the mining business, should inure to the benefit of CNL's preferred equity alone. *See* Motion ¶ 4. Moreover, the UCC has never reached out to the Requesting Holders to discuss any of these issues despite the alleged alignment.

13.    Indeed, shortly thereafter, the Debtors granted the Requesting Holders' request to speak with the Special Committee to educate them as to why customer claims do not exist at the Non-Customer Facing Entities.  Requesting Holders' counsel informed them that the Limitation of Liability provision in the Terms of Use expressly carves "Affiliates" out of any liability to customers, and pointed them to a number of other indicators described below supporting the Requesting Holders' position—facts that the Objectors conveniently leave out of their Objections.  Six days later, the Debtors filed their schedules of assets and liabilities, seemingly throwing their hands up on the issue.  The Debtors wrongly scheduled customer claims against every Debtor as "undisputed" and included a note stating:

> The [Terms of Use] are between each account holder, on the one hand, and Celsius Network LLC and its "Affiliates," on the other hand . . . This ***may mean*** that account holders have claims against every Debtor and non-Debtor entity in the Debtors' corporate structure . . . The Debtors believe that scheduling any such claims as contingent, unliquidated, or disputed would inequitably require each account holder to file a proof of claim against each Debtor Entity in order to preserve the rights to the issues to be decided through the Account Holder Claim Ruling.  For the avoidance of doubt, ***it is not the intent of the Debtors to create any presumption that account holders have claims against each Debtor*** entity, as that issue is disputed by certain holders of the Series B Preferred Shares . . . .[7]

14.    In the face of compelling evidence from counsel to the Requesting Holders and after their agreement with the UCC had already been announced publicly, the Debtors purported to remain neutral on the Liability Issue.  Yet, in their Objection, the Debtors assert both that the issue of where customer claims lie "has been disputed by the Series B Holders *and the Debtors*" (Debtors' Obj. ¶ 15 (emphasis added)) and that the Requesting Holders' position "directly contradicts the plain reading" of the Terms of Use (*id.* ¶ 31).  This equivocation on a threshold issue is simply ***not*** adequate representation.  Indeed, by stating that they are not taking a position

---

[7]    *Global Notes and Statement of Limitations, Methodology And Disclaimers Regarding The Debtors' Schedules of Assets And Liabilities And Statements of Financial Affairs* [Dkt. No. 974] (the "Global Notes") (emphasis added).

on the Liability Issue, while making arguments in favor of the UCC's position and flagging their

expectation that Preferred Equity Holders will seek its resolution before the Court, the Debtors

have effectively abdicated any fiduciary obligation to Preferred Equity Holders.  Accordingly, it

is bewildering that Objectors now oppose the appointment of an Official Preferred Equity

Committee while arguing that the current estate fiduciaries will champion the interests of

Preferred Equity Holders.  What is clear from the Debtors' actions to date is that there is no

universe where the Debtors will take a position on the Liability Issue adverse to the UCC.

Consequently, the usual presumption that the Debtors will pay due regard to the interests of

equity is simply not the reality here.

> **B.**     **The Requesting Holders And Their Counsel Do Not Provide Adequate Representation For Other Preferred Equity Holders.**

15.     While the Requesting Holders and their counsel are zealous advocates of their

own interests, an official committee is fundamentally necessary to ensure adequate

representation of all Preferred Equity Holders.[8]  Objectors, well-resourced estate fiduciaries,

seek to fight the Requesting Holders on the Fundamental Issues ***before*** a fiduciary for preferred

equity is appointed.  That defies logic and is a circumvention of Objectors' responsibilities.  It is

for the equitable resolution of these very Fundamental Issues, among other reasons, that an

Official Preferred Equity Committee should be appointed.  Indeed, now is the time for

appointment of an Official Preferred Equity Committee.[9]

16.     Notwithstanding that all parties have acknowledged that the Fundamental Issues

are critical to Preferred Equity Holders' right to pursue recoveries, the Requesting Holders have

---

[8]  Indeed, a Preferred Equity Holder that is not a Requesting Holder filed a joinder in support of the Motion at Docket No. 924.

[9]  *Cf. In re Spansion*, 421 B.R. 151, 164 n. 23 (Bankr. D. Del. 2009) (denying appointment of equity committee in part because cases were so far along that such appointment would serve little purpose); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 599 (Bankr. D. Del. 1996) (noting that timing issue was "one

not received the same level of engagement with the Debtors that would be given to an official

committee, and their efforts to obtain the same have been ignored or frustrated.[10]  A number of

their repeated inquiries as to the purported Intercompany Claim, requests that only the Debtors

can answer, have gone unanswered for weeks on end.  The Debtors list several documents on

which the Requesting Holders commented to demonstrate engagement.  *See* Debtors' Obj. ¶ 12.

The Requesting Holders inserted themselves, uninvited, into discussions of those documents out

of necessity because there was no fiduciary looking out for their interests.  Their limited

comments sought to preserve the Debtors' corporate separateness, including with respect to asset

ownership.[11]  The Requesting Holders fear, based on the Debtors' conduct in these cases so far,

that, unless an Official Preferred Equity Committee is appointed, the Debtors will

inappropriately continue to ignore the interests of Preferred Equity Holders and divert value

away from CNL's preferred equity to customers.

## II.    CNL Is Not Hopelessly Insolvent.

17.    Objectors suggest that to show there is a substantial likelihood of meaningful

recovery for CNL's preferred equity, the Requesting Holders must prove that the Debtors are

---

of the most important factors" where equity committee would be formed only to object to confirmation and litigate valuation).  In contrast, the process of resolving the Fundamental Issues is yet to commence, and, paradoxically, the Debtors assert that the Motion was filed ***too early***.  *See* Debtors' Obj. ¶ 41.

[10] For example, the Requesting Holders' counsel requested to review the revised proposed order on the Debtors' motion for approval of bidding procedures in connection with the sale of substantially all assets [Dkt. No. 929], and Debtors' counsel provided a one-line response:  "When we finalize with White & Case, we will pass along."  *See Declaration of Andrew M. Leblanc in Support of the Requesting Holders' Motion for Entry of an Order Directing Appointment of an Official Preferred Equity Committee* (the "Leblanc Declaration"), Ex. F.  Nevertheless, Debtors' counsel did not provide the revised proposed order until it was filed.  *Id.*, Ex. F.

[11] The Debtors also cite the filing of Substantial Shareholder Declarations by the Requesting Holders.  Debtors' Obj. ¶ 11.  These declarations were filed because they were required by the Court's *Interim Order (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief* [Dkt. No. 58]. This has no bearing on adequate representation.

solvent on an enterprise basis.  This assertion is not supported by case law and turns the standard

on its head.  ***First***, whether there is a recovery for Preferred Equity Holders hinges on the

solvency of ***CNL***, ***not*** solvency of the Debtors' enterprise as a whole.  The solvency of CNL

hinges on the resolution of the Fundamental Issues because, absent customer claims against each

Debtor (including, in particular, CNL) and the purported Intercompany Claim, any value from

the Mining Entities and GK8 flows to CNL such that CNL is clearly not "hopelessly insolvent."

***Second***, case law is clear that the Requesting Holders are not required to definitively ***prove*** that

CNL's preferred equity will receive a recovery or that CNL is solvent—they must only show a

substantial likelihood of that.[12]  As discussed further below, there is more than a substantial

likelihood that (i) customers do ***not*** have claims against each Debtor and (ii) the Intercompany

Claim is invalid.  It follows, therefore, that CNL does not appear hopelessly insolvent and that

there is a substantial likelihood of a meaningful recovery for CNL's preferred equity.

18.    Objectors allege that, in the absence of "definitive documentation showing the

Debtors' solvency," it would not be appropriate for the estates to pay for an Official Preferred

Equity Committee.  *See* Debtors' Obj. ¶ 30.  Again, this argument relies entirely on the cases

where recovery to equity depended on enterprise valuation or was mere speculation.  *See*, *e.g.*, *In

re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220-21 (Bankr. S.D.N.Y. 2002) (noting that

debtors' hopeless insolvency was clear based on their balance sheet, market value, and other

indicia of poor financial conditions); *In re Eastman Kodak Co.*, No. 01-16034, 2012 WL

2501071, at *3-4 (Bankr. S.D.N.Y. June 28, 2012) (same); *In re SunEdison, Inc.*, 556 B.R. at 103

---

[12] The Debtors ignore that their cited cases state that "courts generally do not require exhaustive evidence on solvency before a decision on a motion to appoint an equity committee." *Eastman Kodak Company*, 2012 WL 2501071, at *3 (citing generally *Williams*, 281 B.R. at 221; *Oneida*, 2006 WL 1288576, at *2; *In re Northwestern Corp.*, No. 03–12872, 2004 WL 1077913, at *3 (Bankr. D. Del. May 13, 2004)); *In re SunEdison Inc.*, 556 B.R. 94 (Bankr. S.D.N.Y. 2017).

(noting that "the question of solvency is intertwined with the concept of adequate representation because [solvency] defines the extent of the interests that require adequate representation.").

19.     This case is markedly different.  Whether or not CNL's preferred equity may be entitled to a meaningful recovery does not depend on the overall size of the pie, but rather on how the pie is carved up.  While the Debtors may be insolvent on a consolidated basis, the only entity whose solvency is relevant for the likelihood of Preferred Equity Holders' recovery is CNL, which, as described in the Motion, has no funded debt, is siloed separately from the retail customer-facing business, and owns significant assets, including, but not limited to, GK8[13] and the Mining Entities.

### A.     CNL Is Not Liable For Customer Claims.

20.     The Debtors claim that the Requesting Holders' argument that customers do not have claims against the Non-Customer Facing Entities "directly contradicts" the Terms of Use.  *Id*.  Not so.  The Debtors ignore the Limitation of Liability provision in the Terms of Use that expressly excludes "Affiliates" from customer liability.  Paragraph 25 of the Terms of Use provides:  "[I]n no event shall you [the customer] have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any . . . ***Affiliate*** . . . of Celsius.") (emphasis added).  Thus, contrary to the Debtors' assertion, the "plain reading" of the Terms of Use provides that CNL, GK8, and the Mining Entities are ***not liable*** for customer claims.[14]  That outcome materially improves the analysis for the benefit of Preferred Equity Holders.

---

[13] CNL purchased GK8 in October 2021 for $115 million.  Mashinsky Declaration ¶ 8.

[14] As of October 18, 2022, at least 9,893 claims have been filed, primarily by customers.  Approximately 94% of customer proofs of claim were filed against LLC alone; less than 1% were filed against CNL.

21.     There is additional evidence both pre- and post-petition, that the Non-Customer Facing Entities are not liable on customer claims.  For example, in contemplation of a public offering of its shares, Celsius Mining LLC ("Mining") submitted a confidential Form S-1 Registration Statement with the United States Securities and Exchange Commission (the "Mining S-1"),[15] relevant portions of which are attached as **Exhibit A** to the *Declaration of Andrew M. Leblanc in Support of the Requesting Holders' Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* ("Leblanc Decl.").  The Mining S-1, ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████.[17]  Post-petition, the Debtors stated that they believed Mining would be able to use its cash from operations to repay the $576 million balance on its loan from CNL and then generate free cash, without any mention of any customer liabilities that Mining would also need to repay prior to generating any such free cash.  *See Mashinsky Declaration* [Dkt. No. 23] ¶ 66.

22.     A number of other pre- and post-petition actions by and documents from the Debtors are also consistent with the Requesting Holders' position, including, but not limited to:

- on or around July 22, 2021, the Debtors emailed their customers to inform them that the Terms of Use had been updated to reflect that their "engagement will be

---

[15] *See* "Celsius Network Announces Confidential Submission of Draft Registration Statement by Bitcoin mining subsidiary, Celsius Mining LLC", Celsius Network (May 16, 2022), available at https://www.prnewswire.com/news-releases/celsius-network-announces-confidential-submission-of-draft-registration-statement-by-bitcoin-mining-subsidiary-celsius-mining-llc-301547547.html.

[16] *See* Leblanc Decl. **Exhibit B**, Mining Executive Summary, Fall 2021 Presentation.

[17] *See* Leblanc Decl. **Exhibit C**, Mining January 2022 Transaction & Business Update.

with Celsius Network LLC . . . .;"[18]

-  ;

- on July 25, 2022, the Debtors filed a motion seeking approval of bidding procedures for the sale of the equity of GK8 [Dkt. No. 188] (the "GK8 Motion"); there is no indication in the GK8 Motion that the Debtors expect that GK8 is liable for billions of dollars of customer liabilities;

- on September 19, 2022, the Debtors filed a Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest [Dkt. No. 850] regarding their non-Debtor affiliates, which did not indicate that any such affiliates are liable to customers; and

- on September 21, 2022, the Debtors filed their Monthly Operating Reports [Dkt. Nos. 858–873] for July and August 2022, and the Monthly Operating Reports for the Non-Customer Facing Entities did not reflect LLC's customer liabilities.

23.     Without customer claims against CNL or the other Non-Customer Facing Entities, and without the purported Intercompany Claim (discussed below), the value at CNL available for recovery by preferred equity includes at least the value of GK8 and the Mining Entities.

**B.      The Purported Intercompany Claim Against CNL Is Highly Dubious.**

24.     In a single sentence in its Objection, the UCC alleges that CNL is nevertheless insolvent because of the purported Intercompany Claim. UCC Obj. ¶ 27. During the October 13, 2022, section 341 meeting of creditors, the Debtors indicated that the Intercompany Claim is attributable to the migration of user accounts from CNL to LLC and reflects user balances. But, LLC's Monthly Operating Report for the period ended August 31, 2022, lists total user balances of approximately $4.9 billion. *See* LLC's Monthly Operating Report for the Period ended

---

[18] *See* Exhibit K to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Dkt. No. 393].

08/31/2022 [Dkt No. 871] at 18.  It is inexplicable how CNL could owe LLC double what LLC reports it owes to customers—the Requesting Holders believe that the UCC's argument is flatly incorrect.

25.    It is not surprising then that the Debtors do not spend even one word on the Intercompany Claim in their Objection.  In prior filings with this Court, its amount varied by billions of dollars and was marked as "Subj[ect] to Compromise."  *See, e.g., id.*  The Requesting Holders have not seen, and the Debtors have not provided, despite repeated requests, any evidence substantiating the amount of the asserted Intercompany Claim.  For that reason, *inter alia,* the Intercompany Claim, popping up in such amount in Court filings only two weeks ago, with no defensible basis, will surely be litigated and should not stand in the way of appointing a fiduciary for Preferred Equity Holders to participate in the resolution of this issue.

### III.    The U.S. Trustee Does Not Oppose Appointment Of An Official Preferred Equity Committee.

26.    Because of how quickly these cases have been progressing, and following the UCC's announcement that the Debtors had agreed to saddle each of the Debtors with all of the customer claims, the Requesting Holders filed the Motion before they received a response from the U.S. Trustee regarding the appointment of an Official Preferred Equity Committee.  Since then, however, the U.S. Trustee has affirmatively taken no position on the matter.  This is noteworthy both because the U.S. Trustee has otherwise taken an active role in these cases and because the U.S. Trustee has opposed motions to appoint an official equity committee in other cases.[19]  In fact, the only other instance that the Requesting Holders are aware of where the U.S.

---

[19] *See, e.g., In re Eastman Kodak Co.*, No. 12-12020 (ALG), (Bankr. S.D.N.Y., Apr. 5, 2012) [Dkt. No. 788]; *In re Innkeepers USA Trust*, No. 10-13800 (SCC), (Bankr. S.D.N.Y. Sep. 21, 2010) [Dkt. No. 453]; *In re Tronox, Inc.*, No. 09-10156 (ALG), (Bankr. S.D.N.Y. Apr. 3, 2009) [Dkt. No. 326]; *In re Ampex Corp.*, No. 08-11094 (AJG), (Bankr. S.D.N.Y., May 9, 2008) [Dkt. No. 127]; *In re Williams Commc'ns Grp., Inc*, No. 02-11957 (SMB), (Bankr. S.D.N.Y., June 21, 2002) [Dkt. No. 156].  The U.S.

Trustee filed a response not opposing an equity committee motion in the Second Circuit is in *Voyager,* another cryptocurrency case pending in this district.[20]  Thus, the Requesting Holders conclude that the U.S. Trustee does not see any reason that the appointment of an Official Preferred Equity Committee in these cases would be unwarranted.

### Conclusion

27.     For these reasons and those set forth in the Motion, the Requesting Holders respectfully request that the Court overrule the Objections, grant the relief requested in the Motion, and grant any other relief that is just.

Dated: October 19, 2022
        New York, New York

                                                  Respectfully submitted,

/s/ *Dennis F. Dunne*                             /s/ *Joshua M. Mester*
Dennis F. Dunne                                   Joshua M. Mester (admitted *pro hac vice*)
Nelly Almeida                                     **JONES DAY**
**MILBANK LLP**                                   555 South Flower Street
55 Hudson Yards                                   Fiftieth Floor
New York, NY 10001                                Los Angeles, CA 90071
Tel: (212) 530-5000                               Tel: (213) 489-3939
Fax: (212) 660-5219                               Fax: (213) 243-2539

- and -
                                                  *Counsel to CDP Investissements Inc.*
Andrew M. Leblanc
Melanie Westover Yanez
**MILBANK LLP**
1850 K Street, NW, Suite 1100
Washington, DC 20006
Tel: (202) 835-7500
Fax: (202) 263-7586

*Counsel to Community First Partners, LLC,*
*Celsius SPV Investors, LP, and Celsius*
*New SPV Investors, LP*

---

Trustee has not filed statements in support of motions to appoint equity committees because, in those cases, the U.S. Trustee would simply appoint the requested committee.

[20] *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW), *Statement of the United States Trustee Regarding Motion for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee* (Bankr. S.D.N.Y. Oct. 3, 2022) [Dkt. No. 492].